1    Theodore B. Olson (#38137)
2    Helgi C. Walker (Pro Hac Vice Pending)
     Michael R. Huston (#278488)
3    Jacob T. Spencer (Pro Hac Vice Pending)
     GIBSON, DUNN & CRUTCHER LLP
4    1050 Connecticut Avenue, N.W.
     Washington, DC 20036-5306
5    Telephone:    202.955.8668
     Facsimile:    202.530.9575
6

7    Joshua S. Lipshutz (#242557)
     Joshua D. Dick (#268853)
8    GIBSON, DUNN & CRUTCHER LLP
     555 Mission Street
9    San Francisco, CA 94105-0921
     Telephone:    415.393.8233
10   Facsimile:    415.374.8469

11

12   *Attorneys for Plaintiff*
     *CTIA – The Wireless Association*®

13

14                  UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 16   CTIA – THE WIRELESS ASSOCIATION®, | CASE NO. _____ |
| 17 | |
| 18             Plaintiff, | **COMPLAINT** |
| 19       v. | |
| 20 | |
| 21   THE CITY OF BERKELEY, CALIFORNIA, | |
| 22   and CHRISTINE DANIEL, CITY | |
| 23   MANAGER OF BERKELEY, CALIFORNIA, | |
| 24   in her official capacity, | |
| 25             Defendants. | |
| 26 | |

27

28

Gibson, Dunn &
Crutcher LLP

Complaint

Plaintiff CTIA – The Wireless Association®, by and through its undersigned counsel, hereby alleges as follows:

## PRELIMINARY STATEMENT

1. The City of Berkeley, California ("the City") may be entitled to its opinions, however unfounded. But the First Amendment prohibits the City from conscripting those who disagree into disseminating those opinions. Yet the City's new Ordinance "REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES," Berkeley Municipal Code Chapter 9.96 (Exh. A), would do precisely that. The Ordinance compels retailers of cell phones to issue to their customers a misleading, controversial, and government-crafted statement about the "safety" of cell phones. The statement conveys, by its terms and design, the City's view that using cell phones in a certain way poses a risk to human health, particularly to children. That compelled speech is not only scientifically baseless and alarmist, but it also contradicts the federal government's determination that cell phones approved for sale in the United States, however worn, are safe for everyone.

2. The Federal Communications Commission ("FCC") implements a mandate from Congress to create a nationwide, uniform set of regulations for wireless communications devices. Pursuant to that mandate, the FCC—consulting with expert federal health and safety agencies and drawing from international standards-setting bodies—has carefully reviewed the scientific studies that have examined cell phones for possible adverse health effects, including health effects from the radio waves—a type of radiofrequency energy ("RF energy")—that cell phones emit in order to function. The FCC has determined, consistent with the overwhelming consensus of scientific authority, that "[t]here is no scientific evidence that proves that wireless phone usage can lead to cancer or a variety of other problems, including headaches, dizziness or memory loss." FCC, *FAQs – Wireless Phones*, available at https://goo.gl/ZrKBly.

3. Because very high levels of RF energy can cause a potentially harmful heating effect, the FCC has established standards that limit the RF energy emissions of cell phones. The FCC approves for sale in the United States only cell phone models that have been certified as compliant with those standards. The FCC concluded that these standards "represent the best scientific thought"

on the standards necessary to protect all members of the public, including children.  *In Re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15184 (¶ 168) (1996) ("*RF Order I*"); *see also id.* ¶ 62.  The FCC's guidelines are highly conservative:  they are set 50 times below the threshold level of RF energy that has been shown to cause potential adverse health effects in laboratory animals, and assume that a cell phone is operating at its maximum certified power setting (even though cell phones rarely use the full extent of their power).  *See In re Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies, Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, 28 FCC Rcd. 3498, 3582 (¶ 236) (2013) ("*Reassessment*").  As the FCC recently put it, "[t]his 'safety' factor can well accommodate a variety of variables such as different physical characteristics and individual sensitivities—and even the potential for exposures to occur in excess of our limits *without posing a health hazard to humans*."  *Id.* (emphasis added).  Thus, according to the FCC, "exposure *well above* the specified [FCC's] limit should *not create an unsafe condition*."  *Id.* ¶ 251 (emphasis added).

4.      Despite the consensus that cell phones are safe, the City of Berkeley has taken the position that cell phones are dangerous, and it has conscripted cell phone retailers into disseminating that opinion.  Specifically, the challenged Ordinance will require cell phone retailers, including CTIA's members, to convey the following message to their customers at the point of sale:

> The City of Berkeley requires that you be provided the following notice:
>
> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines.  If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation.  This potential risk is greater for children.  Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Municipal Code § 9.96.030(A).

5.      By using words and phrases such as "assure safety," "radiation," "potential risk," "children," and "how to use your phone safely," the City's unsubstantiated compelled disclosure is

designed to convey a particular message that will stoke fear in consumers about the dangers of cell phones: "Do not carry your cell phone in your pants or shirt pocket, or in your bra, when powered ON and connected to the wireless network, because by doing so, you may absorb more RF radiation than is safe, as determined by the Federal Government. The risk of exposure to unsafe levels of RF energy is greater for children."

6.      But CTIA's members do not wish to convey that message, because it is not true. As explained above, the FCC has stated that even where the RF emissions limit is exceeded, there is "no evidence that this poses any significant health risk." *Reassessment*, ¶ 251. It has also concluded that RF energy from FCC-approved cell phones poses no heightened risk to children. Berkeley's compelled disclosure is misleading because it fails to explain that the FCC guidelines *already* take account of the fact that consumers may use cell phones in different ways, and that cell phones are used by people of different ages and different sizes. In short, when a cell phone is certified as compliant with the FCC's guidelines, that phone is safe, however it is worn, even if a particular usage results in exposure "well above" the limit. *Id.*

7.      The City, which concededly lacks any evidence that exposure to RF emissions from FCC-approved cell phones at levels in excess of the FCC's guidelines presents a safety issue, cannot meet its heavy burden under the First Amendment to justify compelling CTIA's members' speech, under any applicable standard of review.

8.      The City's infringement on the freedom of speech protected by the First Amendment constitutes per se irreparable injury and supports the entry of injunctive relief (including preliminary relief), as requested in the concurrently filed Motion for Preliminary Injunction.

9.      Moreover, if the Ordinance is allowed to stand, other local governments will soon follow the City's lead, resulting in a crazy-quilt of tens of thousands of inconsistent "disclosure" obligations across the country. The result will be more compelled speech (and very likely self-contradictory speech), as well as widespread and unwarranted consumer confusion and anxiety about the safety of cell phones.

Gibson, Dunn &
Crutcher LLP

Complaint                                              3

10. For these reasons, and as more fully described below, Berkeley's Ordinance violates the First Amendment because it will require CTIA's members to convey a message to which they object, and which is factually inaccurate, misleading, and controversial.

11. Berkeley's Ordinance is also preempted by federal law because it would stand as an obstacle to the careful balance that the FCC has devised between protecting consumer safety and supporting the growth of mobile wireless service.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over CTIA's claims for relief pursuant to 28 U.S.C. § 1331 because they arise under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1337 because they arise under an Act of Congress regulating commerce. CTIA seeks a declaration of its rights in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.

13. CTIA has associational standing to bring this action. One or more of CTIA's members would have standing to sue in their own right. In addition, the interests that CTIA seeks to protect in this lawsuit are germane to CTIA's purpose, and neither the claims asserted nor the relief requested require the participation of individual members in this lawsuit. *See, e.g.*, *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401 (9th Cir. 1991).

14. The City of Berkeley is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure § 410.10 because the City is located in the State of California, and it has caused or threatened to cause harm by acts that occurred in the State of California.

15. City Manager Christine Daniel is subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure § 410.10 because she resides in the State of California, exercises local governmental powers under color of California state law, and has caused or threatened to cause harm by acts that occurred in the State of California.

16. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (b)(3) because Defendants are located in

1   and can be found in this District and because a substantial part of the events giving rise to CTIA's

2   claims for relief occurred in this District.

3       17.     Pursuant to Civil Local Rule 3-2(c) and (d), this action should be assigned to the San

4   Francisco or Oakland Division of this Court because this action arises in Alameda County.   A

5   substantial part of the events or omissions that give rise to CTIA's claims for relief occurred in

6   Alameda County and a substantial part of the property that is the subject of this action is situated in

7   Alameda County.

8                                    **PARTIES**

9       18.     Plaintiff CTIA – The Wireless Association® ("CTIA") is a District of Columbia not-

10  for-profit corporation with its principal place of business in Washington, D.C.  CTIA represents all

11  sectors of the wireless industry, including but not limited to manufacturers of cell phones and

12  accessories, providers of wireless services, and sellers of wireless services, handsets, and accessories.

13  CTIA's members will be affected by the challenged Ordinance.

14      19.     Many of CTIA's members are "cell phone retailers" as defined by the Ordinance that

15  will be subject to the Ordinance's requirements.  For example, Verizon, AT&T, and T-Mobile USA

16  are members of CTIA.  Each operates retail outlets in Berkeley where cell phones are sold, and as a

17  result each entity will be subject to the Ordinance.

18      20.     Defendant City of Berkeley is a municipal corporation located in the State of

19  California.  It exercises local governmental powers under color of California state law.

20      21.     Defendant City Manager Christine Daniel is a municipal official of the City of

21  Berkeley.  She exercises local governmental powers, including the power and duty to enforce all local

22  ordinances, under color of California state law.  *See* Berkeley City Charter § 28; Berkeley Municipal

23  Code § 2.36.020.

24                          **FACTUAL ALLEGATIONS**

25  I.   **Cell Phones Emit RF Energy At Levels That Are Not Hazardous To Humans**

26      22.     Cell phones send and receive radio signals to and from base stations to allow voice,

27  text, and other communications, including wireless Internet access.

28

Gibson, Dunn &
Crutcher LLP

Complaint                                5

23. Cell phones use radio waves, a form of electromagnetic energy called radiofrequency or "RF" energy, to enable wireless communications.

24. RF energy is ubiquitous and is used not only by cell phones, but also by, for example, wireless local area networks (Wi-Fi), baby monitors, pacemakers, garage door openers, the global satellite positioning system (GPS), radio, and over-the-air television broadcasts. "Between Wi-Fi, cellphones and other networks, people are in a nearly constant cloud of wireless signals." EPA, *Non-Ionizing Radiation From Wireless Technology*, available at http://goo.gl/wt95zI.

25. The radio waves used by cell phones are a form of electromagnetic radiation—energy radiating through space as a series of electric and magnetic waves. The electromagnetic spectrum comprises a range of frequencies from very low, such as electrical power from power lines, through visible light, to extremely high, such as gamma rays.



26. There are two basic types of electromagnetic radiation: non-ionizing radiation and ionizing radiation. "Radiation" is often used, colloquially, to imply that ionizing radiation—radioactivity—is present. But the two types of radiation differ significantly and "should not be confused" as to their "possible biological effects." FCC, *Radiofrequency Safety: Frequently Asked Questions*, available at http://goo.gl/rO9P9x.

27. *Ionizing* radiation, such as X-rays or nuclear radiation, has the capacity to remove an electron from an atom (produce an "ion") and to break chemical bonds in the body, damaging biological tissue and affecting DNA.

28. *Non-ionizing* radiation, such as RF energy or visible light, cannot remove electrons from atoms and is incapable of breaking chemical bonds in the body. Indeed, our bodies produce

non-ionizing radiation in the form of infrared energy. The only known adverse health effect of non-ionizing radiation is a "thermal effect": Exposure to "very high levels" of RF energy waves "can heat the body's tissues." EPA, *Non-Ionizing Radiation From Wireless Technology*, available at http://goo.gl/wt95zI. "Cellphones and wireless networks produce RF, but not at levels that cause significant heating." *Id.* Moreover, "[a] review of the extensive literature on RF biological effects, consisting of well over 1300 primary peer reviewed publications published as early as 1950," by the Institute of Electrical and Electronics Engineers ("IEEE"), "reveals no adverse health effects that are not thermally related." *Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz*, IEEE Std C95.1-2005, 35 ("*Safety Levels*"). According to the IEEE, "[t]he scientific consensus is that there are no accepted theoretical mechanisms that would suggest the existence of [non-thermal] effects." *Id.*

29. To protect against adverse biological effects from ionizing radiation, scientific organizations use a safety standards model that assumes *any* exposure can cause harm—that is, there is no threshold below which ionizing radiation is safe. The safety model also assumes that the effect of all exposures is *cumulative*.

30. Scientific organizations *do not* use the same safety standards model for non-ionizing radiation. Instead, the IEEE and other relevant standard-setting bodies have determined, based on the weight of the scientific evidence, that there is a *threshold* for the adverse thermal effects of non-ionizing radiation. *E.g.*, *Safety Levels*, at 33. Because it is the lowest level at which a thermal effect can occur, there are no adverse effects on the body below that threshold, regardless of how long or how intense the exposure to RF energy. *See id.* Thus, a higher level of exposure below the threshold is not less safe than a lower level of exposure below the threshold, because in both cases the level of exposure has no potential adverse effects.

31. The scientific measure of the rate at which RF energy is absorbed in a body is called the "Specific Absorption Rate" or "SAR." This rate is usually expressed in units of watts per kilogram (W/kg). SAR measures how many watts of RF energy are absorbed by a body, averaged over a particular mass of tissue. SAR is usually averaged over a whole human body, or over a small localized part, and reported as the maximum level measured in the volume studied.

## II. The FCC Regulates Cell Phones' Energy Emissions

### A. Congress Directed The FCC To Create A Nationwide, Uniform, And Comprehensive Regulatory Regime For Cell Phones

32. Congress has intended that the federal government exercise exclusive authority to regulate the safety of RF energy from cell phones.

33. For nearly 100 years, beginning with the Radio Acts of 1912 and 1927, wireless communications and the RF energy used for such communications have been subject to continuous, pervasive, and uniform regulation by the federal government. *See*, *e.g.*, *Farina v. Nokia Inc.*, 625 F.3d 97, 105–06 (3d Cir. 2010).

34. The comprehensive federal regulation of nearly all aspects of wireless communications and associated devices has long been to the exclusion of state and local regulation.

35. In 1934, Congress passed the Communications Act of 1934, *see* 47 U.S.C. § 151 *et seq.*, which created the FCC, put it at the helm of "a unified and comprehensive regulatory system for the industry," *NBC v. United States*, 319 U.S. 190, 214 (1943) (internal quotation marks omitted), and gave it exclusive regulatory authority over the "apparatus to be used" for transmission and the "external effects" of the transmission of radio waves, 47 U.S.C. § 303(e).

36. Both Congress and the FCC have extended their long-standing control over traditional radio transmissions and devices to modern wireless telecommunications service, including cell phones.

37. In its first order relating to commercial cellular service, the FCC expressly "assert[ed] Federal primacy in this area," because it was concerned that state or local regulation of this new technology "would . . . direct[ly] conflict with [the FCC's] attempt . . . to establish a nation-wide system of radio communications." *Future Use of Frequency Band 806-960 MHz*, 46 F.C.C.2d 752, 766–67 (¶¶ 43–44) (1974).

38. The FCC made clear that its regulation of wireless telecommunications service is to be exclusive of state or local regulation, stating that "the scheme of regulation we have devised to implement . . . [is] to be carried out on a national basis . . . without regard to state boundaries or varying local jurisdictions." *Future Use of Frequency Band 806-960 MHz*, 46 F.C.C.2d at 766 (¶ 43).

39.     In 1993, Congress ratified and reinforced the FCC's assertion of federal primacy over personal wireless communications.

40.     At that time, Congress amended the Communications Act to further consolidate wireless regulation at the federal level and thus to "foster the growth and development of mobile services that, by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure." H.R. Rep. No. 103-111, at 260 (1993).

41.     In the FCC's words, Congress's purpose in amending the Act in 1993 was to ensure a "national regulatory policy for [wireless telephony], *not a policy that is balkanized state-by-state*." *In re Petition on Behalf of the State of Conn.*, 10 FCC Rcd. 7025, 7034 (¶ 14) (1995) (emphasis added); *see also Conn. Dep't of Pub. Util. Control v. FCC*, 78 F.3d 842, 845 (2d Cir. 1996) (explaining that the 1993 amendments were enacted "to dramatically revise the regulation of the wireless telecommunications industry, of which cellular telephone service is a part").

42.     In the Telecommunications Act of 1996, Congress acted to further ensure the federal government's primacy over wireless telecommunications, facilities, and devices—including their RF emissions. Congress charged the FCC with adopting rules establishing a federal safety standard governing RF emissions from wireless handsets. *See* Pub. L. No. 104-204, § 704(b), 110 Stat. 56 (1996) ("Within 180 days after the enactment of this Act, the Commission shall complete action in ET Docket 93-62 to prescribe and make effective rules regarding the environmental effects of radio frequency emissions.").

**B.      The FCC Has Adopted Regulations Regarding RF Energy Emissions From Cell Phones**

43.     In August 1996, pursuant to Congressional directive, its authority under the Communications Act, and in collaboration with the Food and Drug Administration ("FDA"), Environmental Protection Agency ("EPA"), and the Occupational Safety and Health Administration ("OSHA"), the FCC adopted the current RF exposure guidelines applicable to all cell phones marketed, sold, or distributed in the United States. *RF Order I*, 11 FCC Rcd. at 15184 (¶ 169).

44.     The FCC's regulations that apply to portable devices (such as cell phones) distinguish between devices used in occupational or controlled settings versus devices used by the general

population in uncontrolled settings. *See* 47 C.F.R. § 2.1093(d). Occupational limits apply "when persons are exposed as a consequence of their employment provided these persons are fully aware of and exercise control over their exposure. *Id.* § 2.1093(d)(1)(i). Otherwise, the general population limits apply. *See id.* § 2.1093(d)(2)(i).

45. For occupational settings, the regulations establish a guideline whole-body exposure SAR of 0.4 watts per kilogram, and a localized SAR of 8.0 W/kg, averaged over any one gram of tissue. *Id.* § 2.1093(d)(1).

46. For general population settings, the regulations establish a guideline whole-body exposure SAR of 0.08 W/kg, and a localized SAR of 1.6 W/kg, averaged over any one gram of tissue. *See id.* § 2.1093(d)(2).

47. Critically, the FCC's exposure limits for RF energy in a general population setting "are set at a level on the order of 50 times below the level at which adverse biological effects have been observed in laboratory animals." *Reassessment*, ¶ 236. This "conservative," *id.* ¶ 237, 50-fold "'safety' factor can well accommodate a variety of variables such as different physical characteristics and individual sensitivities—*and even the potential for exposures to occur in excess of [FCC] limits without posing a health hazard to humans*," *id.* ¶ 236 (emphasis added). In other words, even if a human body were to absorb RF energy "well above" the FCC's SAR guideline, that RF energy "should not create an unsafe condition." *Id.* ¶ 251.

48. According to the federal government, cell phones on the market today do not emit the level of RF energy that would be required to cause harm to humans. "At very high levels, RF energy is dangerous. It can heat the body's tissues rapidly. However, such high levels are found *only near certain equipment*, such as powerful long-distance transmitters. Cellphones and wireless networks produce RF, *but not at levels that cause significant heating*." EPA, *Non-Ionizing Radiation From Wireless Technology*, available at http://goo.gl/wt95zI (emphasis added).

49. In adopting the current RF standards, the FCC explained that it was relying "substantially on the recommendations" of federal health and safety agencies, including the FDA and the EPA. *RF Order I*, 11 FCC Rcd. at 15124 (¶ 2).

50. Federal health and safety agencies supported the use of SAR guidelines developed by the IEEE, and the FCC based its RF rules on the IEEE's standards. *RF Order I*, 11 FCC Rcd. at 15146–47 (¶ 62).

51. After the FCC promulgated its current SAR guideline of 1.6 W/kg, averaged over one gram of tissue, the IEEE and other standards-setting bodies published updated guidelines for RF energy exposure. Currently, the IEEE recommends a localized SAR guideline of 2.0 W/kg, averaged over ten grams of tissue. In other words, the FCC's "SAR limits for devices held close to the body are somewhat more restrictive than other more recently adopted international SAR limits." *Reassessment*, ¶ 213.

52. All cell phones marketed, distributed, or sold in the United States must comply with the FCC's SAR guidelines. *See* 47 C.F.R. § 2.803(a)(1); *see also id.* § 24.51(a).

53. "The FCC has determined that wireless phones that do comply with its RF standards are safe for use." Brief of the United States and the FCC as Amicus Curiae in Support of Appellees at 15–16, *Murray v. Motorola, Inc.*, 982 A.2d 764 (D.C. 2009) (No. 07-1074) (available at 2008 WL 7825518) (citing *RF Order I*, 11 FCC Rcd. at 15139–40 (¶¶ 42–45)). Similarly, the FCC has determined that its rules "are sufficient to protect the public and workers from exposure to potentially harmful RF fields," *RF Order I*, 11 FCC Rcd. at 15124 (¶ 1), and that the "FCC does not endorse the need for" "measures to further reduce exposure to RF energy." FCC, *Wireless Devices and Health Concerns*, available at http://goo.gl/gdTuHP (emphasis removed).

54. The FCC concluded that its standards "represent the best scientific thought" on the RF emissions limits necessary "to protect the public health," *RF Order I*, 11 FCC Rcd. at 15184 (¶ 168), and "provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 12 FCC Rcd. 13494, 13496 (¶ 2) (1997) ("*RF Order II*").

55.     The FCC has stated that "[a]ny cell phone at or below [FCC] SAR levels (that is, any phone legally sold in the U.S.) is a 'safe' phone, as measured by these standards."  FCC, *Cellular Telephone Specific Absorption Rate*, available at http://www.fcc.gov/cgb/sar.

56.     The FCC has specifically rejected the argument that particular classes of persons, including children, are more sensitive to RF energy such that a more restrictive SAR guideline is necessary.  *See RF Order II*, 12 FCC Rcd. at 13504–05 (¶¶ 26, 29); *see also* FCC, *Wireless Devices and Health Concerns*, available at http://goo.gl/gdTuHP ("Some health and safety interest groups have interpreted certain reports to suggest that wireless device use may be linked to cancer and other illnesses, posing *potentially greater risks for children than adults*.  While these assertions have gained increased public attention, currently no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses. . . . [A]t this time, *there is no basis on which to establish a different safety threshold than our current requirements*." (emphasis added)).  According to the FDA, "scientific evidence does not show a danger to any users of cell phones from RF exposure, including children and teenagers."  FDA, *Children and Cell Phones*, available at http://goo.gl/UO7brb.  As far back as 1991, when the IEEE developed the exposure standard of 1.6 W/kg, the IEEE stated that "the recommended exposure levels should be safe for all, and submit as support for this conclusion the observation that no reliable scientific data exist indicating that," among other things, "[c]ertain subgroups of the population"—"infants, the aged, the ill and disabled," for example, "are more at risk than others."  IEEE, *Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz*, IEEE C95.1-1991, at 14.

57.     Two federal Courts of Appeals have upheld the FCC's RF standards on petition for review, in both cases rejecting arguments that the standards were insufficiently protective of public health.  *See Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2d Cir. 2000); *EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004).

58.     The FCC "continue[s] to have confidence in the current exposure limits."  *Reassessment*, ¶ 205.  It constantly monitors the scientific evidence of RF safety and regards its RF standard-setting as an ongoing process in which the RF emissions exposure standards for cell phones

would be subject to future revision if scientific research were to demonstrate that the standards were inadequate to protect the public. *See RF Order II*, 12 FCC Rcd. at 13506 (¶ 32).

59.     To that end, in March of 2013, the FCC released a Notice of Inquiry "to open a science-based examination of the efficacy, currency, and adequacy of the Commission's exposure limits for RF electromagnetic fields." *Reassessment*, ¶ 210.  Among the questions on which the FCC requested comment were whether its RF energy standards should be modified, and specifically whether to adopt the *less* stringent IEEE SAR standard. *Id.*, ¶¶ 218–230.  The FCC also noted that despite its "conservative" limit for RF emissions, "there has been discussion of going even further to guard against the possibility of risks from non-thermal biological effects, *even though such risks have not been established by scientific research*." *Id.*, ¶ 237 (emphasis added).  The FCC cautioned that "adoption of extra precautionary measures may have the unintended consequence of opposition to progress and the refusal of innovation, ever greater bureaucracy, . . . [and] increased anxiety in the population." *Id.*, ¶ 240 (quotation marks and citation omitted; alteration and omission in original).

60.     This FCC inquiry was prompted, in part, by a recently issued United States Government Accountability Office ("GAO") report suggesting that SAR limits should be loosened, consistent with the regulatory trend in foreign countries based on further research regarding the health effects of RF emissions. *See GAO, Exposure and Testing Requirements for Mobile Phones Should Be Reassessed*, GAO-12-771 (July 2012).  The GAO noted the "controversy" over whether cell phones pose a risk to human health, but concluded that "[s]cientific research to date has not demonstrated adverse human health effects from RF energy exposure from mobile phone use." *Id.* at 1, 6.

## C.     The FCC Ensures Cell Phone Compliance With Its Guidelines

61.     To ensure compliance with federal RF emission standards, the FCC has adopted detailed testing, certification, and equipment authorization procedures that must be followed before a cell phone can be marketed, sold, or used in the United States.

62.     Manufacturers and service providers applying for "equipment authorization" from the FCC are required to submit "a statement affirming that the equipment complies" with the applicable SAR guidelines—"as measured by an approved method"—and "to maintain a record showing the

basis for the statement of compliance." 47 C.F.R. § 24.51(c); *see also id.*, § 24.52. "Certification is an equipment authorization issued by the Commission, based on representations and test data submitted by the applicant." 47 C.F.R. § 2.907(a). Based on that certification, the FCC authorizes cell phone models for sale. *See id.*, § 2.803(a)(1); 24.51(a).

63. "SAR testing uses standardized models of the human head and body that are filled with liquids that simulate the RF absorption characteristics of different human tissues." FCC, *Specific Absorption Rate (SAR) For Cell Phones: What It Means For You*, available at https://goo.gl/wOhSDR. Most evaluations submitted to the FCC use a simplified, standardized model of an adult. Although the standardized model "does not model children, tissue layers, or a hand holding" the cell phone, it "was designed to be conservative relative to these factors." *Reassessment*, ¶ 245.

64. The FCC requires manufacturers to test their cell phones under the "most severe" and "highest power" conditions "for all the frequency bands used in the USA for that cell phone." FCC, *Specific Absorption Rate (SAR) For Cell Phones: What It Means For You*, available at https://goo.gl/wOhSDR (emphasis omitted). This ensures that "the cell phone does not exceed the FCC's maximum permissible exposure levels even when operating in conditions which result in the device's highest possible—but not its typical—RF energy absorption for a user." *Id.* "The SAR values recorded on the FCC's authorization" thus do "not indicate the amount of RF exposure consumers experience during normal use of the device." *Id.*

65. For testing SAR absorption by the body, the FCC has long suggested that manufacturers maintain separation between the phone and the body to account for "body-worn" devices, such as belt clips or holsters. *Reassessment*, ¶ 248 (citing Supplement C of OET Bulletin 65, Edition 01-01 (Supplement C)); *see also* FCC KDB, No. 447498, *General RF Exposure Guidelines*, § 4.2.2(4) ("The test configurations must be conservative for supporting the body-worn accessory use conditions expected by users."). If a consumer keeps the phone "closer to the body than the distance at which it is tested," then it is possible that "exposure in excess of [FCC] limits might result, but only with the device transmitting continuously and at maximum power." *Reassessment*, ¶ 248. Indeed, "SAR measurements are performed while the device is operating at its maximum capable

power, so that given typical operating conditions, the SAR of the device during normal use would be less than tested." *Id.*, at ¶ 251.

66. As part of the proceeding that was initiated in March 2013, the FCC is considering whether it should make any modifications to its "current portable device separation distance policy," *Reassessment*, ¶¶ 217, 248–252. In doing so, the FCC has emphasized that it "continue[s] to have confidence in the current exposure limits." *Id.*, ¶ 205.

67. Critically, "exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply 'safer' operation" according to the FCC. *Reassessment*, ¶ 251. Even if the limits are exceeded, the FCC possesses "*no evidence that this poses any significant health risk*." *Id.* (emphasis added). That is because the Commission's "limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature." *Id.*

68. Thus, the FCC has concluded, "exposure well above the specified SAR limit should not create an unsafe condition," and "a use that possibly results in non-compliance with the SAR limit should not be viewed with significantly greater concern than compliant use." *Reassessment*, ¶ 251.

**D. The FCC Set The Guideline For RF Energy Emissions From Cell Phones To Eliminate The Need For Any Safety Warning**

69. The FCC's SAR guideline that applies to cell phones is designed to be sufficiently protective of human health and safety so that there is no need for RF safety-related warnings or disclosures, such as those that the FCC requires for certain other types of devices.

70. As noted above, ¶¶ 44–46, the FCC has adopted a two-tier standard for exposure to RF energy. The "occupational/controlled" standard assumes that users have a level of knowledge and control over exposure to RF emissions, and applies only to situations where persons are exposed as a consequence of their employment, have been made fully aware of the potential for exposure, and can exercise control over that exposure. *RF Order I*, 11 FCC Rcd. at 15139–140 (¶¶ 42–45). In contrast, cell phones are governed by the "general population/uncontrolled" tier, a standard that assumes that the users lack knowledge or control over potential exposure. Because of that assumption, the standard is set at a level that eliminates the need for warnings. Thus, the FCC did not mandate RF

safety-related disclosures for cell phones, in contrast to its imposition of such requirements for numerous other emissions sources. *See*, *e.g.*, 47 C.F.R. § 1.1307(b)(1) (table) (requiring subscriber equipment, such as devices used in Part 25 satellite communication services, to include RF-related warnings or disclosures but not imposing such a requirement on cell phones).

71. To ensure that users in occupational settings are "fully aware" of their exposure, manufacturers must either put "visual advisories"—such as labels—on portable devices or offer "special training." *See* 47 C.F.R. § 2.1093(d)(1). "Visual advisories" must be "legible and clearly visible to the user from the exterior of the device." *Id.* § 2.1093(d)(1)(ii)(A). They must also "refer the user to specific information on RF exposure, such as that provided in a user manual." *Id.* § 2.1093(d)(1)(ii)(B).

72. The FCC does not require visual advisories on cell phones, nor are manufacturers required to refer the user to specific information on RF exposure in the user manual. *See id.* § 2.1093(d)(2).

73. In connection with the "equipment authorization" process, the FCC approves the "operating instructions" provided to users. 47 C.F.R. § 2.1033(c)(3) (requiring applicants for equipment authorization to submit "[a] copy of the installation and operating instructions to be furnished to the user"); *see also* 47 C.F.R. § 2.915(a) (stating that the FCC will grant an application if it makes certain findings based on "an examination of the application and supporting data"); 47 C.F.R. § 2.919 (stating that the FCC will deny an application if it cannot make the findings specified in 47 C.F.R. § 2.915(a)).

74. Under its rules, the FCC may not grant an equipment authorization without an affirmative finding based on an examination of all data and information submitted with the application—including the operating instructions for consumers—that the public interest would be served by granting the application. *See* 47 C.F.R. §§ 2.915(a), 2.919; *see also* 47 C.F.R. § 2.1033(c)(3).

75. The FCC's Office of Engineering and Technology Knowledge Database ("KDB") advises cell phone manufacturers to include in their user manual a description of how the user can operate the phone under the same conditions for which its SAR was measured. *See* FCC KDB, No.

447498, *General RF Exposure Guidelines*, § 4.2.2(4). Manufacturers comply with that guideline by including in their user manuals a short statement intended "to make consumers aware of the need to maintain the body-worn distance" represented by accessories that were used when testing for compliance with the SAR standard "if [consumers] want to ensure that their actual exposure does not exceed the SAR measurement obtained during testing." *Reassessment*, ¶ 248.

76. The FCC has been clear, however, that this statement *is not* an instruction to the consumer about how to use the phone safely: The FCC is aware that "some devices may not be compliant with [its] exposure limits without the use of some spacer to maintain a separation distance when body-worn," but has stated that it has "no evidence that this poses any significant health risk." *Reassessment*, ¶ 251. In so stating, the FCC explained that because "[t]he limits were set with a large safety factor, . . . exposure well above the specified SAR limit should not create an unsafe condition." *Id.* In fact, the FCC noted that "using a device against the body without a spacer will generally result in actual SAR *below* the maximum SAR tested" and that "a use that possibly results in non-compliance with the SAR limit *should not be viewed with significantly greater concern than compliant use*." *Id.* (emphasis added).

77. Not all cell phone manufacturers' user manuals are the same. Because the FCC does not regulate the minutiae of user manuals, manufacturers have discretion to publish their own views, including what messages to convey to consumers and in what manner to convey them.

78. Cell phone retailers structure their customer environments to maximize customer experience and communicate the information retailers think most suited to consumers' interests. Cell phone retailers consider how best to communicate and what to say to consumers during the time consumers are in their stores or on their websites.

III. **Berkeley Adopts An RF Safety Ordinance That Is False, Misleading, And Controversial**

A. **Berkeley Proposes An RF Emissions Ordinance**

79. On November 18, 2014, the City Council of Berkeley unanimously adopted a recommendation to refer to the City Manager "for the creation of an ordinance to have cell phone retailers give to consumers who purchase a phone, a factual, informational handout referring the user to their cell phone manufacturers' disclosure regarding the recommended separation distance for use

against the body." City Council Agenda, Item 37 (Nov. 18, 2014), Exh. B, at 7, available at http://goo.gl/8BNybG.

80. The City Council proposed to create this "Cell Phone Right to Know [O]rdinance," Exh. B, at 11, based on factual premises that are false and opinions with which CTIA's members disagree and to which CTIA's members object.

81. The Council's recommendation to create the Ordinance was based on its stated goal to "ensure that consumers are made aware of the Federal Communication Commission (FCC)'s required disclosure to never carry or use a cell phone directly against the body (i.e., in a pocket or tucked into a bra) when turned ON and connected to a wireless network in order to avoid exposure to radio frequency (RF) energy that may exceed federal exposure guideline [sic]." Exh. B, at 7. The Council's recommendation also proclaims that "Consumers have the right to know!" *Id.* at 10.

82. The premise of the Ordinance's stated goal is false, as the FCC *does not* require a disclosure that consumers should never carry or use a cell phone directly against the body, when powered on and connected to a wireless network, in order to avoid exposure to RF energy.

83. The FCC has stated, based on the overwhelming consensus of scientific authority, that even if a consumer is exposed to RF energy from a cell phone "well above" the federal guideline, that exposure does not pose a safety concern, because the guideline is conservatively set at a level 50 times below the amount of RF energy that could potentially have an adverse biological effect. *Reassessment*, ¶ 251. The guideline "can well accommodate a variety of variables such as different physical characteristics and individual sensitivities—and even the potential for exposure to occur in excess of [the] limits without posing a health hazard to humans." *Id.*, ¶ 236.

84. The Council's recommendation falsely claimed that it is not intended to require "a new consumer disclosure." Instead, the ordinance purported to be merely an "attempt to further the effectiveness of cell phone manufacturers' existing consumer disclosures." According to the Council, existing manufacturers' disclosures are "written in 'legalese' and located in the fine print of user manuals or hidden within screens on the phone itself where [they are] unlikely to be seen by the typical consumer." Exh. B, at 8.

85.     In fact, the Ordinance does not merely repeat statements in manufacturers' existing consumer disclosures.  None of the user manuals cited as a basis for the Ordinance includes the same language the Ordinance requires, s*ee* Exh. B, at 9–10, and the disclosures made by the vast majority of manufacturers are different from the notice required by the Ordinance.  Rather, the Ordinance requires CTIA's members to convey messages that reflect the City's subjective interpretation of the manufacturers' disclosures.   The City's message mischaracterizes those disclosures and converts them into safety warnings that the vast majority of manufacturers do not make.  CTIA's members object to the City's mandated messages because they are inaccurate and misleading.

86.     In fact, manufacturers' disclosures are written in plain English and are accessible to any consumer interested in the information.  If a manufacturer's disclosure were misleading or deceptive, the FCC has authority to require the manufacturer to alter its disclosure.

87.     The Council's recommendation claimed that, "as a matter of physics, the microwave emissions from cell phones decrease sharply as the distance is increased.  Even a 5 mm separation distance makes a significant difference in reducing the exposure levels consumers will receive when the phone is used or carried directly against the body." Exh. B, at 10.  This statement is misleading.

88.     In fact, the amount of RF energy that is absorbed by the body when emitted from a cell phone is dependent on several factors, only one of which is the phone's distance from the body.  Another critical factor is the amount of power that the phone is currently using in order to connect to the wireless network.  The FCC tests SAR when a cell phone is operating at maximum certified power, even though most phones are not operating at maximum power most of the time.

**B.      Berkeley Holds A Hearing On The Proposed Ordinance**

89.     On May 12, 2015, the Berkeley City Manager presented the Berkeley City Council with a proposed Ordinance that would compel CTIA's members to convey to their customers certain "safety" information regarding RF energy emissions.

90.     The evidence submitted at the hearing confirms that the premise of the Ordinance is the unsupported proposition that cell phones are unsafe.  Lawrence Lessig, who testified in support of the Ordinance, referred to a letter from 195 scientists to the United Nations recommending further study of the safety of cell phones, as did Dr. Joel Moskowitz.  Tr. of May 12, 2015, Hearing of

Berkeley City Council, Exh. C., at 3, 6, available at http://goo.gl/Fd9H9X (58:23), (1:05:49). Some other participants claimed to be "electromagnetically sensitive," so that even a 15 millimeter distance between cell phones and their bodies did not "do it for [them]." Exh. C, at 9 (1:14:32). Others claimed that the disclosures were necessary because cell phones allegedly adversely affect human reproduction or are linked to tumors. Exh. C, at 4–5(1:02:33), 6–7 (1:06:32). A citizen claimed, "we have no way to know whether or not cell phones are contributing to" "huge problems in our schools today." Exh. C, at 7 (1:08:47). Finally, a resident noted that the World Health Organization has classified RF energy as a "possible carcinogen," and urged the Council to follow the lead of "France and Turkey," which are "practicing the precautionary principle when it comes to cell phone use." Exh. C, at 8 (1:11:14).

91. The proponents of the Ordinance testified that the required disclosure is intended to address these alleged health effects and to change consumers' behavior. Mr. Lessig cited a study of Berkeley residents which purportedly showed that many respondents would be likely to change how they use their cell phones in response to the Ordinance. Mr. Lessig admitted that he himself does not follow Berkeley's recommendation for how to carry a cell phone, stating: "How I carry it is how people should not carry it. . . . I carry it in my back pocket." Exh. C, at 13 (1:23:35).

92. During the hearing, no member of the Berkeley City Council claimed that there is any scientific evidence that suggests RF emissions from cell phones pose any safety concern to humans. The sponsor of the Ordinance, Councilmember Max Anderson, admitted that "[t]he issue before us tonight is not the science itself. The science itself will be debated and will resolve itself as the momentum of scientific discovery and research presents itself." Exh. C, at 11–12 (1:20:17).

93. In order to justify the City's imposing a burden on the First Amendment rights of CTIA's members, the author of the Ordinance, Councilmember Anderson, put forward the following government interest:

"We haven't had the opportunity to do the longitudinal studies that would yield the information that would firmly establish the primacy of the precautionary principle as we apply it to these devices. So I am relying on my colleagues and their sensitivities

and understanding of our role here on this dais but also about what our moral and ethical role is here in this society."

Exh. C, at 12 (1:22:19).

**C.     The Berkeley City Council Votes To Adopt The Proposed Ordinance**

94.     On May 26, 2015, the City Council of Berkeley unanimously adopted Ordinance No. 7,404-N.S., entitled "REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES," Berkeley Municipal Code § 9.96.  *See* Exh. A.

95.     The enacted Ordinance contains several paragraphs on "Findings and Purpose" that are inaccurate or misleading.

96.     The Ordinance finds that "[t]he protocols for testing the [Specific Absorption Rates] for cell phones carried on a person's body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time.  Testing of cell phones under these protocols has generally been conducted based on an assumed separation distance of 10-15 millimeters."  Berkeley Municipal Code § 9.96.010(C).  This statement is misleading because it implies that some separation distance is necessary to ensure safety.

97.     In fact, the FCC's exposure guidelines are set 50 times below the level of RF energy that could potentially have an adverse biological effect.  If the phone is tested for SAR compliance at a separation distance of 10-15 millimeters, failure to maintain that separation distance when using the phone does not result in unsafe use and, in the FCC's words, there is "no evidence that this poses any significant health risk."  *Reassessment*, ¶ 251.  Even if the RF emissions from a phone used in a "body-worn" position might exceed the SAR limit, "a use that possibly results in non-compliance with the SAR limit should not be viewed with significantly greater concern than compliant use."  *Id.*

98.     The Ordinance finds that "[t]o protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices."  Berkeley Municipal Code § 9.96.010(D).  This statement is false.

99.     In fact, CTIA's members—including cell phone manufacturers—do not believe that any phone approved for sale in the United States creates a safety concern for consumers by emission of RF energy, no matter how the phone is worn.  The vast majority of manufacturers do not disclose

separation distances in manuals "to protect the safety of their consumers," because it is not accurate that maintaining the separation distance is necessary to protect safety. Rather, as the FCC has explained, manufacturers "make consumers aware of the need to maintain the body-worn distance . . . if they want to ensure that their actual exposure does not exceed the SAR measurement obtained during testing." *Reassessment*, ¶ 248. While actual exposure in excess of the measured SAR is rare even in body-worn configurations, *id.*, ¶ 248, 251, it does not present a safety concern should it occur, *id.*, ¶ 251.

100. The Ordinance finds that "[c]onsumers are not generally aware of these safety recommendations." Berkeley Municipal Code § 9.96.010(E). This statement is misleading.

101. In fact, the vast majority of manufacturers, based on the overwhelming weight of scientific evidence, do not consider the statements regarding separation distance made in their user manuals to be "safety recommendations." The Ordinance improperly converts these statements into safety recommendations and not only forces CTIA's members to make "safety recommendations" that they believe are unnecessary but also conveys to consumers the misleading message the manufacturer's disclosures are, indeed, "safety recommendations."

102. The Ordinance finds that "[c]urrently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify." Berkeley Municipal Code § 9.96.010(F). This statement is misleading.

103. In fact, the disclosures made by the vast majority of manufacturers are not "safety recommendations."

104. The Ordinance finds that "[s]ome consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations." Berkeley Municipal Code § 9.96.010(G). This statement is misleading.

105. In fact, the disclosures made by the vast majority of manufacturers are not "safety recommendations."

106. The Ordinance finds that "[w]hile the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets,

waistbands, etc., these disclosures and warnings are often buried in fine print, are not written in easily understood language, or are accessible only by looking for the information on the device itself." Berkeley Municipal Code § 9.96.010(H). This statement is inaccurate and misleading.

107. In fact, the vast majority of manuals "make consumers aware of the need to maintain the body-worn distance . . . *if they want to ensure that their actual exposure does not exceed the SAR measurement obtained during testing.*" *Reassessment* ¶ 248 (emphasis added).

108. In fact, manufacturers' disclosures are written in plain English and are accessible to any consumer interested in the information. If a manufacturer's disclosure were misleading or deceptive, the FCC could seek to require the manufacturer to alter its disclosure.

109. The substantive portion of the Ordinance provides that: "A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:

> The City of Berkeley requires that you be provided the following notice:
>
> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. This potential risk is greater for children. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Municipal Code § 9.96.030(A). This required disclosure is false, misleading, and controversial.

110. The Ordinance is designed to have the effect, and has the effect, of conveying to an average consumer that exposure to RF energy from a cell phone in excess of the federal guideline creates a safety concern. CTIA's members do not wish to convey the message, because it is inaccurate. According to the federal government, no cell phone model approved for sale in the United States creates a safety concern because no cell phone approved for sale in the United States emits a level of RF energy that has been shown to have any adverse biological effect. *See*, *e.g.*, EPA,

*Non-Ionizing Radiation From Wireless Technology*, available at http://goo.gl/wt95zI ("Cellphones and wireless networks produce RF, but not at levels that cause significant heating.").

111.     The Ordinance is designed to have the effect, and has the effect, of recommending to an average consumer that the consumer should not carry a cell phone in a pants or shirt pocket, or tucked into a bra, when powered on and connected to a wireless network, in order to avoid a safety concern.  CTIA's members do not wish to convey this message because it is inaccurate.  Although it is possible that "exposure in excess of [FCC] limits might result," if a cell phone "transmitting continuously and at maximum power" is carried against the body, the FCC has explained that "exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply 'safer' operation." *Reassessment*, ¶ 248, 251.  Even if the limits are exceeded, the FCC possesses "no evidence that this poses any significant health risk." *Reassessment*, ¶ 251.  That is because the Commission's "limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature." *Id.*  "As a result, exposure well above the specified SAR limit should not create an unsafe condition." *Id.*

112.     The Ordinance is designed to have the effect, and has the effect, of conveying to an average consumer that the RF energy emitted from cell phones is ionizing "radiation."   RF energy is non-ionizing radiation, such as visible light and the energy produced by the human body.  RF energy is not ionizing radiation, such as X-rays and nuclear radiation, which can damage human biological tissue and affect DNA.

113.     The Ordinance is designed to have the effect, and has the effect, of conveying to an average consumer that there is a "potential risk" from RF energy emitted from cell phones, and that this risk is materially "greater for children."  CTIA's members do not wish to convey either of those messages, because they are inaccurate.  No cell phone model approved for sale in the United States emits RF energy at a level that creates a "potential risk." *See, e.g.*, EPA, *Non-Ionizing Radiation From Wireless Technology*, available at http://goo.gl/wt95zI.  Even if a cell phone were to emit RF energy that was absorbed by a human body in excess of the federal guideline, that energy is not a "risk" to the consumer, because the guideline is set 50 times below the level of RF energy that has been shown to have a potentially adverse biological effect. *See, e.g.*, *Reassessment*, ¶ 251.

Moreover, the FDA has stated that "the scientific evidence does not show a danger to any users of cell phones from RF exposure, including children and teenagers." FDA, *Children and Cell Phones,* available at http://goo.gl/UO7brb. The FCC explained that this is because the "conservative" nature of its SAR limit "accommodate[s] a variety of variables such as different physical characteristics," ensuring that children are adequately protected. *Reassessment*, ¶¶ 236, 237.

114.   The Ordinance mandates that its disclosure "either be provided to each customer who buys or leases a Cell phone or shall be prominently displayed at any point of sale where Cell phones are purchased or leased." Berkeley Municipal Code § 9.96.030(B).

115.   The Ordinance provides that "A Cell phone retailer that believes the notice language required by . . . this Section is not factually applicable to a Cell phone model that retailer offers for sale or lease may request permission to not provide the notice required by this Section in connection with sales or leases of that model of Cell phone. Such permission shall not be unreasonably withheld." Berkeley Municipal Code § 9.96.030(C).

116.   The Ordinance provides that each "Cell phone that is sold or leased contrary to the provisions of this Chapter shall constitute a separate violation," subject to fines and other penalties. Berkeley Municipal Code § 9.96.040.

117.   On information and belief, the Ordinance is effective 30 days after it was adopted by the City Council on May 26, which will be June 25, 2015. *See also* Berkeley Municipal Code § 93 (providing that, with certain exceptions inapplicable here, "[n]o ordinance passed by the Council shall go into effect before thirty days from the time of its final passage"). On information and belief, the City's municipal officers intend to begin enforcing the Ordinance against CTIA's members on that date.

## COUNT 1:

### Compelled Speech In Violation Of The First Amendment

118.   CTIA incorporates the preceding paragraphs by reference.

119.   The First Amendment to the Constitution of the United States provides that "Congress shall make no law . . . abridging the freedom of speech." The Fourteenth Amendment to the Constitution of the United States made this proscription applicable to the States.

120. The Free Speech Clause guarantees the right to speak freely, as well as the right not to speak, and to choose the content of one's own speech.

121. The Ordinance constitutes a content-based restriction on CTIA's members' protected speech. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011); *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988).

122. The information that CTIA's members choose to provide, and not to provide, to consumers regarding RF emissions from cell phones concerns a lawful activity and is not misleading. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY*, 447 U.S. 557 (1980).

123. The Ordinance violates the Free Speech Clause because it compels CTIA's members to convey a message with which they disagree. *See, e.g., Pac. Gas and Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986).

124. The Ordinance would require CTIA's members to convey a message that is inaccurate, misleading, and alarmist. *See, e.g., Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009).

125. The City cannot carry its heavy burden of justifying its infringement on CTIA's members' First Amendment rights, under any standard of review.

126. The City has no legitimate interest—let alone a compelling or substantial interest—that would be furthered by the Ordinance.

127. The Ordinance cannot be justified by an interest in promoting public health, because the FCC has determined, consistent with the overwhelming consensus of scientific authority, that cell phones approved for sale in the United States are safe for use by any consumer. Moreover, the City has no evidence to the contrary—as the City has effectively conceded. *See Edenfield v. Fane*, 507 U.S. 761, 770–72 (1993).

128. The Ordinance cannot be justified by an interest in consumers' "right to know," because that is not a legitimate basis for compelling speech. There is no limit to what the government could force citizens to say in the interest of a public "right to know." *See Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 73–74 (2d Cir. 1996); *Am. Meat Inst. v. USDA*, 760 F.3d 18, 23 (D.C. Cir. 2014).

Gibson, Dunn & Crutcher LLP

129.     The Ordinance cannot be justified by an interest in preventing deception of consumers, because nothing about the existing statements of CTIA's members regarding RF emissions from cell phones—whether in manufacturers' user manuals or otherwise—is deceptive.  The FCC has approved those user manuals.  *See Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994).

130.     There is not a fit between any legitimate ends and the means that the Berkeley City Council has chosen to accomplish those ends.

131.     The Ordinance will not directly advance any governmental interest in amplifying manufacturers' existing disclosures regarding RF energy, because the Ordinance compels disclosure of different information that is not included in many manufacturers' existing speech, and that is inaccurate and misleading.

132.     The Ordinance is not reasonably tailored because the City could easily accomplish its objectives without compelling CTIAs' members to disseminate misleading and controversial opinions to which they object.  For example, the City could publish information on its website or distribute its own "fact sheets" to consumers.

133.     The Ordinance violates the Free Speech Clause because it forces CTIA's members to convey the City's opinions that are inaccurate, misleading, controversial, unduly burdensome, not reasonably related to any legitimate government interest, and not designed to prevent deception of consumers.  *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).

134.     The only method by which the Ordinance allows CTIA's members to avoid making this compelled speech is to petition the government for permission not to provide it, thereby imposing a prior restraint on CTIA's members' speech.

135.     CTIA's members have no adequate remedy at law for the deprivation of their First Amendment rights.

## COUNT 2:

### Violation Of The Supremacy Clause (Preemption)

136.     CTIA incorporates the preceding paragraphs by reference.

137.    When a state or local law stands as an obstacle to the objectives of a federal law, the Supremacy Clause of the Constitution of the United States preempts the state or local law.

138.    A state or local law may be preempted where it disrupts the balance struck by a federal agency, acting pursuant to a mandate from Congress, to resolve competing objectives. *See Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cir. 2010).

139.    The Ordinance is preempted because it stands as an obstacle to the balance struck by the FCC on two federal policies:  safeguarding against potential health risks from RF energy emitted from cell phones, on the one hand, and maintaining a robust and efficient, nationwide, wireless communication system (which itself carries significant benefits for consumers and public safety).

140.    The Ordinance is preempted because it is intended to have the effect, and has the effect, of communicating to an average consumer that exposure to RF energy from a cell phone could exceed the federal guidelines and, therefore, creates a safety concern.  This conflicts with the FCC's finding that when a cell phone complies with federal guidelines for RF emissions, the cell phone is safe, no matter how it is worn, because even the emission of RF energy above the federal guideline would not present any safety concern to humans.

141.    The Ordinance is preempted because it is intended to have the effect, and has the effect, of conveying to an average consumer that there is a "potential risk" from RF energy emitted from cell phones, and that this risk is materially "greater for children."  This conflicts with the FCC's decision not to require manufacturers to make any RF-related safety warnings to consumers, because they are unnecessary in view of the conservative nature of its safety limit and the lack of reliable scientific evidence that cell phone RF energy causes adverse biological effects.

142.    The Ordinance is preempted because it is intended to have the effect, and has the effect, of requiring manufacturers to refer consumers in the general population to specific information on RF exposure that is provided in manufacturers' user manuals.  This conflicts with the FCC's decision not to require warning labels or advisories for general population consumers, because the federal RF exposure guidelines are set at a conservative level that assumes the general population is unaware of the exposure and that eliminates the need for warnings.

1

**COUNT 3:**

2

**Violation of 42 U.S.C. § 1983**

3       143.    CTIA incorporates the preceding paragraphs by reference.

4       144.    42 U.S.C. § 1983 provides a civil cause of action to any person who is deprived of

5   rights guaranteed by the United States Constitution or federal law, by another person, under color of

6   State law.

7       145.    The City, acting under color of state and local law, and through its enactment,

8   threatened enforcement, and enforcement of the Ordinance as alleged, has deprived CTIA's members

9   of their rights under the First and Fourteenth Amendments to the Constitution of the United States.

10                              **COSTS AND ATTORNEYS' FEES**

11      146.    Pursuant to 42 U.S.C. § 1988, CTIA further seeks an award of its costs, including

12  reasonable attorneys' fees, incurred in litigation of this case.

13                                  **PRAYER FOR RELIEF**

14          An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory,

15  and injunctive relief.

16          WHEREFORE, Plaintiff prays that this Court:

17      (A)     Enter a judgment declaring that Berkeley's required disclosure regarding RF

18  Exposure, codified at Berkeley Municipal Code Chapter 9.96, impermissibly abridges CTIA's

19  members' First Amendment rights;

20      (B)     Enter a judgment declaring that Berkeley's required disclosure regarding RF

21  Exposure, codified at Berkeley Municipal Code Chapter 9.96, is preempted by federal law;

22      (C)     Enter an injunction barring Defendants the City of Berkeley, California and Christine

23  Daniel, the City Manager of Berkeley, California, from enforcing or causing to be enforced Berkeley

24  Municipal Code Chapter 9.96 in order to prevent imminent and irreparable injury to CTIA's members

25  and harm to the public;

26      (D)     Grant CTIA such relief as it deems just and proper, including an award of reasonable

27  attorneys' fees and the costs of this action.

28

Gibson, Dunn &
Crutcher LLP

1     June 8, 2015                               By: /s/ Theodore B. Olson

2

3                                          Theodore B. Olson
                                         Helgi C. Walker

4                                          Joshua S. Lipshutz
                                         Joshua D. Dick

5                                          Michael R. Huston
                                         Jacob T. Spencer

6

7                                          GIBSON, DUNN & CRUTCHER LLP

8                                          *Attorneys for Plaintiff*
                                         *CTIA – The Wireless Association®*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**02**

ORDINANCE NO. 7,404-N.S.

REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES; ADDING BERKELEY MUNICIPAL CODE CHAPTER 9.96

BE IT ORDAINED by the Council of the City of Berkeley as follows:

<u>Section 1</u>.    That Berkeley Municipal Code Chapter 9.96 is added to the Berkeley Municipal Code to read as follows:

## CHAPTER 9.96

## REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES

**Section**
**9.96.010  Findings and Purpose**
**9.96.020  Definitions**
**9.96.030  Required notice**
**9.96.040  Violation – remedies**

**Section 9.96.010    Findings and Purpose**

A. Requirements for the testing of cell phones were established by the federal government in 1996.

B. These requirements established "Specific Absorption Rates" (SAR) for cell phones.

C. The protocols for testing the SAR for cell phones carried on a person's body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time. Testing of cell phones under these protocols has generally been conducted based on an assumed separation of 10-15 millimeters.

D. To protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices.

E. Consumers are not generally aware of these safety recommendations.

F. Currently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify.

G. Some consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations.

H.  While the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets, waistbands, etc., these disclosures and warnings are often buried in fine print, are not written in easily understood language, or are accessible only by looking for the information on the device itself.

I.  The purpose of this Chapter is to assure that consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation.

## Section 9.96.020    Definitions

For the purposes of this Chapter, the following terms shall have the following meanings, unless the context requires otherwise.

A.  "Cell phone" means a portable wireless telephone device that is designed to send or receive transmissions through a cellular radiotelephone service, as defined in Section 22.99 of Title 47 of the Code of Federal Regulations. A cell phone does not include a wireless telephone device that is integrated into the electrical architecture of a motor vehicle.

B.  "Cell phone retailer" means any person or entity that sells or leases, or offers to sell or lease, Cell phones to the public, where the sale or lease occurs within the City of Berkeley, including Formula cell phone retailers. "Cell phone retailer" shall not include: (1) anyone selling or leasing Cell phones over the telephone, by mail, or over the internet; or (2) anyone selling or leasing Cell phones directly to the public at a convention, trade show, or conference, or otherwise selling or leasing Cell phones directly to the public within the City of Berkeley on fewer than 10 days in a year.

C.  "Formula cell phone retailer" means a Cell phone retailer that sells or leases cell phones to the public, or which offers Cell phones for sale or lease, through a retail sales establishment located in the City of Berkeley that, along with eleven or more other retail sales establishments located in the United States, maintains two or more of the following features: a standardized array of merchandise; a standardized facade; a standardized decor and color scheme; a uniform apparel; standardized signage; or, a trademark or service mark.

## Section 9.96.030    Required notice

A.  A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:

The City of Berkeley requires that you be provided the following notice:

To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. This potential risk is greater for children.

Refer to the instructions in your phone or user manual for information about how to use your phone safely.

B. The notice required by this Section shall either be provided to each customer who buys or leases a Cell phone or shall be prominently displayed at any point of sale where Cell phones are purchased or leased. If provided to the customer, the notice shall include the City's logo, shall be printed on paper that is no less than 5 inches by 8 inches in size, and shall be printed in no smaller than a 18-point font. The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer, as long as that information is distinct from the notice language required by subdivision (A) of this Section. If prominently displayed at a point of sale, the notice shall include the City's logo, be printed on a poster no less than 8 ½ by 11 inches in size, and shall be printed in no small than a 28-point font. The City shall make its logo available to be incorporated in such notices.

C. A Cell phone retailer that believes the notice language required by subdivision (A) of this Section is not factually applicable to a Cell phone model that retailer offers for sale or lease may request permission to not provide the notice required by this Section in connection with sales or leases of that model of Cell phone. Such permission shall not be unreasonably withheld.

### Section 9.96.040    Violation – remedies

A. Each individual Cell phone that is sold or leased contrary to the provisions of this Chapter shall constitute a separate violation.

B. Remedies for violation of this Chapter shall be limited to citations under Chapter 1.28.

Section 2. Copies of this Ordinance shall be posted for two days prior to adoption in the display case located near the walkway in front of Old City Hall, 2134 Martin Luther King Jr. Way. Within fifteen days of adoption, copies of this Ordinance shall be filed at each branch of the Berkeley Public Library and the title shall be published in a newspaper of general circulation.

At a regular meeting of the Council of the City of Berkeley held on May 12, 2015, this Ordinance was passed to print and ordered published by posting by the following vote:

Ayes:          Anderson, Arreguin, Capitelli, Droste, Maio, Moore, Wengraf, Worthington and Bates.

Noes:          None.

Absent:        None.

# EXHIBIT B

**29**



Office of the City Manager

ACTION CALENDAR
May 12, 2015

To: Honorable Mayor and Members of the City Council

From: Christine Daniel, City Manager

Submitted by: Zach Cowan, City Attorney

Subject: Requiring Notice Concerning Carrying of Cell Phones; Adding BMC Chapter 9.96

## RECOMMENDATION
Adopt first reading of an Ordinance requiring cell phone retailers to provide a notice with each sale or lease concerning the carrying of cell phones, and adding Berkeley Municipal Code Chapter 9.96.

## FISCAL IMPACTS OF RECOMMENDATION
The proposed ordinance would impose a new requirement on cell phone retailers that would require staff time to enforce.

## CURRENT SITUATION AND ITS EFFECTS
On November 18, 2014, the Council directed staff to return with an ordinance that requires cell phone retailers in Berkeley to provide a notice with every sale or lease of a cell phone that warns customers to maintain a minimum separation between their bodies and their cell phones. The attached ordinance complies with that direction.

## BACKGROUND
See Item 37 from the November 18, 2014 City Council agenda, attached to this report.

## ENVIRONMENTAL SUSTAINABILITY
There are no identifiable environmental effects or opportunities associated with the proposed ordinance.

## RATIONALE FOR RECOMMENDATION
The proposed ordinance responds to a Council directive. See Attachment 1.

## ALTERNATIVE ACTIONS CONSIDERED
N/A

## CONTACT PERSON
Zach Cowan, City Attorney, (510) 981-6998

Attachments:
  1: Ordinance
  2: Item 37, November 18, 2014, City Council agenda

ORDINANCE NO. #,###-N.S.

REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES; ADDING BERKELEY MUNICIPAL CODE CHAPTER 9.96

BE IT ORDAINED by the Council of the City of Berkeley as follows:

Section 1.     That Berkeley Municipal Code Chapter 9.96 is added to the Berkeley Municipal Code to read as follows:

## CHAPTER 9.96
## REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES

**Section**
 **9.96.010  Findings and Purpose**
 **9.96.020  Definitions**
 **9.96.030  Required notice**
 **9.96.040  Violation – remedies**

**Section 9.96.010     Findings and Purpose**

A. Requirements for the testing of cell phones were established by the federal government in 1996.

B. These requirements established "Specific Absorption Rates" (SAR) for cell phones.

C. The protocols for testing the SAR for cell phones carried on a person's body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time. Testing of cell phones under these protocols has generally been conducted based on an assumed separation of 10-15 millimeters.

D. To protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices.

E. Consumers are not generally aware of these safety recommendations.

3

F. Currently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify.

G. Some consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations.

H. While the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets, waistbands, etc., these disclosures and warnings are often buried in fine print, are not written in easily understood language, or are accessible only by looking for the information on the device itself.

I. The purpose of this Chapter is to assure that consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation.

## Section 9.96.020    Definitions

For the purposes of this Chapter, the following terms shall have the following meanings, unless the context requires otherwise.

A. "Cell phone" means a portable wireless telephone device that is designed to send or receive transmissions through a cellular radiotelephone service, as defined in Section 22.99 of Title 47 of the Code of Federal Regulations. A cell phone does not include a wireless telephone device that is integrated into the electrical architecture of a motor vehicle.

B. "Cell phone retailer" means any person or entity that sells or leases, or offers to sell or lease, Cell phones to the public, where the sale or lease occurs within the City of Berkeley, including Formula cell phone retailers. "Cell phone retailer" shall not include: (1) anyone selling or leasing Cell phones over the telephone, by mail, or over the internet; or (2) anyone selling or leasing Cell phones directly to the public at a convention, trade show, or conference, or otherwise selling or leasing Cell phones directly to the public within the City of Berkeley on fewer than 10 days in a year.

C. "Formula cell phone retailer" means a Cell phone retailer that sells or leases cell phones to the public, or which offers Cell phones for sale or lease, through a retail sales establishment located in the City of Berkeley that, along with eleven or more other retail sales establishments located in the United States, maintains two or more of the

**4**

following features: a standardized array of merchandise; a standardized facade; a standardized decor and color scheme; a uniform apparel; standardized signage; or, a trademark or service mark.

**Section 9.96.030    Required notice**

A. A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:

The City of Berkeley requires that you be provided the following notice:

To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. This potential risk is greater for children. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

B. The notice required by this Section shall either be provided to each customer who buys or leases a Cell phone or shall be prominently displayed at any point of sale where Cell phones are purchased or leased. If provided to the customer, the notice shall include the City's logo, shall be printed on paper that is no less than 5 inches by 8 inches in size, and shall be printed in no smaller than a 18-point font. The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer, as long as that information is distinct from the notice language required by subdivision (A) of this Section. If prominently displayed at a point of sale, the notice shall include the City's logo, be printed on a poster no less than 8 ½ by 11 inches in size, and shall be printed in no small than a 28-point font. The City shall make its logo available to be incorporated in such notices.

C. A Cell phone retailer that believes the notice language required by subdivision (A) of this Section is not factually applicable to a Cell phone model that retailer offers for sale or lease may request permission to not provide the notice required by this Section in connection with sales or leases of that model of Cell phone. Such permission shall not be unreasonably withheld.

**Section 9.96.040    Violation – remedies**

A. Each individual Cell phone that is sold or leased contrary to the provisions of this Chapter shall constitute a separate violation.

5

B.  Remedies for violation of this Chapter shall be limited to citations under Chapter 1.28.

Section 2.Copies of this Bill shall be posted for two days prior to adoption in the glass case located near the walkway in front of Old City Hall, 2134 Martin Luther King Jr. Way. Within fifteen days of adoption, copies of this Ordinance shall be filed at each branch of the Berkeley Public Library and the title shall be published in a newspaper of general circulation.



Office of Councilmember
Max Anderson, District 3

To:        Honorable Mayor and Members of City Council

From:      Councilmember Max Anderson
           Councilmember Kriss Worthington

Subject: City Manager Referral: Cell phone ordinance referral to City Manager

<u>RECCOMMENDATION;</u>
Refer to City Manager for the creation of an ordinance to have cell phone retailers give to consumers who purchase a phone, a factual, informational handout referring the user to their cell phone manufacturers' disclosure regarding the recommended separation distance for use against the body.

<u>PROPOSED WORDING:</u>
**"The Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. Don't carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is turned ON and connected to a wireless network. This will prevent exposure to RF levels that may exceed the federal guidelines.**

***Refer to the instructions in your phone or user manual for the recommended separation distance."***

The above advisory will appear in the form of an informational handout to be handed to consumers by the retailer at the time of purchasing a cell phone.
NOTE - City staff to provide specific font size and design of the handout as well as text about this being a requirement of the City of Berkeley with the city's official seal.
By adopting this proposal, the City of Berkeley will ensure that consumers are made aware of the Federal Communications Commission (FCC)'s required disclosure to never carry or use a cell phone directly against the body (i.e., in a pocket or tucked into a bra) when turned ON and connected to a wireless network in order to avoid exposure to radio frequency (RF) energy that may exceed the federal exposure guideline.

FINANCIAL IMPLICATIONS:
World renowned attorney, Harvard Law Professor and Director of Edmund J. Safra Center for Ethics, Lawrence Lessig, has offered to provide legal advice to the City of Berkeley as well as to defend this proposed ordinance pro bono.

BACKGROUND:
Essential to understanding the intent of this recommendation is the fact that what is proposed is not a new consumer disclosure, but rather an attempt to further the effectiveness of cell phone manufacturers' existing consumer disclosures. The problem with the current manner in which this information is disclosed is that it is written in "legalese" and located in the fine print of user manuals or hidden within screens on the phone itself where it is unlikely to be seen by the typical consumer.

The nature of the disclosure itself is to direct consumers to never wear or use a cell phone directly against the body (as in a pants or shirt pocket or tucked into a bra or waistband) when turned ON and connected to a wireless network. Doing so, the consumer risks exposure to radiofrequency (RF) radiation that may exceed the federal exposure guideline established by the Federal Communications Commission (FCC).

**Why are the "fine print" separation distance advisories located within phones and user manuals?**

FCC rules state that cell phones must be tested for compliance with exposure guidelines - but, they allow the phones to be tested held a small "separation distance" away from the torso simulating being carried or used in a belt clip or holster.

The testing protocol for "body-worn" use was established prior to 1996 when phones were assumed to be carried on the body in a holster or belt clip and when they were not designed to be worn and/or used in pockets or tucked into bras, typical ways that phones are used today.

Because the 18 year old federal guidelines have not been updated since they were originally established in 1996, the FCC still assumes that all cell phones are only carried or used on the body in a holster or belt clip. Manufacturers (wrongfully) assert that all their customers always use a holster or belt clip to maintain the required separation distance when carried or used on the body.

**The FCC does not test cell phones the way they are typically used in a pocket directly against the body.**

Therefore, if a cell phone is used in a pocket or tucked into a bra or waistband, the consumer may be exposed to RF radiation levels that exceed the federal exposure guideline.

In July, 2012, the Government Accountability Office (GAO) issued a report called Exposure and Testing Requirements for Mobile Phones Should Be Reassessed in which the following statements appear:

**8**

> *"FCC has also not reassessed its testing requirements to ensure that they identify the maximum RF energy exposure a user could experience. Some consumers may use mobile phones against the body, which FCC does not currently test, and could result in RF energy exposure higher than the FCC limit. " ... "FCC should formally reassess and, if appropriate, change its current RF energy exposure limit and mobile phone testing requirements related to likely usage configurations, particularly when phones are held against the body. "*

Because of the separation distance allowed during testing against the body (torso), the FCC requires that manufacturers must inform consumers to always maintain this separation distance used at testing to ensure that the exposure levels remain below the "as tested" levels:

> *"Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements. Users must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-worn accessories to maintain compliance. Instructions on how to place and orient a device in body-worn accessories, in accordance with the test results, should also be included in the user instructions. All supported body-worn accessory operating configurations must be clearly disclosed to users through conspicuous instructions in the user guide and user manual to ensure unsupported operations are avoided."*
> **[FCC KDB 447498 DOl <u>General RF Exposure Guidance</u>- Section 4.2.2(4)]**

The above FCC guideline is the basis for the advisories that appear in the fine print of every cell phone user manual.

In spite of the FCC requiring that consumers be made aware of this information, manufacturers print this necessary separation distance advisor in fine print "legalese" and locate the consumer disclosure in difficult to find sections of cell phone user manuals or buried within the text on the phone itself.

NOTE: This proposed ordinance seeks to make consumers aware of their cell phone manufactures' "separation distance" disclosure as required by the FCC. It also reiterates in consumer-friendly language the manufacturers' message that consumers must never use or carry a cell phone directly against the body (while turned ON and connected to a wireless network).

Examples of "fine print" separation distance advisories for popular cell phones:
<u>Apple iPhone 5</u>- Found on the Apple website at:
https:l\www.apple.com/legal/rfexposure/iphone5,1/e/

And, can be found on the iPhone navigating through the following screens:
Settings>General> About> Legal> RF Exposure

**9**

"To reduce exposure to RF energy, use a hands-free option, such as the built-in speakerphone, the supplied headphones or other similar accessories. Carry iPhone at least 10mm away from your body to ensure exposure levels remain at or below the as-tested levels. "

**Samsung Galaxy S5 -** Refer to "Health & Safety & Warranty Guide" (pg 3)

Also found on the phone navigating through the following screens: Settings>About Device>Legal Information>Samsung Legal>Health & Safety

"For body-worn operation, this phone has been tested and meets FCC RF exposure guidelines when used with an accessory that contains no metal and that positions the mobile device a minimum of 1.0 cm from the body."

**BlackBerry Bold -** Found in user guide "Safety and Product Information"-

"Use hands-free operation if it is available and keep the BlackBerry device at least 0.59 in (15mm) from your body (including the abdomen of pregnant women and the lower abdomen of teenagers) when the BlackBerry device is turned on and connected to a wireless network."

**Motorola Moto X -** Found in user guide in the section titled "Safety, Regulatory & Legal" (pg 64)

"When using the mobile phone next to your body (other than in your hand or against your head), maintain a distance of 1.5 cm (3/4 inch) from your body to be consistent with how the mobile phone is tested for compliance with RF exposure requirements."

**Why should we be concerned about consumers not seeing the manufacturers' "fine print" advisories to keep their cell phone a small distance from the body?**

The manufacturers' separation distance consumer advisories hidden in the manuals range from requiring a minimum usage distance of from 5 mm (1/5 inch) to 25 mm (l inch) away from the torso. They seem like such small distances - why should consumers be informed?

Because, as a matter of physics, the microwave emissions from cell phones decrease sharply as the distance is increased. Even a 5 mm separation distance makes a significant difference in reducing the exposure levels consumers will receive when the phone is used or carried directly against the body.

**Consumers have the right to know!**

**How is this proposed legislation different from what San Francisco adopted in 2011?**

On September 10,2012, the 9th Circuit Court of Appeals ruled in an unpublished decision that the Cell Phone Fact Sheet the city had required to be distributed at the point of sale went beyond facts as it also contained recommendations from the city that do not appear in the user manuals as to

what consumers should do if they want to reduce exposure to radiofrequency energy emissions (such as to "turn off the phone when not in use").

Because the Court saw this situation as mandating controversial statements that were not purely factual, they ruled that the city's law violated industry's 1st Amendment Constitutional rights. Berkeley's proposed Cell Phone Right to Know ordinance seeks to inform consumers of the "body-worn separation distance" disclosure and directs consumers to their particular phone manufacturers' required "separation distance" as this crucial safety information is not visible in the packaging.

The FCC requires that consumers be made aware of these "body-worn separation distance" disclosures - so, this action is clearly in alignment with requirements already promulgated by the federal regulatory agency that oversees cell phone radiation exposure guidelines.

**What are the facts about San Francisco's settlement of their Cell Phone Right to Know Law?**

**From the San Francisco Department of Environment website:** "San Francisco believes the Ninth Circuit's opinion is deeply flawed, but the City is bound by that opinion, as the district court would be in further litigation over San Francisco's ordinance. Accordingly, San Francisco settled the case with CTIA in exchange for a waiver of attorneys' fees. However, because the Ninth Circuit's decision is unpublished, it is not binding on any jurisdiction other than San Francisco, and it would not be binding on any other district court in litigation over any legislation from another jurisdiction imposing disclosure requirements on retailers. Furthermore, under the Federal Rules of Appellate Procedure, no party is permitted to cite the Ninth Circuit's unpublished opinion as precedent in future litigation."

The CTIA dropped their suit (upon San Francisco's repeal of the law) **prior to the court ruling on their petition for reimbursement of $112,097 in attorney** fees.

**For more information, please read these relevant news articles:**
**http://www.newsweek.com/iphone-6-bendgate-apple-says-your-iphone-shouldnt-go-your-pocket-avoid-radiation-273313** - "Apple's Instructions Say Not to Keep Your Phone in Your Pocket Anyway"

**http://content.time.com/time/magazine/article/0,9171,2029493,00.html**-"Cell-Phone Safety: What the FCC Didn't Test"

CONTACT:
Councilmember Max Anderson Council District 3 510981-7130

**11**

# EXHIBIT C

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

>> MAYOR BATES: The Berkeley City Council's called to order, the special meeting workshop. Clerk, please call the roll.

>> Council Member Maio.

>> Here.

>> Moore.

>> Present.

>> Anderson is absent.

Arreguin is absent.

Capitelli.

>> Here.

>> Wengraf.

>> Here.

>> Worthington.

>> Present.

>> Droste.

>> Here.

>> Mayor Bates.

>> MAYOR BATES: Here, quorum is present.

So this is a special meeting so we will now start off.

City manager.

>> STAFF: Mr. Mayor, members of council, thank you so much. This is the presentation, the first presentation of the fiscal 2016-2017 biennial proposed budget. As you know, under the charter we are required to propose that at the first regular meeting in May. And we were able to provide you with the proposed budget documents with the agenda packet about 12 days ago. And I want to start off by thanking the folks in the budget office who prepared this incredible document, our budget manager Teresa Berkeley-Simmons, budget manager RAMA, MERTI and former budget manager Stacey Johnson. They did a terrific job as well as their other colleagues who have been working on this for many months.

I'm joined by Ms. Berkeley-Simmons who will be kicking off the preparation tonight and we have special guests who will be joining us

**1**

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

your support we would be able to increase the number at sites throughout the city, which would be felt throughout Berkeley.  We plan to enhance the volunteering experience by providing necessary amenities to sites all over become to ensure a stable volunteering force.  Come this fall it will be the tenth an veers riff of the Berkeley project.  In the past decade our organization has greatly grown in its network of service activities.  However, BP has ton and is tons of untapped potential to eventually become the ultimate catalyst for citywide community service your support is vital and crucial in helping us maintain our mission of a unified community and city-wide service.  You can empower us.  And we can inspire others to build a better Berkeley.  Thank you for listening.

　　　　　[Applause.]

　　　　　>>  MAYOR BATES:  So those are the names called.  Are there any other names called?

　　　　　>>  STAFF:  There were six and that was six people.  So that was it.

　　　　　>>  L. MAIO:  You were not called.

　　　　　>>  Hello, Berkeley community.

　　　　　>>  MAYOR BATES:  Your name was not called.  You were not called.  You have to wait until the end.  You know how this works.

　　　　　Now we will go back to the cell phone issue.

　　　　　>>  I thought you had changed the rules and more people were allowed to speak.

　　　　　>>  MAYOR BATES:  Thank you.  Have a seat.  You can speak at the end.

　　　　　>>  It is very confusing.  You continue changing the rules.

　　　　　>>  MAYOR BATES:  We will go to the cell phone issue.  We will do this.  I will conduct this a little bit like a public hearing.  So I will give you three minutes and then I will give the other side three minutes, the opposition, because people will speak on this issue.

　　　　　>>  STAFF:  Mr. Mayor, Professor Lustig is here as a consultant to the council.

**2**

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

>> MAYOR BATES: I know you have a plane to catch too. So why don't you start.

>> Thank you, Mr. Mayor and members of council. I'm grateful for the opportunity to address you. You might be aware that just yesterday more than 195 scientists of electromagnetic field scientists sent to the UN a request to address the question of the electromagnetic field concerns they had, about whether these radiation devices were causing risks that had not been appreciated by regulators around the world. It is important to recognize that how ever-significant that debate is. The ordinance that is before you tonight is not related to that debate. The ordinance before you tonight is just about giving citizens information about the existing safety standards about how they should be carrying their cell phones to comply with those safety standards. We know because we conducted a professional survey of the citizens of Berkeley that citizens in Berkeley do not know these facts. 74 percent of the citizens carry their cell phones against their body, 70 percent didn't know that these cell phones were tested with the assumption that people would not carry them against their body. 80 percent said if they knew these facts they would likely change their behavior. 85 percent had never seen the required manufacturer's statements that tell them about carrying the devices away from their bodies and 82 percent said they would like this information when they purchase cell phones.

So using those data, dean post, who used to be a professor here at Berkeley, and I, have helped the city craft an ordinance which we believe complies with the first amendment standards as articulated in the cases that were just decided in San Francisco. And it is a simple standard, a simple requirement that has purely factual and uncontroversial claims in it. It says first to assure safety, the federal government requires that cell phones meet radio frequency exposure guidelines. There can be no ambiguity about that. If you carry or use your phone in your pants or shirt pocket or tucked into a bra when the phone is on and connected to a wireless network, you may exceed the federal guidelines for

**3**

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

exposure to RF radiation.  There could be no argument about that.  This potential risk is greater for children.  There can be no argument about that.  Refer to the instructions in your phone or user manual for information about how to use your phone safely.  There can be no argument about existing standards in a manual.

This ordinance is fundamentally different from what San Francisco recently passed.  San Francisco's ordinance was directed at trying to get people to use cell phones less.  This ordinance is just about giving citizens the information they need to make their choice about how to use their cell phone.  Dean post and I are eager to help defend this ordinance if in fact it gets challenged.  The city ought to have the right to have citizens who are informed about what is perceived to be safety concerns.  And we are increasingly concerned that the first amendment is being used by corporations to bully citizens into inaction about issues they think are important.  So we are happy to support the city however we can and I'm eager to answer any questions you might have.

>>  MAYOR BATES:  Thank you very much.  So we are going to hear now from people.  I assume there will be more than ten.  But we would appreciate it if you didn't restate the arguments, simply say if you are in support of the ordinance, if you can.  You have a minute to do that.

Anybody wish to talk?  The item is before us.

>>  Hi.  Kate Bernier, resident of Berkeley.  This ordinance seems rather harmless to me and I don't know why cell phone companies are threatened by it.  Why don't you pass and it be done with it.  Thank you.

>>  MAYOR BATES:  Next, please.  She is yielding her time.  Thanks.  You have two minutes.

>>  Thank you for doing this.  I just broke your microphone.

Because you have been so kind in giving us this and moving this up in the agenda we will not have as many people speak.  As you know my husband is a brain tumor victim and his tumor is attributed more likely than not to our cell phone use.  This is our baby.  He couldn't be here with us tonight but we want you to know how whole families are destroyed

**4**

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

by brain tumors.  I want to read you a story from another woman who has been affected by this.  My name is Theresa France.  In 2012 Tiffany was diagnosed with breast cancer at the age of 21.  As a family, we underwent dramatic testing which all tested negative.  Therefore there is no genetic predisposition to breast cancer.  Tiffany stored her cell phone in her bra against her bare skin for at least five years every day all day 12 hours a day and the four masses that were found line up exactly where she kept the phone.  Had a left mastectomy reconstruction surgery and they thought that it was removed.  However, in March of 2014 it was discovered that Tiffany's breast cancer has metastasized to her hip, spine, pelvis and skull.  Now it has spread from June 2014 spread to her liver.  Having a child with cancer is extremely difficult because we are supposed to be able to kiss it and make it all better.  However the helpless feeling is not able to do that and makes it overwhelming.  We continue to seek excellent medical care and explore all options and raise awareness among men and women about the dangers of storing your cell phones on your bodies.  I am in contact with many other women who have been diagnosed with breast cancer who stored their cell phones in their bras.  We have heard several times there is no medical proof that your cell phone can cause cancer.  Can somebody give me a minute?  Thank you.

However, there is no proof that it did not.  Please do not confuse no proof with proof.  They are not synonymous.  If she had kept her phone away from her body, she would not be suffering.  Please vote yes.  If this was your daughter, how would you feel.  I was going to mention this, which professor Lustig mentioned, eight two or eight five percent of the people in Berkeley want this information.  So I implore upon you to vote yes on this legislation and I thank you on behalf of my family.

>> MAYOR BATES:  Thank you.  I just want to point out we already heard this issue.  We voted to send it to staff to write the ordinance.  The ordinance is before us.  So the longer you talk the longer it will take to make it active.  Please be responsive.  You don't all have

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

to speak.  Just say your name and why your support.  It would be very helpful.

>>  Good evening.  My name is Joel.  I'm a researcher in the school of public health at UC Berkeley.  Since professor Lustig already mentioned the report, I will make it short.  This is the report, it has been signed by 195 scientists all published and peer-reviewed on the issue.  Don't let the CPIA intimidate you on the science.  These people have published over 2,000 papers.

>>  MAYOR BATES:  Thank you.  Next, please.  Thank you for your work.  That was the right way to do it.  Quick.

>>  Good evening.  Jean B.  I cede to Dr. Debra Davis.

>>  I'm Cory Cody and I cede my time to Dr. Davis.

>>  I'm Sarah Riley and I cede my minute to Dr. Davis.

>>  Hello.  Nice to see you again.  I'm Dr. Debra Davis and I'm here to tell you why it is so important you pass this particular legislation.  As Professor Lustig has said.  If you look in your phone you will see there are advisories.  There is a website showthefineprint.org.  You received a letter showing that the phone protocols be held a certain amount away from the body.  They require that if in fact the phone was in the shirt or pants pocket or in the bra it does exceed the safe guidelines for exposure.  It does exceed them.  Without any question.  That is why the CGIA has agreed to the test protocols we have now.  Democracy rests on the freely given consent of the public to be governed.  You cannot consent to be governed if you don't have basic information.  The denial of access to this information about the safe ways to use phones is creating a huge public health problem.  You have heard from Elly marks and her family about the tragedy they have experienced.  Tiffany France is a brave young woman but also a very sick young woman who just got married and faces four treatments.  Now damage from cell phones can occur to sperm.  And we know that from studies that have been done in test tubes that I spoke with you about before.  Men who produce sperm, one set of sperm is put in one and one to another.  The test tube exposed to cell phone radiation, those

**6**

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

sperm die three times faster and have three times more damage to their Dane.  That's human sperm.  Now of course sperm don't live in test tubes but it is a very important finding.  Other research has been done prenatally exposing animals throughout their short pregnancies that rodents have, three weeks, to cell phone radiation, and those offspring have smaller brains and more brain damage and behavioral studies show more hyperactivity.  We know that we have huge problems in our schools today. We have no way to know whether or not cell phones are contributing to them.  But professor Hugh Taylor, my colleague at Yale medical school, has joined with a number of leading obstetricians who have signed on to the UN statement to form the baby safe project to warn women about ways to use cell phones safely.  Just as your ordinance will do.  It should be passed. I would say in closing the world won't literally remember what we say this evening.  We overall words and say them very quickly.  But the world is watching what you do tonight and you have an opportunity to do the right thing for yourselves, your children, and your grandchildren, and I want to thank you from the bottom of my heart for staying with this issue and I want to thank Elly marks and Cindy Frankman and Joe MOSCOWITZ, who have kept this issue alive despite fighting a very profitable industry.  Thank you very much.

          [Applause.]

          >>  MAYOR BATES:  Thank you.  Please come forward.  We have heard the arguments.  Please just indicate your support, if you would.

          >>  Good evening.  My name is hairy.  I'm a trial lawyer.  I previously sent considerable correspondence in on this issue.  I won't take a lot of time with it except to say that certainly this particular ordinance is, as professor Lustig has pointed out is noncontroversial. And because of that it should not be subject to any significant constitutional attack.  Beyond that I would note there are numerous serious scientific studies.  I think that the international journal of oncology September 2013 led by ARDELL showing a distinct positive relationship between cellular telephone use and the occurrence of

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

glioblastoma cannot be ignored.  Many such studies, things that have been submitted by myself and others.  I thank you very much for your time and good day.

>>  MAYOR BATES:  Thank you.

[Applause.]

>>  Good evening.  I live in Berkeley and I'm a complementary medical practitioner.  The Berkeley City Council offered a precautionary principle.  This is the perfect condition to apply the principle, if you are truly serious about it.  The World Health Organization has clarified radio frequency electromagnetic fields as possible carcinogens to humans based on the increased risk of lethal bran tumors associated with mobile phone use.  Germany's official radiation protection body recently advised its citizens to use landlines instead of cell phones whenever possible.  Britain's official health protection watchdog sir William Stewart has produced two reports calling for caution when using mobile phones.  France and Turkey are also leading the way and practicing the precautionary principle when it comes to cell phone use.

>>  MAYOR BATES:  Thank you.

>>  Please follow this principle.

>>  MAYOR BATES:  Thank you.

>>  And pass the ordinance.  Thanks.

>>  MAYOR BATES:  As soon as we get through with this discussion we can vote.

>>  I will keep this brief.  My name is Kevin P, a Berkeley resident, local business owner and film maker.  First and foremost I'm a huge technology advocate.  But there are three things you can't hide forever.  The sun, moon and the truth.  I believe as more time goes on increasing evidence and data will support safety in regards to cell phone radiation.  Several international countries have adopted legislation since San Francisco passed the bill in 2010.  You are now seeing we are still dragging our feet.  Right now the federal government requires that safety information be provided to cell phone users.  That information is provided

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

but it is buried in folders on your phone and the smallest in print and you can't zoom in to see it bigger but that information can't save them forever.  How will history remember you?  Do you want to be on the side of the people T residents of Berkeley who want to pass this legislation, or do you want to be on the side of telecom lobbyists who flew here on DC on behalf of a multibillion dollar industry?

>>   MAYOR BATES:  Thank you.  Your time is up.

[Applause.]

>>   My name is Jenny shore, I'm in support of the measure.  I just wanted to let you know we did a short wireless safety curriculum at Berkeley high in the academy of medicine and public service and 95 percent of the kids said they changed their behavior, weren't keeping the phone under the pillow, one told their mom not to put the phone on their pregnant belly.  We are looking forward to pass this.

>>   I will move my time.

>>   Thank you for hearing about this.  The CTIA makes the tobacco industry look like the truth-tellers of all history.  The female breast is the most absorbent of all tissues, followed by the brain.  And children and the younger the child absorb even more radiation than adults.  I urge you to pass this bill tonight, this ordinance tonight.  Thank you.

>>   MAYOR BATES:  Thank you very much.

>>   My name is Sandra Nixon.  I'm in favor of the ordinance, which I think is extremely minimal.  I'm electromagnetic field sensitive and I can tell you 15 millimeters that is suggested for the FCC for iPhones do not do it for me, so pass this minimal proposal.

>>   MAYOR BATES:  We appreciate the brief comments.  Thank you.

>>   Hi.  I'm sue Culver and I'm electromagnetically sensitive and I urge you to pass this ordinance.  Thank you very much.

>>   MAYOR BATES:  Thank you.  Perfect.

>>   I'm Stephanie Thomas, also a Berkeley resident, and I urge you to pass this.  It is an historic time for the City of Berkeley to take this small step and I have these copies of American academy of pediatrics,

**9**

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

their stand and they are writing to agencies such as the FCC and US food and drug Administration urging new standards. There are 60,000 members to this. And I will give this to you.

>> MAYOR BATES: Thank you very much.

>> Jerry T, in opposition to this item because it will mislead consumers and is unlawful. All of the agencies that have looked at this issue, whether it be the FDA, FCC or the WHO have determined there are no known adverse health effects from cell phone use. In fact, cell phones --

>> MAYOR BATES: Please.

>> -- have been deemed safe by federal regulators. The FCC holds its cell phone standards can well accommodate a variety of physical characteristics and individual sensitivities and even the potential for exposures to incur in excess of the limits without posing a health hazard to humans. This proposal would irresponsibly alarm consumers into questioning the safety of cell phones and the need for measures to be taken to increase human safety. All of which is contrary to what the experts say. This issue was settled in San Francisco when the ninth circuit overturned the ordinance. The same case lies here.

>> MAYOR BATES: Thank you. Next please. We only have three or four more speakers and that's it. You are going to be brief.

>> My name is Sarah A. I cede my minute to Dr. Tony Stein.

>> My name is Lindsey V and I cede my minute to Dr. Tony Stein.

>> I'm MARIEL and I cede my time.

>> MAYOR BATES: That's it.

>> Hi. Thank you. I'm Tony Stein. I live at 892 Arlington Avenue in Berkeley, California. I have two children, one in 7th grade and one in high school. It is so important that we support this tonight and that we give the right to know and give information on how to safely use and how to understand the instructions of all electronic devices, including cell phones. These devices do emit radiation, non-ionizing radiation, and the WHO, which is part of the UN, has determined that it is a carcinogen. The RF radiation. And it is important we all read the

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

instructions on how to use them correctly and one of the things is not to use them by the body, not to store them and not to hold them by or next to the body.

I also want to make note that the ninth circuit court did not overturn anything.  It was dropped.  And that is not true.  And we have to be careful.  Our words do matter.  And for all of us, we want to be a wonderful community and stand tall for the whole US and lead the way.  So thank you and please vote for this.

[Applause.]

>>  MAYOR BATES:  Thank you.

>>  My name is Lee KOH.  My friend died of brain tumor a couple years ago at age 49.  She was very healthy and a vigorous woman, but she was a very hard working real estate agent.  And so she was on her cell phone all the time.  And she didn't know that it was not safe on her head. And she had no -- she was sure that it was the cell phone that caused her brain tumor.  Thank you.

>>  MAYOR BATES:  Thank you very much.

[Applause.]

So I will move the staff recommendation that we adopt the language as put forth by the staff.

>>  L. MAIO:  Second.

>>  MAYOR BATES:  Council Member Anderson.

>>  M. ANDERSON:  Yeah, you are trying to up stage me there.

>>  MAYOR BATES:  Trying to move the parade here.

>>  M. ANDERSON:  We have been working on this for four years, at least.  And I'm just gratified at the outpouring of -- not agreement but an understanding of the importance of information in making decisions, health decisions about yourself and your family.  The issue before us tonight is not the science itself.  The Sypes itself will be debated and will resolve itself as the momentum scientific discovery and research presents itself.  The real issue before us tonight is whether or not citizens have the right to information that they can rely upon to make

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

decisions.  And when that information is buried deep within five pages deep in your cell phone and total obscurity on the Internet, it makes it very difficult for people to gather this information and utilize it.

Even more importantly is the fact that these people have responded to the survey.  You are not only seeing interest in this information, you see a hunger for this information.  Because this information can be of vital importance to people.  And it is part of our responsibilities as elected officials who pledge to protect the health and safety of the people that we represent, that we take this small step in energizing people's imaginations and understanding of their use of the phone but also their rights as citizens to be participatory in establishing their concern about the effects of any product that we use, and one that is to ubiquitous as the cell phone, there are more cell phones in use than there are population in this country.  And that is huge.  And it is something that we haven't had the real opportunity to do the longitudinal studies that would yield the information that would firmly establish the primacy of precautionary principles to apply them to the use of these devices.  So I'm relying on my colleagues here and their sensitivities and their understanding of what our roles here on this dais but also what our moral and ethical role is in society.  And the telecommunications industry will have their own scientists and they will have their own results and unfortunately they will have their own facts that run contrary to the scientific community that is independent and dedicated to finding answers and approaches to making our lives safer.

>> MAYOR BATES:  Council Member Anderson and Worthington, thank you.  You brought it to us, this issue.  And I would like to call on Council Member Maio, if I may.

>> L. MAIO:  You want to thank you, Dr. Lustig, for your work. I know people might be interested in how they might change their behavior. Do you have a cell phone.

>>  I do have a cell phone.

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

>> L. MAIO: Tell us a little bit about how you carry and it how they might do the same.

>> How I carry sit how people should not carry it.

>> L. MAIO: Uh-oh.

>> So my objective here is to defend your ability to help people understand this better.

>> MAYOR BATES: You carry it in your pocket.

>> I carry it in my back pocket.

>> L. MAIO: So we would all be interested in looking at alternative ways. And that's a good idea.

>> MAYOR BATES: Council Member Worthington.

>> K. WORTHINGTON: Thank you. Well, first I just want to thank Council Member Anderson for bringing this up repeatedly year after year and persisting and staying focused in a very singular way on the consumer aspect of this issue, because although there are many people in Berkeley and all over the world that have opinions about the environmental and health issues related to this, he has kept Berkeley focused specifically on the consumer issues, and that is the singular only thing that we are legislating here, the consumer right to know, the consumer access to information. Ask we are explicitly not making recommendations as to what any consumer should do. We are not telling consumers what to do. And I want to make it really clear because there was a bunch of testimony from the public talking about environmental and health things. That's not what this vote is about. This vote is about a consumer's right to know and making the information available that is already approved by the FCC and already out there in manuals and hidden away, it is just making that information in the light of day. So I just want to clarify that. I really want to thank Council Member Anderson for his incredible leadership on this issue for many, many years.

[Applause.]

>> MAYOR BATES: Call the roll.

13

*This information provided by a Certified Realtime Reporter. The City of Berkeley cannot certify the following text since we did not create it.*

>>   STAFF:  To adopt the first reading of the ordinance as proposed.

Council Member Maio.

>>   Yes.

>>   Moore.

>>   Yes.

>>   Anderson.

>>   Yes.

>>   Arreguin.

>>   Yes.

>>   Capitelli.

>>   Yes.

>>   Wengraf.

>>   Yes.

>>   Worthington.

>>   Yes.

>>   Droste.

>>   Yes.

>>   Mayor Bates.

>>   MAYOR BATES:  Yes.

>>   MAYOR BATES:  Yes.

>>   STAFF:  Motion passes.

>>   MAYOR BATES:  Passes unanimously.

[Applause.]

Please exit quietly.  We have a lot more work to do.  Thank you very much for coming and good luck in court.  We will go to public hearings.

>>   L. MAIO:  You won't go to tobacco?

>>   MAYOR BATES:  We can go to tobacco.  Let's go to public hearing.

Public hearing on the budget.  We had a discussion on the budget.  We are now going to take public testimony, people who wish to