Theodore B. Olson (#38137)
Helgi C. Walker (Pro Hac Vice Pending)
Michael R. Huston (#278488)
Jacob T. Spencer (Pro Hac Vice Pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:     202.955.8668
Facsimile:     202.530.9575

Joshua S. Lipshutz (#242557)
Joshua D. Dick (#268853)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:     415.393.8233
Facsimile:     415.374.8469

*Attorneys for Plaintiff*
*CTIA – The Wireless Association®*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION®,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, in her official capacity,<br><br>Defendants. | CASE NO. **3:15-cv-02529**<br><br>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:   July 17, 2015<br><br>Time:   10:00 AM |

Gibson, Dunn &
Crutcher LLP

## TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ........................................................................................... 1

RELIEF SOUGHT ........................................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 2

ARGUMENT ................................................................................................................................... 6

I.      CTIA Is Likely To Succeed On The Merits ................................................................... 7

     A.      The Ordinance Violates The First Amendment By Compelling Misleading, Controversial Speech ................................................................ 7

         1.      The Ordinance Is A Presumptively Unconstitutional Content- And Viewpoint-Based Regulation Of Protected Speech ...................... 8

         2.      The Ordinance Is Not Drawn To Achieve Any Substantial Or Even Legitimate Government Interest ................................................... 9

         3.      The Ordinance Cannot Survive Even Under *Zauderer* ..................... 13

     B.      The Ordinance Is Preempted By An Exclusive Federal Regime Of Cell Phone Regulation ................................................................................ 18

         1.      Congress Has Established A Uniform National Regime For The Regulation Of RF Emissions From Cell Phones ............................... 18

         2.      The Ordinance Upsets The Balance Struck By The FCC .................. 19

II.      CTIA's Members Will Be Irreparably Injured If The Ordinance Is Enforced .......... 21

     A.      First Amendment Injuries Are Per Se Irreparable ......................................... 21

     B.      The Ordinance Will Irreparably Harm CTIA's Members' Customer Goodwill And Business Reputation ............................................................... 22

     C.      CTIA's Members Face Irreparable Harm From Threatened Enforcement Of A Preempted Ordinance .................................................... 22

III.      The Balance Of Harms Favors CTIA Because An Injunction Will Not Harm The City ........................................................................................................................ 23

IV.      The Public Interest Would Be Served By Enjoining The Ordinance ........................ 24

CONCLUSION ............................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*1-800-411-Pain Referral Serv., LLC v. Otto,*
    744 F.3d 1045 (8th Cir. 2014) ............................................................................. 13

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ............................................................................................. 9

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ............................................................................. 6

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) ............................................................................. 22

*American Meat Institute v. USDA,*
    760 F.3d 18 (D.C. Cir. 2014). ................................................... 11, 13, 16, 17

*Brooks v. Howmedica, Inc.,*
    273 F.3d 785 (8th Cir. 2001) ............................................................................. 25

*Cellular Phone Taskforce v. FCC,*
    205 F.3d 82 (2d Cir. 2000) ................................................................................. 19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY,*
    447 U.S. 557 (1980) ......................................................................................... 9, 10

*CTIA-Wireless Ass'n v. City & Cnty. of S.F.,*
    494 F. App'x 752 (9th Cir. 2012) ....................................................................... 14

*Doe v. Miles Labs., Inc.,*
    927 F.2d 187 (4th Cir. 1991) ............................................................................. 25

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ............................................................................... 2, 8, 10, 11

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................. 21

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014) ............................................................................... 16

*Farina v. Nokia Inc.,*
    625 F.3d 97 (3rd Cir. 2010) ..................................................................... 18, 19, 21

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) ............................................................................................. 18

*Fla. Businessmen for Free Enter. v. City of Hollywood,*
    648 F.2d 956 (5th Cir. 1981) ............................................................................. 25

## TABLE OF AUTHORITIES (continued)

Page(s)

*Geier v. Am. Honda Motor Co., Inc.,*
529 U.S. 861 (2000) ........................................................................................................ 18

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.,*
515 U.S. 557 (1995) .......................................................................................................... 9

*Ibanez v. Fla. Dep't of Bus. & Professional Regulation,*
512 U.S. 136 (1994) ........................................................................................................ 12

*Int'l Dairy Foods Ass'n v. Amestoy,*
92 F.3d 67 (2d Cir. 1996) ......................................................................................... 9, 11, 12

*KH Outdoor, LLC v. City of Trussville,*
458 F.3d 1261 (11th Cir. 2006) ....................................................................................... 23

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.,*
--- F. App'x ---, No. 14-55930, 2015 WL 452437 (9th Cir. Feb. 4, 2015) ................................. 22

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
130 S. Ct. 1324 (2010) ............................................................................................ 10, 13

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ................................................................................................ 22, 23

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health,*
556 F.3d 114 (2d Cir. 2009) ........................................................................................... 17

*Nat'l Ass'n of Mfrs. v. NLRB,*
717 F.3d 947 (D.C. Cir. 2013) ......................................................................................... 16

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
272 F.3d 104 (2d Cir. 2001) ........................................................................................... 17

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.,*
475 U.S. 1 (1986) .......................................................................................................... 21

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,*
822 F.2d 1390 (6th Cir. 1987) ......................................................................................... 25

*R.J. Reynolds Tobacco Co. v. FDA,*
696 F.3d 1205 (D.C. Cir. 2012) .................................................................................. 11, 16

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,*
944 F.2d 597 (9th Cir. 1991) ........................................................................................... 22

*Riley v. Nat'l Fed'n of Blind,*
487 U.S. 781 (1988) ......................................................................................................... 8

*Sammartano v. First Judicial Dist. Court,*
303 F.3d 959 (9th Cir. 2002) ........................................................................................... 21

*Seattle Mideast Awareness Campaign v. King Cnty.,*
781 F.3d 489 (9th Cir. 2015) ........................................................................................... 21

**TABLE OF AUTHORITIES** (*continued*)

Page(s)

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013) ................................................................... 7

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ............................................................ 8, 9, 10, 13

*Stuart v. Camnitz*,
774 F.3d 238 (4th Cir. 2014) .................................................................. 16

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) ............................................................... 10

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ................................................................................ 7

*United States v. Schiff*,
379 F.3d 621 (9th Cir. 2004) ................................................................... 9

*United States v. Stevens*,
559 U.S. 460, 468 (2010) ........................................................................ 8

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) ................................................................................ 7

*Viacom Int'l, Inc. v. FCC*,
828 F. Supp. 741 (N.D. Cal. 1993) ...................................................... 21

*Video Software Dealers Ass'n v. Schwarzenegger*,
556 F.3d 950 (9th Cir. 2009),
*aff'd* by 131 S. Ct. 2729 (2011) ............................................................ 14

*Villas at Parkside Partners v. City of Farmers Branch*,
577 F. Supp. 2d 858 (N.D. Tex. 2008) ................................................. 23

*Williamson v. Mazda Motor of Am., Inc.*,
131 S. Ct. 1131 (2011) .......................................................................... 20

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................... 6

*Wooley v. Maynard*,
430 U.S. 705 (1977) .......................................................................... 7, 12

*Wyeth v. Levine*,
555 U.S. 555 (2009) .............................................................................. 18

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985) .............................................................................. 13

**Statutes**

47 U.S.C. § 151 ............................................................................................ 18

Berkeley Municipal Code § 9.96 .................................................................. 1

**TABLE OF AUTHORITIES** (*continued*)                    Page(s)

Berkeley Municipal Code § 9.96.010 ........................................................... 8, 10, 11, 12, 23

Berkeley Municipal Code § 9.96.030 ........................................................... 6, 7, 12, 19, 20

Berkeley Municipal Code § 9.96.040 ........................................................... 23

Telecommunications Act of 1996
    Pub. L. No. 104-204, § 704(b), 110 Stat. 56 (1996) ........................................... 18

**Regulations**

47 C.F.R. § 2.1033 ........................................................................................ 12

47 C.F.R. § 2.1093 ........................................................................................ 5, 20

47 C.F.R. § 2.915 .......................................................................................... 12

47 C.F.R. § 2.919 .......................................................................................... 12

**Other Authorities**

Brendan Nyhan & Jason Reifler, *When Corrections Fail:  The Persistence of Political Misperceptions*, Political Behavior (2010) ........................................................... 22

EPA, *Non-Ionizing Radiation From Wireless Technology* ............................................ 4

FCC, *Radiofrequency Safety: Frequently Asked Questions* ........................................ 14, 16

FCC, *Wireless Devices and Health Concerns* ........................................................ 4

FCC, *Wireless Emergency Alerts* ...................................................................... 24

FDA, *Children and Cell Phones* ...................................................................... 4, 15

FDA, *Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*, 73 Fed. Reg. 49603 (Aug. 22, 2008) ........................... 24

Federal Hazardous Substances Labeling Act, H.R. Rep. No. 1861 .................................. 24

*Future Use of Frequency Band 806-960 MHz*, 46 F.C.C.2d 752 (1974) .............................. 3

GAO, *Telecommunications: Exposure and Testing Requirements for Mobile Phones Should Be Reassessed* (July 2012) ....................................................................... 15

H.R. Rep. No. 103-111 (1993) .......................................................................... 20

H.R. Rep. No. 104-204 (1995) .......................................................................... 3, 19

*In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123 (1996) .......................................................................... 4

*In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 12 FCC Rcd. 13494 (1997) .......................................................................... 4, 19

**TABLE OF AUTHORITIES** (*continued*)                                    Page(s)

*In re Proposed Changes in the Commission's Rules Regarding Human Exposure to*
   *Radiofrequency Electromagnetic Fields*,
   18 FCC Rcd. 13187 (2003) ............................................................................ 20

*In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*,
   28 FCC Rcd. 3498 (2013) ................................................ 3, 4, 5, 6, 8, 11, 12, 15, 16, 20

Jane L. Levere, *FEMA Promotes Its Wireless Emergency Alert System*,
   N.Y. Times (May 28, 2013) ............................................................................ 24

Lars Noah, *The Imperative to Warn: Disentangling the "Right to Know" from the "Need to
   Know" About Consumer Product Hazards*, 11 Yale J. on Reg. 293 (1994) ................................ 24

*Petition on Behalf of the State of Conn.*,
   10 FCC Rcd. 7025 (1995) ............................................................................ 18

*Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*,
   26 FCC Rcd. 5411 (2011) ............................................................................ 24

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 17, 2015, at 10:00 AM, or as soon thereafter as may be convenient for the Court, Plaintiff CTIA – The Wireless Association® ("CTIA") will bring on for hearing this motion for a preliminary injunction.

**RELIEF SOUGHT**

CTIA seeks a preliminary injunction that will prohibit Defendants the City of Berkeley, California ("the City") and Christine Daniel, the City Manager of Berkeley, California, from enforcing or causing to be enforced Berkeley Municipal Code Chapter 9.96 (the "Ordinance") in order to prevent imminent and irreparable injury to CTIA's members and harm to the public. The Ordinance, entitled "REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES," violates the First Amendment of the Constitution of the United States. It is also preempted by federal law, pursuant to the Constitution's Supremacy Clause. Preliminary relief is needed to afford this Court time to decide in an orderly fashion the important constitutional issues raised by the Ordinance, which may be enforced against CTIA's members beginning June 25, 2015.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

The City of Berkeley, California may be entitled to its opinions, however unfounded. But the First Amendment prohibits the City from conscripting those who disagree into disseminating its opinions. Yet the City's new Ordinance would do precisely that. The Ordinance compels retailers to issue to their customers a misleading, counter-factual, highly controversial, government-crafted statement about the "safety" of cell phones. The statement conveys, by its terms and design, the City's view that using cell phones in a certain way poses a risk to human health, particularly to children, due to cell phones' emission of radiofrequency energy ("RF energy").

That compelled speech is not only scientifically baseless and alarmist, it contradicts the federal government's determination that cell phones approved for sale in the United States are safe, however worn, for everyone. Indeed, the City has effectively conceded that it lacks any evidence of harm from cell phones' RF energy emissions that could possibly support this incursion on protected speech. Instead, the City has relied on a vague notion of its "moral and ethical role." But the

government cannot justify burdening commercial speech "by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).  The Ordinance fails to survive *any* form of First Amendment scrutiny.

The Ordinance is also preempted by federal law because it upsets the Federal Communications Commission's ("FCC") careful balance between adequate health and safety safeguards versus an efficient, effective telecommunications network.  If Berkeley's cell phone Ordinance is allowed to stand, other cities will follow suit.  The result will be just the crazy-quilt of differing and inconsistent "disclosure" obligations across the country that Congress deliberately sought to eliminate when it directed the FCC to adopt comprehensive, national standards that cover all aspects of cell phone safety.  The Ordinance will lead to more compelled speech (and very likely self-contradictory speech), as well as widespread and unwarranted confusion and anxiety for consumers about the safety of a product that is an important part of their daily lives.

If this unconstitutional law is allowed to take effect, CTIA's members will suffer irreparable harm, including abridgement of fundamental First Amendment rights—which is per se irremediable.  Their reputations and consumer relationships will also suffer irreparably if they are forced to brand themselves to their own customers as purveyors of a dangerous product.  An injunction will merely preserve the status quo, with the FCC's well-established RF emission standards still in effect, so that this Court can adjudicate the legality of the Ordinance in an orderly fashion.

## BACKGROUND

The federal government ensures that all cell phones authorized for sale in the United States are safe.  Compl. ¶ 52–53, 55.  One way the government does this is by setting standards to limit cell phones' emission of RF energy.  RF energy—another name for radio waves—is used by all sorts of wireless communications systems, including Wi-Fi networks, baby monitors, garage door openers, and GPS systems.  Compl. ¶ 24.  It is a form of non-ionizing radiation, like visible light or infrared.  Compl. ¶ 28.  Unlike ionizing radiation (such as X-rays), which is always potentially harmful to human tissue, non-ionizing radiation is incapable of breaking chemical bonds that could damage DNA.  Compl. ¶ 27–28.  The only known adverse health effect of non-ionizing radiation is heat, but even then non-ionizing radiation poses no known health risk to the human body until it reaches a

particular threshold level.  Compl. ¶ 28, 30.  No matter how much RF exposure occurs below that threshold, it has no known adverse health effect.  Compl. ¶ 30.

The FCC has established comprehensive, nationwide standards to protect against any adverse health effects from cell phones' emission of RF energy.  Compl. ¶ 32–43.  Congress directed the FCC to adopt these standards out of concern that "decisions by non-federal units of government [had] created an inconsistent, and, at times, conflicting patchwork of requirements" regarding RF emissions, and it was in "the national interest" to establish "uniform, consistent requirements."  H.R. Rep. No. 104-204, at 94 (1995).  The FCC was tasked with striking "an appropriate balance" between "the availability of competitive wireless telecommunications services" and "adequate safeguards of the public health and safety."  *Id.*  And the FCC has long asserted that its regulatory program "[is] to be carried out on a national basis . . . without regard to state boundaries or varying local jurisdictions."  *Future Use of Frequency Band 806-960 MHz*, 46 F.C.C.2d 752, 766–67 (¶ 43) (1974).

The FCC worked with the Food and Drug Administration ("FDA") and other federal agencies to adopt the current RF exposure standards for all cell phones marketed, sold, or distributed in the United States.  Compl. ¶ 43.  These guidelines are derived from industry standards developed by leading scientific standard-setting bodies, and are based on a measurement known as the "Specific Absorption Rate" or "SAR."  Compl. ¶ 50.  SAR measures how many watts of RF energy emitted from a cell phone are absorbed by a particular mass of tissue.  Compl. ¶ 31.  To conservatively determine the maximum amount of RF energy that a cell phone model is capable of generating, the FCC requires that the phone be tested while operating at the highest power setting, even though consumers' cell phones rarely operate at full power.  Compl. ¶ 64.  The FCC approves for sale only those cell phone models that are certified as compliant with the SAR standards.  Compl. ¶ 62.

Critically, the FCC's SAR limit for cell phones is *not* the threshold above which RF energy has the potential for adverse biological effects on humans.  Rather, the SAR limit is set "at a level on the order of *50 times below* the level at which adverse biological effects have been observed in laboratory animals."  *In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*, 28 FCC Rcd. 3498, 3582 (¶ 236) (2013) ("*Reassessment*") (emphasis added).  This 50-fold "'safety' factor can well accommodate a variety of variables such as different physical characteristics and

individual sensitivities—and even the potential for exposures to occur in excess of [FCC] limits without posing a health hazard to humans." *Id.* The high levels of RF energy that would be required to cause harm to humans "are found only near certain equipment, such as powerful long-distance transmitters. Cellphones and wireless networks produce RF, but not at levels that cause significant heating." EPA, *Non-Ionizing Radiation From Wireless Technology*, available at http://goo.gl/wt95zI.

The FCC has concluded that its standards "represent the best scientific thought" on the RF emission limits that are necessary "to protect the public health." *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15184 (¶ 169) (1996). The standards also "provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 12 FCC Rcd. 13494, 13496 (¶ 2) (1997) ("*RF Order II*"). The FCC has specifically *rejected* the argument that particular classes of persons, including children, are more sensitive to RF energy. Compl. ¶ 56, 63. Overall, available "scientific evidence does not show a danger to any users of cell phones from RF exposure, *including children* and teenagers." FDA, *Children and Cell Phones* (emphasis added), available at http://goo.gl/UO7brb. The FCC "closely monitors" ongoing research regarding RF energy and human health, and recently re-affirmed that "there is no basis on which to establish a different safety threshold than [its] current requirements." FCC, *Wireless Devices and Health Concerns*, *available at* https://goo.gl/5mUjeo. The FCC explicitly "does not endorse the need for" any "measures to further reduce exposure to RF energy." *Id.* (emphasis removed).

As part of its comprehensive regulatory regime, the FCC suggests that manufacturers test a cell phone model for SAR compliance a few millimeters away from the body, to account for the fact that some consumers will use body-worn accessories such as belt clips or holsters. But even without the use of such accessories, using cell phones against the body "will generally result in actual SAR *below* the maximum SAR tested." *Reassessment*, ¶ 251 (emphasis added). And even if the SAR limit *were* exceeded because a consumer placed her phone directly against her body while it was operating at the maximum power setting, the FCC has stated that there is "*no evidence that this poses*

1  *any significant health risk.*"  *Id.* (emphasis added).  In short, the FCC has found that when a cell

2  phone is tested to comply with the FCC's SAR limit, that phone is safe, no matter how it is worn.

3        Because of the 50-fold safety factor, the FCC has decided not to require cell phone

4  manufacturers to warn consumers about RF energy exposure.  By contrast, the FCC uses a different

5  regime to protect users of portable transmitting devices in "occupational" settings:  It sets a higher

6  SAR limit—thereby approving devices that emit more RF energy—but requires manufacturers to

7  either place "visual advisories" (such as labels) on portable devices or offer "specific training."  47

8  C.F.R. § 2.1093(d)(1).  "Visual advisories" must be "legible and clearly visible to the user from the

9  exterior of the device," *id.* § 2.1093(d)(1)(ii)(A), and must "refer the user to specific information on

10  RF exposure, such as that provided in a user manual."  *Id.* § 2.1093(d)(1)(ii)(B) (emphasis added).

11  But manufacturers of *consumer* cell phones are not subject to these requirements:  The cell phone

12  guideline is set low enough *to eliminate the need for warnings*.  *See id.* § 2.1093(d)(2).  Cell phone

13  manufacturers include in their manuals a description of how the user can operate the phone under the

14  same conditions for which its SAR was measured.  Compl. ¶ 75.  But the FCC has made clear that

15  these are not "safety" instructions.  Compl. ¶ 76.

16        The City of Berkeley disagrees with the FCC's conclusions that all cell phones sold in the

17  United States are safe and that there is no need to warn consumers about RF energy.  On May 26,

18  2015, the City Council adopted an Ordinance that imposes on cell phone retailers the City's own

19  regulatory program for RF energy emissions.  Specifically, the Ordinance compels retailers in

20  Berkeley to provide the following notice to every customer who purchases or leases a cell phone,

21  either by displaying the notice on a poster or by distributing it on a handout:

22        The City of Berkeley requires that you be provided the following notice:

23        To assure safety, the Federal Government requires that cell phones meet radio

24        frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt

25        pocket or tucked into a bra when the phone is ON and connected to a wireless

26        network, you may exceed the federal guidelines for exposure to RF radiation. This

27        potential risk is greater for children. Refer to the instructions in your phone or user

28        manual for information about how to use your phone safely.

Berkeley Municipal Code § 9.96.030(A), (B), Compl. Exh. A.

In fact, the FCC has plainly stated:  "We have no evidence that [use of a cell phone against the body] poses any significant health risk," even if RF exposure should occur "well above" the federal guideline.  *Reassessment*, ¶ 251.  Nor does Berkeley claim to have *any* scientific evidence that RF energy from cell phones sold in the United States poses any safety risk.  The sponsor of the Ordinance on the City Council admitted that "[t]he issue before us tonight is not the science itself.  The science itself will be debated and will resolve itself as the momentum of scientific discovery and research presents itself."  Compl. ¶ 92, Exh. C, at 11–12.  Thus, to justify burdening the First Amendment rights of CTIA's members by compelling their speech, the sponsor put forward the following government interest:

> We haven't had the opportunity to do the longitudinal studies that would yield the information that would firmly establish the primacy of the precautionary principle as we apply it to these devices.  So I am relying on my colleagues and their sensitivities and understanding of our role here on this dais but also about what our moral and ethical role is here in this society.

Comp. ¶ 93, Exh. C, at 12.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  After *Winter*, the Ninth Circuit continues to use a "sliding scale" approach to preliminary injunctions.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Id.*  Thus, the plaintiff need "only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—[and] then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are

satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (internal quotation marks omitted).

## I.    CTIA Is Likely To Succeed On The Merits

The City's Ordinance is unconstitutional for two independent reasons.  First, it unlawfully compels CTIA's members to convey to their customers misleading and controversial messages with which they disagree.  Second, it would frustrate the FCC's careful balance in establishing a system of nationwide, uniform cell phone regulation.  CTIA is likely to succeed on both challenges.

### A.    The Ordinance Violates The First Amendment By Compelling Misleading, Controversial Speech

The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  A law that "requires the utterance of a particular message favored by the Government contravenes this essential right."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (punctuation omitted).  "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views."  *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (citations omitted).

The Ordinance requires cell phone retailers to convey the City's *opinion* that cell phones are dangerous, especially for children.  *See* Berkeley Municipal Code § 9.96.030(A).  By its terms and design, the Ordinance conveys to the average consumer that:  cell phones emit dangerous RF "radiation"; exposure to RF radiation in excess of federal guideline creates a "safety" concern; the consumer should refrain from carrying a cell phone against the body while powered on and connected in order to mitigate that safety concern; there is a "potential risk" from RF radiation emitted from cell phones; and this risk is materially "greater for children."  *Id.*

Plaintiffs' members do not wish to convey any of these messages, because they are inaccurate and misleading.  The RF "radiation" emitted from cell phones is non-ionizing and, unlike ionizing radiation, is not dangerous to humans below a particular threshold.  No cell phone approved for sale in the United States emits RF energy at a level anywhere close to that threshold.  The FCC has explained that "using a device against the body without a spacer generally will result in actual SAR

*below* the maximum SAR tested." *Reassessment*, ¶ 251 (emphasis added). And while the FCC is aware that "some devices may not be compliant with [its] exposure limits without the use of some spacer to maintain a separation distance when body-worn," it has "no evidence that this poses any significant health risk." *Id.* That is because "[t]he limits were set with a large safety factor . . .[, so] exposures well above the specified SAR limit should not create an unsafe condition." *Id.* In other words, "exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply 'safer' operation." *Id.* Moreover, the FCC has found no scientific evidence that RF energy emitted from cell phones poses a materially greater risk to children.

It is elementary that government cannot justify burdening commercial speech "by mere speculation or conjecture"; rather, it "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). Remarkably, the City has effectively *conceded* that it lacks any evidence of real harm that might arise from consumers' exposure to RF energy from cell phones worn against the body, acting instead based on a generalized and undefined notion of its "moral and ethical role." The City's required disclosure thus would mislead consumers about a non-existent danger, especially to children, from cell phones' RF energy. Accordingly, the City cannot meet its heavy burden under the First Amendment to justify compelling CTIA's members' speech, under any standard of review.

### 1. The Ordinance Is A Presumptively Unconstitutional Content- And Viewpoint-Based Regulation Of Protected Speech

The City's Ordinance is a content- and viewpoint-based regulation of speech that is "presumptively invalid." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotation marks omitted). The Ordinance is content-based because it compels CTIA's members to convey a message and a recommendation to consumers that they would not otherwise convey. *See Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988) ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."). The Ordinance's "stated purpose may also be considered" to determine whether it is content-based. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011). Here, the City has acknowledged that it enacted the Ordinance because it objects to cell phone manufacturers' existing choices about what to say and how to say it. *See* Berkeley

Municipal Code § 9.96.010 (describing the disclosures in cell phone manufacturers' user manuals as "buried in fine print, [and] not written in easily understood language").  And the City regulates the speech of "[c]ell phone retailer[s]" but no other groups, including providers of other commonly used sources of RF energy, such as Wi-Fi networks, baby monitors, and garage door openers.  *See Sorrell*, 131 S. Ct. at 2663–64 (laws targeting one particular type of speech are content-based; those targeting one particular type of speaker are viewpoint-based).  Even if the Ordinance is understood to merely report facts, rather than the City's opinion, *but see infra* Section I.A.3, it still runs afoul of the First Amendment's prohibitions against content- and viewpoint-based burdens on speech.  *See Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 572 (1995) ("[The] general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid.").

The Supreme Court has foreclosed any argument that heightened judicial scrutiny is unwarranted here because the Ordinance concerns a commercial matter.  *See Sorrell*, 131 S. Ct. at 2664–67.  "The right not to speak inheres in political and commercial speech alike."  *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996).  The information that CTIA's members choose to provide, and not to provide, to consumers regarding RF emissions from cell phones "concern[s] lawful activity" and is not "misleading"—and thus it is inarguably protected speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of NY*, 447 U.S. 557, 566 (1980).

### 2.     The Ordinance Is Not Drawn To Achieve Any Substantial Or Even Legitimate Government Interest

That the Ordinance imposes content- and viewpoint-based restrictions on protected speech is "all but dispositive" to show that it violates the First Amendment.  *Sorrell*, 131 S. Ct. at 3667.  But even if the Ordinance does not automatically fail,[1] it is "the [City's] burden" to show "*at least* that the

---

[1]  Although "[c]ommercial speech traditionally has been granted less protection than political speech and expressive speech," *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004), the same constitutional protection should apply to commercial speech as to any other category of protected speech.  *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and in the judgment) ("I do not see a philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech.").

statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Id.* at 2667–68 (emphasis added) (citing, among others, *Central Hudson*, 447 U.S. at 566); *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (once a party makes a "colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, . . . the burden shifts to the government to justify" the infringement).  "There must be a fit between the legislature's ends and the means chosen to accomplish those ends," *Sorrell*, 131 S. Ct. at 2668 (internal quotation marks omitted), such that the regulation is "[n]o more extensive than necessary to serve [the government's] interest," *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339 (2010) (quoting *Central Hudson*, 447 U.S. at 566).

Here, the City cannot show that it has any *legitimate* interest, much less a "compelling" or "substantial" interest, in forcing CTIA's members to convey a message with which they vehemently disagree, nor can the City demonstrate any reasonable fit.  Despite the Ordinance's assumption that there is a "safety" problem with RF energy emitted from cell phones, and its concomitant desire to change the way that consumers use their phones, *see* Berkeley Municipal Code § 9.96.010(G), the Ordinance cannot be supported by any *real* health or safety concern.  Indeed, the City has effectively conceded that it has no scientific evidence of real harm associated with RF energy emitted from cell phones.  *See* Compl. ¶ 92–93.  The sponsor of the Ordinance admitted that it "is not [about] the science itself," as "[t]he science itself will be debated and will resolve itself as the momentum of scientific discovery and research presents itself."  Compl. ¶ 92.  He further admitted that the City has not done "studies that would yield the information" necessary to regulate even as a "precautionary" matter.  Compl. ¶ 93.  Instead he asked his colleagues to compel cell phone retailers to engage in government-prescribed speech based on a generalized and undefined notion of the Council's "moral and ethical role." Compl. ¶ 93.

In reality, the City's assumption about a safety concern is entirely unfounded.  "In contrast to the [City's] anxiety" over RF emissions from cell phones, *Edenfield*, 507 U.S. at 772, the FCC has determined, consistent with the overwhelming consensus of scientific authority, that cell phones legally sold in the United States pose no safety concern.  As the FCC has explained, exceeding the federal RF exposure limit "does not necessarily imply unsafe operation, nor do lower SAR quantities

imply 'safer' operation." *Reassessment*, ¶ 251.  Even if a consumer were exposed to more RF energy than the applicable guideline by wearing the phone against her body, the FCC possesses "*no evidence that this poses any significant health risk*." *Id.* (emphasis added).  That is because the Commission's "limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature." *Id.*  As a result, even RF exposure "*well above* the specified SAR limit should not create an unsafe condition." *Id.* (emphasis added).  The City's "speculation or conjecture" about harms from RF emissions cannot justify its infringement of CTIA's members' speech. *Edenfield*, 507 U.S. at 770; *see also Amestoy*, 92 F.3d at 74 ("Absent . . . some indication that this information bears on a reasonable concern for human health or safety . . . the manufacturers cannot be compelled to disclose it.").  And because there are no "real" "harms," there is nothing for the Ordinance to address "in any direct and material way." *Edenfield*, 507 U.S. at 771.

In an effort to sidestep the lack of any evidence of an actual safety problem, the Ordinance purports only to provide information so that consumers can "make their own choices about the extent and nature of their exposure to radio frequency radiation."  Berkeley Municipal Code § 9.96.010(I); *see also* Compl. Exh. B, at 10 ("Consumers have the right to know!").  But courts have consistently held that "the public's 'right to know'" is "insufficient to justify compromising protected constitutional rights." *Amestoy*, 92 F.3d at 73; *see also Am. Meat Inst. v. USDA*, 760 F.3d 18, 23 (D.C. Cir. 2014) (en banc) (suggesting that "satisfying consumers' 'idle curiosity'" is not a legitimate government interest); *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1221 (D.C. Cir. 2012) ("The government's attempt to reformulate its interest as purely informational is unconvincing, as an interest in 'effective' communication is too vague to stand on its own."), *overruled on other grounds* by *American Meat Institute*, 760 F.3d 18.  "Were consumer interest alone sufficient, there is no end to the information that states could require manufacturers to disclose." *Amestoy*, 92 F.3d at 74.  Thus, to argue that government has a "substantial interest in giving consumers information" is a "circular formulation [that] would drain the *Central Hudson* test of any meaning in the context of compelled commercial disclosures." *American Meat Institute*, 760 F.3d at 31 (Kavanaugh, J., concurring).  For as much as the City "would love to have such a free pass to spread their preferred messages on the backs of others," *id.*, the First Amendment does not permit it to require cell phone retailers to "use

their private property as a 'mobile billboard'" to convey Berkeley's chosen message, *Wooley*, 430

U.S. at 715.  "[C]onsumer curiosity alone is not a strong enough state interest" to justify the

Ordinance.  *Amestoy*, 92 F.3d at 74 (citing cases).

The City also cannot contend that the Ordinance's required disclosure is anything but its own

chosen message.  While the Ordinance suggests that it merely seeks to amplify and clarify disclosures

"generally" contained in existing cell phone user manuals "[t]o protect the safety of . . . consumers,"

Berkeley Municipal Code § 9.96.010(D), (H), that is not so.  The vast majority of cell phone

manufacturers do not recommend that consumers keep their phones away from their bodies while

using them ¶ order "to protect the safety of their consumers."  Compl. ¶ 99.  Rather, as the FCC

recently explained, these recommendations are made to consumers "if they want to ensure that their

actual exposure does not exceed the SAR measurement obtained during testing."  *Reassessment*,

¶ 248.  The City has reframed and distorted those disclosures to warn of an unsubstantiated "safety"

"risk" from "RF radiation."  The City does not contend that manufacturers' existing disclosures are

potentially misleading on the subject of RF energy, such that the City might be able to compel speech

to "correct" them.  Indeed, the City cannot make that contention:  CTIA's members have complied

with all applicable FCC regulations regarding the RF energy emitted from cell phones, including

those that mandate FCC review and approval of the "operating instructions" provided to users.  47

C.F.R. § 2.1033(c)(3); *id.* § 2.915(a); *id.* § 2.919.  "If the protections afforded commercial speech are

to retain their force," courts "cannot allow rote invocation of the words 'potentially misleading' to

supplant the [City's] burden to demonstrate that the harms it recites are real."  *Ibanez v. Fla. Dep't of

Bus. & Professional Regulation*, 512 U.S. 136, 146 (1994) (quotation marks and citations omitted).

If anything is misleading here, it is the City's compelled disclosures.

Nor is the Ordinance tailored in any reasonable way to amplifying manufacturers' existing

disclosures on RF energy.  If that were the City's only intention, it would have left off all but the last

sentence of its required disclosure and simply referred consumers to the user manuals for

information, without editorializing about RF emissions and recasting manufacturers' statements as

safety warnings.  *Cf.* Berkeley Municipal Code § 9.96.030(A) ("Refer to the instructions in your

phone or user manual for information about how to use your phone safely.").  Far from merely

"clarifying" existing disclosures, the City seeks to compel disclosure of *different* information that is not included in many manufacturers' existing speech.  The City is not seeking merely to highlight or clarify CTIA's members' speech; it is seeking to *change* the content of that speech.

Finally, the Ordinance is not reasonably tailored because the City could easily accomplish its goals without compelling Plaintiffs' members to disseminate misleading and controversial opinions. For example, the City could publish information on its website or distribute its own "fact sheets" to consumers.  If the City wishes to share its opinions about the safe usage of cell phones, however unsupported, it must do so itself.

In short, none of the City's ostensible interests are sufficient to justify forcing CTIA's members to convey a message with which they strongly disagree.  The City's flimsy justifications and utter lack of fit demonstrate its real purpose:  "to suppress [the] disfavored message" that cell phones are safe, *Sorrell*, 131 S. Ct. at 2668, and to conscript cell phone retailers into joining the scientifically baseless side of a manufactured controversy.  The City may adopt whatever unfounded opinions it likes about cell phones, but it may not force CTIA's members to spread that message.

### 3.        The Ordinance Cannot Survive Even Under *Zauderer*

The Supreme Court held in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985), that government may have a legitimate interest in compelling certain commercial speech in order to prevent deception of consumers, provided that the information required to be disclosed is "purely factual," "uncontroversial," not "unduly burdensome," and "reasonably related to" the government's interest.  *Zauderer* has sometimes been described as a form of "less exacting scrutiny."  *Milavetz*, 130 S. Ct. at 1339.  Here, however, *Zauderer* only confirms that Berkeley's ordinance is unconstitutional.

In the first place, *Zauderer* does not govern this Ordinance.  That standard applies only where the government's interest is "in preventing deception of consumers."  471 U.S. at 651.  *See Milavetz*, 130 S. Ct. at 1340 (applying *Zauderer* because the state's required disclosures were "intended to combat the problem of inherently misleading commercial advertisements"); *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1061–62 (8th Cir. 2014) (applying *Zauderer* because the advertisements at issue were "inherently misleading on their face"); *but see American Meat Institute*,

760 F.3d at 22 (majority op.). As explained above, the City here has not attempted to show—and could not show, even if it tried—that the Ordinance is reasonably related to preventing any deception of consumers by CTIA's members.

Even assuming that less exacting scrutiny can apply to compelled commercial disclosures that are justified by something other than consumer deception, this Ordinance still fails every element of the Supreme Court's test from *Zauderer*.

*First*, the message that the City would force CTIA's members to convey is not purely factual. From its inception, the Ordinance was designed to promote the City's misguided and scientifically unsupported *opinion* that cell phones are dangerous, especially for children. But the First Amendment does not permit the City to force CTIA's members to broadcast the City's opinions. *See*, *e.g.*, *CTIA-Wireless Ass'n v. City & Cnty. of S. F.*, 494 F. App'x 752, 753 (9th Cir. 2012) (invalidating mandatory disclosure regarding RF energy from cell phones because it "could prove to be interpreted by consumers as expressing [the city's] opinion that using cell phones is dangerous").

The City's message not only goes beyond the purely factual, it is *counter*-factual. There is never a "legitimate reason to force retailers to affix false information on their products." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd* by 131 S. Ct. 2729 (2011). Yet the Ordinance demands speech that is untrue and misleading in several respects:

- The Ordinance warns about "RF radiation"—rather than "RF energy" or "radio waves"—in order to imply that harmful ionizing radiation, such as nuclear radiation, is present. But cell phones emit only *non-ionizing radiation*, which is all around us, even emanating from the human body. Compl. ¶¶ 24, 28. The Ordinance deliberately fails to clarify that important difference. FCC, *Radiofrequency Safety: Frequently Asked Questions*, available at http://goo.gl/rO9P9x ("Often the term 'radiation' is used, colloquially, to imply that ionizing radiation (radioactivity), such as that associated with nuclear power plants, is present. Ionizing radiation should not be confused with the lower-energy, non-ionizing radiation with respect to possible biological effects[.]").
- The Ordinance suggests that a consumer might exceed the FCC's RF exposure guideline by carrying a cell phone against the body if the phone is powered on and connected to a wireless

network.  But it declines to clarify that such exposure may be possible only "with the device transmitting continuously and at maximum power," and that "using a device against the body without a spacer will generally result in an actual SAR *below* the maximum SAR testing." *Reassessment*, ¶¶ 248, 251 (emphasis added).

- The Ordinance warns that exceeding the FCC's RF exposure guideline may create a "safety" concern, or a "potential risk."  But "exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply 'safer' operation," and the FCC has "no evidence that this poses any significant health risk."  *Id.* ¶ 251.  The Ordinance neglects to mention that the FCC has determined that a certified cell phone does not emit enough RF energy to pose a potential safety risk to humans, given the 50-fold safety factor, and that there is no scientific basis to establish a different guideline.

- The Ordinance cautions that the "potential risk" of RF energy is "greater for children."  But the FCC has rejected that conclusion, and federal agencies expert in health and safety have explained that "scientific evidence does not show a danger to any users of cell phones from RF exposure, including children and teenagers."  FDA, *Children and Cell Phones*, available at http://goo.gl/UO7brb.

- The Ordinance implies that cell phone manufacturers view using body-worn devices as a "safety" issue.  But that is not true.  Virtually all manufacturers agree with the FCC and the overwhelming consensus of science that cell phones approved for sale in the United States are safe however worn, in light of the substantial safety factor built into the FCC guideline.

*Second*, the City's message is not uncontroversial.  Although overwhelming scientific evidence supports the FCC's determination that all cell phones approved for sale in the United States are safe, there is continuing controversy—albeit unfounded—over whether RF energy is harmful. *See*, *e.g.*, GAO, *Telecommunications: Exposure and Testing Requirements for Mobile Phones Should Be Reassessed* (July 2012) ("The rapid adoption of mobile phones has occurred amidst controversy over whether the technology poses a risk to human health as a result of long-term exposure to RF energy from mobile phone use.").  As is the case with other controversies—such as misguided and speculative fears about harm from vaccines, for example—some people hold fierce yet unfounded

opinions about the safety of cell phones.  Government may not force businesses to convey its chosen message where that message implicates a matter of public controversy.  *See, e.g., Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 n.6 (2d Cir. 2014) (holding that the government may not require a company to "mention controversial services" that some providers oppose).

A compelled disclosure may be uncontroversial when it is "factually straightforward, evenhanded, and readily understood."  *American Meat Institute*, 760 F.3d at 34 (Kavanaugh, J., concurring).  But the City's message is none of those.  Rather, as explained above, it is impermissibly misleading and one-sided:  The Ordinance emphasizes the possibility of RF exposure above the FCC's guideline, without mentioning the FCC's findings that body-worn usage generally produces RF exposure *below* the guideline, and that exceeding the guideline is possible "only with the device transmitting continuously and at maximum power—such as might happen during a call with a handset and the phone in a user's pocket at the fringe of a reception area."  *Reassessment*, ¶ 248.  The Ordinance also ignores the FCC's view that, in any event, such exposure does not raise a safety concern because of the 50-fold safety factor built into the guideline.  *See, e.g., Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) (the government may not require even factual disclosures where the required facts "all fall on one side" of a public debate); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 958 (D.C. Cir. 2013), *overruled on other grounds* by *American Meat Institute*, 760 F.3d 18.  The City's disclosure exploits the average person's understanding of and likely reaction to the term "radiation," deliberately avoiding the difference between ionizing versus non-ionizing radiation.  *See* FCC, *Radiofrequency Safety: Frequently Asked Questions*, available at http://goo.gl/rO9P9x (warning that these concepts, and their "possible biological effects," "should not be confused").  And by stringing together the words "radiation," "potential risk," and "children" in the same few sentences— notwithstanding the FCC's and FDA's finding that children face no particular risk from RF energy— the City uses "inflammatory" language that is an "unabashed attempt[ ] to evoke emotion." *R.J. Reynolds*, 696 F.3d at 1216–17.  The City may not stoke public anxiety by compelling CTIA's members to broadcast this controversial message.

*Third*, the disclosure required by the Ordinance is unduly burdensome and threatens to create even greater burdens on CTIA's members.  The Ordinance would intrude deep into cell phone

retailers' customer environment, which is structured to maximize the customer experience and communicate the information that retailers, not the government, think most suited to consumers' interests.  Cell phone retailers consider how best to communicate and what to say to consumers during the time consumers are in their stores or on their websites, and the City would force those messages aside with its own disruptive and controversial message.  Moreover, if Berkeley may impose its unfounded concerns about cell phone dangers on CTIA's members, then there will be nothing to stop any other state, county, or city from doing the same.  The result will be a patchwork of overlapping and inconsistent disclosure obligations based on the idiosyncrasies of any given town council, board of supervisors, or state agency, as opposed to the nationwide, uniform, scientifically grounded rules established by federal regulators.

*Fourth*, the Ordinance is not reasonably related to *any* legitimate government interest.  *See supra* Section I.A.2.  Even when applying *Zauderer*'s less exacting scrutiny, the City may not justify a compelled disclosure based on a mere desire to offer information to the public.  *See American Meat Institute*, 760 F.3d at 23.  Nor can the City plausibly claim merely to be clarifying CTIA's members' existing disclosures when the required notice goes much farther, forcing them to put forward representations about cell phones that they do not already make.  And of course, the City may not claim a reasonable interest in preventing deception or public health:  Its required disclosures are simultaneously misleading and contrary to the overwhelming consensus of scientific authority, and the City has effectively conceded that it lacks any evidence of harm to health or safety.

The power to turn private businesses into a mouthpiece for the government's chosen message must be strictly limited.  Under *Zauderer*, courts have narrowly confined that power to such innocuous and uncontroverted facts as country-of-origin labels on meat products, *see American Meat Institute*, 760 F.3d at 27, calorie counts, *see N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 136 (2d Cir. 2009), or how to dispose of mercury, *see Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001).  How many calories are in a sandwich, or where a cow was born, are objectively verifiable facts.  Here, by contrast, little to nothing in the City's mandated notice is an objectively demonstrable fact.  Instead the City would use its power to force CTIA's members to

distribute its one-sided, innuendo-laden, highly misleading, and scientifically unsupported opinion on a matter of public controversy.  The First Amendment forbids this incursion on speech.

### B.    The Ordinance Is Preempted By An Exclusive Federal Regime Of Cell Phone Regulation

Federal law preempts any state law that stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (internal quotation marks omitted).  "Federal regulations have no less pre-emptive effect than federal statutes."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  And where federal regulations strike a balance between competing national priorities, state prescriptions in the same area can stand as an "obstacle" to achievement of the federal goals, because federal law serves as a regulatory ceiling as well as a floor.  *See, e.g.*, *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 886 (2000).  Here, the Ordinance is preempted because it interferes, in multiple ways, with the FCC's comprehensive, uniform regulation of RF energy emissions from cell phones.

### 1.    Congress Has Established A Uniform National Regime For The Regulation Of RF Emissions From Cell Phones

For over a century, wireless communications have been subject to continuous, pervasive, and uniform regulation by the federal government.  *See Farina v. Nokia Inc.*, 625 F.3d 97, 105–06 (3rd Cir. 2010).  In 1934, Congress passed the Communications Act "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges."  47 U.S.C. § 151.  "To that end, the [Act] established the FCC, which was endowed with broad authority to license and regulate radio communications."  *Farina*, 625 F.3d at 105.  In 1993, Congress amended the Act to further consolidate wireless regulation at the federal level, in order to ensure a "national regulatory policy for [wireless telephony], not a policy that is balkanized state-by-state."  *Petition on Behalf of the State of Conn.*, 10 FCC Rcd. 7025, 7034 (¶ 14) (1995).

The FCC has regulated human exposure to RF emissions since 1985.  *Farina*, 625 F.3d at 106.  In the Telecommunications Act of 1996 (the "1996 Act"), Congress expressly charged the FCC

with establishing a federal safety standard governing RF emissions from wireless handsets.  *See* Pub. L. No. 104-204, § 704(b), 110 Stat. 56 (1996).  Congress directed the FCC to adopt these rules because "decisions by non-federal units of government [had] created an inconsistent, and, at times, conflicting patchwork of requirements" regarding RF emissions, and it was in "the national interest" to establish "uniform, consistent requirements."  H.R. Rep. No. 104-204, at 94.  In crafting its RF energy rules, the FCC calibrated a "proper balance between" two Congressionally mandated goals— "the need to protect the public" from high levels of RF energy and "the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible."  *RF Order II*, 12 FCC Rcd. at 13496 (¶ 2); *see also Farina*, 625 F.3d at 125 ("In order to satisfy both its mandates to regulate the safety concerns of RF emissions and to ensure the creation of an efficient and uniform nationwide network, the FCC was required to weigh those considerations and establish a set of standards that limit RF emissions enough to protect the public and workers while, at the same time, leaving RF levels high enough to enable cell phone companies to provide quality nationwide service in a cost-effective manner.").

### 2.    The Ordinance Upsets The Balance Struck By The FCC

The Ordinance strikes a different balance than the FCC by warning consumers about potential safety risks from cell phones, especially to children, based on how cell phones are carried.  The Ordinance requires cell phone manufacturers to provide warnings about RF energy exposure to consumers despite the FCC's deliberate choice not to impose such a requirement.  The overall effect of the City's rule will be to interfere with core federal objectives, including efficient deployment and use of wireless devices and services, a uniform national regulatory approach to wireless, and an effective and accurate public safety system.

*First*, the Ordinance communicates to an average consumer that cell phones are unsafe:  that exposure to "radiation" from a cell phone in excess of the federal guideline creates a "safety" concern, that that there is a "potential risk" from such "radiation" emitted from cell phones, and that this risk is materially "greater for children."  Berkeley Municipal Code § 9.96.030(A).  This conflicts with the FCC's determination—as affirmed by the federal courts*, see Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2d Cir. 2000); *EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004)—that every

phone approved for sale in the United States is safe, including for children.  The City's message also

conflicts with the FCC's determination that even RF exposure well above the SAR standard should

not create a safety risk.  *Reassessment*, ¶ 236 (50-fold safety factor can "well accommodate . . . the

potential for exposures in excess of [the FCC's] limits without posing a health hazard to humans");

¶ 251 ("exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR

quantities imply 'safer' operation").  By kindling unfounded fear and stoking consumer anxiety, the

Ordinance threatens to change consumers' behavior in a way that would hamper "the growth and

development of mobile services," that Congress hopes to foster.  H.R. Rep. No. 103-111, at 260

(1993).  Moreover, if Berkeley's effort to second-guess the FCC's decisions regarding RF emissions

is upheld, then other state and local governments will soon follow—thus recreating the very crazy-

quilt of RF emission regulation that Congress purposely tried to eliminate in the 1996 Act.

*Second*, the Ordinance requires retailers to provide consumers with safety warnings about RF

energy.  Berkeley Municipal Code § 9.96.030.  But the FCC made a deliberate choice *not* to require

that consumers be warned against exceeding the RF energy guideline.  *See* 47 C.F.R. § 2.1093(d)(2).

The SAR standard is set low enough to make awareness of RF exposure unnecessary.  Compl. ¶ 70.

Even in "occupational" settings, the FCC provided manufacturers a choice between warning labels or

other means of making users "fully aware" of their potential RF exposure.  *See* 47 C.F.R.

§ 2.1093(d)(1)(i).  That approach reflects a careful balance between ensuring safety and "avoiding

any unnecessary burden in complying with our RF exposure rules."  *In re Proposed Changes in the

Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, 18 FCC

Rcd. 13187, 13188 (¶ 1) (2003).  And it preserves manufacturer "flexibility," which is "the most cost-

effective way to reliably achieve awareness."  *Reassessment*, ¶ 63.  Any state law depriving

manufacturers of that flexibility, or imposing additional warning requirements, is preempted.  *See

Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1137 (2011) (where "manufacturer choice

was an important regulatory objective," state law "restrict[ing] that choice" was preempted).  That is

true for RF exposure in occupational settings, where the FCC demands consumer awareness about RF

energy.  It is especially true for RF exposure in general population settings—including from cell

phones—where the FCC does not.

In sum, the FCC balanced public safety against the efficient provision of wireless phone service by setting an RF exposure guideline that eliminated the need for consumer warnings. *See Farina*, 625 F.3d at 125. By disrupting that balance, and by requiring warnings that the FCC has not, the City's Ordinance stands as an obstacle to federal objectives. If Berkeley is allowed to impose its warning requirement, then many other localities will soon attempt the same thing, thereby reestablishing exactly the balkanized and inconsistent regulatory regime that Congress sought to replace with a uniform, national approach.

## II.   CTIA's Members Will Be Irreparably Injured If The Ordinance Is Enforced

A preliminary injunction is necessary in order to prevent multiple, imminent and irreparable harms to CTIA's members, including the abridgement of First Amendment rights. An injunction will preserve the status quo, which includes compliance with the FCC's existing RF emissions standards, so that this Court can adjudicate the constitutionality of the Ordinance in an orderly fashion.

### A.   First Amendment Injuries Are Per Se Irreparable

It is well-settled that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury' for purposes of the issuance of a preliminary injunction." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), *abrogated on other grounds* by *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489 (9th Cir. 2015). Indeed, "the fact that a case raises serious First Amendment questions compels a finding that there exists 'the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [the applicant's] favor.'" *Id.* (quoting *Viacom Int'l, Inc. v. FCC*, 828 F. Supp. 741, 744 (N.D. Cal. 1993)).

As explained above, CTIA's members have determined what to say to their customers—and what not to say—about the products that they sell, and they disagree with the messages that the City's Ordinance would compel them to spread. CTIA's members will be irreparably harmed if they are compelled to use their voices and customer relationships to support the City's misleading message. Counter-speech cannot remedy this intrusion, because "[t]hat kind of forced response is [itself] antithetical to the free discussion that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).

**B.** **The Ordinance Will Irreparably Harm CTIA's Members' Customer Goodwill And Business Reputation**

A threat to a company's "reputation and goodwill . . . constitutes irreparable harm, as it is not readily compensable." *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, --- F. App'x ---, No. 14-55930, 2015 WL 452437, at *3 (9th Cir. Feb. 4, 2015); *see also Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (upholding preliminary injunction because "intangible injuries" to advertising efforts and goodwill are irreparable).  If CTIA's members are forced to spread misinformation about their products, it will be very difficult for them to later correct consumers' resulting misperceptions.  *Cf.* Brendan Nyhan & Jason Reifler, *When Corrections Fail:  The Persistence of Political Misperceptions*, *Political Behavior* (2010).

The Ordinance requires CTIA's members to disparage their products at the very point of sale by conveying to their customers the City's opinion that cell phones are dangerous, especially for children.  The City's alarmist compelled disclosure will not only discourage consumers from purchasing and using cell phones, it will breed uncertainty and fear about the products.  Indeed, parents may well conclude that children should not be allowed to have cell phones *at all*, if they are unwilling to assume that their children will carry their phones "safely."  Modifying consumer behavior was one of Berkeley's central motives in enacting the Ordinance.  Compl. ¶ 91, 104.  And even if consumers later discover that, as the FCC has stated, cell phones worn against the body do not pose any significant health risk, they may refuse to alter their beliefs.  It will not be possible to compensate CTIA's members for this damage to their reputations and customer goodwill.

**C.** **CTIA's Members Face Irreparable Harm From Threatened Enforcement Of A Preempted Ordinance**

Threatened enforcement of a preempted—and thus unconstitutional—ordinance also constitutes irreparable injury.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (affirming district court's injunction against enforcement of preempted state guidelines); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (holding that where parties face imminent enforcement of a likely preempted municipal law, "the constitutional violation alone . . . c[ould] suffice to show irreparable harm" (citing *Morales*, 504 U.S. at 381)); *Villas at*

*Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008) (holding, under *Morales*, that "[a] party may be irreparably injured in the face of the threatened enforcement of a preempted law"). Parties facing imminent enforcement of a preempted local law face a "Hobson's choice: continually violate the . . . law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales*, 504 U.S. at 381.

CTIA's members face just such a Hobson's choice. They can continuously violate the Ordinance, incurring new liability with every cell phone they lease or sell. *See* Berkeley Municipal Code § 9.96.040(A) ("Each individual Cell phone that is sold or leased contrary to the provisions of this Chapter shall constitute a separate violation."); *Morales*, 504 U.S. at 381 (noting problem of "repetitive penalties"). Or they can "suffer the injury of obeying the law during the pendency of the proceedings" to determine that the Ordinance is preempted. *Id.* Either outcome would irreparably harm CTIA's members.

### III.   The Balance Of Harms Favors CTIA Because An Injunction Will Not Harm The City

The City will not be harmed in any way by a preliminary injunction—which would merely preserve the status quo—to allow for orderly litigation of this case. As an initial matter, the City "has no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

Furthermore, there is no pressing need for the City immediately to enforce the Ordinance. The City does not contend that cell phones pose an imminent threat to public safety—the supposed purpose of the Ordinance is simply to provide information to consumers. Berkeley Municipal Code § 9.96.010(I). But accurate and balanced disclosures regarding RF energy are *already* available (and will remain so) to any consumer interested in the information. And one of the chief proponents of the Ordinance effectively conceded the lack of urgency in getting the City's safety message out—indeed, he conceded the lack of any threat at all to public safety—when he acknowledged that he does not himself follow Berkeley's recommendation for how to "safely" carry a cell phone. *See* Compl. ¶ 96 ("How I carry it is how people should not carry it. I carry it in my back pocket.") (Testimony of Attorney Lawrence Lessig). Finally, the FCC's regulations governing cell phones' emission of RF

energy have been in place for nearly twenty years, and the City by its own admission has no evidence that they will not be sufficient while this litigation is pending.

## IV.     The Public Interest Would Be Served By Enjoining The Ordinance

If the Ordinance is allowed to go into effect, the public will be harmed by the City's misleading warnings.  The Ordinance will scare consumers into changing the way that they use their cell phones (including turning them off or disconnecting them from the network) or reducing the use of their phones altogether—thereby decreasing the public's full use of wireless technology, creating needless public anxiety, and diluting the force of truly important safety warnings, all without offering *any benefits* in terms of increased safety.

Cell phone services are an "increasingly significant part of the lives of American consumers . . . [and] are used for a variety of both personal and business purposes, including back-up communications during emergencies and for accessibility."  *Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 26 FCC Rcd. 5411, 5418 (¶ 14) (2011).  The Federal Emergency Management Agency has recognized cellphones as "life-saving tool[s]."  Jane L. Levere, *FEMA Promotes Its Wireless Emergency Alert System*, N.Y. Times (May 28, 2013), *available at* http://goo.gl/ISzajI.  Among other things, they provide immediate access to emergency dispatchers and information about public safety threats.  *See, e.g.*, FCC, *Wireless Emergency Alerts*, *available at* http://goo.gl/ca7kfA.  Reduced use of cell phones would impair the effectiveness of these services.

Moreover, enforcement of the Ordinance would harm the public by stoking unfounded fear and generating needless stress and anxiety about a product that is part of consumers' everyday lives. Enforcement would also dilute the efficacy of warnings about genuine dangers to public safety.  *See* Lars Noah, *The Imperative to Warn:  Disentangling the "Right to Know" from the "Need to Know" About Consumer Product Hazards*, 11 Yale J. on Reg. 293, 383 (1994) ("Whatever their degree of sophistication, consumers can attend only to a limited number of information signals in a given period of time.").  As Congress and federal agencies have recognized, when consumers are deluged with warnings, they "tend more and more to disregard label warnings, thus inviting indifference to cautionary statements [regarding] substances presenting a real hazard of substantial injury or illness." Federal Hazardous Substances Labeling Act, H.R. Rep. No. 1861, at 6; *see also, e.g.*, FDA,

*Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*, 73 Fed. Reg. 49603, 49605–06 (Aug. 22, 2008) (over-warning may "overshadow more important warnings"); *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 796 (8th Cir. 2001) (explaining that "warnings about dangers with less basis in science or fewer hazards could take attention away from those that present confirmed, higher risks"); *Doe v. Miles Labs., Inc.*, 927 F.2d 187, 194 (4th Cir. 1991) ("If . . . companies were required to warn of every suspected risk that could *possibly* attend the use of a [product], the consuming public would be so barraged with warnings that it would undermine the effectiveness of these warnings."). Warnings are particularly harmful "when[, as here,] the primary purpose of such efforts is nothing more than fulfilling an amorphous 'right to know.'" Noah, *supra*, at 384.

Finally, just as the City can suffer no harm from the inability to enforce an unconstitutional law, the "public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional." *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding that the public has an interest in "prevention of enforcement of ordinances which may be unconstitutional").

## CONCLUSION

For the foregoing reasons, CTIA respectfully requests that this Court preliminarily enjoin all Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 9.96 before the Ordinance goes into effect on June 25, 2015, pending final judgment.

June 8, 2015

By:  /s/ Theodore B. Olson

Theodore B. Olson
Helgi C. Walker
Joshua S. Lipshutz
Joshua D. Dick
Michael R. Huston
Jacob T. Spencer

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Plaintiff
CTIA – The Wireless Association®*