1   ZACH COWAN, City Attorney        SBN 96372
    ZCowan@ci.berkeley.ca.us
2   BERKELEY CITY ATTORNEY'S OFFICE
    2180 Milvia Street, Fourth Floor
3   Berkeley, CA 94704
    TEL.:  (510) 981-6998
4   FAX.:  (510) 981-6960

5   LESTER LAWRENCE LESSIG III (Appearance Pro Hac Vice)
    Lessig@law.harvard.edu
6   1563 Massachusetts Avenue
    Cambridge, MA 02138
7
    ROBERT CHARLES POST        SBN 111917
8   Robert.post@yale.edu
    265 East Rock Road
9   New Haven, CT 06511

10  AMANDA SHANOR (Appearance Pro Hac Vice)
    Amanda.shanor@yale.edu
11  127 Wall Street
    New Haven, CT 06511
12
    Attorneys for Defendants
13  CITY OF BERKELEY and CHRISTINE DANIEL

14              UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17  CTIA – THE WIRELESS ASSOCIATION,          NO. C15-02529 EMC

18          Plaintiff,

19      vs.                                   DEFENDANTS' OPPOSITION TO
                                              PLAINTIFF'S MOTION FOR
20  CITY OF BERKELEY, CHRISTINE               PRELIMINARY INJUNCTION
    DANIEL, CITY MANAGER OF CITY OF
21  BERKELEY,                                 DATE:   August 20, 2015
                                              TIME:   1:30 p.m.
22          Defendants.                       CTRM:   5, 17th Flr., San Francisco

23

24

25

26

27

28

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 5

   I.   Plaintiff Has Not Demonstrated A Likelihood Of Success On The Merits ...................... 5

      A.  The Ordinance Raises No First Amendment Concern ................................................... 5

         1.  Compelled Commercial Disclosures are Reviewed Under *Zauderer* ................... 5

         2.  *Zauderer* is Not Limited to Cases in which the State's Interest is to Prevent Commercial Deception .................................................................................................. 8

         3.  The Ordinance is Constitutional Under *Zauderer* ................................................. 9

            (a)  Berkeley's Interest is Substantial and Reasonably Related to the Required Disclosure .............................................................................................................. 9

            (b)  The Disclosure Required by the Ordinance is Accurate and Factual ............. 13

            (c)  The Disclosures Mandated by the Ordinance are Neither Opinion Nor Controversial ..................................................................................................... 17

            (d)  The Disclosure Required by the Ordinance is Not Unduly Burdensome ....... 19

         4.  Plaintiff's Claim Also Fails Under *Central Hudson* ........................................... 19

      B.  The Ordinance is Not Preempted ............................................................................. 20

   II.  Plaintiff's Members Will Not Be Harmed If The Ordinance Is Enforced ....................... 23

   III. The Balance of Harm Militates Against Granting An Injunction ................................... 23

   IV. The Public Interest Is Not Advanced By Interfering With This Local Ordinance .......... 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................5

*American Meat Institute v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) (en banc) .............................................8, 9, 17, 20

*Board of Trustees of SUNY v. Fox*,
492 U.S. 469 (1989) .........................................................................................6, 20

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
331 F.3d 342 (2d Cir. 2003) ..................................................................................23

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
447 U.S. 557 (1980) ..................................................................... 6, 9, 17, 19-20

*Coyote Pub., Inc. v. Miller*,
598 F.3d 592 (9th Cir. 2010) ...................................................................................6

*CTIA-Wireless Ass'n v. City & Cty. of San Francisco*,
827 F. Supp. 2d 1054 (N.D. Cal. 2011), *aff'd in part and vacated in part on*
*other grounds*, 494 Fed.Appx. 752 (9th Cir. 2012)....................................4, 21, 22

*Disc. Tobacco City & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012)..................................................................................18

*Dwyer v. Cappell*,
762 F.3d 275 (3d Cir. 2014) ....................................................................................7

*Evergreen Ass'n, Inc. v. City of New York*,
740 F.3d 233 (2d Cir. 2014) ..................................................................................17

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007)................................................................................23

*Farina v. Nokia, Inc.*,
625 F.3d 97 (3rd Cir. 2010).........................................................................3, 21, 22

*Grocery Mfrs. Ass'n v. Sorrell*,
— F. Supp.3d —, 2015 WL 1931142 (D.Vt. April 27, 2015) ...............................17

*In Re Guidelines for Evaluating the Environmental Effects of Radiofrequency*
*Radiation*,
11 FCC Rcd. 15123 (1996) ....................................................................................14

**TABLE OF AUTHORITIES (CON'T.)**

**Page(s)**

*Hurley v. Irish-American GLB Group of Boston, Inc.*,
515 U.S. 557 (1995) ...........................................................................................7

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*,
512 U.S. 136 (1994) .........................................................................................19

*Kansas v. United States*,
16 F.3d 436 (D.C. Cir. 1994) ...........................................................................20

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) (per curiam) .........................................................5

*McDaniel v. Wells Fargo Invs., LLC*,
717 F.3d 668 (9th Cir. 2013) ...........................................................................22

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010) ...............................................................................5, 7, 8, 9

*Murray v. Motorola, Inc.*,
982 A.2d 764 (D.C. 2009) ................................................................................22

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009) ...........................................................................7, 8

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ...................................................................7, 8, 9, 17

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) ...........................................................................................6

*Pharm. Care Mgmt. Ass'n v. Rowe*,
429 F.3d 294 (1st Cir. 2005) (Torruella, J.) ...................................................8, 9

*In re Reassessment of FCC Radiofrequency Exposure Limits and Policies*,
28 FCC Rcd. 3498 (2013) ..................................................................................1

*Riley v. National Federation of the Blind*,
487 U.S. 781 (1988) ...........................................................................................7

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ........................................................................................6

*Sports Form, Inc. v. United Press Int'l., Inc.*,
686 F.2d 750 (9th Cir. 1982) .............................................................................5

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) ...........................................................................7

iii

## TABLE OF AUTHORITIES (CON'T.)

**Page(s)**

*Towery v. Brewer*,
    672 F.3d 650 (9th Cir. 2012) (per curiam) ............................................................5

*United States v. Schiff*,
    379 F.3d 621 (9th Cir. 2004) .........................................................................13

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ...................................................................................13

*Viacom Int'l, Inc. v. FCC*,
    828 F. Supp. 741 (N.D. Cal. 1993)..................................................................23

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) .........................................................................13

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .................................................................................6, 18

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................5, 23

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ....................................................................................7

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) .....................................................5, 6, 7, 8, 9, 13, 17, 18, 19

**Federal Statutes**

15 U.S.C.
    § 78*l* ..................................................................................................9
    § 1604 ..................................................................................................9

21 U.S.C.
    § 343 .................................................................................................3, 9

27 U.S.C.
    § 215 ....................................................................................................9

**Other Statutes**

Berkeley Municipal Code
    § 9.96.010(I) ......................................................................................10, 13
    § 9.96.030(A)-(B) ..................................................................................1, 14
    § 9.96.030(B) ..........................................................................................19

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

## <u>TABLE OF AUTHORITIES (CON'T.)</u>

**Page(s)**

**Regulations**

14 C.F.R. § 135.117 ...................................................................................................9

21 C.F.R. § 201.57(a)(4) .........................................................................................17

21 C.F.R. § 202 ........................................................................................................9

21 C.F.R. § 369.21 ..................................................................................................17

21 C.F.R. § 1030.10(c)(4)(iii)(a) ............................................................................17

21 C.F.R. § 1250.38(b) ...........................................................................................17

47 C.F.R. § 2.915(a) .................................................................................................4

47 C.F.R. § 2.919 ......................................................................................................4

47 C.F.R. § 2.1093(d) .............................................................................................10

47 C.F.R. § 2.1093(d)(2) ..........................................................................................4

47 C.F.R. §§ 2.1033(c)(3) .........................................................................................4

47 C.F.R. § 2.1093(d) .............................................................................................14

47 C.F.R. § 2.1093(d)(2) .........................................................................................10

**Other Authorities**

FCC Office of Eng'g and Tech. Lab. Div., *Mobile & Portable Devices RF
    Exposure Procedures and Equipment Authorization Policies,*
    FCC KDB No. 447498, General *RF Exposure Guidance*, § 4.2.2(4) .................1, 4, 10, 16, 19

*Implementing the Food Quality Protection
    Act*, EPA No. 735-R-99001 (1999) .......................................................................12

Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 910 (2015)................7, 18

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

CTIA has launched a war based on a mistake. It labors hard to paint Berkeley's "right to know" Ordinance, Berkeley Municipal Code § 9.96.030(A)-(B), Compl. ¶ 4 & Ex. A, as an attack on settled science. It objects with vigor to being "compelled," as it puts it, to spread a view about cell phone safety that it claims is "scientifically baseless and alarmist." Pl.'s Mot. 1. And it links Berkeley's motives, as it describes them, to the "unsupported proposition that cell phones are unsafe." Compl. ¶ 90.[1]

But Berkeley has no purpose to engage a scientific debate through political means. Its Ordinance simply reinforces a message that the Federal Communications Commission ("FCC") itself *already requires* manufacturers to disseminate.

The FCC has since 2001 encouraged—and now requires—manufacturers to "include information in device manuals to make consumers aware of **the need to maintain the body-worn distance**—by using appropriate accessories **if they want to ensure that their actual exposure does not exceed the [Specific Absorption Rate ("SAR")] measurement obtained during testing**." *In re Reassessment of FCC Radiofrequency Exposure Limits and Policies*, 28 FCC Rcd. 3498, 3587 (¶ 248) (2013) ("*Reassessment*") (emphasis added); FCC Office of Eng'g and Tech. Lab. Div., *Mobile & Portable Devices RF Exposure Procedures and Equipment Authorization Policies*, FCC KDB No. 447498, General RF Exposure Guidance, § 4.2.2(4) (2014) (hereinafter "*FCC RF Exposure Guidance*") (former "encourage[ment]" now a requirement), available at http://bit.ly/FCC-RF-Guidance. And the FCC explains the reason why:

---

[1] Plaintiff grounds its characterization of Berkeley's motives in part on testimony for the City Attorney introducing the Ordinance. As its complaint describes, that testimony "referred to a letter from 195 scientists to the United Nations recommending further study of the safety of cell phones." Compl. ¶ 90. Yet the very next sentence of that testimony shows just how mistaken this characterization is. As that witness for the City continued, "It is important to recognize that however significant that debate is, the *ordinance that is before you tonight is not related to that debate*." Video of Regular City Council Meeting, May 12, 2015, available at http://bit.ly/BerkeleyCellPhoneHearing.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

1   when "a consumer disregards this information on separation distance and maintains a device

2   closer to the body than the distance at which it is tested . . . **exposure in excess of [FCC] limits**

3   **might result.**" *Reassessment* ¶ 248.

4        The Ordinance is a response to data demonstrating that Berkeley residents are unaware of

5   the information that the FCC desires them to have. Berkeley residents do not understand that cell

6   phones are tested at a "body-worn distance" and are not aware that carrying a phone against

7   one's body "might result" in "exposure in excess of [FCC] limits." Declaration of Tom Jensen

8   ("Jensen Decl."), ¶ 6, Exh. A, Public Policy Polling, *Berkeley Results*, at 1 (March 6-8, 2015

9   survey of Berkeley voters) (hereinafter "*Berkeley Survey*"). The Ordinance also responds to data

10  that a significant proportion of Berkeley residents want this information (82%) and said that it

11  would affect their behavior (80%). *Id.* The Ordinance thus answers a desire of Berkeley residents

12  to have the information about RF exposure limits that the FCC wants them to have.

13       Yet on the basis of a single paragraph in a single FCC Notice of Inquiry, *Reassessment*

14  ¶ 251, cited by Plaintiff more than a dozen times, CTIA insists that no government can have any

15  legitimate purpose in making consumers aware of long established RF guidelines—the very

16  instructions and mandates that CTIA's members must meet and must disclose—because, in

17  CTIA's view, these precautions are too cautious. *Regardless* of how cell phones are used, in

18  CTIA's view, cell phones must be deemed safe. And any effort to draw the public's attention to

19  the actual manner in which cell phones were tested to be safe in effect, Plaintiff maintains,

20  slanders CTIA's members.

21       But a single paragraph in a single FCC *Notice of Inquiry* cannot establish such an

22  extraordinary proposition. Neither was it meant to. The whole purpose of the FCC *Notice* is to

23  initiate an inquiry into whether the FCC should alter its limits for RF radiation, by either

24  strengthening or weakening them. The FCC does not begin an inquiry by announcing its results.

25       FCC mandates about cell phone RF limits and the disclosure of information about those

26  limits are the law. So long as that is true, nothing in the First Amendment blocks Berkeley from

27  requiring retailers to inform customers about those mandates as well. The Ordinance requires the

28  disclosure only of uncontested statements of fact that refer to existing federal requirements.

1  CTIA may wish it were allowed to keep this truthful information from consumers. But its wish is

2  not the law. This Court should deny Plaintiff's motion for a preliminary injunction.

3  <center>**BACKGROUND**</center>

4      On every package of food sold in America, there is a nutrition label. That label informs

5  consumers about the recommended daily allowance for various nutrients in food, and the amount

6  of those nutrients contained in a single serving of the relevant food.

7      One of the nutrients tracked by food labels is "sodium," which in most foods comes in

8  the form of salt. No one would claim that "salt is unsafe." Yet among scientists and nutritionists,

9  there is a fierce debate about how much salt consumption is healthy. That debate notwithstand-

10  ing, the Nutrition Labeling and Education Act, 21 U.S.C.  343 (1990), requires that the amount

11  of salt in a serving be reported, as well as the percentage that amount is of the recommended

12  daily intake of salt.

13      The purpose of this regulation is to give consumers the information they need to make a

14  choice. By requiring that food processors report the amount of salt, the label does not condemn

15  salt as unhealthy. The only objective of nutrition labeling requirements is to provide information

16  that consumers need in order to choose how much of a particular product to consume.

17      In every relevant respect, the Ordinance at issue in this case is the equivalent of

18  Congress's Nutrition Labeling and Education Act. The Ordinance does not imply that cell

19  phones are unsafe, any more than congressionally mandated nutritional labels imply that salt is

20  unsafe. The Ordinance responds to a demonstrable lack of information about how cell phones

21  may be used in a manner consistent with how they have been tested to comply with federally

22  established RF exposure limits. The Ordinance does not challenge those limits.

23      No one denies that at some level, RF exposure is not safe. FCC, Office of Eng'g and

24  Tech., *Questions and Answers about Biological Effects and Potential Hazards of*

25  *Radiofrequency Electromagnetic Fields*, OET Bulletin No. 56, at 6 (4th ed. 1999) ("It has been

26  known for many years that exposure to high levels of RF radiation can be harmful. . . .")

27  (thermal effects); *Farina v. Nokia, Inc.*, 625 F.3d 97, 105 (3rd Cir. 2010) ("The science is clear

28

<center>3</center>

1   that at high levels RF radiation can cause adverse 'thermal' effects resulting from the heating of

2   human tissue."). Plaintiff itself concedes as much. Compl. ¶¶ 47-48.[2]

3       The FCC has established standards to ensure that cell phones are manufactured to

4   comply with its judgment about safe levels of RF radiation. 47 C.F.R. 2.1093(d)(2); Pl.'s Mot.

5   3; Compl. ¶¶ 43, 46. It requires that every cell phone sold in America be shown to comply with

6   these standards. *Id*. It specifies procedures by which cell phones may be tested to ensure

7   compliance with these standards. Compl. ¶ 61. And it mandates that manufacturers include

8   information in their manuals or handbooks about the way the phones were tested to ensure

9   compliance with these standards. Compl. ¶¶ 73-75; 47 C.F.R. §§ 2.1033(c)(3), 2.915(a), 2.919;

10  *FCC RF Exposure Guidance*, § 4.2.2(4).

11      The aim of Berkeley's regulation is simply to ensure that consumers are aware of FCC

12  instructions and mandates. Berkeley does not challenge the science of cell phone radiation. Its

13  aim is not to induce or to force people to reduce their cell phone usage.[3] The Ordinance merely

14  gives residents information about how their cell phones might be used in a manner consistent

15  with existing RF standards. That aim raises no First Amendment concerns and is not preempted

16  by federal law.

17  _____

18  [2] Notwithstanding this fact, CTIA, citing a decade old document from a technical standards
    organization, tries to create the impression that beyond thermal effects at "very high levels" of

19  energy, it is settled science that only ionizing radiation can be harmful to humans. Compl. ¶ 28.
    ***Nothing in this case turns on this issue***, but CTIA's representations do not accord with the

20  facts. *See* Declaration of Anthony Miller, ¶¶ 11-19; Stanton Glantz, *Primer of Biostatics* 247
    (7th ed. 2011) ("Taking all the information we have discussed on cell phones and sperm allows

21  us to confidently conclude that exposure to cell phones adversely affects sperm."); Declaration
    of Om Gandhi, ¶¶ 10-16 (describing the history of the IEEE standard); *see also* Letter from

22  Norbert Hankin, U.S. Environmental Protection Agency, to Janet Newton President, The EMR
    Network (July 16, 2002), available at http://bit.ly/EPA-HankinLetter ("[t]he FCC's exposure

23  guideline is considered protective of effects arising from a thermal mechanism but not from all
    possible mechanisms. Therefore, the generalization that the guidelines protect human beings

24  from harm by any or all mechanisms is not justified.").

25  [3] Berkeley's Ordinance is thus fundamentally different from the San Francisco ordinance
    invalidated by the Ninth Circuit in 2012. *CTIA-Wireless Ass'n v. City & Cty. of San Francisco*,

26  494 Fed.Appx. 752 (9th Cir. 2012). That ordinance was expressly predicated on San Francisco's

27  views about the dangers from RF radiation *even when a phone was used according to testing
    guidelines*.

28

**ARGUMENT**

Plaintiff relies on the Ninth Circuit's "sliding scale" standard to justify the "extraordinary remedy," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), that it asks this Court to grant. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this standard, "elements of the preliminary injunction test [must] be balanced, so that a stronger showing of one element may offset a weaker showing of another," *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (per curiam), at least so long as the "balance of hardships … **tips sharply** towards the plaintiff." *Cottrell*, 632 F.3d at 1135 (emphasis added).

Even under this Circuit's weaker version of the preliminary injunction test, Plaintiff does not prevail. It cannot make the "certain threshold showing . . . on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). It fails to establish any "serious questions going to the merits," which itself renders unnecessary determining whether there is a potential injury or of balance the hardships. *Sports Form, Inc. v. United Press Int'l., Inc*., 686 F.2d 750, 753 (9th Cir. 1982). It fails utterly to demonstrate how the Ordinance's requirement to state more clearly existing federal law (which already is communicated by its members to consumers) could possibly constitute "irreparable harm." And it thus fails to show any "balance of hardships that tip" toward the Plaintiff, or how such an injunction could be in the public interest. *Cottrell*, 632 F.3d at 1135.

**I.     Plaintiff Has Not Demonstrated A Likelihood Of Success On The Merits**

**A.     The Ordinance Raises No First Amendment Concern**

Plaintiff's claim that the disclosure requirement in Berkeley's Ordinance violates the First Amendment is without merit. Plaintiff's contention is based on a fundamental misstatement of First Amendment law and a mischaracterization of the purpose of the Ordinance.

**1.     Compelled Commercial Disclosures are Reviewed Under *Zauderer***

The Ordinance compels only commercial speech, a point Plaintiff does not dispute. In the context of commercial speech, mandated factual disclosures are constitutional as long as they are "reasonably related" to an identified governmental interest, and are not so "[u]njustified or unduly burdensome" as to "chill[] protected speech." *Milavetz, Gallop & Milavetz, P.A. v.*

5

1   *United States*, 559 U.S. 229, 250 (2010) (quoting *Zauderer v. Office of Disciplinary Counsel of*

2   *Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)).

3          This relatively relaxed standard of review reflects the "material differences between

4   disclosure requirements and outright prohibitions on speech," *Zauderer*, 471 U.S. at 650, as well

5   as the "limited measure of protection" afforded commercial speech, "commensurate with its

6   subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*,

7   436 U.S. 447, 456 (1978); *see also Board of Trustees of SUNY v. Fox*, 492 U.S. 469, 478 (1989);

8   *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 598 (9th Cir. 2010). Unlike restrictions on commercial

9   speech, mandated disclosure requirements do not prevent sellers "from conveying information to

10  the public"; they simply require sellers to provide "more information than they might otherwise

11  be inclined to present." *Zauderer*, 471 U.S. at 650.

12         By contrast, *restrictions* on commercial speech are subject to the intermediate review of

13  *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557,

14  566 (1980). *See also Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2264 (2011) (applying

15  heightened scrutiny to Vermont law prohibiting dissemination of commercial information);

16  *Zauderer*, 471 U.S. 626, 647 (applying "reasonably related" standard to mandated disclosure but

17  *Central Hudson* test to restrictions on advertising). Plaintiff's brief consistently confuses the

18  *Central Hudson* standard applicable to restrictions on commercial speech with the *Zauderer*

19  standard applicable to compelled disclosures of commercial speech.

20         The difference between these two standards reflects the fact that the "First Amendment's

21  concern for commercial speech is based on [its] informational function." *Central Hudson*, 447

22  U.S. at 563.

23         So long as we preserve a predominantly free enterprise economy, the allocation
          of our resources in large measure will be made through numerous private
24        economic decisions. It is a matter of public interest that those decisions, in the
          aggregate, be intelligent and well informed. To this end, the free flow of
25        commercial information is indispensable. And if it is indispensable to the proper
          allocation of resources in a free enterprise system, it is also indispensable to the
26        formation of intelligent opinions as to how that system ought to be regulated or
          altered.
27

28  *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976)

(citations omitted). Restrictions on commercial speech interrupt the flow of accurate information to the public and are therefore subject to intermediate scrutiny. *See*, *e.g.*, *Milavetz*, 559 U.S. at 249. Compelled commercial speech that is factual and accurate, by contrast, amplifies the flow of information to the public. It is therefore subject to more relaxed review under *Zauderer*, a standard that some courts have described as akin to rational basis review. *See*, *e.g.*, *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 132 (2d Cir. 2009); *cf.* Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 869-80 (2015).

The Supreme Court has stressed that a commercial actor's "constitutionally protected interest in *not* providing any particular factual information . . . is minimal." *Zauderer*, 471 U.S. at 651. "[M]andated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001) (footnote omitted); *see also Dwyer v. Cappell*, 762 F.3d 275, 282 (3d Cir. 2014) ("The takeaway: there exist different frameworks for analyzing restrictions on speech and disclosure requirements.").

Plaintiff does not suggest that the Ordinance limits what Plaintiff's members can say or what information they can distribute about RF exposure, the FCC's regulations, the safety of cell phones, or anything else. The Ordinance does not limit speech. CTIA's strained assertion that heightened scrutiny somehow applies is without merit.[4] Instead, *Zauderer* is the proper standard.

---

[4] Plaintiff's novel contention that commercial speech should enjoy constitutional protection on par with core political speech, Pl.'s Mot. 9 n.1, is without any support in the case law. And CTIA's repeated citations to plainly inapplicable political speech cases, such as *Wooley v. Maynard*, 430 U.S. 705 (1977), *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988), *Hurley v. Irish-American GLB Group of Boston, Inc*., 515 U.S. 557 (1995), and *Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011), are at best misleading. Pl.'s Mot. 7-12. The City of Berkeley has not attempted to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," but only "what shall be orthodox in commercial advertising." *Zauderer*, 471 U.S. at 651 (quotation omitted).

Plaintiff's assertion that the disclosure is subject to heightened scrutiny because it is

1

2.       *Zauderer* is Not Limited to Cases in which the State's Interest is to Prevent Commercial Deception

2

Plaintiff's contention that *Zauderer* is limited to cases in which the state's interest is in

3

preventing commercial deception is equally unavailing. Circuit case law makes clear that factual

4

commercial disclosures are reviewed under *Zauderer* regardless of whether the government's

5

interest is in preventing commercial deception. *See, e.g.*, *American Meat Institute v. U.S. Dep't*

6

*of Agric.*, 760 F.3d 18, 21-22 (D.C. Cir. 2014) (en banc); *N.Y. State Rest. Ass'n*, 556 F.3d at 133

7

(2d Cir. 2009); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 (1st Cir. 2005) (Torruella,

8

J.); *id.* at 316 (Boudin, C.J. & Dyk, J.); *id.* at 297-98 (per curiam) (explaining that the opinion of

9

Judges Boudin and Dyk is controlling on the First Amendment issue); *Nat'l Elec. Mfrs. Ass'n*,

10

272 F.3d at 113-15 (2d Cir. 2001).

11

As the District of Columbia Circuit recently concluded in an *en banc* decision, "[t]he

12

language with which *Zauderer* justified its approach . . . sweeps far more broadly than the

13

interest in remedying deception." *American Meat Institute*, 760 F.3d at 22. *Zauderer*'s holding

14

that a commercial actor's interest in "*not* providing any particular factual information . . . is

15

minimal," 471 U.S. at 651, is "inherently applicable beyond the problem of deception, as other

16

circuits have found." *American Meat Institute*, 760 F.3d at 22. This is because "[p]rotection of

17

the robust and free flow of accurate information is the principal First Amendment justification

18

for protecting commercial speech, and requiring disclosure of truthful information promotes that

19

goal." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114.

20

Plaintiff's misreading of *Zauderer* would put at risk the routinely mandated disclosure of

21

commercially significant information justified by substantial purposes other than preventing

22

commercial deception. "There are literally thousands of similar regulations on the books—such

23

as product labeling laws, environmental spill reporting, accident reports by common carriers,

24

SEC reporting as to corporate losses and (most obviously) the requirement to file tax returns to

25

26

'content-' or 'viewpoint-based' is likewise soundly foreclosed. The disclosures in *Zauderer* and

27

*Milavetz* were content and viewpoint discriminatory in the sense Plaintiff uses the terms, but the Supreme Court did not hesitate to apply relaxed review. *Milavetz*, 559 U.S. 229; *Zauderer*, 471 U.S. 626.

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

government units who use the information to the obvious disadvantage of the taxpayer." *Pharm. Care Mgmt. Ass'n*, 429 F.3d at 316. Plaintiff's contention would subject to intermediate review innumerable irreproachable laws that serve interests other than preventing consumer deception— laws like those that require nutritional labels, 21 U.S.C. § 343; disclosure of information related to securities, 15 U.S.C. § 78*l*; Truth in Lending Act disclosures, 15 U.S.C. § 1604; disclosures in prescription drug advertisements, 21 C.F.R. § 202; warnings for pregnant women on alcoholic beverages, 27 U.S.C. § 215; and airplane safety information, 14 C.F.R. § 135.117.

"The idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken." *Pharm. Care Mgmt. Ass'n*, 429 F.3d at 316. *See also Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 116. Indeed, it verges on the absurd. It is starkly inconsistent with modern efforts to regulate economic transactions through transparency and the reduction of information costs, rather than through the heavy hand of command and control regulation.

### 3.   The Ordinance is Constitutional Under *Zauderer*

(a)   Berkeley's Interest is Substantial and Reasonably Related to the Required Disclosure

A mandated commercial disclosure is consistent with the First Amendment if it is "'reasonably related'" to an identified state interest, and not so "[u]njustified or unduly burdensome" as to "chill[] protected speech." *Milavetz*, 559 U.S. at 250 (quoting *Zauderer*, 471 U.S. at 651).

The City of Berkeley's interest is plainly substantial,[5] and the disclosure is not unduly burdensome. Plaintiff insists that Berkeley's purpose is to challenge the safety of cell phones. But this misrepresents Berkeley's purpose. The Ordinance states explicitly that its purpose is to assure that "consumers have the information they need to make their own choices about the

---

[5] *Zauderer* does not expressly require the state to have a "substantial" purpose before compelling commercial speech, a requirement that is articulated in *Central Hudson*, 447 U.S. at 565, and applicable to restrictions on commercial speech. Some courts have, nonetheless, questioned whether they might require such a showing. *See American Meat Institute*, 760 F.3d at 23 ("Because the interest motivating [the challenged regulation] is a substantial one, we need not decide whether a lesser interest could suffice under *Zauderer.*").

extent and nature of their exposure to radio frequency radiation." Berkeley Municipal Code

§ 9.96.010(I).

Plaintiff belittles this purpose as pandering to the "idle curiosity" of consumers. Pl.'s

Mot. 11-12. Plaintiff is flatly mistaken. It is uncontested that the FCC establishes RF exposure

limits. 47 C.F.R. § 2.1093(d)(2); Pl.'s Mot. 3; Compl. ¶¶ 43, 46. It is equally clear that those

limits are required for safety reasons. The FCC's regulation states that "[t]he limits to be used

for evaluation are based generally on criteria published by the American National Standards

Institute (ANSI) for localized specific absorption rate ('SAR') in Section 4.2 of "IEEE Standard

for **Safety Levels** with Respect to Human Exposure to Radio Frequency Electromagnetic Fields,

3 kHz to 300 GHz." 47 C.F.R. 2.1093(d) (emphasis added). The FCC is explicit that "SAR

values have been related to threshold levels for potential biological hazards." *Id.* Compliance

with FCC RF exposure limits is not a matter of "idle curiosity."

It likewise cannot be questioned that the FCC requires manufacturers, including CTIA's

own members, to include specific information in their user manuals detailing how devices must

be used to remain compliant with the federal RF exposure limits. As the FCC describes:

> Specific information **must be included in the operating manuals** to enable users to select body-worn accessories that meet the minimum *test separation distance* requirements. **Users must be fully informed of the operating requirements and restrictions**, to the extent that the typical user can easily understand the information, **to acquire the required body-worn accessories to maintain compliance**. Instructions on how to place and orient a device in body-worn accessories, in accordance with the test results, should also be included in the user instructions. All supported body-worn accessory operating configurations must be clearly disclosed to users through conspicuous instructions in the user guide and user manual to ensure unsupported operations are avoided. All body-worn accessories containing metallic components must be tested for compliance and clearly identified in the operating manual. **The instruction must inform users** to avoid using other body-worn accessories containing metallic components **to ensure RF exposure compliance**.

*FCC RF Exposure Guidance* § 4.2.2(4) (emphasis added); *see also id.* at § 1 ("The guidance in

this document . . . must be applied for equipment to qualify for . . . approval.").[6]

---

[6] The earlier FCC OET document guiding manufacturers in RF compliance had stated "*[t]his supplement is not intended, however, to establish mandatory procedures, and other methods and procedures may be acceptable if based on sound engineering practice.*" OET Bulletin 65

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

1     If the federal government has a legitimate interest in setting RF exposure limits and

2 requiring that manufacturers inform consumers about how to use their cell phones consistent

3 with those limits, Berkeley certainly has a substantial interest in ensuring that its residents know

4 about federally mandated RF limits and instructions about how to remain within those limits.

5     This is especially true when the City knows that its residents don't understand these

6 facts. Berkeley had evidence that its residents (70%) were unaware of test separation distances,

7 and that they (82%) indicated a desire for this information. Jensen Decl., ¶ 6, Exh. A, *Berkeley*

8 *Survey*, at 1. The vast majority (85%) said they had not seen or read any recommendations about

9 how to use a phone to avoid excessive exposure. *Id.* Berkeley acted to give its citizens the

10 information they wanted to make choices in a manner that would comply with applicable federal

11 guidelines.

12     Plaintiff challenges this substantial interest on the basis of a single paragraph in a single

13 FCC *Notice of Inquiry*, which calls for the reassessment of the FCC's RF exposure regulations

14 and states that they "were set with a large safety factor." *Reassessment* ¶ 251. Several points

15 should be made about Plaintiff's reliance on this statement.

16     First, and most importantly, the paragraph in no way displaces or alters *existing* FCC

17 instructions and mandates. The statement was made in the context of the FCC's intention "to

18 open discussion on both the currency of our RF exposure limits and possible policy approaches

19 regarding RF exposure." *Id.* at ¶ 1. "In this *Inquiry*, we seek comment on whether our limits

20 should be more restrictive, less restrictive, or remain the same." *Id.* at ¶ 207. The *Inquiry*

21 specifically states that the FCC continues "to have confidence in our exposure limits." *Id.* at

22 ¶ 216. So long as current FCC mandates and instructions on cell phone use remain in effect,

23 Berkeley has a substantial interest in ensuring that consumers are aware of them.

24

25

26

27 Supplement C, at 3 (2001), but that Bulletin has been superseded, and its replacement has no
similar qualification. *See Reassessment* ¶ 37. Indeed, § 1 explicitly states it is now mandatory.

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

Second, the *Notice of Inquiry* explicitly states that the current FCC limit on RF exposure

is a "**bright-line rule.**" . . . The limit is readily justified when it is based on known adverse health effects having a well-defined threshold, and the limit **includes prudent additional safety factors** (*e.g.*, setting the limit significantly below the threshold where known adverse health effects may begin to occur.). . . This "safety" factor can well accommodate a variety of variable such as different physical characteristics and individual sensitivities . . . .

*Id.* at ¶ 236 (emphasis added). Berkeley's Ordinance seeks to inform residents about the nature of the FCC's "bright line" and information about how to stay within it.

Yet Plaintiff essentially argues that because the RF "safety factor" is so high, no government can have any legitimate interest in making the public aware of this "bright line" standard. That because the FCC's guideline incorporates a "50-fold" safety factor, there could be no constitutionally sufficient interest in requiring anyone to inform the public about the FCC's guideline.

This argument, if accepted, would be a radical change in existing law. Safety guidelines include high "safety factors" all the time. *See*, *e.g.*, EPA, *Implementing the Food Quality Protection Act*, *EPA No. 735-R-99001*, at 2 (1999) (describing adding a "10-fold" safety factor for children to "the traditional 100-fold safety factor"). If courts must use the First Amendment to evaluate mandated disclosures about "bright line" safety guidelines, at least whenever there is a significant "safety factor" beyond proven risks, there would be no end to litigation undoing consumer safety regulations. Plaintiff seeks a ruling that would effect a profound change in the capacity of government to inform consumers about safety risks. Such a ruling would draw the judiciary into an endless line-drawing exercise to evaluate which warnings provide notice about sufficiently risky threats and which do not.[7] In our system, this is the responsibility of agencies;

---

[7] Indeed, Plaintiff's argument would also invalidate warning requirements for "controlled" environments. As Plaintiff describes, the FCC "sets a higher [2x] SAR limit [in 'controlled' environments]—thereby approving devices that emit more RF energy—but requires manufacturers to either place 'visual advisories' (such as labels) on portable devices or offer 'specific training.'" Pl.'s Mot. 5. But if the "50-fold" safety factor built into uncontrolled SAR exposure limits renders disclosure regulations unconstitutional, why would a "25-fold" safety factor fare any better?

1    the work of those agencies can be challenged under the Administrative Procedure Act under

2    appropriate standards of deference. Plaintiff seeks now to re-litigate these questions as a matter

3    of First Amendment law. Constitutional law is ill suited to such a task.

4         Third, the FCC has itself now begun reconsideration of what its RF exposure limits

5    should be—specifically, "on whether [FCC] limits should be more restrictive, less restrictive, or

6    remain the same." *Reassessment* ¶ 207. In essence, Plaintiff seeks to short circuit this

7    reconsideration by asking this Court to hold as a constitutional matter that it is irrational to

8    require the disclosure of current RF exposure limits. If this Court holds that Berkeley is

9    constitutionally precluded from mandating disclosure about current FCC limits, it must then

10   follow that the FCC itself cannot require manufacturers to disclose these limits either. Yet

11   mandatory disclosure is an integral aspect of the FCC's regulatory scheme. CTIA thus asks this

12   Court to cripple in advance the reconsideration already initiated by the FCC. The Court should

13   not allow its jurisdiction to be abused in this way.

14        If CTIA disagrees with existing FCC disclosure requirements, it ought to sue the FCC.

15   So long as the safety standards issued by the FCC remain valid, the City of Berkeley has a

16   substantial interest in assuring that its residents know about the standards, so they can "make

17   their own choices about the extent and nature of their exposure to radio frequency radiation."

18   Berkeley Municipal Code § 9.96.010(I).

19        (b)    The Disclosure Required by the Ordinance is Accurate and Factual

20        The *Zauderer* "reasonably related" test applies to the mandated disclosure of commercial

21   speech that is factual in nature. *See, e.g.*, *United States v. Schiff*, 379 F.3d 621, 631 (9th Cir.

22   2004) ("[M]andated disclosure of factual, commercial information does not offend the First

23   Amendment."). It does not apply to the compelled publication of opinion. *See United States v.

24   United Foods*, *Inc.*, 533 U.S. 405, 411 (2001) (invalidating mandated subsidy funding compelled

25   opinion about "whether a branded mushroom is better than just any mushroom"); *Video

26   Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 953 (9th Cir. 2009). CTIA complains

27   that Berkeley is conscripting it "into disseminating [the City's] opinions." Compl. 1. This is

28   flatly untrue.

The disclosure mandated by the City of Berkeley is factual and accurate. The Ordinance requires simply that cell phone retailers provide each customer who buys or leases a cell phone a notice containing the following language, or to post the following language at the point of sale:

> The City of Berkeley requires that you be provided the following notice:

> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. This potential risk is greater for children. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Municipal Code § 9.96.030(A)-(B).

Each sentence in this disclosure is factual, accurate, and objectively verifiable, as is the disclosure as a whole.

> **[1]** **"To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines."**

There is no dispute that the FCC has established RF exposure limits. There is no dispute that all cell phones marketed, distributed, or sold in the United States must comply with these limits. There is no dispute that the federal government sets these limits in the interests of public health and safety. 47 C.F.R. § 2.1093(d) ("SAR values have been related to threshold levels for potential biological hazards."). When it adopted the current RF limits, the FCC explicitly did so "[t]o protect public health with respect to RF radiation from FCC-regulated transmitters." *In Re Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15184 (¶ 169) (1996); *id.* at 15124 (¶ 2) ("[W]e believe that these guidelines represent a consensus view of the federal agencies responsible for matters relating to the public safety and health."). These facts are acknowledged by the Plaintiff itself. Pl.'s Mot. 3 ("The FCC has established comprehensive, nationwide standards to protect against any adverse health effects from cell phones' emission of RF energy." (citing Compl. ¶¶ 32-43)).

>       **[2]**      **"If you carry or use your phone in a pants or shirt pocket**
>                **or tucked into a bra when the phone is ON and connected**
>                **to a wireless network, you may exceed the federal**
>                **guidelines for exposure to RF radiation."**

There is no dispute that the level of RF exposure depends in part on how a cell phone is used. There is no dispute that holding a cell phone against one's body risks RF exposure beyond the FCC's limits. Plaintiff acknowledges as much in its complaint: "'exposure in excess of [FCC] limits might result,' if a cell phone 'transmitting continuously and at maximum power' is carried against the body." Compl. ¶ 111 (quoting *Reassessment* ¶ 248). Cell phone manufacturers expressly indicate that device-to-body exposure can exceed federal SAR limits. For example, as one Apple iPhone manual states:

> iPhone's SAR measurement may exceed the FCC exposure guidelines for body-worn operation if positioned less than 15 mm (5/8 inch) from the body (e.g. when carrying iPhone in your pocket).[8]

The manual provided by the LG Shine states:

> To comply with FCC RF exposure requirements, a minimum separation distance of 0.6 inches (1.5 cm) must be maintained between the user's body and the back of the phone.[9]

Plaintiff responds to these facts by arguing that cell phones remain safe even if RF exposure exceeds SAR limits. But nothing in the Ordinance contradicts that proposition. The Ordinance states only what is uncontested: that device-on-body exposure "may exceed the federal guidelines for exposure to RF radiation."

>       **[3]**      **"This potential risk is greater for children."**

The words "this potential risk" refer to the risk described in the preceding sentence, that device-on-body exposure "may exceed federal guidelines." This risk is "greater for children" for two reasons—one grounded in the observed behavior of children, and the other grounded in the physiology of children.

---

[8] *See* iPhone 3G manual, at 7, available at http://manuals.info.apple.com/en_US/iPhone_3G_Important_Product_Information_Guide.pdf.

[9] See *LG Electronics 300G Cell Phone User Manual*, at 9, available at http://cellphone.manualsonline.com/manuals/mfg/lg/lg300g.html?p=9.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

As Sandra Cortesi declares, children are more likely to keep a phone against their body, including more likely to sleep with cell phones than adults. Declaration of Sandra Cortesi ("Cortesi Decl.") ¶¶ 4-8. Children use phones to text more than adults.  *Id.*, ¶ 7. As the Pew Study cited by Cortesi finds, texting behavior is associated with keeping a phone either in bed, or next to a bed. And though Cortesi confirms this fact, it doesn't take an expert to recognize that children are also less likely to read any manufacturer warnings about RF exposure limits than adults. *Id.,* ¶ 8. Thus, because children are less likely to be aware of warnings as well as less likely to comply with warnings, it is factually correct to state that children are at a greater risk of using their phones in a way that "may exceed federal guidelines."

Berkeley is also justified in taking account of research that demonstrates that children absorb more RF radiation than adults, meaning that whatever risk device-on-body exposure might create, it is greater with children than with adults. As Professor Om Gandhi declares, based on his own research, confirmed by others, "for 5- and 10-year old children, using only head size differences compared to an adult, the children's SAR was 153% higher than adults." Declaration of Om Gandhi ("Ghandi Decl.") ¶ 20.

Plaintiff objects to this sentence in the Ordinance, citing numerous examples of the FCC declaring that cell phones are safe for children as well as adults. Compl. ¶¶ 3, 56, 113. But once again, the Ordinance does not state to the contrary. It states only that there is an increased risk that children will be exposed to RF radiation at levels that "exceed federal guidelines." Plaintiff can point to no research to the contrary.

> ### *[4]    "Refer to the instructions in your phone or user manual*
> ### *for information about how to use your phone safely."*

It is a fact that the FCC mandates that cell phone "[u]sers must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-worn accessories to maintain [RF exposure] compliance." *FCC RF Exposure Guidance* § 4.2.2(4). The Ordinance directs consumers to these same federally required instructions, which are *written by CTIA's members themselves*. The final

1   sentence of the Ordinance is thus a hortatory disclosure that directs consumers to accurate

2   relevant information.

3        Its hortatory quality is analogous to countless disclosures required by the federal

4   government, *see*, *e.g.*, 21 C.F.R. § 1250.38(b) (mandating signs "directing food-handling

5   employees to wash their hands after each use of toilet facilities"); 21 C.F.R.

6   § 1030.10(c)(4)(iii)(a) ("Do not attempt to operate this [microwave] oven with the door open

7   since open-door operation can result in harmful exposure to microwave energy."), and

8   disclosures directing individuals to additional resources and information, *see*, *e.g.*, 21 C.F.R.

9   § 369.21 ("Keep out of reach of children. In case of overdose, get medical help or contact a

10   Poison Control Center right away."); 21 C.F.R. § 201.57(a)(4) ("See full prescribing information

11   for complete boxed warning.").

12          (c)     The Disclosures Mandated by the Ordinance are Neither Opinion

13                  Nor Controversial

14        Each statement in the Ordinance is factual, accurate, and objectively verifiable. Yet some

15   courts have concluded that compelled factual commercial disclosures under *Zauderer* must also

16   be "uncontroversial." *See American Meat Institute*, 760 F.3d at 21; *Evergreen Ass'n*, *Inc. v. City

17   of New York*, 740 F.3d 233, 245 n.6 (2d Cir. 2014); *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 113-14.

18   CTIA has chosen to argue that the Ordinance is "controversial" because cell phones are safe

19   regardless of FCC mandated limits and instructions. This argument implies that mandated FCC

20   disclosures are also controversial and so unconstitutional.

21        But *Zauderer*'s "reasonably related" test does not cease to apply because a commercial

22   entity objects to its own regulation and in this way seeks to make it "controversial." Commercial

23   speech does not receive greater constitutional protection if it "links a product to a current public

24   debate" because "many, if not most, products may be tied to public concerns with the

25   environment, energy, economic policy, or individual health and safety." *Central Hudson*, 447

26   U.S. at 562-63 n.5; *see also Grocery Mfrs. Ass'n v. Sorrell*, — F. Supp.3d —, 2015 WL

27   1931142, at *26 (D.Vt. April 27, 2015).

28

1    Instead, "whether a disclosure is scrutinized under *Zauderer* turns on whether the

2    disclosure conveys factual information or an opinion, not on whether the disclosure emotionally

3    affects its audience or incites controversy." *Disc. Tobacco City & Lottery*, *Inc. v. United States*,

4    674 F.3d 509, 569 (6th Cir. 2012). For, "[f]acts can disconcert, displease, provoke an emotional

5    response, spark controversy, and even overwhelm reason, but that does not magically turn such

6    facts into opinions." *Id.* Under *Zauderer*, mandated disclosures are "uncontroversial" if they are

7    uncontroversially true. *See* Robert Post, *Compelled Commercial Speech*, 117 W. VA. L. REV.

8    867, 910 (2015).

9    Finally, even though each sentence of the Ordinance is uncontroversially true, Plaintiff

10   nevertheless suggests that the disclosure, taken as a whole, somehow conveys the impression

11   that cell phones are unsafe. But this is a willful misreading of what the Ordinance says. Just as

12   requiring manufacturers of food products to declare the amount of salt in their product is not a

13   claim that "salt is unsafe," requiring cell phone distributors to make customers aware of how

14   they may use their phones consistent with FCC mandated RF exposure guidelines is not to

15   declare that "cell phones are unsafe."

16   Plaintiff complains that public knowledge of factually true information will somehow

17   mislead consumers about the safety of cell phones. In Plaintiff's view, the First Amendment

18   requires citizens to be shielded from true facts—the knowledge of federal regulations—so as to

19   preserve their confidence in a commercial product.

20   There is an alternative to this paternalism—the one announced by the Supreme Court

21   when it first held that commercial speech should be protected by the First Amendment. "That

22   alternative is to assume that this information is not in itself harmful, that people will perceive

23   their own best interests if only they are well enough informed, and that the best means to that

24   end is to open the channels of communication rather than to close them." *Virginia Bd. of*

25   *Pharmacy*, 425 U.S. at 770. "It is precisely this kind of choice, between the dangers of

26   suppressing information, and the dangers of its misuse if it is freely available, that the First

27   Amendment makes for us." *Id.*

28

(d)     The Disclosure Required by the Ordinance is Not Unduly Burdensome

Plaintiff does not even attempt to demonstrate that the challenged Ordinance unduly burdens commercial speech in a way that chills protected speech. CTIA does not identify *any* speech that the compelled disclosure chills, let alone demonstrate that the "detail required in the disclaimer . . . effectively rules out" its ability to speak at all, the burden the Supreme Court has found undue. *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, *Bd. of Accountancy*, 512 U.S. 136, 146 (1994); *see also American Meat Institute*, 760 F.3d at 27 ("*Zauderer* cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech").

Nor does Plaintiff suggest that it has *any* legitimate interest in preventing customers from knowing FCC guidelines about how consumers should use their phones so as to stay within the "bright line" of federal RF radiation limits. Indeed, Plaintiff's members are *already* required to disclose this very information in their operating manuals under the FCC's regulations. *FCC RF Exposure Guidance* § 4.2.2(4).

In short, Plaintiff does not articulate any cognizable First Amendment interest in blocking Berkeley's desire to disseminate this factual information to consumers. Instead, CTIA conjures fears of inconsistent state or municipal disclosure requirements. Pl.'s Mot. 17. Those fears are exaggerated, but more to the point, constitutionally irrelevant. Retailers, including some of Plaintiff's members acting as retailers, must provide customers who buy or lease a cell phone a 5 x 8 inch sheet of paper containing the notice OR post a single 8.5 x 11 inch notice at the point of sale. Berkeley Municipal Code § 9.96.030(B). Certainly that requirement is far less burdensome and less variable by locality than disclosure obligations in the various state and municipal taxes, zoning requirements, and tort and contract rules that Plaintiff's members must negotiate daily. There is nothing in the Ordinance that approaches a constitutional "unduly burdensome" standard.

### 4.     Plaintiff's Claim Also Fails Under *Central Hudson*

Defendants maintain that the proper test for mandatory disclosures of truthful commercial speech is the one articulated by the Supreme Court in *Zauderer.* But even if *Central*

19

*Hudson's* test for bans on commercial speech were to apply, which it does not, Plaintiff's claim would fare no better. That four-part test asks:

> [First,] whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566.

The Berkeley Ordinance mandates a disclosure that concerns a lawful activity—the use of a cell phone. The Ordinance mandates disclosures that are not misleading; they are instead accurate, factual, and uncontroversial. Plaintiff's insinuation that revealing the *existence* of the federal RF limits and federally mandated disclosures will somehow mislead consumers about the safety of cell phones is a contention properly directed to the FCC, not the City of Berkeley.

Berkeley's interest in ensuring that its citizens know of the federal safety standards and possess the information necessary to adhere to those federal standards is plainly substantial. "Indeed, the pedestrian nature of those interests affirmed as substantial [under *Central Hudson*] calls into question whether *any* governmental interest—except those already found trivial by the Court—could fail to be substantial." *Kansas v. United States*, 16 F.3d 436, 443 (D.C. Cir. 1994); *see also*, *e.g.*, *Fox*, 492 U.S. at 475.

Finally, mandated commercial disclosures *by definition* satisfy the final two prongs of *Central Hudson*. Under *Central Hudson*, courts have "commonly required evidence of a measure's effectiveness" but "such evidentiary parsing is hardly necessary when the government uses a disclosure mandate" due to the "self-evident tendency of a disclosure mandate to assure that recipients get the mandated information." *American Meat Institute*, 760 F.3d at 26.

## B.    The Ordinance is Not Preempted

Among Plaintiff's members are cell phone manufacturers. These manufacturers are subject to FCC regulations. Some of these manufacturers are also retailers. As retailers, they are subject to the rules imposed on retailers by many state and local governments, including Berkeley.

20

1       Plaintiff argues that Berkeley's regulation of local retailers is preempted by federal law

2   that regulates manufacturers. In Plaintiff's view, because the federal government has regulated

3   how manufacturers test cell phones, and regulated the information that cell phone manufacturers

4   must include within their manuals, local governments are forbidden from regulating the

5   information retailers of cell phone provide *simply because some retailers might also be*

6   *manufacturers.*

7       To support its claim, Plaintiff cites a host of federal authority about the regulation of

8   manufacturers. Pl.'s Mot. 25, *citing Geier v. Am. Honda Motor Co.*, *Inc.*, 529 U.S. 861, 886

9   (2000); *Farina v. Nokia Inc.*, 625 F.3d at 105-06. It rests its argument most squarely on *Farina*.

10      Yet Plaintiff fails to cite the most relevant local authority addressing precisely the

11  question before this Court. In rejecting Plaintiff's almost identical argument challenging San

12  Francisco's cell phone ordinance, Judge Alsup held that "[t]he field of consumer disclosures to

13  cell phone purchasers has not been occupied by the FCC (even though the field of technical-

14  emission standards has been so occupied)." *CTIA-Wireless Ass'n v. City & Cty. of San*

15  *Francisco*, 827 F. Supp. 2d 1054, 1059 (N.D. Cal. 2011), *aff'd in part and vacated in part on*

16  *other grounds*, 494 Fed.Appx. 752 (9th Cir. 2012).

17      Nothing in Plaintiff's current submission gives any reason to doubt Judge Alsup's sound

18  conclusion. Berkeley is not requiring manufacturers to issue warnings that cell phones are

19  unsafe. It does not even purport to control how manufacturers craft their user manuals or

20  establish safety standards. Berkeley is instead simply requiring that *retailers* who sell cell

21  phones within the City provide the very same type of information that the FCC requires

22  *manufacturers* to include in their manuals—through a simple handout or a notice posted at the

23  point of sale.

24      *Farina* is not to the contrary. In that class action suit against a cell phone manufacturer

25  for its failure to include headphones with its product (so as to minimize RF exposure), the Third

26  Circuit Court of Appeals held that the state lawsuit was preempted by federal regulation. 625

27  F.3d at 122-24. The FCC had determined that cell phones were safe, if properly used, without

28  headphones. To avoid liability had the suit succeeded, a manufacturer would have needed to

offer different products in different geographic locations. *Id.* at 126. The FCC's uniform judgment about the proper balance of safety and efficiency would have conflicted with the judgment of localities. That conflict triggered the application of conflict preemption. *Id.* at 122.

Importantly, the *Farina* court expressly held that "[w]hile the FCC may have primacy over the areas of technical standards and competitive market structure for cellular service, . . . neither Congress nor the FCC has evinced an intent to occupy the entire field." 625 F.3d at 121 (quotation omitted). But because the Court concluded that "[i]n order for Farina to succeed, he necessarily must . . . show that [FCC] standards are inadequate—that they are insufficiently protective of public health and safety," *id.* at 122, his claim was preempted.

The presumption against preemption, *see McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 674-75 (9th Cir. 2013) (applying presumption where a law is in a field that the States have traditionally occupied (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), is even stronger in a case where the "FCC has left it as a matter of manufacturer discretion what information to provide to consumers about the use of their cell phones." *Murray v. Motorola, Inc.*, 982 A.2d 764, 788 (D.C. 2009). In this case, while the FCC requires manufacturers to include information about RF testing procedures, it has not specified precisely what that information must be. The details are left to the manufacturers. This undermines any claim that "the federal government has purported to occupy entirely the field of consumer disclosures to cell-phone purchasers." *Id.*

There is no conflict in this case between the judgments of the FCC and Berkeley. Both aim to give consumers the information they need to limit their RF exposure to the levels set by the FCC. The FCC has acted on this objective by requiring manufacturers of cell phones to include that information in their manual. *FCC RF Exposure Guidance*, § 4.2.2(4). Berkeley has acted in a complementary way, by requiring retailers to disclose this same information more saliently. Even if the FCC has evinced an intent to occupy the field of RF emission regulations, Plaintiff has yet to demonstrate any determination by the FCC that would justify rejecting Judge Alsup's conclusion that the FCC has no intent to occupy "[t]he field of consumer disclosures." 827 F. Supp. 2d at 1059.

## II.     Plaintiff's Members Will Not Be Harmed If The Ordinance Is Enforced

The sum of Plaintiff's argument regarding harm is that by requiring retailers to provide consumers with the same kind of information that manufacturers must already provide, cell phones will in effect be slandered as unsafe. This is a willful misreading of the Ordinance, which is nothing but an arrow that points to the very manuals written by manufacturers represented by CTIA. Calling attention to a manufacturer's own words cannot harm the goodwill of that manufacturer. Plaintiff can point to no plausible—let alone established—harm that can justify the extraordinary remedy for which it asks. As the Ninth Circuit has held, "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations*, *Inc*., 502 F.3d 1086, 1098 (9th Cir. 2007) (citing *Goldie's Bookstore*, *Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)).

Plaintiff argues that "First Amendment injuries" are "per se irreparable." Pl.'s Mot. 21. But courts distinguish between restrictions on speech (which the Berkeley Ordinance is not), where a presumption is appropriate, and a "rule or regulation that may only potentially affect speech," where the plaintiff must demonstrate the "injunction will prevent the feared deprivation of free speech rights." *See Bronx Household of Faith v. Bd. of Educ. of City of New York,* 331 F.3d 342, 349-50 (2d Cir. 2003). Where Plaintiff's members are already required to convey the same information that an injunction would block, that showing cannot be made.[10]

## III.     The Balance of Harm Militates Against Granting An Injunction

Berkeley has established that its residents do not know about RF exposure limits, and that they would likely change their behavior if they did. *See Berkeley Survey*, at 1. Plaintiff responds that residents *could* know. It argues that "accurate and balanced disclosures regarding RF energy are already available (and will remain so) to any consumer interested in the information." Pl.'s Mot. at 23.

---

[10] Plaintiff's reliance on *Viacom Int'l, Inc. v. FCC*, 828 F. Supp. 741, 744 (N.D. Cal. 1993) is inapposite. *Viacom* too was a case of speech restriction, and in any case, it applied this Circuit's "serious question" standard for a preliminary injunction, which the Supreme Court drew into question in *Winter*. 555 U.S. at 20-21.

1   Although Plaintiff's assurance is meant to be comforting, it fails to face the reality that *in*

2   *fact* consumers are not presently aware of this important information. *See Berkeley Survey*, at 1.

3   Because Plaintiff's members are already obligated to provide "accurate and balanced disclosures

4   regarding RF energy," they can suffer no harm when Berkeley acts to ensure that its residents in

5   fact have more "accurate and balanced disclosures regarding RF energy." Whatever the harm

6   from the public more certainly understanding what manufacturers are already required reveal, it

7   cannot outweigh the strong benefit of the public more fully understanding something that they

8   have indicated they want to know.

9   **IV.    The Public Interest Is Not Advanced By Interfering With This Local Ordinance**

10   Plaintiff asks this Court to use its federal power to displace the actions of a municipality

11   regulating local retailers about safety—an extraordinary step within a federal system. But the

12   most compelling policy reason it can cite for this extraordinary remedy is the reflections of a law

13   review article arguing that consumer warnings have gone too far. Pl.'s Mot. at 24 (citing Lars

14   Noah, *The Imperative to Warn: Disentangling the "Right to Know" from the "Need to Know"*

15   *About Consumer Product Hazards*, 11 Yale J. on Reg. 293, 383 (1994)).

16   This argument captures perfectly what this case is really about. Having failed to persuade

17   either the FCC or the Berkeley City Council that true information about RF exposure need not

18   be provided to consumers, Plaintiff now seeks to constitutionalize routine consumer information

19   law to avoid regulation. It invites this Court to displace the judgment of a federal agency and a

20   City Council, both more accountable as democratic branches, after a judicial determination of

21   which safety risks are sufficiently risky to permit a government to warn consumers about, and

22   which risks are not.

23   This is the ghost of *Lochner* in the guise of the First Amendment. Whether there are too

24   many warnings or too few is an important question. It is not a judicial question. The only

25   constitutional issue before this Court is whether Berkeley's effort to emphasize what federal law

26   *already requires* Plaintiff's members to say violates federal law. It does not—and thus it could

27   //

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC

1   not advance the public's interest to further interfere with the power of a municipality to provide

2   information that its residents desire.

3   **CONCLUSION**

4   Based on the foregoing, the City respectfully requests the Court deny Plaintiff's Motion

5   for a Preliminary Injunction.

6

7   Dated: July 6, 2015.                          ZACH COWAN, City Attorney
                                                 LESTER LAWRENCE LESSIG, III
8                                                ROBERT CHARLES POST
                                                 AMANDA SHANOR
9

10                                   By:      _____/s/  Lester Lawrence Lessig, III_____
                                                 LESTER LAWRENCE LESSIG, III
11                                               Attorneys for Defendant City of Berkeley

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
No. C15-02529 EMC