1  Michael E. Wall (SBN 170238)
2  Natural Resources Defense Council
   111 Sutter Street, 20th Floor
3  San Francisco, CA 94104
4  Tel.: (415) 875-6100 / Fax: (415) 875-6161
   Email: mwall@nrdc.org
5

6  *Attorney for Natural Resources Defense Council*

7

8              UNITED STATES DISTRICT COURT FOR THE

9              NORTHERN DISTRICT OF CALIFORNIA

10
   CTIA – THE WIRELESS            ) Case No. C15-02529 EMC
11 ASSOCIATION,                   )
                                  ) **[PROPOSED] BRIEF OF**
12                                ) **AMICUS CURIAE NATURAL**
             Plaintiff,           ) **RESOURCES DEFENSE**
13     v.                         ) **COUNCIL IN OPPOSITION TO**
14                                ) **PLAINTIFF'S MOTION FOR**
   CITY OF BERKELEY, CHRISTINE    ) **PRELIMINARY INJUNCTION**
15 DANIEL, CITY MANAGER OF CITY   )
16 OF BERKELEY,                   )
                                  ) Hearing Date: August 20, 2015
17           Defendants.          ) Hearing Time: 1:30 p.m.
18                                ) Courtroom 5, 17th Fl., San Francisco

19

20

21

22

23

24

25

26

27

28

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

**STATEMENT OF INTEREST**

The Natural Resources Defense Council (NRDC) is a nonprofit environmental and public health advocacy organization with hundreds of thousands of members nationwide, tens of thousands of members in California, and 1,244 members who live in the City of Berkeley.

Part of NRDC's mission is to protect public health by minimizing human exposure to harmful substances. Regulations like Berkeley's radiofrequency exposure right-to-know ordinance are important to advancing that goal: after all, an individual cannot choose whether to minimize her exposure if she does not know that it is occurring.

The logic of Plaintiff's First Amendment claim, if accepted, would undermine not just the Berkeley right-to-know ordinance, but legions of risk-disclosure rules that apprise the public of exposures that they might not otherwise discover. Many rules that NRDC, on behalf of its members, has long supported and advanced could be swept away. NRDC files this amicus brief to urge the Court to deny Plaintiff's motion for preliminary injunction.[1]

**INTRODUCTION**

Mandatory-disclosure laws are a critical tool, used by all levels of government, to ensure that individuals have the information they need to make reasoned choices about their exposure to products that endanger their health at certain exposure levels. Plaintiff's argument to nullify the Berkeley right-to-know ordinance, if endorsed by this Court, could lead to the dismantling of an array of commonsense risk-disclosure requirements that apply to everything from carcinogens in consumer products, to hazardous materials at job sites, to

---

[1] No party's counsel authored this brief in whole or in part; nor did any party or party's counsel contribute money intended to fund its preparation. No entity or person other than NRDC contributed money to fund the brief's preparation and filing.

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

1 | contaminants in public water supplies.

2 | All such disclosure requirements reflect a governmental determination that

3 | members of the public have a right to know about certain risks, so that individuals

4 | can decide for themselves whether to accept, limit, or avoid them. Determining the

5 | precise *level* of risk sufficient to mandate disclosure is a quintessentially legislative

6 | act. If this Court were to accept Plaintiff's invitation to second-guess such

7 | judgments, setting some judicially invented threshold below which an acknowledged

8 | risk would be deemed insufficiently serious to mandate a warning, then judges

9 | would find themselves drawn into policy-laden line drawing—not only here, but in

10 | the cascade of cases that would surely follow. And judges overruling a legislative

11 | assessment of the risk would deprive the public of information about potential

12 | hazards, leaving that information concentrated in the hands of entities with

13 | incentives to downplay dangers. The First Amendment does not require, and sound

14 | policy cannot countenance, such an outcome.

**ARGUMENT**

16 | Under Plaintiff's view, the First Amendment conditions legislative authority

17 | to compel disclosure of potential public-health hazards not on a legislative judgment

18 | that exposure poses a risk of harm, but on a judge's determination that it poses a

19 | heightened threat of harm. Defendant's brief in opposition to Plaintiff's motion for a

20 | preliminary injunction addresses the doctrinal fallacies in that argument; we will not

21 | repeat those points here. NRDC's purpose in offering this brief is to describe the

22 | disruptive, destructive repercussions Plaintiff's approach would have for (1)

23 | countless routine and salutary disclosure requirements, (2) the federal judiciary, and

24 | (3) the public at large.

25 | **I.    Plaintiff's reasoning threatens myriad federal, state, and local health-risk**

26 | **disclosure requirements**

27 | In 1965, Congress instituted the first mandatory federal labeling scheme for

28 | cigarette packaging, to alert the public "that cigarette smoking *may be* hazardous to

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

1  health." Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, § 2, 79

2  Stat. 282, 282 (1965) (emphasis added). Informed by the Surgeon General's

3  scientific review of the health risks posed by cigarettes, the Senate Commerce

4  Committee reported to the wider body that "'appropriate remedial action' is

5  warranted," notwithstanding the uncertainties articulated at that time by "the

6  substantial number of individual physicians and scientists…who do not believe it

7  has been demonstrated scientifically that smoking causes lung cancer or other

8  diseases." S. Rep. No. 89-195, at 3 (1965). A slew of regulations, from all levels of

9  government, have since mandated disclosure of any number of threats members of

10  the public may encounter in the products they consume and in the environments they

11  inhabit. *See infra*.

12        It is thus hardly exceptional that Berkeley's right-to-know ordinance,

13  Berkeley Municipal Code § 9.96.030(A)-(B), as well as the Federal

14  Communications Commission (FCC) requirements that Berkeley's ordinance

15  amplifies, *see* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 33, at 1-2,

16  demand disclosure of risks to consumer health from certain types of exposures to

17  cell phones. Plaintiff's suggestion that a government must show something greater

18  than a risk of harm—what Plaintiff calls a "*real* health or safety concern" or "real

19  harm," Pl.'s Mot. for Prelim. Inj., ECF No. 4, at 10 [hereinafter "Mot."]—to justify

20  such a requirement, places in the constitutional crosshairs *all* laws requiring parties

21  to disclose risks.

22        A ruling for Plaintiff could accordingly disrupt bedrock consumer-safety laws.

23  For example, at the state level, California's Safe Drinking Water and Toxic

24  Enforcement Act of 1986 (commonly known as "Prop 65"), requires the

25  identification of chemicals known to the State to cause cancer or reproductive

26  toxicity. Cal. Health & Safety Code § 25249.8(a); *see* State of Calif., Chemicals

27  Known to the State to Cause Cancer or Reproductive Toxicity (June 19, 2015),

28  *available at* http://oehha.ca.gov/prop65/prop65_list/files/P65single061915.pdf.

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

1   Businesses must warn the public before knowingly exposing people to listed

2   chemicals, unless the exposure is below established safe-harbor levels or the

3   business can show that an exposure will not cause harm to consumers, allowing for a

4   health-protective margin of error. Cal. Health & Safety Code §§ 25249.6,

5   25249.10(c). For carcinogens, the law requires disclosure unless the responsible

6   party can show that the level of exposure would result in not more than one excess

7   case of cancer in 100,000 individuals exposed to the chemical over a 70-year

8   lifetime. *Id.* § 25249.10(c); Cal. Code Regs. tit. 27, § 25703(b). For substances that

9   cause reproductive toxicity, the law requires disclosure if a product containing that

10  substance causes exposures that exceed even 1/1000th of the "no observable effect

11  level." Cal. Health & Safety Code § 25249.10(c). This disclosure regime reflects the

12  State's interest in alerting its citizens to substances known to cause harm at some

13  levels, so that citizens can decide for themselves whether or to what extent to expose

14  themselves to risk.

15      Similarly, California's Division of Occupational Safety and Health, like the

16  Federal Occupational Safety and Health Administration, requires employers "to

17  provide information to their employees about the hazardous chemicals to which they

18  may be exposed" on the job. Cal. Code Regs. tit. 8, § 5194(b)(1); *see* Cal. Lab. Code

19  § 6398; *see also* 29 C.F.R. § 1910.1200 (federal workplace disclosure regulation).

20  Such disclosures focus on workplace-exposure risks that may, but may not, result in

21  actual harm. While the risks of actual harm may be small, that does not make those

22  risks unimportant to workers, because the consequences can be serious. Nor does the

23  fact that the risk may be small mean that courts should second-guess legislators'

24  policy judgment to mandate disclosure of these hazards. *See* Cal. Lab. Code

25  § 6361(a). Disclosure of such hazards has been a cornerstone of workplace safety

26  regimes for decades. Such disclosure requirements could fall under Plaintiff's view

27  of the First Amendment.

28      At the federal level, Defendants have already shown that the Nutrition

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

4

1   Labeling and Education Act, 21 U.S.C. § 343, and the now thoroughly familiar

2   food-nutrition labels it requires, fare no differently under the logic Plaintiff advances

3   than does Berkeley's ordinance. *See* Defs.' Opp'n at 3. Likewise, mandatory

4   warnings on cigarettes and alcohol are both based on a *risk* of harm to the individual

5   consumer. *See* 15 U.S.C. § 1333(a)(1) (requiring that packages bear one of several

6   warnings including that "[t]obacco smoke *can* harm your children," that "[s]moking

7   during pregnancy *can* harm your baby," and that "[s]moking *can* kill you"

8   (emphases added)); 27 U.S.C. § 215(a) (requiring warning that "women should not

9   drink alcoholic beverages during pregnancy because of the *risk* of birth defects" and

10  that "[c]onsumption of alcoholic beverages . . . *may* cause health problems"

11  (emphases added)). Plaintiff's approach could extinguish these now-customary

12  warning regimes.

13       A similar fate could befall the suite of laws that guarantee individuals' rights

14  to know what potentially harmful substances are in the environment—in their

15  homes, in their drinking water, and in their communities. For example, the

16  Emergency Planning and Community Right-to-Know Act requires facilities that

17  manufacture, process, or use certain quantities of toxic chemicals to disclose that

18  fact, along with the maximum amount of each chemical present at the facility at any

19  point in the last year, and the annual quantities released to the environment.

20  42 U.S.C. §§ 11023(a), (g)(1)(C). These compelled disclosures are not premised on

21  proof of actual harm at the expected level of exposure; rather, like the Berkeley

22  ordinance, they serve to inform members of the public about known risks that may

23  affect the environment or their health.

24       Such disclosure requirements are commonplace, perhaps because

25  requirements to disclose risk are often viewed as less onerous—and perhaps more

26  palatable to some legislators and constituencies—than direct regulation preventing

27  the risk. Thus, federal law requires that the seller or lessor of a home disclose to the

28  purchaser or lessee *any* lead-based paint present in the housing. 40 C.F.R.

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

1    § 745.107(a)(2). The Safe Drinking Water Act requires "[e]ach owner or operator of

2    a public water system" to give notice to the public served by that system of "*any*

3    failure on the part of the public water system*" to comply with applicable regulatory

4    criteria or testing procedures, or to perform required monitoring, and to publish an

5    annual report on the level of contaminants in the water supply—whatever that level

6    may be. *See* 42 U.S.C. §§ 300g-3(c)(1), (c)(4)(A) (emphasis added).

7        Because each of these regimes compels public disclosure of exposure to a

8    substance that poses a *risk* of harm, each is vulnerable to the same attack that

9    Plaintiff levels at Berkeley's right-to-know ordinance. Although Plaintiff may argue

10   that the risk presented by radiofrequency radiation from cell phones is lower than the

11   risk present in some of these examples, such a factual distinction lacks an obvious

12   limiting principle. Instead, Plaintiff's analytic approach invites judges to strike down

13   *any* disclosure based on risk, whenever the judge perceives the magnitude or

14   seriousness of the risk differently from a legislature or regulator wielding delegated

15   legislative authority. Such a holding would have broad and troubling consequences,

16   unnecessarily "expos[ing] . . . long-established programs to searching scrutiny by

17   unelected courts." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir.

18   2001).

19   **II.    The inquiry Plaintiff attempts to force on this Court is best left to**

20           **regulators**

21       Plaintiff seeks to foist on the federal courts a role to which they are not ideally

22   suited. The risk at issue here is one that both the FCC and Berkeley have

23   acknowledged. Assessing the significance of a risk presented by radiofrequency

24   radiation from cell phones—or any other public-health or environmental hazard—is

25   a task that may require scientific, medical, and engineering expertise. That expertise

26   involves disciplines where certainty is elusive and knowledge is evolving.

27       Perhaps more importantly, Plaintiff's suggestion that this Court must decide

28   for itself whether that risk is a "*real* health or safety concern," Mot. at 10, invites

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

1  judicial second-guessing of policy judgments, in the guise of constitutional analysis.

2  Answering questions such as 'How safe is safe enough?' and 'How risky is too

3  risky?' is a task that falls more within the functions and competencies of legislatures,

4  and the regulators to whom they delegate authority, than of judges.[2]

5      There is no reason for the Court to look skeptically on Berkeley's reasoned

6  judgment in this case. When, as here, a thing is hazardous, and there is some

7  uncertainty about precisely what level of exposure will cause harm or an increased

8  risk of harm, a legislature may properly make a policy judgment to set the standard

9  below the level where harm has been observed to occur. It may do so to take into

10  account both inherent uncertainty and the fact that some vulnerable subpopulations

11  may be more sensitive than the population as whole. *See, e.g.*, 21 U.S.C.

12  § 346a(b)(2)(D)(vii) (requiring the Administrator of U.S. EPA to take into account

13  "available information concerning the variability of the sensitivities of major

14  identifiable subgroups of consumers" when setting limits for pesticide residues on

15  food).

16      Indeed, governments frequently regulate to prevent exposures that exceed a

17  threshold that incorporates a safety margin. *See* Defs.' Opp'n at 12; *see also*

18  21 U.S.C. § 346a(b)(2)(C) (presumptively requiring the Administrator of the U.S.

19  EPA to use "an additional tenfold margin of safety . . . to take into account potential

20  pre- and post-natal toxicity and completeness of the data with respect to exposure

21  and toxicity to infants and children" when setting limits for pesticide residues on

22

23      [2] Indeed, one of the two cases Plaintiff cites as critical of requiring over-disclosure of risks does so while expressing support for the regulatory agency's (not the court's) prerogative to reasonably determine how much or how little disclosure is

24  valuable. *See Brooks v. Howmedica, Inc.*, 273 F.3d 785, 796 (8th Cir. 2001) ("There

25  are . . . a number of sound reasons why *the FDA may prefer* to limit warnings on

26  product labels." (emphasis added)). The other case deals not with an *agency*'s

27  determination as to what warnings are worth requiring, but with the scope of a common-law—that is, judge-created—duty to warn. *See Doe v. Miles Labs., Inc.,*

28  *Cutter Labs. Div.*, 927 F.2d 187, 190, 194-95 (4th Cir. 1991).

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

1   food). Likewise, governments routinely limit exposures that carry risks that Plaintiff

2   (or another self-interested entity) might consider vanishingly small. *See, e.g.*,

3   *Natural Res. Def. Council v. U.S. EPA*, 735 F.3d 873, 884 (9th Cir. 2013) (requiring

4   EPA to comply with agency's own rule that demanded mitigating pesticide exposure

5   at a level the agency characterized as "1/1000th of the amount . . . that has been

6   shown to produce no harmful effects in mice in laboratory studies"). If there is a

7   legitimate governmental interest in *preventing* even relatively small or uncertain

8   risks, there must be at least as legitimate an interest in ensuring that the public has

9   *warning* of such risks. That legitimate interest goes well beyond merely satisfying

10  consumers' "idle curiosity." Mot. at 11 (internal quotation marks omitted).

11          Reanalyzing the validity of even one environmental or public-health risk

12  would push the judiciary outside its sphere of institutional expertise and into an area

13  committed to legislative discretion. But if Plaintiff's arguments are endorsed by this

14  Court, regulated entities like Plaintiff will feel free to challenge any and all

15  mandatory risk disclosures—of which there are many, *see* Section I, *supra*. In each

16  of the many cases that will predictably follow, judges will be asked to act as super-

17  legislatures or super-administrators, deciding anew when a risk becomes sufficiently

18  dangerous to warrant disclosure. The threat of diverting judicial resources (and

19  subverting judicial credibility) by answering questions the judiciary is not well

20  suited to address is reason enough for this Court to defer to Berkeley's reasoned

21  determination that the risk should be disclosed. Alerting members of the public to

22  that risk, to allow them to make their own decisions about exposures, more than

23  meets even the substantial-governmental-interest test articulated in *Central Hudson*

24  *Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980). *See*

25  Defs.' Opp'n at 9-11.

26

27

28

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

8

**III.  Mandatory disclosure of environmental and health risks is crucial to protecting the public's safety and individuals' autonomy**

By inviting judicial second-guessing of what risks should be disclosed, Plaintiff asks for a one-way ratchet that would ever narrow how much information the public receives. That result would ill-serve First Amendment values.

While Plaintiff apparently believes that keeping information from the public actually *helps* the public, by saving it from information overload, Mot. at 24-25, that is not for Plaintiff to decide. *Any* risk communication potentially deflects attention from other risk disclosures. But what subset of hazards is significant enough to warrant public disclosure is a decision for other branches of government to make, in their reasoned discretion, without undue interference from the judiciary. It is not a decision for the parties that create or contribute to those risks, which such parties may have a financial or other incentive to deny or obscure.

Precisely what does the Berkeley ordinance compel purveyors of cell phones to do? It simply requires retailers to advise the public, in a more effective way than a phone owner's manual does, of hazards that the FCC already requires phone manufacturers to disclose. That is a legitimate and useful exercise of Berkeley's authority to safeguard the public health and welfare.[3]

The public cannot protect itself against potential harms of which it is unaware. To be sure, some—and hopefully many—of those potential harms will never materialize at the level to which the public is exposed. Public disclosure requirements, however, are properly prophylactic, giving individuals data they need to make confident, informed, intelligent choices about how and if they wish to modify their behavior to avoid relatively small or uncertain risks. The alternative

---

[3] Plaintiff claims that federal preemption, in addition to the First Amendment, forbids this exercise of authority. Mot. at 18-21. Defendants have already shown the error of Plaintiff's argument. Defs.' Opp'n at 20-22. We see no preemption issue in a municipality instructing cell phone *retailers* to repeat and amplify a message FCC already requires cell phone *manufacturers* to convey.

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC

9

1   that Plaintiff advances—hiding from the public all but the most dire risks—robs

2   consumers of the chance to make their own judgments about risks that, although

3   relatively remote, may nonetheless result in serious consequences. Neither the First

4   Amendment nor preemption law dictates such a blow to human safety and individual

5   autonomy.

6

7                                **CONCLUSION**

8           For all of the foregoing reasons, this Court should deny Plaintiff's motion for

9   a preliminary injunction.

10

11  Dated: July 13, 2015              Respectfully submitted,

12

13                                   /s/ Michael E. Wall

14                                   MICHAEL E. WALL (SBN 170238)
                                     Natural Resources Defense Council
15                                   111 Sutter Street, 20th Floor
                                     San Francisco, CA 94104
16                                   Tel.: (415) 875-6100 / Fax: (415) 875-6161
                                     Email: mwall@nrdc.org
17

18

19                                   *Attorney for Natural Resources Defense Council*

20

21

22

23

24

25

26

27

28

Amicus's Opp'n to Pl.'s Mot. for Prelim. Inj.,
Case No. C15-02529 EMC