Theodore B. Olson (#38137)
TOlson@gibsondunn.com
Helgi C. Walker (Pro Hac Vice)
HWalker@gibsondunn.com
Michael R. Huston (#278488)
MHuston@gibsondunn.com
Jacob T. Spencer (Pro Hac Vice)
JSpencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    202.955.8668
Facsimile:    202.530.9575

Joshua S. Lipshutz (#242557)
JLipshutz@gibsondunn.com
Joshua D. Dick (#268853)
JDick@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:    415.393.8233
Facsimile:    415.374.8469

*Attorneys for Plaintiff*
*CTIA – The Wireless Association®*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION®, | **CASE NO. 3:15-cv-02529** |
| Plaintiff, | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| THE CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, in her official capacity, | Date:   August 20, 2015 |
| | Time:  1:30 PM |
| Defendants. | Place:  Courtroom 5, 17th Floor, San Francisco |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 2

    I.    CTIA Is Likely To Succeed On The Merits ........................................... 2

        A.    The Ordinance Violates The First Amendment By Compelling Misleading, Controversial Speech ..................................... 2

            1.    The Ordinance Is Subject To Heightened Scrutiny ............................ 3

            2.    The Ordinance Is Not Drawn To Achieve Any Substantial Or Even Legitimate Government Interest .................................... 4

            3.    The Ordinance Cannot Survive Even Under *Zauderer* ........................ 6

                (i)    The Ordinance Is Misleading, Not Purely Factual ................... 6

                (ii)    The Ordinance Is Controversial ............................................. 10

                (iii)    The Ordinance Is Unduly Burdensome .................................. 10

                (iv)    The Ordinance Is Nothing Like Existing Disclosures ............ 11

        B.    The Ordinance Is Preempted By An Exclusive Federal Regime Of Cell Phone Regulation ............................................. 12

    II.    CTIA's Members Will Be Irreparably Injured If The Ordinance Is Enforced .......... 13

    III.    The Balance Of Harms Favors CTIA Because An Injunction Will Not Harm The City .................................................... 14

    IV.    The Public Interest Would Be Served By Enjoining The Ordinance ......................... 15

CONCLUSION ............................................................................................... 15

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011).................................................................................................. 14

*Am. Meat Inst. v. USDA,*
    760 F.3d 18 (2014)........................................................................................................... 4, 10

*Bronx Household of Faith v. Bd. of Educ. of City of New York,*
    331 F.3d 342 (2d Cir. 2003).................................................................................................. 14

*Centro Tepeyac v. Montgomery Cnty.,*
    722 F.3d 184 (4th Cir. 2013)................................................................................................ 14

*CTIA-Wireless Ass'n v. City & Cnty. of San Francisco,*
    827 F. Supp. 2d 1054 (N.D. Cal. 2011),
    *aff'd,* 494 F. App'x 752 (9th Cir. 2012)........................................................................... 1, 6, 8

*Dwyer v. Cappell,*
    762 F.3d 275 (3d. Cir. 2014)................................................................................................... 3

*Edenfield v. Fane,*
    507 U.S. 761 (1993)............................................................................................................. 4, 5

*Evergreen Ass'n, Inc. v. City of New York,*
    740 F.3d 233 (2d Cir. 2014).................................................................................................. 10

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982).............................................................................................................. 12

*Geier v. Am. Honda Motor Co., Inc.,*
    529 U.S. 861 (2000).............................................................................................................. 13

*Int'l Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996).................................................................................................... 3, 4

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006).............................................................................................. 15

*Lochner v. New York,*
    198 U.S. 45 (1905)................................................................................................................ 15

*Mason v. Fla. Bar,*
    208 F.3d 952 (11th Cir. 2000)................................................................................................. 3

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    130 S. Ct. 1324 (2010)............................................................................................................. 3

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
    475 U.S. 1 (1986).................................................................................................................. 11

**TABLE OF AUTHORITIES** (*continued*)                      <u>Page(s)</u>

*R.J. Reynolds Tobacco Co. v. FDA,*
   696 F.3d 1205 (D.C. Cir. 2012) ..................................................................... 10

*Safelite Grp., Inc. v. Jepsen,*
   764 F.3d 258 (2d Cir. 2014) ........................................................................... 14

*Sorrell v. IMS Health Inc.,*
   131 S. Ct. 2653 (2011) .............................................................................. 4, 15

*Stuart v. Camnitz,*
   774 F.3d 238 (4th Cir. 2014) ......................................................................... 10

*Video Software Dealers Ass'n v. Schwarzenegger,*
   556 F.3d 950 (9th Cir. 2009),
   *aff'd,* 131 S. Ct. 2729 (2011) ..................................................................... 3, 10

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
   135 S. Ct. 2239 (2015) .................................................................................... 2

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ........................................................................................ 3

*Warsoldier v. Woodford,*
   418 F.3d 989 (9th Cir. 2005) ......................................................................... 13

*Williamson v. Mazda Motor of Am., Inc.,*
   131 S. Ct. 1131 (2011) ................................................................................... 13

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ...................................................................................... 12

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
   471 U.S. 626 (1985) ................................................................................... 3, 10

**Statutes**

Berkeley Municipal Code § 9.96 ....................................................................... 15

Berkeley Municipal Code § 9.96.010 .................................................................. 4

Berkeley Municipal Code § 9.96.030 ......................................................... 1, 9, 11

**Other Authorities**

Anita Chabria, *City of Berkeley to Require Cellphone Sellers to Warn of Possible
   Radiation Risks,*
   The Guardian (May 16, 2015) .......................................................................... 7

*Berkeley Says Cell Phones Cause Tumors,*
   U.S. News (May 13, 2015) ............................................................................... 8

**TABLE OF AUTHORITIES** (*continued*)                     Page(s)

*Berkeley, California, to Require Cellphone Health Warnings*,
   CBSNews (May 13, 2015) ............................................................................ 7

FCC KDB, No. 447498, *Gen. RF Exposure Guidelines*, § 4.2.2(4) ...................... 9, 11

*In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*,
   28 FCC Rcd. 3498 (2013) ........................................... 5, 6, 9, 10, 12, 13, 15

Josh Harkinson, *Berkeley Votes to Warn Cellphone Buyers of Health Risks*,
   Mother Jones (May 13, 2015) ................................................................... 8

Robert Post, Compelled Commercial Disclosure,
   117 W. Va. L. Rev. 867 (2015) ................................................................ 7, 8

Wiart, *Analysis of RF exposure in the head tissues of children and adults*,
   53 Phys. Med. Biol. 3681 (2008) ................................................................ 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**INTRODUCTION**

The City of Berkeley is playing a First Amendment shell game.  On the one hand, Berkeley is of the opinion—as confirmed by the entire history of the Ordinance and those who urged its passage for fear of cancer and other scientifically baseless health concerns—that cell phones are unsafe.  *See* Compl. ¶¶ 89–93; Video of Regular City Council Meeting, May 12, 2015, available at http://goo.gl/mzDOIX.  And Berkeley wants to spread that misleading and inaccurate message not by its own speech, but by compelling CTIA's members to speak.  On the other hand, Berkeley has a problem: This Court and the Ninth Circuit recently held that a city cannot force CTIA's members to disseminate its opinion.  *See CTIA-Wireless Ass'n v. City & Cnty. of San Francisco*, 827 F. Supp. 2d 1054 (N.D. Cal. 2011), *aff'd*, 494 F. App'x 752 (9th Cir. 2012).  So Berkeley tried to write around the First Amendment:  It artfully drafted the wording of the Ordinance to convey the "overall impression . . . that cell phones are dangerous," *id.* at 1062, yet still allow the City to attempt to argue, with something of a straight face, that it has done nothing but direct consumers to existing disclosures.

The Ordinance on its face belies this claim.  If all the City wanted was to "point[ ]" consumers "to the . . . manuals written by manufacturers," it would simply have done so.  Defs.' Opp. to Pl's. Mot. for Prelim. Inj. ("Opp."), Doc. 33, at 23.  But instead, Berkeley scripted its *own* editorial message, which it has already admitted "does *not* repeat the statements in manufacturers' existing consumer disclosures."  Defs.' Answer to Compl., Doc. 31, ¶ 85 (emphasis added).  The misleading and inaccurate nature of that message is readily apparent as soon as one compares it with the FCC's considered findings regarding cell phones' RF energy.  The conclusion that average consumers will draw from the City's message—which puts into the mouths of CTIA's members words such as "radiation," "potential risk . . . greater for children," and "how to use your phone safely," Berkeley Municipal Code § 9.96.030—is that cell phones are dangerous, especially for kids.  Whatever *facts* consumers might be interested to know about an issue does not justify force-feeding them skewed content based on a particular *point of view*.  That approach, not CTIA's, is the "paternalism" prohibited by the First Amendment.  Opp. 18.  And although the City disclaims any "purpose to engage a scientific debate through political means," *id.* at 1, it cannot help itself from proselytizing for its view that cell phones are unsafe no matter *how* used, *see id.* at 4 n.2 (arguing that "exposure to

cell phones adversely affects sperm") (quotation marks and citation omitted); *id.* at 16 (arguing that "children absorb more RF radiation than adults"); Opp. Exh. 3, ¶ 14 (stating that "RF fields are . . . a probable human carcinogen"). Because the Ordinance is misleading and inaccurate, because it will be interpreted by reasonable consumers as a warning that cell phones are dangerous, and because it concededly goes beyond the manufacturers' own disclosures, the Court should reject Berkeley's thinly veiled attempt to circumvent this Court's precedent and the Ninth Circuit's ruling.

## ARGUMENT

Berkeley's argument on *every* preliminary injunction factor depends heavily on its claim that the Ordinance does nothing more than require CTIA's members to "provide consumers with the same kind of information that manufacturers must already provide." Opp. 23. As shown below and in CTIA's opening brief, that contention is false. The Ordinance does not clarify anything; it *distorts* existing federal law and manufacturers' disclosures in order to stoke consumer fear about the safety of cell phones when used in a certain way. Moreover, Berkeley contests a *field* preemption argument CTIA does not make, overlooking CTIA's *conflict* preemption claim, and so does nothing to dispel the specter of municipalities across the country compelling different and conflicting messages about RF emissions. Berkeley thus fails to rebut CTIA's showing that a preliminary injunction is warranted given the *per se* irreparable harm that flows from constitutional violations.

## I.     CTIA Is Likely To Succeed On The Merits

Berkeley's Opposition does not defeat CTIA's argument that the ordinance violates the First Amendment, Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. ("Mem."), Doc. 4, at 7–18, and is preempted by federal law, *id.*, 18–21.

### A.     The Ordinance Violates The First Amendment By Compelling Misleading, Controversial Speech

"[T]he First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2243 (2015). That is because freedom of speech includes the right not to speak and the right to tailor one's speech. Mem. 7–9. Berkeley suggests that this fundamental right applies to nothing but political speech, and thus does not pertain to CTIA's members when

interacting with customers.  *See* Opp. 7 n.4.  But "[t]he right not to speak inheres in political and commercial speech alike."  *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996).

As a result, Berkeley bears the burden of establishing the Ordinance's constitutionality—a point the City does not contest.  Mem. 9–10.  Heightened scrutiny applies in this case, but the City cannot meet its burden *regardless* of the level of scrutiny.  It is undisputed that the government may not require businesses to disseminate misleading and inaccurate information.  *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd*, 131 S. Ct. 2729 (2011).  The Ordinance conveys just such a message, so it is unconstitutional and must be enjoined.

### 1.    The Ordinance Is Subject To Heightened Scrutiny

Because the Ordinance is a content- and viewpoint-based regulation of protected speech,[1] and because the City does not attempt to show (nor could it) that CTIA's members' existing speech is misleading, heightened scrutiny applies.  Mem. 8–10.  The City contends that *Zauderer* applies merely because the Ordinance compels a disclosure, rather than restricting speech.  Opp. 5–9.  That is incorrect.  *See*, *e.g.*, *Mason v. Fla. Bar*, 208 F.3d 952, 954–55 (11th Cir. 2000) (applying the *Central Hudson* standard to invalidate a disclosure requirement for truthful attorney advertising).  Although some circuit courts have extended *Zauderer* beyond a state's effort to combat potentially misleading advertising, the Supreme Court has never done so.  In fact, in *Milavetz*, the Court declined the State's request to hold that *Zauderer* applies whenever "the challenged provisions impose a disclosure requirement rather than an affirmative limitation on speech."  130 S. Ct. at 1339–40; *see also Dwyer v. Cappell*, 762 F.3d 275, 282 (3d. Cir. 2014) ("[*Milavetz*] explained that *Zauderer* applied because the provision in question was 'directed at misleading commercial speech' *and* 'impose[d] a disclosure

---

[1]  Berkeley cannot seriously dispute that the Ordinance is content- and viewpoint-based.  Opp. 8 n.4.  It requires CTIA's members to convey a message that they otherwise would not, and regulates "[c]ell phone retailer[s]" but no others.  What is more, Berkeley adopted the Ordinance "because of disagreement with the message" that cell phones are safe, as well as with how CTIA's members convey information to consumers—in accurate user manuals.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also* Mem. 8–9, 13.  The City responds that the "disclosures in *Zauderer* and *Milavetz*" were similar.  Opp. 8 n.4.  But those cases explicitly addressed a particular type of content:  misleading or deceptive commercial advertising.  *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1340 (2010); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

requirement rather than an affirmative limitation on speech.'" (emphasis added)).

Ultimately, "*Zauderer* is best read simply as an application of *Central Hudson*, not a different test altogether." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 33 (2014) (en banc) (Kavanaugh, J., concurring); *see also id.* at 26–27 (majority op.) ("[O]ne could think of *Zauderer* largely as an application of *Central Hudson*."). To justify forcing CTIA's members to deliver its message, then, Berkeley must show *at least* that the Ordinance "directly advances a substantial government interest and that the measure is drawn to achieve that interest." Mem. 9–10 (quoting *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667–68 (2011)).

### 2. The Ordinance Is Not Drawn To Achieve Any Substantial Or Even Legitimate Government Interest

Berkeley cannot show that the Ordinance is reasonably related to even a *legitimate* interest, much less a *substantial* interest. As previously explained, Berkeley "must demonstrate that the harms it recites are real" and that the Ordinance "will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The Opposition fails to do either, let alone both. Berkeley puts forward only one interest: "to assure that 'consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation.'" Opp. 9–10 (quoting Berkeley Municipal Code § 9.96.010(I)). That interest, standing alone, is not legitimate, and even if it were, the Ordinance is not reasonably related to it.

Regardless what percentage of Berkeley's inhabitants desire some information—even assuming that the City's survey itself is not misleading, *but see, e.g.*, *Berkeley Survey*, Opp. Exh. 2, at 1 (asking about "the government's *radiation tests* to assure the safety of cell phones" (emphasis added))—"consumer curiosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement." *Amestoy*, 92 F.3d at 74. Were it otherwise, "there is no end to the information that states could require manufacturers to disclose." *Id.* Most of Berkeley's residents probably do not know, for instance, that cell phone circuits are made of nickel rather than aluminum, and it is easy to imagine citizens answering "Yes" if asked in a survey whether they would like to know. But under *Edenfield*, the City could not justify a compelled disclosure on nickel versus aluminum without also showing that the distinction is relevant to some real harm.

1    Berkeley says that it wants its residents to "know about federally mandated RF limits and

2  instructions about how to remain within those limits," Opp. 11, but it *still* does not present any

3  evidence that the Ordinance addresses real harms.  It does not suffice to note that the FCC has

4  established RF guidelines that are "related to threshold levels for *potential* biological hazards."  *Id.* at

5  10 (emphasis added; citation omitted).  Without any evidence that exceeding the guidelines presents

6  an *actual* safety concern—and the FCC possesses "no evidence" that excess exposure from an

7  approved phone poses "any significant health risk," *In re Reassessment of FCC Radiofrequency*

8  *Exposure Limits & Policies*, 28 FCC Rcd. 3498, 3582 (¶ 251) (2013) ("*Reassessment*")[2]—Berkeley

9  can offer nothing but "speculation or conjecture," *Edenfield*, 507 U.S. at 770.

10    CTIA does not contend that "no government can have any legitimate interest in making the

11  public aware" of a "'bright line' standard" supported by a substantial "safety factor."  Opp. 12.

12  Instead, CTIA contends, as the Supreme Court has made clear, that government must point to real

13  harms before it may compel private speech.  Berkeley cannot do so here, not simply because the

14  FCC's guidelines incorporate a 50-fold safety factor, but because that buffer permits "even the

15  potential for exposures to occur in excess of [FCC] limits without posing a health hazard to humans."

16  *Reassessment*, ¶ 236.  That is so because exposure to RF energy is not cumulative and must reach a

17  certain *threshold* before it has even potentially adverse thermal effects.  *See* Compl. ¶¶ 29−30.  Thus,

18  according to the FCC itself, exposure "well above" the guideline "should not create an unsafe

19  condition."  *Id.*, ¶ 251.  Indeed, Berkeley has *conceded* that the Ordinance is not based on any

20  scientific evidence of real harm associated with RF energy emitted from cell phones.  Mem. 10; *see*

21  *also* Opp. 1 (disclaiming any "purpose to engage a scientific debate").[3]

22

23    [2]  The City criticizes CTIA for relying too heavily on the *Reassessment*, Opp. at 2, but it is the
        FCC's most recent discussion of the precise topic at issue in this case.

24

25    [3]  Consequently, enjoining the Ordinance would not draw this Court into "an endless line-drawing
        exercise" as to how much evidence of risk is sufficient.  Opp. 12.  Berkeley has made *no* attempt

26      to provide any evidence of a health or safety risk from exceeding the FCC's guidelines, and any
        evidence that it did put forth would conflict with the FCC's own statements.  The declarations

27      attached to the Opposition could not possibly suffice:  (1) they were not part of the legislative
        record; (2) they assert that cell phones are unsafe *regardless* of compliance with the guidelines;

28      and (3) in any event, the City says that "***nothing in this case turns on***" them.  *Id.* at 4 n.2.

The City has offered no interest sufficient to justify the Ordinance.  Indeed, the City could never offer an interest sufficient to justify forcing CTIA's members to convey its misleading and inaccurate message that cell phones are unsafe.

### 3.     The Ordinance Cannot Survive Even Under *Zauderer*

In any event, the Ordinance fails every element of the standard laid out in *Zauderer*.  As shown in CTIA's opening brief and further demonstrated below, the Ordinance is misleading, inaccurate, controversial, and unduly burdensome.  Nor does the Ordinance simply require the "same" information that manufacturers provide in their user manuals—as the Ordinance on its face makes clear and the City has *admitted* in this Court.  Opp. 23.

### (i)     The Ordinance Is Misleading, Not Purely Factual

a.     Read as a whole—as an average consumer would read it—the Ordinance is misleading.  *See* Mem. 14–15; *cf. CTIA*, 827 F. Supp. 2d at 1062 ("Although each factoid in isolation may have an anchor in some article somewhere, . . . [t]he overall impression left is that cell phones are dangerous.").  It conveys to an average person that the federal RF guideline is the demarcation point of "safety" for cell phones.  That is, it suggests that the federal government has determined that exposure to RF energy in any amount greater than the testing guideline creates a "safety" concern and a "potential risk."  But the Ordinance omits the FCC's considered view, which is precisely the opposite:  The FCC has "*no* evidence that [exceeding the Specific Absorption Rate ("SAR") limit] poses any significant health risk."  *Reassessment*, ¶ 251 (emphasis added).

The Ordinance also warns against particular ways of carrying a cell phone, yet omits that even when carried against the body, a cell phone could exceed the federal guideline only in the rare circumstance where it was operating continuously and at full power.  Further, the Ordinance ominously refers to "radiation"—rather than "RF energy" or "radio waves"—a term that consumers are likely to associate with dangerous ionizing radiation, such as nuclear radiation.  The City even cautions against a "potential risk" that is "greater for children," even though expert federal health and safety agencies have *rejected* that view.  And the Ordinance implies, incorrectly, that cell phone manufacturers view using body-worn devices as a "safe[ty]" issue.

Like *Casablanca*'s Captain Renault, the City is shocked, *shocked* to find that the Ordinance

could "somehow convey[ ] the impression that cell phones are unsafe."  Opp. 18.  But there is no other impression that realistically *could* come across to an average consumer from a warning—deemed significant enough in comparison to all other information to be directly conveyed at the point of sale—that strings together the phrases "assure safety," "radiation," "potential risk," "greater for children," and "use your phone safely."

Berkeley protests that, "*in every relevant respect*," the Ordinance is like a sodium disclosure (as well as other product labeling laws), and that forcing manufacturers "to declare the amount of salt in their product is not a claim that 'salt is unsafe.'"  Opp. 3, 8–9, 18 (emphasis added).  But the message conveyed by any particular compelled disclosure depends, of course, on what it actually says.  There is an obvious and significant difference between stating "This product contains 50 mg of sodium," which is an objectively verifiable and uncontroversial fact, and a compelled disclosure like Berkeley's that emphasizes safety, exposure guidelines, and a potential risk to children, all in conflict with the conclusions of federal regulators and the overwhelming weight of scientific evidence.  It is the *misleading* nature of the Ordinance, and the fact that it is *not* purely factual, that distinguishes it from the City's other examples of compelled disclosures.

That the City's Ordinance conveys a particular (indeed, erroneous) point of view about the safety of cell phones is confirmed not just by its text and common sense, but by the actual perceptions of actual readers.  *Cf.* Robert Post, Compelled Commercial Disclosure, 117 W. Va. L. Rev. 867, 910 (2015) ("[F]rom a constitutional perspective the meaning of the statement must be determined from the perspective of a reasonable member of the public.").  Several journalists have, in the course of covering the Ordinance, come away with the impression that Berkeley believes cell phones are dangerous.  For example, the Los Angeles Times reported that Berkeley was "the first municipality in the country to require that cellphone retailers warn customers that mobile devices may emit cancer-causing radiation."  David Lazarus, *Berkeley's Warning About Cellphone Radiation May Go Too Far*, L.A. Times (June 26, 2015), available at http://goo.gl/kQQHwE.[4]  Surely the City would not say

---

[4]  *See also*, *e.g.*, *Berkeley, California, to Require Cellphone Health Warnings*, CBSNews (May 13, 2015), available at http://goo.gl/uSi9qM; Anita Chabria, *City of Berkeley to Require Cellphone Sellers to Warn of Possible Radiation Risks*, The Guardian (May 16, 2015), available at http://goo.gl/irR550; Josh Harkinson, *Berkeley Votes to Warn Cellphone Buyers of Health Risks*,

Gibson, Dunn &
Crutcher LLP

these readers are not "reasonable member[s] of the public." Post, *supra*, at 910.  And if professional journalists, who have the benefit of ready access to additional information, perceive the meaning of the Ordinance this way, then the average consumer is certainly likely to do the same.

In short, the Ordinance trumpets Berkeley's opinion that cell phones, when carried in a particular manner, are not safe, and are especially dangerous for children.  The Ordinance was designed to convey just that message.  Compl. ¶¶ 110–113.  CTIA's members do not object to "public knowledge of factually true information," Opp. 18; they object to needlessly provoking consumer anxiety through misleading and exaggerated warnings.  If the City wants to communicate its scientifically unsupported opinion to its citizens, it must do so itself, not by conscripting CTIA's members to transmit a message with which they fundamentally disagree.

**b.**      The City attempts to avoid the obvious "Health and Safety Warning!" import of its message by analyzing the Ordinance sentence by sentence.  But even if every fact in each sentence were accurate—and they are not—the relevant question is what a reasonable reader would understand the disclosure to mean read as a whole.  *See CTIA*, 827 F. Supp. 2d at 1062; Post, *supra*, at 910.  The average cell phone buyer, when confronted with Berkeley's message, will not engage in the legalistic parsing that the City's Opposition proposes.  *See* Opp. 14–17.  For instance, the City explains:  "The words 'this potential risk' refer to the risk described in the preceding sentence, that device-on-body exposure 'may exceed federal guidelines.'"  *Id*. at 15; *see also id.* at 16 ("[T]he Ordinance does not state [that cells phones are not safe for children].  It states only that there is an increased risk that children will be exposed to RF radiation at levels that 'exceed federal guidelines.'").  It strains credulity that the average consumer will deconstruct the Ordinance like this.

Even read as decontextualized factoids, however, the statements are each misleading and false.  Opp. 14.  The declarations attached to Berkeley's brief do not establish, for example, that children are at greater risk of "device-on-body exposure" exceeding "federal guidelines."  *Id*. at 15.  That children may well "text more than adults," or keep their phones "in bed, or next to a bed," *id.* at 16, says nothing at all about whether children carry their phones against their *bodies* or do so while

Mother Jones (May 13, 2015), available at http://goo.gl/9calwS; *Berkeley Says Cell Phones Cause Tumors*, U.S. News (May 13, 2015), available at http://goo.gl/sL9MKm.

their phones are "transmitting continuously and at maximum power," *Reassessment*, ¶ 248.

Moreover, the City presents no evidence that children who carry their phones next to their bodies are likelier than adults who carry them that way to exceed the federal RF guidelines. Professor Gandhi, by his own admission, relied on "only head size difference" to conclude that "children absorb more RF radiation than adults." Opp. 16. According to the FCC, however, the standard head model used for testing "was designed to be conservative" relative to "model[ing] children." *Reassessment*, ¶ 245. And in any event, differences in *head* sizes are irrelevant to consumers' *body*-worn usage of cell phones, which is the subject of the Ordinance. *See Reassessment*, 28 FCC Rcd. at 3588 n.447 ("For the purposes of SAR determination, the human head and the body are simulated differently. . . . No spacers are allowed when the device is held to the head mannequin.").[5] Thus, *none* of the City's authorities provide support for its statement about a potential risk to children, a particularly inflammatory aspect of the compelled disclosure.

The Ordinance also misleadingly states that the information in cell phone user manuals concerns how to use phones "safely." Berkeley Municipal Code, § 9.96.030; *see* Mem. 15. In fact, the vast majority of manuals "make consumers aware of the need to maintain the body-worn distance *. . . if they want to ensure that their actual exposure does not exceed the SAR measurement obtained during testing*." *Reassessment*, ¶ 248 (emphasis added). The City conflates using "body-worn accessories to maintain [RF exposure] *compliance*," Opp. 16 (emphasis added) (quoting FCC KDB, No. 447498, *Gen. RF Exposure Guidelines*, § 4.2.2(4) ("FCC KDB")), with using a cell phone *safely*. But "exceeding the SAR limit does not necessarily imply unsafe operation." *Reassessment*, ¶ 251.

Berkeley avers that "the Ordinance states only what is uncontested: that device-on-body exposure 'may exceed the federal guidelines for exposure to RF radiation.'" Opp. 15 (quoting Berkeley Municipal Code § 9.96.030). But the Ordinance *omits* information that would keep that statement from being misleading. It omits that above-guideline exposure "might" occur only if the

---

[5]   Even if head sizes were relevant, the studies relied on by Professor Gandhi refute his assertion that "no research . . . would draw [his] conclusion into doubt." Opp. Exh. 5, ¶ 24. *See* Wiart, *Analysis of RF exposure in the head tissues of children and adults*, 53 Phys. Med. Biol. 3681, 3682 (2008) (identifying *two* studies (including Gandhi's) suggesting RF exposure is higher for children versus *six* finding that RF exposure in child models is "similar" to that in adult models).

phone "transmit[s] continuously and at maximum power." *Reassessment*, ¶ 248. It omits that the FCC possesses "no evidence that this poses any significant health risk." *Id.*, ¶ 251. It omits that the Commission's "limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature." *Id.* And it omits that, "[a]s a result, exposure well above the specified SAR limit should not create an unsafe condition." *Id.*

Whether read as a whole (as an average consumer would) or sentence by isolated sentence (as the Opposition does), Berkeley's Ordinance is misleading, and thus infringes on CTIA's members' freedom of speech under *Zauderer* and this Court's precedent in *CTIA*.

### (ii)    The Ordinance Is Controversial

Berkeley grudgingly acknowledges that "some courts" have held that compelled speech must be "uncontroversial." Opp. 17. But that requirement comes from *Zauderer* itself, which permits compelled disclosure only of "'purely factual and uncontroversial information.'" *Video Software Dealers Ass'n*, 556 F.3d at 966 (quoting *Zauderer*, 471 U.S. at 651). The Ordinance fails this test because: it forces CTIA's members to take the side of those who hold strong yet scientifically unsupported views about the safety of cell phones, thus implicating a matter of public controversy, Mem. 15–16 (citing *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 n.6 (2d Cir. 2014)); it is misleading and one-sided, *id.* at 16 (citing, *e.g.*, *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014)); and it uses inflammatory language designed to stoke public fear, *id.* (citing *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), *overruled on other grounds* by *American Meat Institute*, 760 F.3d 18). Berkeley responds by attacking a straw man, arguing that a regulation is not "controversial" merely "because a commercial entity objects to its own regulation." Opp. 17. This gets it backwards: CTIA's members object to the Ordinance *because* it is misleading and controversial. *See American Meat Institute*, 760 F.3d at 34 (Kavanaugh, J., concurring) (a compelled disclosure is not uncontroversial when it is not "evenhanded").

### (iii)    The Ordinance Is Unduly Burdensome

The Ordinance is unduly burdensome because it supplants CTIA's members' carefully considered messages with the City's preferred message at a crucial moment: the point of sale. Mem. 16–17. This imposition is no less burdensome because the City gives retailers a choice between

1   handing over a disclosure and posting it for consumers to see.  And to the extent that Berkeley asks

2   retailers to engage in counter-speech—perhaps in an attempt to inform consumers about the FCC's

3   *actual* determinations in this area—that is precisely the sort of burden that the First Amendment

4   guards against.  *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).

5   Berkeley's response unpersuasively dismisses CTIA's showing that sustaining the Ordinance

6   threatens to subject CTIA's members to a crazy quilt of inconsistent disclosure requirements.  Mem.

7   17.  Various "taxes, zoning requirements, and tort and contract rules"—even assuming they impose

8   "disclosure obligations" at all, Opp. 19—do not require CTIA's members to say one thing to

9   consumers in one town and make a contradictory statement to consumers in the neighboring village.

10              **(iv)     The Ordinance Is Nothing Like Existing Disclosures**

11         Berkeley's only real answer to all of this is to repeat that the FCC already requires

12   manufacturers to include in their operating manuals information "to enable users to select body-worn

13   accessories that meet the minimum test separation distance requirements," FCC KDB, § 4.2.2(4).

14   Opp. 1, 2, 4, 10, 11, 16, 19, 20, 22, 23-24.  On its face, however, the Ordinance makes clear that it

15   goes far beyond providing that "same" information.  *Id.* at 23.  If all the City wanted was to "point[ ]"

16   consumers "to the . . . manuals written by manufacturers," *id.,* it would simply have done so.  Instead,

17   Berkeley scripted its *own* editorial message, which dramatically changes the manufacturer's

18   disclosures in both content and context.  The City's characterization even misrepresents the

19   Ordinance's last sentence—"Refer to the instructions in your phone or user manual for information

20   about how to use your phone *safely*," Berkeley Municipal Code § 9.96.030 (emphasis added).

21         Critically for First Amendment purposes, the FCC does *not* dictate the content of CTIA's

22   members' speech, but instead leaves cell phone manufacturers free to decide how to convey accurate

23   information to customers.  Compl. ¶¶ 75; Opp. 22.  Unlike Berkeley, the FCC does not demand a

24   one-size-fits-all instruction to consumers about how to use their phones "safely," but instead allows

25   manufacturers flexibility in providing information to "enable" consumers "to maintain

26   compliance"—that is, to "meet the minimum test separation requirements."  FCC KDB, § 4.2.2(4);

27   *see also* Compl. ¶ 76.  Given the variety of ways in which manufacturers choose to exercise this

28   discretion, Compl. ¶ 77, there is *no* uniform way to paraphrase the disclosures.  Moreover, as the

1   FCC has stated, "a use that possibly results in noncompliance with the SAR limit *should not be*

2   *viewed with significantly greater concern than compliant use*."  *Reassessment*, ¶ 251 (emphasis

3   added).  Unlike Berkeley, the FCC does not require manufacturers to use inflammatory words—

4   "radiation," "safety," "potentially greater risk to children"—at all, much less at the point of sale.[6]

5        The *manner* in which Berkeley requires CTIA's members to deliver Berkeley's message—at

6   the point of sale, rather than in a user manual—also distinguishes the Ordinance from the FCC's

7   requirements.  That decision matters because it is context that affects the consumer's takeaway

8   message.  A manual or product packaging is the place where a consumer expects to find product

9   information that, though warranting disclosure, raises no immediate concern.  But consumers are not

10  accustomed to receiving warnings at the point of sale, and they are likely to believe that any "safety"

11  issue serious enough to warrant such explicit treatment is (or ought to be) a serious concern.[7]

12       Indeed, Berkeley has already *admitted* that "the Ordinance does *not* repeat the statements in

13  manufacturers' existing consumer disclosures."  Defs.' Answer to Compl. ¶ 85 (emphasis added).

14  The central premise of the City's case for the constitutionality of the Ordinance is untenable.

15       **B.     The Ordinance Is Preempted By An Exclusive Federal Regime Of Cell Phone**
         **Regulation**

16

17       The Ordinance is preempted by federal law because it stands as an "obstacle to the

18  accomplishment and execution of the full purposes and objectives of Congress."  *Wyeth v. Levine*,

19  555 U.S. 555, 563–64 (2009) (internal quotation marks omitted); Mem. 18–21.  Berkeley does not

20  dispute that the FCC balanced competing national priorities when it established a uniform national

21  regime for the regulation of cell phones and when it made a deliberate choice *not* to require warning

22  labels on cell phones.  *See* Opp. 20–21.  In fact, Berkeley hardly responds to CTIA's *conflict*

_____

23  [6]  It is Berkeley, not CTIA, that "seeks to short circuit" FCC review.  Opp. 13.  Enjoining the
    Ordinance would not affect FCC "reconsideration of what its RF exposure limits should be" in
24  any way.  *Id.*  The FCC's *Notice of Inquiry* sought comment on whether the agency should
    "requir[e] that advisory information be more prominent and detailed" in light of "the considerable
25  safety margin in [its] requirements" and the potential "costs and benefits" of such a requirement.
    *Reassessment*, ¶ 252.  If Berkeley disagrees with existing FCC disclosure requirements, then it is
26  free to share it views with the FCC in that proceeding.

27  [7]  For all these reasons, protecting CTIA's member's First Amendment rights in this case would
    not, as Berkeley suggests (Opp. 13) cast any doubt on the FCC requirements' constitutionality.
28

preemption argument at all; it challenges a *field* preemption argument that CTIA does not raise.  *Id.*

Specifically, the City argues that the FCC has not occupied "the field of consumer disclosures to cellphone purchasers."  Opp. 22.  But the FCC has *regulated* in that field, and the City's own brief demonstrates that the Ordinance interferes with the objectives of those regulations.  As the City concedes, the FCC "has not specified precisely what th[e] information [in cell phone user manuals] must be," leaving the "details" to "the manufacturers."  *Id.*  Preserving manufacturer "flexibility" in how to disclose information to consumers was, in the FCC's view, "the most cost-effective way to *reliably achieve awareness.*"  *Reassessment*, ¶ 63 (emphasis added).  Berkeley does not and cannot contest that "that manufacturer choice was an important regulatory objective," *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1137 (2011).  *See* Opp. 22.  Yet the Ordinance deprives manufacturers of that flexibility, scripting a warning label for use in general population settings that the FCC has declined to require even for users in occupational settings.  Mem. 5, 20.

Because the Ordinance is an obstacle to the FCC's regulatory objectives, it is preempted even if its language were merely "complementary" to FCC regulations, Opp. 22.  *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 886 (2000).  But it is not true that Berkeley requires the "same kind of information" as does the FCC.  Opp. 23.  Instead, the City demands a misleading and one-sided message conveying Berkeley's view that cell phones are unsafe, particularly for children.  That message frustrates, rather than complements, the FCC's message that cell phones approved for sale in the United States are safe for everyone.  Mem. 19–20.

Finally, the City distinguishes between its regulation of cell phone retailers and the FCC's regulation of manufacturers.  Opp. 21.  But the City does not explain how that is relevant from the standpoint of the consumer.  The FCC's comprehensive regulatory scheme encompasses not just what should be said, but who should say it, and the City may not enact an Ordinance that conflicts with either (indeed, both) of those determinations.

## II.    CTIA's Members Will Be Irreparably Injured If The Ordinance Is Enforced

At a minimum, CTIA has raised serious First Amendment concerns about the Ordinance, which by itself "compels a finding that the potential for irreparable injury exists."  *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*.").  *But see* Opp. 23 n.10.

Berkeley suggests that only "restrictions on speech," as opposed to compelled disclosures, cause irreparable injury.  Opp. 23.  There is no doctrinal basis for such a distinction:  The First Amendment protects the right not to speak just as the right to speak.  Berkeley's sole citation for this dubious proposition merely distinguishes direct from indirect speech burdens.  *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003).  But "mandatory" disclosures directly burden speech, "creat[ing] a presumption of irreparable harm."  *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 266 n.4 (2d Cir. 2014) (quotation marks omitted); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 190 (4th Cir. 2013) (finding irreparable harm and enjoining mandate that pregnancy resource centers post signs encouraging customers to seek medical advice).  Here, because the "deprivation of plaintiffs' First Amendment rights results directly from a policy of the defendant . . ., irreparable harm may be presumed."  *Bronx Household of Faith*, 331 F.3d at 350.

In addition, the Ordinance will cause irreparable injury to the customer goodwill and reputation of CTIA's members.  Again, Berkeley's claim that the Ordinance is "nothing but an arrow that points to the very manuals written by manufacturers represented by CTIA," Opp. 23, is false. The Ordinance also causes irremediable harm by forcing CTIA's members to choose between suffering the consequences of violating a preempted law and the injury of obeying that law during the pendency of these proceedings—a harm that Berkeley's Opposition does not address.

## III.   The Balance Of Harms Favors CTIA Because An Injunction Will Not Harm The City

Berkeley shows no urgent need for the Ordinance, which was supposedly enacted for only one reason:  Residents do not know a piece of information that might lead them to change their behavior if they knew it.  Opp. 23–24.  According to Berkeley, this outweighs the Ordinance's burden on CTIA's members' First Amendment rights regardless of whether there is *any* reason for residents to change their behavior—a factor that Berkeley claims is irrelevant.  *Id.* at 4 ("Berkeley does not challenge the science of cell phone radiation.  Its aim is not to induce or to force people to reduce their cell phone usage.").  Berkeley cites no precedent to support its calculation, and the law is clear that it "has no legitimate interest in enforcing an unconstitutional ordinance."  *KH Outdoor, LLC v.*

1    *City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

2           Berkeley has "established" nothing about whether citizens would change their behavior based

3    on *accurate and balanced information* "about RF exposure limits"—information already contained in

4    user manuals.  *Cf.* Opp. 23.  The survey that Berkeley relies on to support its arguments is, like the

5    Ordinance itself, highly misleading.  In an automated phone survey, Berkeley asked residents about

6    "government[ ] radiation tests to assure the safety of cell phones," *Berkeley Survey*, at 1, a loaded

7    question at best.  The City also asked residents whether they would change their behavior if they

8    knew these "radiation tests" "assume that a cell phone w[ill] not be carried against [the] body."  *Id.*

9    But the FCC's approval process "assumes" nothing about how cell phones are used—the FCC

10   designed it to ensure that, when a cell phone is tested to comply with the FCC's SAR limit, that

11   phone is safe no matter how it is worn.  *Reassessment*, ¶ 251.  Thus, even if citizens' desire to know

12   more about the FCC's SAR limit could alone outweigh CTIA's members' constitutional rights—and

13   it cannot—Berkeley has not established that harm.

14   **IV.    The Public Interest Would Be Served By Enjoining The Ordinance**

15          Berkeley indicates that the Ordinance is "about safety" and involves "safety risks," Opp. 24,

16   apparently overlooking its earlier insistence that it had no purpose "to challenge the safety of cell

17   phones."  Opp. 9.  Rather than show that the FCC has ignored a genuine public safety concern,

18   however, the City hyperbolically summons "the ghost of *Lochner*."  *Id.* at 23–24.  But it is

19   fundamental that the Constitution limits a city's ability to infringe fundamental rights, and the federal

20   courts are charged with protecting those rights.  "The Constitution 'does not enact Mr. Herbert

21   Spencer's Social Statics.'  It does enact the First Amendment."  *Sorrell*, 131 S. Ct. at 2665 (quoting

22   *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting)).  The public interest will be

23   *disserved* by compelling CTIA's members to convey misleading and controversial information that

24   conflicts with the judgment and requirements of the FCC.

25                                        **CONCLUSION**

26          For these reasons, and those set forth in CTIA's opening brief, CTIA respectfully requests

27   that this Court preliminarily enjoin all Defendants from enforcing or causing to be enforced Berkeley

28   Municipal Code Chapter 9.96 before the Ordinance goes into effect, pending final judgment.

1    July 20, 2015                                    By:  /s/ Theodore B. Olson

2                                                     Theodore B. Olson
3                                                     Helgi C. Walker
                                                      Joshua S. Lipshutz
4                                                     Joshua D. Dick
                                                      Michael R. Huston
5                                                     Jacob T. Spencer

6                                                     GIBSON, DUNN & CRUTCHER LLP

7                                                     *Attorneys for Plaintiff*
8                                                     *CTIA – The Wireless Association®*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28