Theodore B. Olson (#38137)
TOlson@gibsondunn.com
Helgi C. Walker (Pro Hac Vice)
HWalker@gibsondunn.com
Michael R. Huston (#278488)
MHuston@gibsondunn.com
Jacob T. Spencer (Pro Hac Vice)
JSpencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    202.955.8668
Facsimile:    202.530.9575

Joshua S. Lipshutz (#242557)
JLipshutz@gibsondunn.com
Joshua D. Dick (#268853)
JDick@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:    415.393.8233
Facsimile:    415.374.8469

*Attorneys for Plaintiff*
*CTIA – The Wireless Association®*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION®, | **CASE NO. 3:15-cv-02529** |
| Plaintiff, | **STATEMENT OF RECENT DECISIONS** |
| v. | Date:   August 20, 2015 |
| THE CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, in her official capacity, | Time:  1:30 PM |
| | Place:  Courtroom 5, 17th Floor, San Francisco |
| Defendants. | |

1    Pursuant to Local Rule 7-3(d), Plaintiff CTIA – The Wireless Association® respectfully

2    brings to the Court's attention two recent decisions in support of its Motion for Preliminary

3    Injunction:   *Norton v. City of Springfield, Ill.*, No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7,

4    2015), attached as Exhibit A, and *Cahaly v. Larosa*, No. 14-1651, 2015 WL 4646922 (4th Cir. Aug.

5    6, 2015), attached as Exhibit B.  These decisions are relevant to Plaintiff's Memorandum in Support

6    of Plaintiff's Motion for Preliminary Injunction, Dkt. 4, at 8–10, and Plaintiff's Reply in Support of

7    Plaintiff's Motion for Preliminary Injunction, Dkt. 38, at 3–4 & n.1, discussing content-based

8    regulation of speech.   For the Court's convenience, CTIA also attaches *Reed v. Town of Gilbert,*

9    *Ariz.*, 135 S. Ct. 2218 (2015), attached as Exhibit C, on which both decisions relied.

10

11   August 17, 2015                                          By:  /s/ Theodore B. Olson

12                                                            Theodore B. Olson
                                                             Helgi C. Walker
13                                                           Joshua S. Lipshutz
                                                             Joshua D. Dick
14                                                           Michael R. Huston
                                                             Jacob T. Spencer
15

16                                                           GIBSON, DUNN & CRUTCHER LLP

17                                                           *Attorneys for Plaintiff*
18                                                           *CTIA – The Wireless Association®*

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 13-3581

DON NORTON and KAREN OTTERSON,

*Plaintiffs-Appellants,*

*v.*

CITY OF SPRINGFIELD, ILLINOIS, *et al.,*

*Defendants-Appellees.*

———————————

On Petition for Rehearing

———————————

DECIDED AUGUST 7, 2015

———————————

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Our first decision in this appeal concluded that Springfield's anti-panhandling ordinance does not draw lines based on the content of anyone's speech. Because the litigants agreed that the ordinance's validity depends on this issue, we affirmed the district court's decision. 768 F.3d 713 (7th Cir. 2014). We deferred consideration of the petition for rehearing until the Supreme Court decided *Reed v. Gilbert*, 135 S. Ct. 2218 (2015). Shortly after deciding *Reed*, the Court remanded *Thayer v. Worcester*, 755

F.3d 60 (1st Cir. 2014), a panhandling-ordinance decision on which our first opinion had relied, for further consideration in light of *Reed*. 135 S. Ct. 2887 (2015). At our request, the parties filed supplemental memoranda discussing *Reed*. We now grant the petition for rehearing and apply *Reed* to Springfield's ordinance.

As our first opinion explained, §131.06 of Springfield's Municipal Code

> prohibits panhandling in its "downtown historic district"—less than 2% of the City's area but containing its principal shopping, entertainment, and governmental areas, including the Statehouse and many state-government buildings. The ordinance defines panhandling as an oral request for an immediate donation of money. Signs requesting money are allowed; so are oral pleas to send money later. Springfield evidently views signs and requests for deferred donations as less impositional than oral requests for money immediately, which some persons (especially at night or when no one else is nearby) may find threatening.

768 F.3d at 714. Plaintiffs contend that the ordinance's principal rule—barring oral requests for money now but not regulating requests for money later—is a form of content discrimination.

The panel disagreed with that submission for several reasons. We observed that the ordinance does not interfere with the marketplace for ideas, that it does not practice viewpoint discrimination, and that the distinctions that plaintiffs call content discrimination appear to be efforts to make the ordinance less restrictive, which should be a mark in its favor. We summed up: "The Court has classified two kinds of regulations as content-based. One is regulation that restricts speech because of the ideas it conveys. The other is regula-

tion that restricts speech because the government disap-
proves of its message. It is hard to see an anti-panhandling
ordinance as entailing either kind of discrimination." 768
F.3d at 717 (citations omitted). We classified the ordinance as
one regulating by subject matter rather than content or
viewpoint.

*Reed* understands content discrimination differently. It
wrote that "regulation of speech is content based if a law
applies to particular speech because of the topic discussed *or*
the idea or message expressed." 135 S. Ct. at 2227 (emphasis
added). Springfield's ordinance regulates "because of the
topic discussed". The Town of Gilbert, Arizona, justified its
sign ordinance in part by contending, as Springfield also
does, that the ordinance is neutral with respect to ideas and
viewpoints. The majority in *Reed* found that insufficient: "A
law that is content based on its face is subject to strict scruti-
ny regardless of the government's benign motive, content-
neutral justification, or lack of 'animus toward the ideas con-
tained' in the regulated speech." 135 S. Ct. at 2228. It added:
"a speech regulation targeted at specific subject matter is
content based even if it does not discriminate among view-
points within that subject matter." *Id*. at 2230.

Three Justices concurred only in the judgment in *Reed*.
135 S. Ct. at 2236–39 (Kagan, J., joined by Ginsburg & Breyer,
JJ.). Like our original opinion in this case, these Justices
thought that the absence of an effort to burden unpopular
ideas implies the absence of content discrimination. But the
majority held otherwise; that's why these three Justices
wrote separately. The majority opinion in *Reed* effectively
abolishes any distinction between content regulation and
subject-matter regulation. Any law distinguishing one kind

of speech from another by reference to its meaning now re-
quires a compelling justification.

Our observation, 768 F.3d at 717, that Springfield has at-
tempted to write a narrowly tailored ordinance now pertains
to the justification stage of the analysis rather than the classi-
fication stage. But Springfield has not contended that its or-
dinance is justified, if it indeed represents content discrimi-
nation. As we said at the outset, the parties have agreed that
the ordinance stands or falls on the answer to the question
whether it is a form of content discrimination. *Reed* requires
a positive answer.

The judgment of the district court is reversed, and the
case is remanded for the entry of an injunction consistent
with *Reed* and this opinion.

MANION, *Circuit Judge,* concurring.

I join the opinion of the court in full, but write separately to underscore the significance of the Supreme Court's recent decision in *Reed v. Town of Gilbert,* which held that a speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter. 135 S. Ct. 2218, 2230 (2015). *Reed* injected some much-needed clarity into First Amendment jurisprudence and, in doing so, should eliminate the confusion that followed from *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). While *Ward* is well-recognized as the Court's seminal time, place, and manner First Amendment case, it also described a standard for content-neutrality that was in tension with the Court's developing content-based regulation of speech doctrine. *Reed* resolved this uncertainty.

*Ward* stated that "[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." 491 U.S. at 791. Over time, courts interpreted this statement to mean that it did not matter if a law regulated speakers based on what they said, so long as the regulation of speech was not imposed because of government disagreement with the message. Under this approach, if an ordinance was not viewpoint-based, then it was content-neutral. For example, a local government's decision to eliminate religious speech or abortion-related speech was considered content-neutral because it was not viewpoint-based—as, for instance, a regulation prohibiting "Christian speech" or "pro-life speech" was and remains. *Reed* eliminates this distinction. 135 S. Ct. at 2227 (concluding that a speech regulation is content-based if it prohibits the topic discussed or the idea or message expressed);

*ante* at 3 ("*Reed* effectively abolishes any distinction between content regulation and subject-matter regulation."). On this point, *Reed* overrules *Ward*.

*Reed* saw what *Ward* missed—that topical censorship is still censorship. Rejecting the idea that the government may remove controversial speech from the marketplace of ideas by drafting a regulation to eliminate the topic, *Reed* now requires any regulation of speech implicating religion or abortion to be evaluated as content-based and subject to strict scrutiny, just like the aforementioned viewpoint-based restrictions covering more narrow contours of speech. 135 S. Ct. at 2228, 2230. Few regulations will survive this rigorous standard.

Because the court has faithfully applied *Reed* to the City's ordinance, I concur.

# EXHIBIT B

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-1651**

———————

ROBERT C. CAHALY,

               Plaintiff – Appellee,

      v.

PAUL C. LAROSA, III; REGINALD I. LLOYD; SOUTH CAROLINA LAW
ENFORCEMENT DIVISION,

               Defendants – Appellants.

———————

**No. 14-1680**

———————

ROBERT C. CAHALY,

               Plaintiff – Appellant,

      v.

PAUL C. LAROSA, III; REGINALD I. LLOYD; SOUTH CAROLINA LAW
ENFORCEMENT DIVISION,

               Defendants – Appellees.

———————

Appeals from the United States District Court for the District
of South Carolina, at Greenville.  J. Michelle Childs, District
Judge.  (6:13-cv-00775-JMC)

———————

Argued:  March 25, 2015          Decided:  August 6, 2015

———————

Before WYNN, DIAZ, and THACKER, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Diaz wrote the opinion, in which Judge Wynn and Judge Thacker joined.

---

**ARGUED:** Kenneth Paul Woodington, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellants/Cross-Appellees. Samuel Darryl Harms, III, HARMS LAW FIRM, PA, Greenville, South Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Robert D. Cook, Solicitor General, OFFICE OF THE ATTORNEY GENERAL, Columbia, South Carolina; William H. Davidson, II, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellants/Cross-Appellees.

---

DIAZ, Circuit Judge:

Robert C. Cahaly, a self-described Republican political consultant, was arrested for alleged violations of South Carolina's anti-robocall statute. After the charges were dismissed, Cahaly filed suit, challenging the statute on three First Amendment grounds: as an unlawful regulation of speech, as impermissibly compelling speech, and as unconstitutionally vague. Cahaly also sought damages from the law enforcement officials involved in his arrest (and the agency employing them), advancing claims under 42 U.S.C. § 1983 and state law for false imprisonment and malicious prosecution.

Under the content-neutrality framework set forth in <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218 (2015), we find that the anti-robocall statute is a content-based regulation that does not survive strict scrutiny.[1] We also hold that Cahaly lacks standing to bring compelled-speech and vagueness challenges, and that his other claims fail due to the presence of probable cause to arrest him. As a result, we affirm the district court's judgment except for the compelled-speech claim, which we vacate and remand with instructions to dismiss it.

---

[1] We received supplemental briefs from the parties on the import of <u>Reed</u> to the issues on appeal.

I.

A.

In 1991, the South Carolina General Assembly enacted a statute regulating automated telephone calls that deliver recorded messages, or "robocalls."[2]  This statute places different restrictions on robocalls depending on whether they are (1) unsolicited and (2) made for consumer, political, or other purposes.  By definition, it prohibits only those robocalls that are "for the purpose of making an unsolicited consumer telephone call" or are "of a political nature including, but not limited to, calls relating to political campaigns."  S.C. Code Ann. § 16-17-446(A).

All qualifying robocalls are banned with three exceptions, based on the express or implied consent of the called party:

> (1) in response to an express request of the person called; (2) when primarily connected with an existing debt or contract, payment or performance of which has not been completed at the time of the call; (3) in response to a person with whom the telephone solicitor has an existing business relationship or has had a previous business relationship.

Id. § 16-17-446(B).  If an exception applies, the permitted robocall must "disconnect immediately when the called party hangs up"; must be made between 8:00 AM and 7:00 PM; and "may

---

[2] The statute refers to robocalls as "Adad calls," which stands for "automatically dialed announcing device."  S.C. Code Ann. § 16-17-446 (2014).

4

not ring at hospitals, police stations, fire departments, nursing homes, hotels, or vacation rental units." <u>Id.</u> § 16-17-446(C)(2)-(4).   Some permitted robocalls must also disclose certain information to the called party: "(1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; [and] (3) the nature of the goods or services." <u>Id.</u> §§ 16-17-445(B)(1)-(3), -446(C)(1).

Other statutory provisions contain rules for live solicitors making unsolicited consumer telephone calls. Solicitors must place their calls from 8:00 AM and 9:00 PM, make certain disclosures, and maintain a do-not-call list.   <u>Id.</u> §§ 16-17-445(B)-(E).

A violation of the statute constitutes a misdemeanor offense.   <u>Id.</u> § 16-17-446(D) (cross-referencing § 16-17-445(F)). A first or second conviction carries a maximum punishment of a $200 fine or 30 days in prison while a third or later conviction carries a fine of $200 to $500 or the same maximum 30 days' imprisonment.   <u>Id.</u>

B.

On September 23, 2010, Cahaly allegedly placed robocalls in six South Carolina house legislative districts.   With the name changed to reflect the Democratic candidate in each district, the calls' prerecorded message said:

Please hold for a one-question survey.

5

> As you may have heard, Speaker of the House Nancy
> Pelosi is coming to South Carolina.
>
> Do you think incumbent Democrat Anne Peterson Hutto
> should invite her fellow Democrat Nancy Pelosi to come
> campaign for her?
>
> Press 1 if you think incumbent Democrat Anne Peterson
> Hutto should invite her fellow Democrat Nancy Pelosi
> to come and campaign for her.
>
> Press 2 if you think incumbent Democrat Anne Peterson
> Hutto should not invite her fellow Democrat Nancy
> Pelosi to come and campaign for her.

J.A. 219-20.

About one week before the calls were placed, an attorney with the South Carolina Office of the Attorney General told Cahaly that the anti-robocall statute did not cover "automated telephone survey polls of a political nature." J.A. 74. The attorney encouraged him to ask a member of the state House of Representatives to seek a written opinion to that effect. A representative made that request, and the Attorney General issued a letter, the day before Cahaly made the robocalls, stating:

> In the opinion of this office, organizations, such as
> Survey USA, may routinely conduct automated survey
> telephone calls for political purposes in this State
> that require the recipient's responses via a phone
> key.  The purpose of the ADAD law is to prohibit the
> unwarranted invasion by automated dialing devices in
> order to promote advocacy of a "product" including a
> particular candidate.  Thus, as long as these polling
> calls, even if they are of a political nature, do not
> advocate a particular political candidate but simply

6

obtain a "snapshot" opinion of a voter, they may be made.

J.A. 83.

The day after Cahaly placed the robocalls, an incumbent seeking reelection in one of the targeted districts wrote to the South Carolina Law Enforcement Division ("SLED") reporting that her constituents had received telephone calls that violated the anti-robocall statute.  Over the next three weeks, Democratic candidates in the other five districts also reported to SLED that their constituents had received the same calls using their names.

On November 1, 2010, a state magistrate judge issued six warrants--one for each targeted district--for Cahaly's arrest. The election was held November 2.  That same day, SLED issued a press release announcing the warrants.  On November 3, Cahaly turned himself in, was booked, and was released on his own recognizance.  The warrants were dismissed eighteen months later.

### C.

Cahaly filed a complaint in state court against SLED; Paul C. LaRosa, III, a special agent with SLED who completed the arrest warrant applications; and Reginald I. Lloyd, the director of SLED at the time of Cahaly's arrest (collectively, the "Defendants").  Cahaly sought a declaration that the anti-

7

robocall statute was unconstitutional and an injunction prohibiting the Defendants from enforcing it. He also alleged a damages claim under 42 U.S.C. § 1983 and state law claims for false imprisonment and malicious prosecution.

The Defendants removed the case to federal court. Cahaly moved for partial summary judgment on his claim for declaratory and injunctive relief. The Defendants moved for summary judgment on all claims.

The district court granted Cahaly's motion, declared the anti-robocall statute unconstitutional, and issued a permanent injunction barring enforcement of the statute. The district court concluded that the statute was a content-based restriction on speech and applied strict scrutiny. Under that rubric, the court found the statute unconstitutional due to "its underinclusiveness and its singling out of commercial and political speech" when the asserted government interest was to eliminate nearly all robocalls to protect residential privacy. Cahaly v. LaRosa, 25 F. Supp. 3d 817, 827 (D.S.C. 2014). The court also determined that the statutory provision requiring robocalls to disclose certain identifying information was unconstitutional as compelled speech, but that Cahaly lacked standing to bring his vagueness challenge.

The district court awarded summary judgment to the Defendants on Cahaly's other claims. The court held that LaRosa

and Lloyd were entitled to qualified immunity on the § 1983 claim because the right at issue was not clearly established. The court also held that the existence of probable cause to arrest Cahaly defeated his false imprisonment and malicious prosecution claims.

The Defendants appeal the district court's judgment granting declaratory and injunctive relief. Cahaly cross-appeals the district court's judgment on his damages claims. We review de novo the district court's order granting summary judgment and its ruling that a party lacks standing. Brown v. Town of Cary, 706 F.3d 294, 300 (4th Cir. 2013).


II.

We begin with Cahaly's First Amendment claim. First, we consider whether the anti-robocall statute is a content-neutral restriction on speech subject to intermediate scrutiny or a content-based restriction that must withstand strict scrutiny. We then turn to whether the statute's mandatory disclosure provision constitutes compelled speech. Lastly, we reach Cahaly's vagueness challenge. As explained below, we hold that the statute is content based and does not survive strict scrutiny, and that Cahaly lacks standing to bring his compelled-speech and vagueness challenges.

A.

The Supreme Court recently clarified the content-neutrality inquiry in the First Amendment context.   In Reed, the Court explained that "the crucial first step in the content-neutrality analysis" is to "determin[e] whether the law is content neutral on its face."   135 S. Ct. at 2228.   At the second step, a facially content-neutral law will still be categorized as content based if it "cannot be '"justified without reference to the content of the regulated speech,"' or . . . adopted by the government 'because of disagreement with the message [the speech] conveys.'"   Id. at 2227 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).

This formulation conflicts with, and therefore abrogates, our previous descriptions of content neutrality in cases such as Brown v. Town of Cary.   See 706 F.3d at 303 ("[I]f a regulation is 'justified without reference to the content of regulated speech,' [citation omitted] 'we have not hesitated to deem [that] regulation content neutral even if it facially differentiates between types of speech.'") (quoting Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359, 366 (4th Cir. 2012) (last alteration in original)).   Our earlier cases held that, when conducting the content-neutrality inquiry, "[t]he government's purpose is the controlling consideration." Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th

10

Cir. 2013) (quoting Ward, 491 U.S. at 791).  But Reed has made clear that, at the first step, the government's justification or purpose in enacting the law is irrelevant.  135 S. Ct. at 2228-29.

Applying Reed's first step, we find that South Carolina's anti-robocall statute is content based because it makes content distinctions on its face.  Reed instructs that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  135 S. Ct. at 2227.  Here, the anti-robocall statute applies to calls with a consumer or political message but does not reach calls made for any other purpose. Because of these facial content distinctions, we do not reach the second step to consider the government's regulatory purpose. See id. at 2228 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral.")

As a content-based regulation of speech, the anti-robocall statute is subject to strict scrutiny.  Id. at 2231.  Under this standard, the government must prove "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  Id. (quoting Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2817 (2011)).  "If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative."  United

11

<u>States v. Playboy Entm't Grp., Inc.</u>, 529 U.S. 803, 813 (2000). Moreover, the restriction cannot be overinclusive by "unnecessarily circumscrib[ing] protected expression," <u>Republican Party of Minn. v. White</u>, 536 U.S. 765, 775 (2002) (quoting <u>Brown v. Hartlage</u>, 456 U.S. 45, 54 (1982)), or underinclusive by "leav[ing] appreciable damage to [the government's] interest unprohibited," <u>Reed</u>, 135 S. Ct. at 2232 (quoting <u>White</u>, 536 U.S. at 780).

The asserted government interest here is to protect residential privacy and tranquility from unwanted and intrusive robocalls. Assuming that interest is compelling, we hold that the government has failed to prove that the anti-robocall statute is narrowly tailored to serve it. Plausible less restrictive alternatives include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists. <u>See</u> <u>Maryland v. Universal Elections, Inc.</u>, 729 F.3d 370, 376 (4th Cir. 2013) (evaluating the federal Telephone Consumer Protection Act's identity disclosure requirement); <u>Nat'l Fed'n of the Blind v. F.T.C.</u>, 420 F.3d 331, 333-34 (4th Cir. 2005) (examining a federal regulation that "requires callers to make certain disclosures, refrain from making late-night, early-morning, and 'abandoned calls' (calls followed by silence), and comply with a . . . 'do-not-call list'"); <u>Van Bergen v. Minnesota</u>, 59 F.3d 1541, 1551 (8th Cir. 1995) (considering

12

Minnesota's ban on robocalls from 9 PM to 9 AM).  The government has offered no evidence showing that these alternatives would not be effective in achieving its interest.

In addition, the record contains evidence that the anti-robocall statute is overinclusive.  The Defendants themselves cite to a report from a U.S. House of Representatives committee that concluded, "Complaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations."  H.R. Rep. 102-317, at 16 (1991).  Yet the statute also targets political calls.

At the same time, the statute suffers from underinclusiveness because it restricts two types of robocalls--political and consumer--but permits "unlimited proliferation" of all other types.  Reed, 135 S. Ct. at 2231; see id. ("The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem.").

Because the statute does not pass muster under strict scrutiny, we affirm the district court's judgment declaring it unconstitutional.

B.

Turning to Cahaly's compelled-speech challenge, if robocalls are permitted because they fall within one of the

13

three exceptions listed in Section 16-17-446(B), then the statute requires those calls to disclose "(1) the identity of the seller; (2) that the purpose of the call is to sell goods or services; [and] (3) the nature of the goods or services." S.C. Code Ann. § 16-17-446(C)(1) (cross-referencing § 16-17-445(B)(1)-(3)). The district court ruled that these mandatory disclosures unconstitutionally compel speech. The Defendants contend this ruling is in error due to the absence of a case or controversy, a jurisdictional prerequisite under Article III of the U.S. Constitution. We agree.

One requirement of Article III standing is that the plaintiff suffer an "injury in fact." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). While "actual arrest or prosecution" for violating a statute establishes an injury in fact, Steffel v. Thompson, 415 U.S. 452, 459 (1974), so too may a "credible threat of prosecution thereunder." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).

As the Defendants note, Cahaly was not charged with violating Section 16-17-446(C)(1), the disclosure provision, despite the affidavits submitted to the magistrate judge alleging that Cahaly's robocalls "failed to promptly disclose in a clear and conspicuous manner to the receiver of the call the

14

identity of the originating party, endorsement of a candidate and or [sic] the nature of the call." J.A. 237-42. Rather, he was charged solely with violating Sections 16-17-446(A)-(B), which ban political robocalls outright. In addition, the affidavits do not allege any facts about Cahaly's relationship to the called parties, but the called parties' express or implied consent to being called is a necessary condition for the disclosure provision to apply. See S.C. Code Ann. § 16-17-446(B)-(C). Thus, federal jurisdiction hinges on whether Cahaly faces "sufficiently imminent" future arrest or prosecution. Driehaus, 134 S. Ct. at 2342.

The record contains no evidence to support this prerequisite to federal jurisdiction. In a declaration, Cahaly explains his "desire to conduct telephone survey polls in the future in the State of South Carolina of a political nature and telephone calls related to political campaigns." J.A. 73. But never does he allege his intention to make robocalls permitted by the statute, and therefore subject to the disclosure provision, by falling within one of the Section 16-17-446(B) exceptions.

As a result, Cahaly lacks standing to challenge the disclosure provision as compelled speech. We therefore vacate the district court's judgment on this claim, and remand with instructions to dismiss it.

C.

Regarding Cahaly's vagueness challenge, the district court ruled that he lacked standing to press it.  We agree.

"One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  Parker v. Levy, 417 U.S. 733, 756 (1974).  Cahaly argues that the anti-robocall statute does not clearly apply to him because he made survey calls.  But he does not dispute that his robocalls were also "of a political nature," a category to which the statute expressly applies.  S.C. Code Ann. § 16-17-446(A).  Because the statute squarely covers Cahaly's calls, we affirm the district court's judgment dismissing his vagueness challenge.


III.

We turn to Cahaly's cross-appeal of his § 1983 and state law claims.  Because we find that probable cause supported his arrest for violating the anti-robocall statute, we affirm the district court's grant of summary judgment to the Defendants.

A.

Cahaly alleges that LaRosa and Lloyd violated § 1983 by arresting and prosecuting him in retaliation for his exercise of free speech.  He first argues that a genuine issue of material fact exists as to whether LaRosa had probable cause to arrest him.  We disagree.

16

A law enforcement officer who obtains an arrest warrant loses the protection of qualified immunity "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991) (alteration in original) (quoting Malley v. Briggs, 475 U.S. 335, 344-45 (1986)). "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). Although we agree with Cahaly and the district court that the statute is unconstitutional, at the time of Cahaly's arrest, "there was no controlling precedent that [the statute] was or was not constitutional [and a] prudent officer [is not] required to anticipate that a court would later hold the [statute] unconstitutional." Id. at 37-38. Thus, our earlier holding has no bearing on whether LaRosa had probable cause when he arrested Cahaly.

Before making the arrest, LaRosa had statements from six witnesses describing the robocalls and a recording of one of the calls. Some of the witnesses also provided the telephone number of the caller, and a later investigation connected that number

17

to Cahaly as the president of the entity that paid for it. Moreover, one witness reported that the call "was not a real survey because pressing a button was not an option."  J.A. 128.

LaRosa was also aware of the Attorney General's opinion letter stating that "automated survey telephone calls for political purposes" fell outside the anti-robocall statute. J.A. 83.  However, we think that a reasonable officer could have determined that Cahaly's robocalls differed from those contemplated by the Attorney General based on the overtly political nature of the calls and one witness's view that the survey aspect was a sham.  Even if that determination was wrong as a matter of law, officers may have probable cause to arrest based on "reasonable mistakes of law."  Heien v. North Carolina, 135 S. Ct. 530, 536-37 (2014).

Cahaly contends that the arrest warrants are facially invalid because they include disclosure requirements that appear nowhere in the statute.  The affidavits used to obtain the warrants allege that Cahaly "failed to promptly disclose in a clear and conspicuous manner to the receiver of the call the identity of the originating party, endorsement of a candidate and or [sic] the nature of the call."  J.A. 237-42.  But Section 16-17-446(C) only requires some robocalls to disclose "(1) the identity of the seller; (2) that the purpose of the call is to

sell goods or services; [and] (3) the nature of the goods or service." S.C. Code Ann. § 16-17-445(B)(1)-(3).

An arrest warrant is invalid only if the officer preparing the affidavit included a false statement with reckless disregard for its truth and, after that statement is redacted, "the affidavit's remaining content is insufficient to establish probable cause." Franks v. Delaware, 438 U.S. 154, 156 (1978). Even assuming that the disclosure requirements in the affidavits were false statements and that LaRosa acted with reckless disregard for their truth by including them, we still find probable cause based on the remaining content. The affidavits allege that Cahaly made robocalls of a political nature, and nothing more is required to violate the anti-robocall statute. Consequently, we affirm the district court's judgment that LaRosa and Lloyd are entitled to qualified immunity.[3]

---

[3] Cahaly also argues that the arrest warrant affidavits fail to include an essential element of the offense by not alleging that his robocalls included a prize promotion. Section 16-17-446(A) defines "'Adad' [to] mean[] an automatically dialed announcing device which delivers a recorded message without assistance by a live operator for the purpose of making an unsolicited consumer telephone call as defined in Section 16-17-445(A)(3)." The cross-reference takes readers to the definition for a "prize promotion" at Section 16-17-445(A)(3) while the definition for "unsolicited consumer telephone call" appears at Section 16-17-445(A)(4). According to Cahaly, this cross-reference should be interpreted literally, such that "unsolicited consumer telephone call" means "prize promotion."

(Continued)

                                   B.

     From our conclusion that LaRosa had probable cause to

arrest Cahaly, we quickly dispense with Cahaly's state law

claims.    Under South Carolina law, a claim for false

imprisonment requires the plaintiff to demonstrate, in part,

that "the restraint was unlawful." Law v. S.C. Dep't of Corr.,

629 S.E.2d 642, 651 (S.C. 2006).    "The fundamental issue in

determining the lawfulness of an arrest is whether there was

probable cause to make the arrest."   Id.  To state a claim for

malicious prosecution, a South Carolina plaintiff must

establish, among other things, "lack of probable cause."  Id. at

648.  Because Cahaly has not satisfied this element of the

claims, we affirm the district court's judgment in favor of the

Defendants.

---------------

     We find that construction nonsensical and obviously
contrary to legislative intent.   The statute provides a
definition for "unsolicited consumer telephone call" in the very
next subsection.   And as the Defendants point out, the
legislative history shows that the cross-reference to prize
promotion is a typographical error.   As originally enacted, the
definition of "unsolicited consumer telephone call" appeared at
Section 16-17-445(A)(3).   H.R. 3453, 107th Gen. Assemb. (S.C.
1988).   The legislature later added a definition for "prize
promotion" and bumped the definition for "unsolicited consumer
telephone call" to the next subsection.   In so doing, the
legislature simply neglected to update the cross-reference in
Section 16-17-446(A).

                                   20

IV.

For the foregoing reasons, we affirm in part and vacate in part the district court's judgment, and remand the case with instructions to dismiss the compelled-speech claim.

<u>AFFIRMED IN PART, VACATED IN PART,
AND REMANDED WITH INSTRUCTIONS</u>

# EXHIBIT C

OCTOBER  TERM,  2014                 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REED ET AL. *v.* TOWN OF GILBERT, ARIZONA, ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–502.   Argued January 12, 2015—Decided June 18, 2015

Gilbert, Arizona (Town), has a comprehensive code (Sign Code or Code) that prohibits the display of outdoor signs without a permit, but exempts 23 categories of signs, including three relevant here.  "Ideological Signs," defined as signs "communicating a message or ideas" that do not fit in any other Sign Code category, may be up to 20 square feet and have no placement or time restrictions.  "Political Signs," defined as signs "designed to influence the outcome of an election," may be up to 32 square feet and may only be displayed during an election season.  "Temporary Directional Signs," defined as signs directing the public to a church or other "qualifying event," have even greater restrictions: No more than four of the signs, limited to six square feet, may be on a single property at any time, and signs may be displayed no more than 12 hours before the "qualifying event" and 1 hour after.

Petitioners, Good News Community Church (Church) and its pastor, Clyde Reed, whose Sunday church services are held at various temporary locations in and near the Town, posted signs early each Saturday bearing the Church name and the time and location of the next service and did not remove the signs until around midday Sunday.  The Church was cited for exceeding the time limits for displaying temporary directional signs and for failing to include an event date on the signs.  Unable to reach an accommodation with the Town, petitioners filed suit, claiming that the Code abridged their freedom of speech.  The District Court denied their motion for a preliminary injunction, and the Ninth Circuit affirmed, ultimately concluding that the Code's sign categories were content neutral, and that the Code satisfied the intermediate scrutiny accorded to content-neutral regulations of speech.

*Held*: The Sign Code's provisions are content-based regulations of

speech that do not survive strict scrutiny. Pp. 6–17.

(a) Because content-based laws target speech based on its communicative content, they are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *E.g., R. A. V.* v. *St. Paul*, 505 U. S. 377, 395. Speech regulation is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell* v. *IMS Health, Inc.*, 564 U. S. ___, ___–___. And courts are required to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Id.,* at ___. Whether laws define regulated speech by particular subject matter or by its function or purpose, they are subject to strict scrutiny. The same is true for laws that, though facially content neutral, cannot be " 'justified without reference to the content of the regulated speech,' " or were adopted by the government "because of disagreement with the message" conveyed. *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791. Pp. 6–7.

(b) The Sign Code is content based on its face. It defines the categories of temporary, political, and ideological signs on the basis of their messages and then subjects each category to different restrictions. The restrictions applied thus depend entirely on the sign's communicative content. Because the Code, on its face, is a content-based regulation of speech, there is no need to consider the government's justifications or purposes for enacting the Code to determine whether it is subject to strict scrutiny. Pp. 7.

(c) None of the Ninth Circuit's theories for its contrary holding is persuasive. Its conclusion that the Town's regulation was not based on a disagreement with the message conveyed skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech. *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 429. Thus, an innocuous justification cannot transform a facially content-based law into one that is content neutral. A court must evaluate each question—whether a law is content based on its face and whether the purpose and justification for the law are content based—before concluding that a law is content neutral. *Ward* does not require otherwise, for its framework applies only to a content-neutral statute.

The Ninth Circuit's conclusion that the Sign Code does not single out any idea or viewpoint for discrimination conflates two distinct but related limitations that the First Amendment places on government regulation of speech. Government discrimination among viewpoints

Syllabus

is a "more blatant" and "egregious form of content discrimination," *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829, but "[t]he First Amendment's hostility to content-based regulation [also] extends . . . to prohibition of public discussion of an entire topic," *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537. The Sign Code, a paradigmatic example of content-based discrimination, singles out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter.

The Ninth Circuit also erred in concluding that the Sign Code was not content based because it made only speaker-based and event-based distinctions. The Code's categories are not speaker-based—the restrictions for political, ideological, and temporary event signs apply equally no matter who sponsors them. And even if the sign categories were speaker based, that would not automatically render the law content neutral. Rather, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 658. This same analysis applies to event-based distinctions. Pp. 8–14.

(d) The Sign Code's content-based restrictions do not survive strict scrutiny because the Town has not demonstrated that the Code's differentiation between temporary directional signs and other types of signs furthers a compelling governmental interest and is narrowly tailored to that end. See *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. ___, ___. Assuming that the Town has a compelling interest in preserving its aesthetic appeal and traffic safety, the Code's distinctions are highly underinclusive. The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town when other types of signs create the same problem. See *Discovery Network, supra,* at 425. Nor has it shown that temporary directional signs pose a greater threat to public safety than ideological or political signs. Pp. 14–15.

(e) This decision will not prevent governments from enacting effective sign laws. The Town has ample content-neutral options available to resolve problems with safety and aesthetics, including regulating size, building materials, lighting, moving parts, and portability. And the Town may be able to forbid postings on public property, so long as it does so in an evenhanded, content-neutral manner. See *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 817. An ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers—*e.g.,* warning signs marking hazards on private property or signs directing traffic—might also survive strict scrutiny. Pp. 16–17.

4                    REED *v.* TOWN OF GILBERT

Syllabus

707 F. 3d 1057, reversed and remanded.

    THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, ALITO, and SOTOMAYOR, JJ., joined. ALITO, J., filed a concurring opinion, in which KENNEDY and SOTOMAYOR, JJ., joined. BREYER, J., filed an opinion concurring in the judgment. KAGAN, J., filed an opinion concurring in the judgment, in which GINSBURG and BREYER, JJ., joined

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 13–502

————

## CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF GILBERT, ARIZONA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE THOMAS delivered the opinion of the Court.

The town of Gilbert, Arizona (or Town), has adopted a comprehensive code governing the manner in which people may display outdoor signs. Gilbert, Ariz., Land Development Code (Sign Code or Code), ch. 1, §4.402 (2005).[1] The Sign Code identifies various categories of signs based on the type of information they convey, then subjects each category to different restrictions. One of the categories is "Temporary Directional Signs Relating to a Qualifying Event," loosely defined as signs directing the public to a meeting of a nonprofit group. §4.402(P). The Code imposes more stringent restrictions on these signs than it does on signs conveying other messages. We hold that these provisions are content-based regulations of speech that cannot survive strict scrutiny.

————

[1] The Town's Sign Code is available online at http://www.gilbertaz.gov/ departments/development-service/planning-development/land-development-code (as visited June 16, 2015, and available in Clerk of Court's case file).

Opinion of the Court

## I

## A

The Sign Code prohibits the display of outdoor signs anywhere within the Town without a permit, but it then exempts 23 categories of signs from that requirement. These exemptions include everything from bazaar signs to flying banners. Three categories of exempt signs are particularly relevant here.

The first is "Ideological Sign[s]." This category includes any "sign communicating a message or ideas for noncommercial purposes that is not a Construction Sign, Directional Sign, Temporary Directional Sign Relating to a Qualifying Event, Political Sign, Garage Sale Sign, or a sign owned or required by a governmental agency." Sign Code, Glossary of General Terms (Glossary), p. 23 (emphasis deleted). Of the three categories discussed here, the Code treats ideological signs most favorably, allowing them to be up to 20 square feet in area and to be placed in all "zoning districts" without time limits. §4.402(J).

The second category is "Political Sign[s]." This includes any "temporary sign designed to influence the outcome of an election called by a public body." Glossary 23.[2] The Code treats these signs less favorably than ideological signs. The Code allows the placement of political signs up to 16 square feet on residential property and up to 32 square feet on nonresidential property, undeveloped municipal property, and "rights-of-way." §4.402(I).[3] These signs may be displayed up to 60 days before a primary election and up to 15 days following a general election. *Ibid.*

_____

[2] A "Temporary Sign" is a "sign not permanently attached to the ground, a wall or a building, and not designed or intended for permanent display." Glossary 25.

[3] The Code defines "Right-of-Way" as a "strip of publicly owned land occupied by or planned for a street, utilities, landscaping, sidewalks, trails, and similar facilities." *Id.,* at 18.

Opinion of the Court

The third category is "Temporary Directional Signs Relating to a Qualifying Event."  This includes any "Temporary Sign intended to direct pedestrians, motorists, and other passersby to a 'qualifying event.'"  Glossary 25 (emphasis deleted).  A "qualifying event" is defined as any "assembly, gathering, activity, or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization."  *Ibid.*  The Code treats temporary directional signs even less favorably than political signs.[4]  Temporary directional signs may be no larger than six square feet. §4.402(P).  They may be placed on private property or on a public right-of-way, but no more than four signs may be placed on a single property at any time.  *Ibid.*  And, they may be displayed no more than 12 hours before the "qualifying event" and no more than 1 hour afterward.  *Ibid.*

## B

Petitioners Good News Community Church (Church) and its pastor, Clyde Reed, wish to advertise the time and location of their Sunday church services.  The Church is a small, cash-strapped entity that owns no building, so it holds its services at elementary schools or other locations in or near the Town.  In order to inform the public about its services, which are held in a variety of different loca-

––––––––––

[4] The Sign Code has been amended twice during the pendency of this case.  When litigation began in 2007, the Code defined the signs at issue as "Religious Assembly Temporary Direction Signs."  App. 75. The Code entirely prohibited placement of those signs in the public right-of-way, and it forbade posting them in any location for more than two hours before the religious assembly or more than one hour afterward.  *Id.,* at 75–76.  In 2008, the Town redefined the category as "Temporary Directional Signs Related to a Qualifying Event," and it expanded the time limit to 12 hours before and 1 hour after the "qualifying event."  *Ibid.*  In 2011, the Town amended the Code to authorize placement of temporary directional signs in the public right-of-way. *Id.,* at 89.

tions, the Church began placing 15 to 20 temporary signs around the Town, frequently in the public right-of-way abutting the street. The signs typically displayed the Church's name, along with the time and location of the upcoming service. Church members would post the signs early in the day on Saturday and then remove them around midday on Sunday. The display of these signs requires little money and manpower, and thus has proved to be an economical and effective way for the Church to let the community know where its services are being held each week.

This practice caught the attention of the Town's Sign Code compliance manager, who twice cited the Church for violating the Code. The first citation noted that the Church exceeded the time limits for displaying its temporary directional signs. The second citation referred to the same problem, along with the Church's failure to include the date of the event on the signs. Town officials even confiscated one of the Church's signs, which Reed had to retrieve from the municipal offices.

Reed contacted the Sign Code Compliance Department in an attempt to reach an accommodation. His efforts proved unsuccessful. The Town's Code compliance manager informed the Church that there would be "no leniency under the Code" and promised to punish any future violations.

Shortly thereafter, petitioners filed a complaint in the United States District Court for the District of Arizona, arguing that the Sign Code abridged their freedom of speech in violation of the First and Fourteenth Amendments. The District Court denied the petitioners' motion for a preliminary injunction. The Court of Appeals for the Ninth Circuit affirmed, holding that the Sign Code's provision regulating temporary directional signs did not regulate speech on the basis of content. 587 F. 3d 966, 979 (2009). It reasoned that, even though an enforcement

Opinion of the Court

officer would have to read the sign to determine what provisions of the Sign Code applied to it, the "'kind of cursory examination'" that would be necessary for an officer to classify it as a temporary directional sign was "not akin to an officer synthesizing the expressive content of the sign." *Id.*, at 978. It then remanded for the District Court to determine in the first instance whether the Sign Code's distinctions among temporary directional signs, political signs, and ideological signs nevertheless constituted a content-based regulation of speech.

On remand, the District Court granted summary judgment in favor of the Town. The Court of Appeals again affirmed, holding that the Code's sign categories were content neutral. The court concluded that "the distinctions between Temporary Directional Signs, Ideological Signs, and Political Signs . . . are based on objective factors relevant to Gilbert's creation of the specific exemption from the permit requirement and do not otherwise consider the substance of the sign." 707 F. 3d 1057, 1069 (CA9 2013). Relying on this Court's decision in *Hill* v. *Colorado*, 530 U. S. 703 (2000), the Court of Appeals concluded that the Sign Code is content neutral. 707 F. 3d, at 1071–1072. As the court explained, "Gilbert did not adopt its regulation of speech because it disagreed with the message conveyed" and its "interests in regulat[ing] temporary signs are unrelated to the content of the sign." *Ibid.* Accordingly, the court believed that the Code was "content-neutral as that term [has been] defined by the Supreme Court." *Id.,* at 1071. In light of that determination, it applied a lower level of scrutiny to the Sign Code and concluded that the law did not violate the First Amendment. *Id.*, at 1073–1076.

We granted certiorari, 573 U. S. ___ (2014), and now reverse.

Opinion of the Court

## II
### A

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U. S. Const., Amdt. 1. Under that Clause, a government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *R. A. V.* v. *St. Paul*, 505 U. S. 377, 395 (1992); *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 115, 118 (1991).

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell* v. *IMS Health, Inc.*, 564 U. S. ___, ___–___ (2011) (slip op., at 8–9); *Carey* v. *Brown*, 447 U. S. 455, 462 (1980); *Mosley, supra,* at 95. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. *Sorrell, supra,* at ___ (slip op., at 8). Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to

the content of the regulated speech,'" or that were adopted by the government "because of disagreement with the message [the speech] conveys," *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989). Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

### B

The Town's Sign Code is content based on its face. It defines "Temporary Directional Signs" on the basis of whether a sign conveys the message of directing the public to church or some other "qualifying event." Glossary 25. It defines "Political Signs" on the basis of whether a sign's message is "designed to influence the outcome of an election." *Id.,* at 24. And it defines "Ideological Signs" on the basis of whether a sign "communicat[es] a message or ideas" that do not fit within the Code's other categories. *Id.,* at 23. It then subjects each of these categories to different restrictions.

The restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign. If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government. More to the point, the Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas. On its face, the Sign Code is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the Code to determine whether it is subject to strict scrutiny.

### C

In reaching the contrary conclusion, the Court of Appeals offered several theories to explain why the Town's Sign Code should be deemed content neutral.  None is persuasive.

### 1

The Court of Appeals first determined that the Sign Code was content neutral because the Town "did not adopt its regulation of speech [based on] disagree[ment] with the message conveyed," and its justifications for regulating temporary directional signs were "unrelated to the content of the sign."  707 F. 3d, at 1071–1072.  In its brief to this Court, the United States similarly contends that a sign regulation is content neutral—even if it expressly draws distinctions based on the sign's communicative content—if those distinctions can be "'justified without reference to the content of the regulated speech.'"  Brief for United States as *Amicus Curiae* 20, 24 (quoting *Ward, supra*, at 791; emphasis deleted).

But this analysis skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face.  A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech.  *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 429 (1993).  We have thus made clear that "'[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment,'" and a party opposing the government "need adduce 'no evidence of an improper censorial motive.'"  *Simon & Schuster, supra,* at 117.  Although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary."  *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642 (1994).  In other words, an

innocuous justification cannot transform a facially content-based law into one that is content neutral.

That is why we have repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose. See, *e.g., Sorrell, supra,* at ___–___ (slip op., at 8–9) (statute was content based "on its face," and there was also evidence of an impermissible legislative motive); *United States* v. *Eichman,* 496 U. S. 310, 315 (1990) ("Although the [statute] contains no explicit content-based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted *interest* is related to the suppression of free expression" (internal quotation marks omitted)); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 804 (1984) ("The text of the ordinance is neutral," and "there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance"); *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984) (requiring that a facially content-neutral ban on camping must be "justified without reference to the content of the regulated speech"); *United States* v. *O'Brien,* 391 U. S. 367, 375, 377 (1968) (noting that the statute "on its face deals with conduct having no connection with speech," but examining whether the "the governmental interest is unrelated to the suppression of free expression"). Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny.

The Court of Appeals and the United States misunderstand our decision in *Ward* as suggesting that a government's purpose is relevant even when a law is content based on its face. That is incorrect. *Ward* had nothing to say about facially content-based restrictions because it involved a facially content-*neutral* ban on the use, in a

city-owned music venue, of sound amplification systems not provided by the city. 491 U. S., at 787, and n. 2. In that context, we looked to governmental motive, including whether the government had regulated speech "because of disagreement" with its message, and whether the regulation was "'justified without reference to the content of the speech.'" *Id.,* at 791. But *Ward*'s framework "applies only if a statute is content neutral." *Hill*, 530 U. S., at 766 (KENNEDY, J., dissenting). Its rules thus operate "to protect speech," not "to restrict it." *Id.,* at 765.

The First Amendment requires no less. Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.,* the "abridg[ement] of speech"—rather than merely the motives of those who enacted them. U. S. Const., Amdt. 1. "'The vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.'" *Hill, supra,* at 743 (SCALIA, J., dissenting).

For instance, in *NAACP* v. *Button*, 371 U. S. 415 (1963), the Court encountered a State's attempt to use a statute prohibiting "'improper solicitation'" by attorneys to outlaw litigation-related speech of the National Association for the Advancement of Colored People. *Id.,* at 438. Although *Button* predated our more recent formulations of strict scrutiny, the Court rightly rejected the State's claim that its interest in the "regulation of professional conduct" rendered the statute consistent with the First Amendment, observing that "it is no answer . . . to say . . . that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." *Id.,* at 438–439. Likewise, one could easily imagine a Sign Code compliance manager who disliked the Church's

substantive teachings deploying the Sign Code to make it more difficult for the Church to inform the public of the location of its services. Accordingly, we have repeatedly "rejected the argument that 'discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas.'" *Discovery Network,* 507 U. S., at 429. We do so again today.

### 2

The Court of Appeals next reasoned that the Sign Code was content neutral because it "does not mention any idea or viewpoint, let alone single one out for differential treatment." 587 F. 3d, at 977. It reasoned that, for the purpose of the Code provisions, "[i]t makes no difference which candidate is supported, who sponsors the event, or what ideological perspective is asserted." 707 F. 3d, at 1069.

The Town seizes on this reasoning, insisting that "content based" is a term of art that "should be applied flexibly" with the goal of protecting "viewpoints and ideas from government censorship or favoritism." Brief for Respondents 22. In the Town's view, a sign regulation that "does not censor or favor particular viewpoints or ideas" cannot be content based. *Ibid.* The Sign Code allegedly passes this test because its treatment of temporary directional signs does not raise any concerns that the government is "endorsing or suppressing 'ideas or viewpoints,'" *id.,* at 27, and the provisions for political signs and ideological signs "are neutral as to particular ideas or viewpoints" within those categories. *Id.,* at 37.

This analysis conflates two distinct but related limitations that the First Amendment places on government regulation of speech. Government discrimination among viewpoints—or the regulation of speech based on "the specific motivating ideology or the opinion or perspective of the speaker"—is a "more blatant" and "egregious form of

content discrimination." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). But it is well established that "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980).

Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. *Ibid.* For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed. See *Discovery Network, supra,* at 428. The Town's Sign Code likewise singles out specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter. Ideological messages are given more favorable treatment than messages concerning a political candidate, which are themselves given more favorable treatment than messages announcing an assembly of like-minded individuals. That is a paradigmatic example of content-based discrimination.

### 3

Finally, the Court of Appeals characterized the Sign Code's distinctions as turning on "'the content-neutral elements of who is speaking through the sign and whether and when an event is occurring.'" 707 F. 3d, at 1069. That analysis is mistaken on both factual and legal grounds.

To start, the Sign Code's distinctions are not speaker based. The restrictions for political, ideological, and temporary event signs apply equally no matter who sponsors them. If a local business, for example, sought to put up

signs advertising the Church's meetings, those signs would be subject to the same limitations as such signs placed by the Church. And if Reed had decided to display signs in support of a particular candidate, he could have made those signs far larger—and kept them up for far longer—than signs inviting people to attend his church services. If the Code's distinctions were truly speaker based, both types of signs would receive the same treatment.

In any case, the fact that a distinction is speaker based does not, as the Court of Appeals seemed to believe, automatically render the distinction content neutral. Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 340 (2010), we have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner,* 512 U. S., at 658. Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based. Likewise, a content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers. See *Citizens United, supra*, at 340–341. Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry.

Nor do the Sign Code's distinctions hinge on "whether and when an event is occurring." The Code does not permit citizens to post signs on any topic whatsoever within a set period leading up to an election, for example. Instead, come election time, it requires Town officials to determine whether a sign is "designed to influence the outcome of an election" (and thus "political") or merely "communicating a message or ideas for noncommercial purposes" (and thus "ideological"). Glossary 24. That obvious content-based

inquiry does not evade strict scrutiny review simply because an event (*i.e.,* an election) is involved.

And, just as with speaker-based laws, the fact that a distinction is event based does not render it content neutral. The Court of Appeals cited no precedent from this Court supporting its novel theory of an exception from the content-neutrality requirement for event-based laws. As we have explained, a speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed. *Supra,* at 6. A regulation that targets a sign because it conveys an idea about a specific event is no less content based than a regulation that targets a sign because it conveys some other idea. Here, the Code singles out signs bearing a particular message: the time and location of a specific event. This type of ordinance may seem like a perfectly rational way to regulate signs, but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem "entirely reasonable" will sometimes be "struck down because of their content-based nature." *City of Ladue* v. *Gilleo*, 512 U. S. 43, 60 (1994) (O'Connor, J., concurring).

## III

Because the Town's Sign Code imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny, "'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest,'" *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. ___, ___ (2011) (slip op., at 8) (quoting *Citizens United*, 558 U. S., at 340). Thus, it is the Town's burden to demonstrate that the Code's differentiation between temporary directional signs and other types of signs, such as political signs and ideological signs, furthers a compelling governmental interest and is narrowly tai-

Opinion of the Court

lored to that end.  See *ibid.*

The Town cannot do so.  It has offered only two governmental interests in support of the distinctions the Sign Code draws: preserving the Town's aesthetic appeal and traffic safety.  Assuming for the sake of argument that those are compelling governmental interests, the Code's distinctions fail as hopelessly underinclusive.

Starting with the preservation of aesthetics, temporary directional signs are "no greater an eyesore," *Discovery Network*, 507 U. S., at 425, than ideological or political ones.  Yet the Code allows unlimited proliferation of larger ideological signs while strictly limiting the number, size, and duration of smaller directional ones.  The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem.

The Town similarly has not shown that limiting temporary directional signs is necessary to eliminate threats to traffic safety, but that limiting other types of signs is not.  The Town has offered no reason to believe that directional signs pose a greater threat to safety than do ideological or political signs.  If anything, a sharply worded ideological sign seems more likely to distract a driver than a sign directing the public to a nearby church meeting.

In light of this underinclusiveness, the Town has not met its burden to prove that its Sign Code is narrowly tailored to further a compelling government interest.  Because a "'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited,'" *Republican Party of Minn.* v. *White*, 536 U. S. 765, 780 (2002), the Sign Code fails strict scrutiny.

### IV

Our decision today will not prevent governments from enacting effective sign laws. The Town asserts that an "'absolutist'" content-neutrality rule would render "virtually all distinctions in sign laws . . . subject to strict scrutiny," Brief for Respondents 34–35, but that is not the case. Not "all distinctions" are subject to strict scrutiny, only *content-based* ones are. Laws that are *content neutral* are instead subject to lesser scrutiny. See *Clark*, 468 U. S., at 295.

The Town has ample content-neutral options available to resolve problems with safety and aesthetics. For example, its current Code regulates many aspects of signs that have nothing to do with a sign's message: size, building materials, lighting, moving parts, and portability. See, *e.g.,* §4.402(R). And on public property, the Town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an evenhanded, content-neutral manner. See *Taxpayers for Vincent*, 466 U. S., at 817 (upholding content-neutral ban against posting signs on public property). Indeed, some lower courts have long held that similar content-based sign laws receive strict scrutiny, but there is no evidence that towns in those jurisdictions have suffered catastrophic effects. See, *e.g., Solantic, LLC* v. *Neptune Beach*, 410 F. 3d 1250, 1264–1269 (CA11 2005) (sign categories similar to the town of Gilbert's were content based and subject to strict scrutiny); *Matthews* v. *Needham*, 764 F. 2d 58, 59–60 (CA1 1985) (law banning political signs but not commercial signs was content based and subject to strict scrutiny).

We acknowledge that a city might reasonably view the general regulation of signs as necessary because signs "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue*, 512 U. S., at 48. At the same time, the presence of certain

Opinion of the Court

signs may be essential, both for vehicles and pedestrians, to guide traffic or to identify hazards and ensure safety. A sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers—such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses—well might survive strict scrutiny. The signs at issue in this case, including political and ideological signs and signs for events, are far removed from those purposes. As discussed above, they are facially content based and are neither justified by traditional safety concerns nor narrowly tailored.

\*        \*        \*

We reverse the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

Alito, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–502

_____

## CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF GILBERT, ARIZONA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE ALITO, with whom JUSTICE KENNEDY and JUSTICE SOTOMAYOR join, concurring.

I join the opinion of the Court but add a few words of further explanation.

As the Court holds, what we have termed "content-based" laws must satisfy strict scrutiny. Content-based laws merit this protection because they present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint. Limiting speech based on its "topic" or "subject" favors those who do not want to disturb the status quo. Such regulations may interfere with democratic self-government and the search for truth. See *Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537 (1980).

As the Court shows, the regulations at issue in this case are replete with content-based distinctions, and as a result they must satisfy strict scrutiny. This does not mean, however, that municipalities are powerless to enact and enforce reasonable sign regulations. I will not attempt to provide anything like a comprehensive list, but here are some rules that would not be content based:

Rules regulating the size of signs. These rules may distinguish among signs based on any content-neutral criteria, including any relevant criteria listed below.

Rules regulating the locations in which signs may be

placed.   These rules may distinguish between free-standing signs and those attached to buildings.

Rules distinguishing between lighted and unlighted signs.

Rules distinguishing between signs with fixed messages and electronic signs with messages that change.

Rules that distinguish between the placement of signs on private and public property.

Rules distinguishing between the placement of signs on commercial and residential property.

Rules distinguishing between on-premises and off-premises signs.

Rules restricting the total number of signs allowed per mile of roadway.

Rules imposing time restrictions on signs advertising a one-time event.  Rules of this nature do not discriminate based on topic or subject and are akin to rules restricting the times within which oral speech or music is allowed.*

In addition to regulating signs put up by private actors, government entities may also erect their own signs consistent with the principles that allow governmental speech.  See *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–469 (2009).  They may put up all manner of signs to promote safety, as well as directional signs and signs pointing out historic sites and scenic spots.

Properly understood, today's decision will not prevent cities from regulating signs in a way that fully protects public safety and serves legitimate esthetic objectives.

————————

*Of course, content-neutral restrictions on speech are not necessarily consistent with the First Amendment.  Time, place, and manner restrictions "must be narrowly tailored to serve the government's legitimate, content-neutral interests."  *Ward* v. *Rock Against Racism*, 491 U. S. 781, 798 (1989).  But they need not meet the high standard imposed on viewpoint- and content-based restrictions.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–502

_____

## CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF GILBERT, ARIZONA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE BREYER, concurring in the judgment.

I join JUSTICE KAGAN's separate opinion. Like JUSTICE KAGAN I believe that categories alone cannot satisfactorily resolve the legal problem before us. The First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than a simple recitation of categories, such as "content discrimination" and "strict scrutiny," would permit. In my view, the category "content discrimination" is better considered in many contexts, including here, as a rule of thumb, rather than as an automatic "strict scrutiny" trigger, leading to almost certain legal condemnation.

To use content discrimination to trigger strict scrutiny sometimes makes perfect sense. There are cases in which the Court has found content discrimination an unconstitutional method for suppressing a viewpoint. *E.g., Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828–829 (1995); see also *Boos* v. *Barry*, 485 U. S. 312, 318–319 (1988) (plurality opinion) (applying strict scrutiny where the line between subject matter and viewpoint was not obvious). And there are cases where the Court has found content discrimination to reveal that rules governing a traditional public forum are, in fact, not a neutral way of fairly managing the forum in the interest of all

speakers. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972) ("Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say"). In these types of cases, strict scrutiny is often appropriate, and content discrimination has thus served a useful purpose.

But content discrimination, while helping courts to identify unconstitutional suppression of expression, cannot and should not *always* trigger strict scrutiny. To say that it is not an automatic "strict scrutiny" trigger is not to argue against that concept's use. I readily concede, for example, that content discrimination, as a conceptual tool, can sometimes reveal weaknesses in the government's rationale for a rule that limits speech. If, for example, a city looks to litter prevention as the rationale for a prohibition against placing newsracks dispensing free advertisements on public property, why does it exempt other newsracks causing similar litter? Cf. *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410 (1993). I also concede that, whenever government disfavors one kind of speech, it places that speech at a disadvantage, potentially interfering with the free marketplace of ideas and with an individual's ability to express thoughts and ideas that can help that individual determine the kind of society in which he wishes to live, help shape that society, and help define his place within it.

Nonetheless, in these latter instances to use the presence of content discrimination automatically to trigger strict scrutiny and thereby call into play a strong presumption against constitutionality goes too far. That is because virtually all government activities involve speech, many of which involve the regulation of speech. Regulatory programs almost always require content discrimination. And to hold that such content discrimination triggers strict scrutiny is to write a recipe for judicial management

of ordinary government regulatory activity.

Consider a few examples of speech regulated by government that inevitably involve content discrimination, but where a strong presumption against constitutionality has no place. Consider governmental regulation of securities, *e.g.,* 15 U. S. C. §78*l* (requirements for content that must be included in a registration statement); of energy conservation labeling-practices, *e.g.,* 42 U. S. C. §6294 (requirements for content that must be included on labels of certain consumer electronics); of prescription drugs, *e.g.,* 21 U. S. C. §353(b)(4)(A) (requiring a prescription drug label to bear the symbol "Rx only"); of doctor-patient confidentiality, *e.g.,* 38 U. S. C. §7332 (requiring confidentiality of certain medical records, but allowing a physician to disclose that the patient has HIV to the patient's spouse or sexual partner); of income tax statements, *e.g.,* 26 U. S. C. §6039F (requiring taxpayers to furnish information about foreign gifts received if the aggregate amount exceeds $10,000); of commercial airplane briefings, *e.g.,* 14 CFR §136.7 (2015) (requiring pilots to ensure that each passenger has been briefed on flight procedures, such as seatbelt fastening); of signs at petting zoos, *e.g.,* N. Y. Gen. Bus. Law Ann. §399–ff(3) (West Cum. Supp. 2015) (requiring petting zoos to post a sign at every exit "'strongly recommend[ing] that persons wash their hands upon exiting the petting zoo area'"); and so on.

Nor can the majority avoid the application of strict scrutiny to all sorts of justifiable governmental regulations by relying on this Court's many subcategories and exceptions to the rule. The Court has said, for example, that we should apply less strict standards to "commercial speech." *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n of N. Y.,* 447 U. S. 557, 562–563 (1980). But I have great concern that many justifiable instances of "content-based" regulation are noncommercial. And, worse than that, the Court has applied the heightened

"strict scrutiny" standard even in cases where the less stringent "commercial speech" standard was appropriate. See *Sorrell* v. *IMS Health Inc.*, 564 U. S. ___, ___ (2011) (BREYER, J., dissenting) (slip op., at ___ ). The Court has also said that "government speech" escapes First Amendment strictures. See *Rust* v. *Sullivan*, 500 U. S. 173, 193–194 (1991). But regulated speech is typically private speech, not government speech. Further, the Court has said that, "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 388 (1992). But this exception accounts for only a few of the instances in which content discrimination is readily justifiable.

I recognize that the Court could escape the problem by watering down the force of the presumption against constitutionality that "strict scrutiny" normally carries with it. But, in my view, doing so will weaken the First Amendment's protection in instances where "strict scrutiny" should apply in full force.

The better approach is to generally treat content discrimination as a strong reason weighing against the constitutionality of a rule where a traditional public forum, or where viewpoint discrimination, is threatened, but elsewhere treat it as a rule of thumb, finding it a helpful, but not determinative legal tool, in an appropriate case, to determine the strength of a justification. I would use content discrimination as a supplement to a more basic analysis, which, tracking most of our First Amendment cases, asks whether the regulation at issue works harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives. Answering this question requires examining the seriousness of the harm to speech, the importance of the countervailing objectives, the extent to which the law will achieve those objectives,

and whether there are other, less restrictive ways of doing so. See, *e.g., United States* v. *Alvarez*, 567 U. S. ___, ___–___ (2012) (BREYER, J., concurring in judgment) (slip op., at 1–3); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 400–403 (2000) (BREYER, J., concurring).  Admittedly, this approach does not have the simplicity of a mechanical use of categories.  But it does permit the government to regulate speech in numerous instances where the voters have authorized the government to regulate and where courts should hesitate to substitute judicial judgment for that of administrators.

   Here, regulation of signage along the roadside, for purposes of safety and beautification is at issue.  There is no traditional public forum nor do I find any general effort to censor a particular viewpoint.  Consequently, the specific regulation at issue does not warrant "strict scrutiny."  Nonetheless, for the reasons that JUSTICE KAGAN sets forth, I believe that the Town of Gilbert's regulatory rules violate the First Amendment.  I consequently concur in the Court's judgment only.

KAGAN, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

No. 13–502

## CLYDE REED, ET AL., PETITIONERS *v.* TOWN OF GILBERT, ARIZONA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 18, 2015]

JUSTICE KAGAN, with whom JUSTICE GINSBURG and JUSTICE BREYER join, concurring in the judgment.

Countless cities and towns across America have adopted ordinances regulating the posting of signs, while exempting certain categories of signs based on their subject matter. For example, some municipalities generally prohibit illuminated signs in residential neighborhoods, but lift that ban for signs that identify the address of a home or the name of its owner or occupant. See, *e.g.*, City of Truth or Consequences, N. M., Code of Ordinances, ch. 16, Art. XIII, §§11–13–2.3, 11–13–2.9(H)(4) (2014). In other municipalities, safety signs such as "Blind Pedestrian Crossing" and "Hidden Driveway" can be posted without a permit, even as other permanent signs require one. See, *e.g.*, Code of Athens-Clarke County, Ga., Pt. III, §7–4–7(1) (1993). Elsewhere, historic site markers—for example, "George Washington Slept Here"—are also exempt from general regulations. See, *e.g.*, Dover, Del., Code of Ordinances, Pt. II, App. B, Art. 5, §4.5(F) (2012). And similarly, the federal Highway Beautification Act limits signs along interstate highways unless, for instance, they direct travelers to "scenic and historical attractions" or advertise free coffee. See 23 U. S. C. §§131(b), (c)(1), (c)(5).

Given the Court's analysis, many sign ordinances of that kind are now in jeopardy. See *ante*, at 14 (acknowledging

2            REED *v.* TOWN OF GILBERT

Kagan, J., concurring in judgment

that "entirely reasonable" sign laws "will sometimes be
struck down" under its approach (internal quotation
marks omitted)). Says the majority: When laws "single[]
out specific subject matter," they are "facially content
based"; and when they are facially content based, they are
automatically subject to strict scrutiny. *Ante*, at 12, 16–
17. And although the majority holds out hope that some
sign laws with subject-matter exemptions "might survive"
that stringent review, *ante*, at 17, the likelihood is that
most will be struck down. After all, it is the "rare case[] in
which a speech restriction withstands strict scrutiny."
*Williams-Yulee* v. *Florida Bar*, 575 U. S. ___, ___ (2015)
(slip op., at 9). To clear that high bar, the government
must show that a content-based distinction "is necessary
to serve a compelling state interest and is narrowly drawn
to achieve that end." *Arkansas Writers' Project, Inc.* v.
*Ragland*, 481 U. S. 221, 231 (1987). So on the majority's
view, courts would have to determine that a town has a
compelling interest in informing passersby where George
Washington slept. And likewise, courts would have to find
that a town has no other way to prevent hidden-driveway
mishaps than by specially treating hidden-driveway signs.
(Well-placed speed bumps? Lower speed limits? Or how
about just a ban on hidden driveways?) The conse-
quence—unless courts water down strict scrutiny to some-
thing unrecognizable—is that our communities will find
themselves in an unenviable bind: They will have to either
repeal the exemptions that allow for helpful signs on
streets and sidewalks, or else lift their sign restrictions
altogether and resign themselves to the resulting clutter.*

————————

\* Even in trying (commendably) to limit today's decision, Justice
Alito's concurrence highlights its far-reaching effects. According to
Justice Alito, the majority does not subject to strict scrutiny regula-
tions of "signs advertising a one-time event." *Ante*, at 2 (Alito, J.,
concurring). But of course it does. On the majority's view, a law with
an exception for such signs "singles out specific subject matter for

KAGAN, J., concurring in judgment

Although the majority insists that applying strict scrutiny to all such ordinances is "essential" to protecting First Amendment freedoms, *ante*, at 14, I find it challenging to understand why that is so. This Court's decisions articulate two important and related reasons for subjecting content-based speech regulations to the most exacting standard of review. The first is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen* v. *Coakley*, 573 U. S. ___, ___–___ (2014) (slip op., at 8–9) (internal quotation marks omitted). The second is to ensure that the government has not regulated speech "based on hostility—or favoritism—towards the underlying message expressed." *R. A. V.* v. *St. Paul*, 505 U. S. 377, 386 (1992). Yet the subject-matter exemptions included in many sign ordinances do not implicate those concerns. Allowing residents, say, to install a light bulb over "name and address" signs but no others does not distort the marketplace of ideas. Nor does that different treatment give rise to an inference of impermissible government motive.

We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any "realistic possibility that official suppression of ideas is afoot." *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 189 (2007) (quoting *R. A. V.*, 505 U. S., at 390). That is always the case when the regulation facially differentiates on the basis of viewpoint. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). It is also the case (except in nonpublic or limited public forums) when a law restricts "discussion of an entire topic" in public debate. *Consolidated*

_____

differential treatment" and "defin[es] regulated speech by particular subject matter." *Ante*, at 6, 12 (majority opinion). Indeed, the precise reason the majority applies strict scrutiny here is that "the Code singles out signs bearing a particular message: the time and location of a specific event." *Ante*, at 14.

KAGAN, J., concurring in judgment

*Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 537, 539–540 (1980) (invalidating a limitation on speech about nuclear power). We have stated that "[i]f the marketplace of ideas is to remain free and open, governments must not be allowed to choose 'which issues are worth discussing or debating.'" *Id.*, at 537–538 (quoting *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972)). And we have recognized that such subject-matter restrictions, even though viewpoint-neutral on their face, may "suggest[] an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 785 (1978); accord, *ante*, at 1 (ALITO, J., concurring) (limiting all speech on one topic "favors those who do not want to disturb the status quo"). Subject-matter regulation, in other words, may have the intent or effect of favoring some ideas over others. When that is realistically possible—when the restriction "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace"—we insist that the law pass the most demanding constitutional test. *R. A. V.*, 505 U. S., at 387 (quoting *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)).

But when that is not realistically possible, we may do well to relax our guard so that "entirely reasonable" laws imperiled by strict scrutiny can survive. *Ante*, at 14. This point is by no means new. Our concern with content-based regulation arises from the fear that the government will skew the public's debate of ideas—so when "that risk is inconsequential, . . . strict scrutiny is unwarranted." *Davenport*, 551 U. S., at 188; see *R. A. V.*, 505 U. S., at 388 (approving certain content-based distinctions when there is "no significant danger of idea or viewpoint discrimination"). To do its intended work, of course, the category of content-based regulation triggering strict scrutiny must

sweep more broadly than the actual harm; that category exists to create a buffer zone guaranteeing that the government cannot favor or disfavor certain viewpoints. But that buffer zone need not extend forever. We can administer our content-regulation doctrine with a dose of common sense, so as to leave standing laws that in no way implicate its intended function.

And indeed we have done just that: Our cases have been far less rigid than the majority admits in applying strict scrutiny to facially content-based laws—including in cases just like this one. See *Davenport*, 551 U. S., at 188 (noting that "we have identified numerous situations in which [the] risk" attached to content-based laws is "attenuated"). In *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984), the Court declined to apply strict scrutiny to a municipal ordinance that exempted address numbers and markers commemorating "historical, cultural, or artistic event[s]" from a generally applicable limit on sidewalk signs. *Id.*, at 792, n. 1 (listing exemptions); see *id.*, at 804–810 (upholding ordinance under intermediate scrutiny). After all, we explained, the law's enactment and enforcement revealed "not even a hint of bias or censorship." *Id.*, at 804; see also *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 48 (1986) (applying intermediate scrutiny to a zoning law that facially distinguished among movie theaters based on content because it was "designed to prevent crime, protect the city's retail trade, [and] maintain property values . . . , not to suppress the expression of unpopular views"). And another decision involving a similar law provides an alternative model. In *City of Ladue* v. *Gilleo*, 512 U. S. 43 (1994), the Court assumed *arguendo* that a sign ordinance's exceptions for address signs, safety signs, and for-sale signs in residential areas did not trigger strict scrutiny. See *id.*, at 46–47, and n. 6 (listing exemptions); *id.*, at 53 (noting this assumption). We did not need to, and so did not, decide the

level-of-scrutiny question because the law's breadth made it unconstitutional under any standard.

The majority could easily have taken *Ladue*'s tack here. The Town of Gilbert's defense of its sign ordinance—most notably, the law's distinctions between directional signs and others—does not pass strict scrutiny, or intermediate scrutiny, or even the laugh test. See *ante*, at 14–15 (discussing those distinctions). The Town, for example, provides no reason at all for prohibiting more than four directional signs on a property while placing no limits on the number of other types of signs. See Gilbert, Ariz., Land Development Code, ch. I, §§4.402(J), (P)(2) (2014). Similarly, the Town offers no coherent justification for restricting the size of directional signs to 6 square feet while allowing other signs to reach 20 square feet. See §§4.402(J), (P)(1). The best the Town could come up with at oral argument was that directional signs "need to be smaller because they need to guide travelers along a route." Tr. of Oral Arg. 40. Why exactly a smaller sign better helps travelers get to where they are going is left a mystery. The absence of any sensible basis for these and other distinctions dooms the Town's ordinance under even the intermediate scrutiny that the Court typically applies to "time, place, or manner" speech regulations. Accordingly, there is no need to decide in this case whether strict scrutiny applies to every sign ordinance in every town across this country containing a subject-matter exemption.

I suspect this Court and others will regret the majority's insistence today on answering that question in the affirmative. As the years go by, courts will discover that thousands of towns have such ordinances, many of them "entirely reasonable." *Ante*, at 14. And as the challenges to them mount, courts will have to invalidate one after the other. (This Court may soon find itself a veritable Supreme Board of Sign Review.) And courts will strike down those democratically enacted local laws even though no

KAGAN, J., concurring in judgment

one—certainly not the majority—has ever explained why the vindication of First Amendment values requires that result.  Because I see no reason why such an easy case calls for us to cast a constitutional pall on reasonable regulations quite unlike the law before us, I concur only in the judgment.