Theodore B. Olson (#38137)
TOlson@gibsondunn.com
Helgi C. Walker (Pro Hac Vice)
HWalker@gibsondunn.com
Michael R. Huston (#278488)
MHuston@gibsondunn.com
Jacob T. Spencer (Pro Hac Vice)
JSpencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    202.955.8668
Facsimile:    202.530.9575

Joshua S. Lipshutz (#242557)
JLipshutz@gibsondunn.com
Joshua D. Dick (#268853)
JDick@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:    415.393.8233
Facsimile:    415.374.8469

*Attorneys for Plaintiff*
*CTIA – The Wireless Association®*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION®,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, in her official capacity,<br><br>Defendants. | **CASE NO. 3:15-cv-02529**<br><br>**STATEMENT OF RECENT DECISION**<br><br>Date:   August 20, 2015<br><br>Time:  1:30 PM<br><br>Place:  Courtroom 5, 17th Floor, San Francisco |

Gibson, Dunn &
Crutcher LLP

1        Pursuant to Local Rule 7-3(d), Plaintiff CTIA – The Wireless Association® respectfully

2   brings to the Court's attention a recent decision in support of its Motion for Preliminary Injunction:

3   *Nat'l Ass'n of Mfrs. SEC*, No. 13-5252 (D.C. Cir. Aug. 18, 2015), attached as Exhibit A. This

4   decision is relevant to Plaintiff's Memorandum in Support of Plaintiff's Motion for Preliminary

5   Injunction, Dkt. 4, at 1–2, 8–16, Plaintiff's Reply in Support of Plaintiff's Motion for Preliminary

6   Injunction, Dkt. 38, at 4–10, and Plaintiff's [Proposed] Brief in Response to [Proposed] Brief of

7   Amicus Curiae Natural Resources Defense Council, Dkt. 42, at 1–5, discussing the application of the

8   Supreme Court's decisions in *Edenfield* and *Zauderer*.

9

10   August 18, 2015                        By:  /s/ Theodore B. Olson

11                                      Theodore B. Olson

12                                      Helgi C. Walker
Joshua S. Lipshutz

13                                      Joshua D. Dick
Michael R. Huston

14                                      Jacob T. Spencer

15                                      GIBSON, DUNN & CRUTCHER LLP

16

17                                      *Attorneys for Plaintiff*
*CTIA – The Wireless Association®*

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Decided August 18, 2015

No. 13-5252

NATIONAL ASSOCIATION OF MANUFACTURERS, ET AL.,
APPELLANTS

v.

SECURITIES AND EXCHANGE COMMISSION, ET AL.,
APPELLEES

———

On Petitions For Panel Rehearing

———

*Peter D. Keisler*, *Jonathan F. Cohn*, *Erika L. Maley*, *Steven P. Lehotsky*, *Quentin Riegel*, and *Rachel L. Brand* were on the briefs for appellants.

*Michael A. Conley*, Deputy General Counsel, Securities and Exchange Commission, *Tracey A. Hardin*, Senior Counsel, *Benjamin L. Schiffrin*, Senior Litigation Counsel, and *Daniel Staroselsky*, Senior Counsel were on the briefs for appellees.

*Scott L. Nelson*, *Julie A. Murray*, and *Adina H. Rosenbaum* were on the briefs for intervenors-appellees Amnesty International USA, et al.

*Ronald A. Fein*, *David Hunter Smith*, *David N. Rosen*, and *Jodi Westbrook Flowers* were on the brief for *amici curiae*

2

Global Witness and Free Speech For People in support of appellees.

Before: SRINIVASAN, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* SRINIVASAN.

RANDOLPH, *Senior Circuit Judge*: We assume familiarity with our opinion in *National Association of Manufacturers v. SEC*, 748 F.3d 359 (D.C. Cir. 2014) ("*NAM*").[1]

The subject of this rehearing is the intervening decision in *American Meat Institute v. U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014) (en banc) ("*AMI*"), and its treatment of *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985).

Justice White, writing for the majority in *Zauderer*, expressed the Court's holding with his customary precision: we "hold," he wrote, "that an advertiser's [First Amendment] rights are adequately protected *as long as* disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651 (italics added). In several opinions, our court therefore treated *Zauderer* as limited to compelled speech designed to cure misleading advertising. Government regulations forcing persons to engage in commercial speech for other purposes were evaluated under *Central Hudson Gas & Electric Corp. v. Public Service*

---

[1] For ease of reference, our original opinion and the accompanying concurrence are reprinted in an Appendix to this opinion after the dissent.

3

*Commission*, 447 U.S. 557, 564-66 (1980), rather than *Zauderer*.[2] *See, e.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213-17 (D.C. Cir. 2012); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 n.18 (D.C. Cir. 2013).[3]

Our initial opinion in this case adhered to circuit precedent and declined to apply *Zauderer* on the ground that the "conflict minerals"[4] disclosures, compelled by the Dodd-Frank law and the implementing regulations of the Securities and Exchange Commission, were unrelated to curing consumer deception. *NAM*, 748 F.3d at 370-71.

After our opinion in *NAM* issued, the en banc court in *AMI* decided that *Zauderer* covered more than a state's forcing disclosures in order to cure what would otherwise be misleading

---

[2] The *Central Hudson* standard is more demanding than *Zauderer*'s but much less exacting than the Supreme Court's doctrines for evaluating non-commercial speech. *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010); *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 142 (1994).

[3] *See In re R.M.J.*, 455 U.S. 191, 203 (1982), holding that when the commercial advertising "is not misleading" the State's regulations, including forced disclosures, must be tested under *Central Hudson*. The Supreme Court later interpreted *R.M.J.* to mean that when advertisements are "not inherently misleading," state-compelled disclosures are to be tested by "*Central Hudson*'s intermediate scrutiny," rather than by *Zauderer*'s looser standard. *Milavetz,* 559 U.S. at 250. *See also Glickman v. Wileman Bros. & Elliot, Inc.*, 521 U.S. at 491 (1997) (Souter, J., dissenting, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas); *Spirit Airlines, Inc. v. Dep't of Transp.*, 687 F.3d 403, 412 (D.C. Cir. 2012).

[4] Gold, tantalum, tin, and tungsten.

4

advertisements.   *AMI*, 760 F.3d at 21-23.   Some other
governmental interests might suffice.  Using *Zauderer*'s relaxed
standard of review,[5] *AMI* held that the federal government had
not violated the First Amendment when it forced companies to
list on the labels of their meat cuts the country in which the
animal was born, raised, and slaughtered.  *Id.* at 23, 27.  It was
of no moment that the governmental objective the *AMI* court
identified as sufficient – enabling "consumers to choose
American-made products," *id.* at 23 – was one the government
disavowed not only when the Department of Agriculture issued
its regulations, but also when the Department of Justice
defended them in our court, *id.* at 25; *id.* at 46-47 (Brown, J.,
dissenting).[6]  The *AMI* court therefore overruled the portion of

_____

[5] The *AMI* court held that *Zauderer* – unlike *Central Hudson* –
does not require the government to prove that its disclosure
requirement will accomplish its objective.  *AMI*, 760 F.3d at 26.

[6] The en banc court framed the governmental interest in terms of
enabling consumers to buy American products, *id.* at 23-24, but the
government refrained from articulating any such interest.  The only
interest the government asserted in *AMI* was the open-ended,
unbounded notion of providing consumers with information when they
make their purchasing decisions.

The government's unwillingness to frame its interest in
protectionist terms, as the en banc court did, is understandable.  While
*AMI* was pending before the panel, and then before the court en banc,
the World Trade Organization was conducting a proceeding to
determine whether the United States, by requiring country-of-origin
labeling, violated its treaty obligations not to engage in protectionism.
Canada and Mexico, joined by other countries, had filed a complaint
so alleging.

On October 20, 2014, after the *AMI* en banc opinion issued, the
WTO compliance panel ruled against the United States.  The panel
held that the statute and regulations at issue in the *AMI* case violated

5

our decisions in *NAM*, *R.J. Reynolds*, and *National Association of Manufacturers v. NLRB* holding that the analysis in *Zauderer* was confined to government compelled disclosures designed to prevent the deception of consumers.

In light of the *AMI* decision, we granted the petitions of the Securities and Exchange Commission and intervenor Amnesty International for rehearing to consider what effect, if any, *AMI* had on our judgment that the conflict minerals disclosure requirement in 15 U.S.C. § 78m(p)(1)(A)(ii) & (E), and the Commission's final rule, 77 Fed. Reg. 56,274, 56,362-65, violated the First Amendment to the Constitution. *See* Order of November 18, 2014. For the reasons that follow we reaffirm our initial judgment.

Before we offer our legal analysis, a pervasive theme of the dissent deserves a brief response. To support the conflict minerals disclosure rule, the dissent argues that the rule is valid because the United States is thick with laws forcing "[i]ssuers of securities" to "make all sorts of disclosures about their products," Dissent at 1. Charles Dickens had a few words about this form of argumentation: "'Whatever is is right'; an aphorism

---

the treaty obligations of the United States because the regulations accord less favorable treatment to imported livestock than to domestic livestock. The WTO's Appellate Body rejected the United States' appeal on May 18, 2015. *GATT Dispute Panel on United States-Certain Country of Origin Labeling (COOL) Requirements*, Article 21.5 Panel Report (Oct. 20, 2014), Appellate Body Report (May 18, 2015), WT/DS384/RW, WT/DS386/RW. Canada has requested authorization to retaliate and some expect a trade war. *See* Gov't of Canada, *Canada to Seek WTO Authorization in Response to Country of Origin Labeling*; *Editorial: Time to Lose COOL. Avoid Trade War, After WTO Ruling*, Herald News (Can.), May 19, 2015; Krista Hughes, *U.S. Loses Meat Labeling Case; Trade War Looms*, Reuters, May 18, 2015.

6

that would be as final as it is lazy, did it not include the troublesome consequence, that nothing that ever was, was wrong." CHARLES DICKENS, A TALE OF TWO CITIES 65 (Signet Classics) (1859). Besides, the conflict minerals disclosure regime is not like other disclosure rules the SEC administers. This particular rule, the SEC determined, is "quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve." Conflict Minerals, 77 Fed. Reg. 56,274, 56,350 (Sept. 12, 2012) (codified at 17 C.F.R. §§ 240.13p-1, 249b.400).[7]

As to the First Amendment, we agree with the SEC that "after *AMI*, whether *Zauderer* applies in this case is an open question." Appellee Supp. Br. 10-11. NAM, in its initial briefing and in its supplemental brief on rehearing, argued that *Zauderer* did not apply to this case, not only because the compelled disclosures here were unrelated to curing consumer deception, but also because this government-compelled speech was not within the Supreme Court's category of "commercial speech." Appellants Supp. Br. 18-19; Appellants Br. 53. NAM therefore argued that the commercial speech test of *Central Hudson*, 447 U.S. at 564-66, also did not govern the First Amendment analysis in this case.

---

[7] The dissent likens the disclosures here to the "mine-run of uncontroversial requirements to disclose factual information to consumers." Dissent at 4. But consumer protection was not a reason for the conflict minerals disclosure regime. As the Commission noted, "unlike in most of the securities laws, Congress intended the Conflict Minerals Provision to serve a humanitarian purpose," 77 Fed. Reg. at 56,350, and that purpose was to reduce the trade in minerals from the DRC in order "to inhibit the ability of armed groups in the [DRC] to fund their activities." *Id.* at 56,276.

7

In our initial decision we did not decide whether the compelled speech here was commercial speech;[8] we assumed *arguendo* that it was.  *NAM v. SEC*, 748 F.3d at 372.  Now on rehearing the question looms again.  But before we may confront that broad issue, we address a narrower subsidiary question: whether *Zauderer*, as now interpreted in *AMI*, reaches compelled disclosures that are unconnected to advertising or product labeling at the point of sale.

To put the matter differently, even if the conflict minerals disclosures are categorized as "commercial speech," it may not

---

[8] It is easier to discern what the Supreme Court does not consider "commercial speech" than to determine what speech falls within that category.  *See Nike, Inc. v. Kasky*, 539 U.S. 654, 655 (2003) (per curiam) (writ of certiorari dismissed as improvidently granted).

For instance, even if "money is spent to project" speech, this does not make it commercial speech.  *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976).  Otherwise there is no explaining cases such as *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and *Buckley v. Valeo*, 424 U.S. 1 (1976).  Speech "carried in a form" sold for profit does not render it commercial speech under the Court's decisions.  *Va. Pharmacy*, 425 U.S. at 761.  Otherwise books, newspapers, and television programming would all be commercial speech.  *Id.*  Not all speech soliciting money is commercial speech.  Otherwise, *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988), and other cases such as *Cantwell v. Connecticut*, 310 U.S. 296 (1940), would have been decided differently.  The Court has also determined that just because the speech is about "a commercial subject," it does not fall into the category of commercial speech, otherwise "business section editorials would be commercial speech; and it isn't even factual speech on a commercial subject, or else business section news reporting would be commercial speech."  Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627, 638 (1990) (citing *Va. Pharmacy*, 425 U.S. at 761-62).

8

follow that *Zauderer*'s loose standard of review[9] rather than the more demanding standard of *Central Hudson* determines whether the law violates the First Amendment rights of those who are subject to the government's edicts.

Conflict minerals disclosures are to be made on each reporting company's website and in its reports to the SEC. In the rulemaking, the SEC acknowledged that the statute – and its regulations – were "directed at achieving overall social benefits," that the law was not "intended to generate measurable, direct economic benefits to investors or issuers," and that the regulatory requirements were "quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve." 77 Fed. Reg. at 56,350.[10]

The SEC thus recognized that this case does not deal with advertising or with point of sale disclosures. Yet the Supreme Court's opinion in *Zauderer* is confined to advertising, emphatically and, one may infer, intentionally. In a lengthy opinion, the Court devoted only four pages to the issue of compelled disclosures. *Zauderer*, 471 U.S. at 650-53. Yet in those few pages the Court explicitly identified advertising as the

---

[9] *See Milavetz, Gallop & Milavetz*, 559 U.S. at 249; and note 5 *supra*.

[10] *See* Mary Jo White, Chairwoman, Sec. & Exch. Comm'n, A.A. Sommer, Jr. Corporate Securities and Financial Law Lecture, Fordham Law School (Oct. 3, 2013) ("Seeking to improve safety in mines for workers or to end horrible human rights atrocities in the Democratic Republic of the Congo are compelling objectives, which, as a citizen, I wholeheartedly share. But, as the Chair of the SEC, I must question, as a policy matter, using the federal securities laws and the SEC's powers of mandatory disclosure to accomplish these goals.").

9

reach of its holding no less than thirteen times.[11]  Quotations in the preceding footnote prove that the Court was not holding that any time a government forces a commercial entity to state a message of the government's devising, that entity's First Amendment interest is minimal.  Instead, the *Zauderer* Court – in a passage *AMI* quoted, 760 F.3d at 22 – held that the advertiser's "constitutionally protected interest in *not* providing any particular factual information *in his advertising* is minimal." *Zauderer*, 471 U.S. at 651 (last italics added).

For these reasons the Supreme Court has refused to apply *Zauderer* when the case before it did not involve voluntary commercial advertising.[12]  In *Hurley v. Irish-American Gay,*

---

[11] Consider the following excerpts from *Zauderer* with our italics added: "the Dalkon Shield *advertisement*," *id.* at 650; "the *advertisement*, absent the required disclosure," *id.*; "In requiring attorneys who *advertise*," *id.*; "The State has attempted only to prescribe what shall be orthodox in commercial *advertising*," *id.* at 651; "a requirement that appellant include in his *advertising* purely factual and uncontroversial information," *id.*; "appellant's constitutionally protected interest in *not* providing any particular factual information in his *advertising* is minimal," *id.*; "an *advertiser's* interests," *id.*; "the *advertiser's* First Amendment rights," *id.*; "an *advertiser's* rights," *id.*; "attorney *advertising*," *id.* at 652; "Appellant's *advertisement*," *id.*; "The *advertisement*," *id.*; "The State's position that it is deceptive to employ *advertising*," *id.*

[12] Whatever the commercial speech doctrine entails, commercial advertising is at least at the heart of the matter.  *See, e.g., Central Hudson*, 447 U.S. at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising."); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973) ("The critical feature of the advertisement [making it commercial speech] was that . . . it did no more than propose a commercial transaction . . .."); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) ("[T]he core notion of

10

*Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), a unanimous Supreme Court treated *Zauderer* as a decision permitting the government "at times" to "'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information.'" *Hurley*, 515 U.S. at 573. But *Hurley* went on to stress that "*outside that context*" (commercial advertising) the "general rule" is "that the speaker has the right to tailor the speech" and that this First Amendment right "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* (italics added). The Court added that this constitutional rule was "enjoyed by business corporations generally." *Id.* at 574.

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001), distinguished *Zauderer* for much the same reason. United Foods claimed that a federal law compelling it to fund generalized advertising for mushrooms violated the company's First Amendment rights. United Foods thought the mushrooms it

_____

commercial speech [is] speech which does no more than propose a commercial transaction." (internal quotation marks omitted)); *Spirit Airlines*, 687 F.3d at 412 ("The speech at issue here – the advertising of prices – is quintessentially commercial insofar as it seeks to do no more than propose a commercial transaction." (internal quotation marks omitted)); *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998) ("The 'core notion' of commercial speech includes 'speech which does no more than propose a commercial transaction.' Outside this so-called 'core' lie various forms of speech that combine commercial and noncommercial elements. Whether a communication combining those elements is to be treated as commercial speech depends on factors such as whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication." (internal citations omitted)).

11

produced were superior to others.  Although the Court indicated that the United Foods' forced contribution was commercial speech, the First "Amendment may prevent the government from compelling individuals to express certain views or from compelling certain individuals to pay subsidies for speech to which they object."  *Id.* at 410 (internal citations omitted).  As to *Zauderer*, the Court found that decision inapplicable because – as in this case – *United Foods* did not deal with "voluntary advertising" or advertising by the company's "own choice."  *Id.* at 416.[13]

In answer to the SEC's "open question," we therefore hold that *Zauderer* has no application to this case.[14]  This puts the

_____

[13] The *AMI* en banc majority did not mention *Hurley*'s or *United Foods*' distinction of *Zauderer*.  Perhaps the cases escaped attention or perhaps the *AMI* majority believed that product labeling at the point of sale was simply an adjunct of advertising, to which *Zauderer* did apply.  The dissent in this case would dismiss *Hurley* and *United Foods* on the ground that both opinions were merely describing "*Zauderer*'s factual context."  Dissent at 11-12.  This will not wash.  Of course both opinions describe *Zauderer*.  The important point is why *Hurley* and *United Foods* do so – to explain that *Zauderer* did not apply because the case before the Court did not involve commercial advertising (*Hurley*) or voluntary advertising (*United Foods*).

[14] In calling our holding a "newly minted constriction of *Zauderer*" to advertising, Dissent at 9, the dissent distorts not only the language of *Zauderer* itself, but also the Supreme Court's decisions in *Hurley* and *United Foods* distinguishing *Zauderer* on the ground that it applied only to commercial or voluntary advertising.

The dissent also detects an anomaly: if the conflict minerals disclosure were required at the point of sale of the company's product, *Zauderer* would apply but if, as here, the disclosure is required once a year on the company's website, *Central Hudson* applies.  Dissent at 9-10.  What the dissent fails to see is that this dichotomy results from

12

case in the same posture as in our initial opinion when we determined that *Zauderer* did not apply, but for a different reason. As we ruled in our initial decision, we need not decide whether "strict scrutiny or the *Central Hudson* test for commercial speech" applies. *NAM*, 748 F.3d at 372. For the reasons we gave in that opinion, *id.* at 372-73, the SEC's "final rule does not survive even *Central Hudson*'s intermediate standard." *Id.* at 372. We need not repeat our reasoning in this regard.

But given the flux and uncertainty of the First Amendment doctrine of commercial speech,[15] and the conflict in the circuits regarding the reach of *Zauderer*,[16] we think it prudent to add an alternative ground for our decision. It is this. Even if the compelled disclosures here are commercial speech and even if *AMI*'s view of *Zauderer* governed the analysis, we still believe that the statute and the regulations violate the First Amendment.

To evaluate the constitutional validity of the compelled conflict minerals disclosures, the first step under *AMI* (and *Central Hudson*) is to identify and "assess the adequacy of the

the *AMI* decision stretching *Zauderer* to cover laws compelling disclosures at the time of sale for reasons other than preventing consumer deception. In other words if there is something anomalous, it is attributable to *AMI*, not our decision here, which follows Supreme Court precedents confining the *Zauderer* standard to "voluntary advertising." *United Foods*, 533 U.S. at 416.

[15] *See AMI*, 760 F.3d at 43 (Brown, J., dissenting).

[16] *See Dwyer v. Cappell*, 762 F.3d 275, 282-85 (3d Cir. 2014); *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012) (opinion for the court by Stranch, J.); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651-53 (7th Cir. 2006); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001).

13

[governmental] interest motivating" the disclosure requirement. *AMI*, 760 F.3d at 23.  Oddly, the SEC's Supplemental Brief does not address this subject.  In the first round of briefing the SEC described the government's interest as "ameliorat[ing] the humanitarian crisis in the DRC."  Appellee Br. 26.[17]  We will treat this as a sufficient interest of the United States under *AMI* and *Central Hudson*.

After identifying the governmental interest or objective, we are to evaluate the effectiveness of the measure in achieving it. *AMI*, 760 F.3d at 26; *see, e.g.*, *Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*, 512 U.S. 136, 146 (1994); *Central Hudson*, 447 U.S. at 564-66.[18]  Although the burden was on the government, *see Ibanez*, 512 U.S. at 146, here again the SEC has offered little substance beyond citations to statements by two Senators and members of the executive branch, and a United Nations resolution.  The government asserts that this is a matter of foreign affairs and represents "the type of 'value judgment based on the common sense of the people's representatives' for which

---

[17] The SEC said much the same in the rulemaking – that the interest was "the promotion of peace and security in the Congo," rather than "economic or investor protection benefits that [SEC] rules ordinarily strive to achieve."  77 Fed. Reg. at 56,350; *see also id.* at 56,276.  In fact, the statute and rule "may provide significant advantage to foreign companies that are not reporting in the United States" and may place public companies in this country at a "competitive disadvantage" against private companies who are not subject to the SEC's reporting rules.  *Id.* at 56,350.

[18] Show us not the aim without the way.
     For ends and means on earth are so entangled
     That changing one, you change the other too;
     Each different path brings other ends in view.

ARTHUR KOESTLER, DARKNESS AT NOON 241 (1940).

14

this Court has not required more detailed evidence." Appellee Br. 64 (quoting *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009)). As the government notes, in the area of foreign relations, "conclusions must often be based on informed judgment rather than concrete evidence." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010).

But in the face of such evidentiary gaps, we are forced to assume what judgments Congress made when crafting this rule. The most obvious stems from the cost of compliance, estimated to be $3 billion to $4 billion initially and $207 million to $609 million annually thereafter,[19] *see* 77 Fed. Reg. at 56,334, and the prospect that some companies will therefore boycott mineral suppliers having any connection to this region of Africa.[20] How would that reduce the humanitarian crisis in the region? The idea must be that the forced disclosure regime will decrease the revenue of armed groups in the DRC and their loss of revenue

---

[19] A recent study suggests companies spent "roughly $709 million and six million staff hours last year to comply with" the conflict minerals rule. Emily Chasan, *U.S. Firms Struggle to Trace 'Conflict Minerals'*, THE WALL STREET JOURNAL, Aug. 3, 2015.

[20] The SEC made this point in the rulemaking:

> The high cost of compliance provides an incentive for issuers to choose only suppliers that obtain their minerals exclusively from outside the Covered Countries, thereby avoiding the need to prepare a Conflict Minerals Report. To the extent that Covered Countries are the lowest cost suppliers of the minerals affected by the statute, [such] issuers . . . would have to increase the costs of their products to recoup the higher costs.

Conflict Minerals, 77 Fed. Reg. at 56,351.

15

will end or at least diminish the humanitarian crisis there.  But there is a major problem with this idea – it is entirely unproven and rests on pure speculation.[21]

Under the First Amendment, in commercial speech cases the government cannot rest on "speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).  But that is exactly what the government is doing here.  Before passing the statute, Congress held no hearings on the likely impact of § 1502.  The SEC points to hearings Congress held on prior bills addressing the conflict in the DRC, but those hearings did not address the statutory provisions at issue in this case.  When Congress held

---

[21] This problem was raised by one of the SEC Commissioners during an open meeting:

> The SEC's conflict minerals rulemaking suffers from an analytical gap that I cannot overlook – namely, there is a failure to assess whether and, if so, the extent to which the final rule will in fact advance its humanitarian goal as opposed to unintentionally making matters worse.  Indeed, based on some of the comment[s] that the Commission has received, there is reason to worry that, contrary to the aims of Section 1502, a chief consequence of the final rule could be that it actually worsens conditions in the DRC. . . . Because this rulemaking lacks any analysis of whether the benefits will materialize – failing to assess how the choices the Commission has made will impact life on the ground in the DRC – I am unable to support the recommendation and respectfully dissent.

Troy A. Paredes, Commissioner, Sec. & Exch. Comm'n, Statement at Open Meeting to Adopt a Final Rule Regarding Conflict Minerals Pursuant to Section 1502 of the Dodd-Frank Act, Washington, D.C. (Aug. 22, 2012).

16

hearings after § 1502's enactment, the testimony went both ways – some suggested the rule would alleviate the conflict, while others suggested it had "had a significant adverse effect on innocent bystanders in the DRC." *The Unintended Consequences of Dodd-Frank's Conflict Minerals Provision: Hearing Before the Subcomm. on Monetary Policy and Trade of the H. Comm. on Financial Services*, 113th Cong. (May 21, 2013) (Statement of Rep. Campbell).

Other post-hoc evidence throws further doubt on whether the conflict minerals rule either alleviates or aggravates the stated problem. As NAM points out on rehearing, the conflict minerals law may have backfired. Because of the law, and because some companies in the United States are now avoiding the DRC, miners are being put out of work or are seeing even their meager wages substantially reduced, thus exacerbating the humanitarian crisis and driving them into the rebels' camps as a last resort. Appellants Supp. Br. 17; *see, e.g.*, Sudarsan Raghavan, *How a Well-Intentioned U.S. Law Left Congolese Miners Jobless*, WASH. POST, Nov. 30, 2014; Lauren Wolfe, *How Dodd-Frank is Failing Congo*, FOREIGN POL'Y, Feb. 2, 2015.[22]

---

[22] *See* Aloys Tegera et al., *Open Letter*, Sept. 9, 2014, ("[T]he conflict minerals movement has yet to lead to meaningful improvement on the ground, and has had a number of unintended and damaging consequences. Nearly four years after the passing of the Dodd-Frank Act, only a small fraction of the hundreds of mining sites in the eastern DRC have been reached by traceability or certification efforts. The rest remain beyond the pale, forced into either illegality or collapse as certain international buyers have responded to the legislation by going 'Congo-free.' This in turn has driven many miners into the margins of legality . . . and in areas where mining has ceased, local economies have suffered.").

17

Our original opinion pointed out that the SEC was unable to quantify any benefits of the forced disclosure regime itself. *NAM*, 748 F.3d at 364. *See* 77 Fed. Reg. at 56,335 ("The statute therefore aims to achieve compelling social benefits, which we are unable to readily quantify with any precision."). The Government Accountability Office has refrained from addressing the issue, even though the conflict minerals statute required it to assess the effectiveness of the required disclosures in relieving the humanitarian crises. 15 U.S.C. § 78m(p)(1)(A)(ii) & (E); *see* U.S. G.A.O., CONFLICT MINERALS: STAKEHOLDER OPTIONS FOR RESPONSIBLE SOURCING ARE EXPANDING, BUT MORE INFORMATION ON SMELTERS IS NEEDED 3 (June 26, 2014) ("[W]e have not yet addressed the effectiveness of SEC's conflict minerals rule as required under the legislation.").[23]

That is not to say that we know for certain that the conflict minerals rule will not help – other sources contend the rule will do so.[24] But it is to say that whether § 1502 will work is not

---

[23] The Department of Commerce is charged in Dodd-Frank with compiling a list of "all known conflict mineral processing facilities worldwide." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1502(d)(3)(C), 124 Stat. 1376, 2217 (2010). Instead, it compiled a list of "all known processing facilities" for gold, tantalum, tin, or tungsten, but did "not indicate whether a specific facility processes minerals that are used to finance conflict in the [DRC] or an adjoining country." The Department confessed that it "do[es] not have the ability to distinguish such facilities." International Trade Administration, Department of Commerce, Reporting Requirements Under Section 1502(d)(3)(C) of the Dodd-Frank Act World-Wide Mineral Processing Facilities, Sept. 5, 2014.

[24] *See* John Prendergast et al., *Suffocating Congo's War*, FOREIGN POL'Y, Feb. 7, 2015, (responding to Wolfe, *How Dodd-Frank is*

18

proven to the degree required under the First Amendment to compel speech.

All of this presents a serious problem for the SEC because, as we have said, the government may not rest on such speculation or conjecture. *Edenfield v. Fane*, 507 U.S. at 770. Rather the SEC had the burden of demonstrating that the measure it adopted would "in fact alleviate" the harms it recited "to a material degree." *Id.* at 771; *see, e.g.*, *Ibanez*, 512 U.S. at 146; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion); *Pearson v. Shalala*, 164 F.3d 650, 659 (D.C. Cir. 1999); *Action for Children's Television v. FCC*, 58 F.3d 654, 665 (D.C. Cir. 1995) (en banc). The SEC has made no such demonstration in this case and, as we have discussed, during the rulemaking the SEC conceded that it was unable to do so.

This in itself dooms the statute and the SEC's regulation. If that were not enough, we would move on to evaluate another aspect of *AMI*, an aspect of the opinion on which two of the supplemental briefs on rehearing (those of the SEC and NAM) focus – namely, whether the compelled disclosures here are "purely factual and uncontroversial," *AMI*, 760 F.3d at 26 (quoting *Zauderer*, 471 U.S. at 651). The intervenors, although supporting the SEC, write in their supplemental brief that *AMI* "sheds little light on whether *Zauderer*'s reference to 'purely factual and uncontroversial information' states a legal standard and, if so, what the standard means." Intervenors Supp. Br. 8. They continue: "*Zauderer* itself used the phrase . . . to characterize the particular information subject to disclosure in that case, not to articulate a legal test," *id.* at 9. They add that

───────────────

*Failing Congo*); Zainab Hawa Bangura, *Sexual Violence and Conflict Minerals: International Demand Fuels Cycle*, THE GUARDIAN, June 18, 2014.

19

the term "uncontroversial" is "ill-suited to establishing an element of a legal standard," *id.* at 11.  In support, the intervenors cite the Sixth Circuit's decision that the "purely factual and uncontroversial" phrase from *Zauderer*, which the Supreme Court's opinion mentioned only once and not in its statement of the holding, was merely descriptive and not a legal standard.  *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012) (opinion for the court by Stranch, J.).

However persuasive we might find the intervenors' argument,[25] we see no way to read *AMI* except as holding that – to quote *AMI – Zauderer* "requires the disclosure to be of 'purely factual and uncontroversial information' about the good or service being offered."  *AMI*, 760 F.3d at 27.  We are therefore bound to follow that holding.  *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).

Even so, the intervenors are correct that the *AMI* majority "made no attempt to define those terms precisely."  Intervenors Supp. Br. 9.  *AMI* did speak of "controversial in the sense that [the compelled speech] communicates a message that is controversial for some reason other than [a] dispute about simple factual accuracy."  *AMI*, 760 F.3d at 27.  Judge Kavanaugh, concurring in the judgment in *AMI*, wrote that "it is unclear how we should assess and what we should examine to

---

[25] In our initial opinion we quoted the holding in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), that the cases dealing with forced ideological messages "cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact.'"  *NAM*, 748 F.3d at 371 (quoting *Riley*, 487 U.S. at 797); *see also Va. Pharmacy*, 425 U.S. at 762.

20

determine whether a mandatory disclosure is controversial." *Id.* at 34 (Kavanaugh, J., concurring in the judgment).

One clue is that "uncontroversial," as a legal test, must mean something different than "purely factual."   Hence, the statement in *AMI* we just quoted, describing "controversial in the sense that [the compelled speech] communicates a message that is controversial for some reason other than [a] dispute about simple factual accuracy." *AMI*, 760 F.3d at 27.   Perhaps the distinction is between fact and opinion.   But that line is often blurred, and it is far from clear that all opinions are controversial.   Is Einstein's General Theory of Relativity fact or opinion, and should it be regarded as controversial?   If the government required labels on all internal combustion engines stating that "USE OF THIS PRODUCT CONTRIBUTES TO GLOBAL WARMING" would that be fact or opinion?   It is easy to convert many statements of opinion into assertions of fact simply by removing the words "in my opinion" or removing "in the opinion of many scientists" or removing "in the opinion of many experts."[26]   *Cf. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015);

---

[26] The conflict minerals provisions contain a "Sense of Congress" preamble, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1502(a), 124 Stat. 1376, 2213 (2010), which strikes us not as a statement of fact but a statement of opinion. Some courts treat such provisions as precatory. *See, e.g.*, *Yang v. Cal. Dep't of Social Servs.*, 183 F.3d 953, 958 (9th Cir. 1999); *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 994-95 (1st Cir. 1992); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 909 (3d Cir. 1990). We have previously noted that a "sense of Congress provision" may be used by that body to voice disagreement with an opinion of this court, *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 877 (D.C. Cir. 2006), and that such a provision may be non-binding, *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 14 n.6 (D.C. Cir. 2008).

21

Frederick Schauer, *Facts and the First Amendment*, 57 UCLA L. REV. 897 (2010). It is also the case that propositions once regarded as factual and uncontroversial may turn out to be something quite different.[27] What time frame should a court use in assessing this? At the time of enactment of the disclosure statute? At the time of an agency's rulemaking implementing the disclosure statute? Or at some later time when the compelled disclosures are no longer considered "purely factual" or when the disclosures have become "controversial"?

That the en banc court viewed the country-of-origin disclosures at issue in *AMI* as "uncontroversial" poses another puzzle. A controversy, the dictionaries tell us, is a dispute, especially a public one.[28] Was there a dispute about the country-

---

[27] To illustrate, consider *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157 (7th Cir. 1977), a case cited in *Zauderer*, 471 U.S. at 645. The Seventh Circuit upheld the FTC's order requiring petitioners to cease placing newspaper advertisements stating that eating eggs does not increase a person's cholesterol level and to make certain disclosures. Petitioners' advertisements, and other statements like it, were considered false and misleading. *Nat'l Comm'n on Egg Nutrition*, 570 F.2d at 160-61. But the tables have turned. In its 2015 report, the Dietary Guidelines Advisory Committee of the Department of Agriculture found that there was "no appreciable relationship between consumption of dietary cholesterol and serum [blood] cholesterol." U.S. Dep't of Agric., *Scientific Report of the 2015 Dietary Guidelines Advisory Committee*, Part D Ch. 1, 17 (2015).

[28] The dissent claims that under *AMI*, "purely factual and uncontroversial" means "purely factual" and "accurate." Dissent at 12-15. In so twisting the phrase, the dissent turns it into a redundancy. Is there such a thing as a "purely factual" proposition that is not "accurate"? The en banc majority in *AMI*, which used the phrase as a First Amendment test, did not think so. *AMI* described an unconstitutional compelled disclosure as one "communicat[ing] a message that is *controversial for some reason other than dispute about*

22

of-origin disclosures in *AMI* or as *AMI* put it, was there a controversy "for some reason other than [a] dispute about simple factual accuracy"? *AMI*, 760 F.3d at 27. One would think the answer surely was yes. As we explained earlier, while *AMI* was pending a panel of the World Trade Organization was conducting a proceeding in which other nations charged that the country-of-origin labeling law violated the treaty obligations of the United States, a controversy that later resulted in a ruling against the United States. *See supra* n.6.

In its Supplemental Brief, the SEC invoked for the first time *Meese v. Keene*, 481 U.S. 465 (1987), describing the case as one in which "the Supreme Court rejected a First Amendment challenge to compelled disclosures accompanying materials that met the statutory definition of 'political propaganda,'" Appellee Supp. Br. 16. The SEC's description is not accurate. *Keene* was not a compelled speech case. An agency of the Canadian government distributed films the Department of Justice considered "political propaganda" under the Foreign Agents Registration Act. This triggered the requirement that the foreign

---

*simple factual accuracy*." *AMI*, 760 F.3d at 27 (italics added).

In struggling to provide content to this portion of *AMI*, the dissent asserts that a "misleading disclosure, by definition, would not convey accurate information to a consumer" and therefore would not be "uncontroversial." Dissent at 16. But as Mark Twain wrote, "Often, the surest way to convey misinformation is to tell the strict truth." *Pudd'nhead Wilson's New Calendar* in MARK TWAIN, FOLLOWING THE EQUATOR 567 (1st ed. 1897). *See Bronston v. United States*, 409 U.S. 352 (1973). It is also worth noting that the attorney in *Zauderer* provided, as the dissent puts it, "factually accurate information" to consumers: his advertisement informed potential clients that if there were "no recovery, no legal fees are owed by our clients." *Zauderer*, 471 U.S. at 631. The trouble was that he did not mention that they would still be liable for other expenses.

23

agent – Canada – affix a label to the material identifying its source.   The label did not contain the words "political propaganda." *Keene*, 481 U.S. at 470-71.  The Court made clear that the constitutionality of this disclosure regime was "not at issue in this case."  *Id.* at 467.  The plaintiff – an attorney and state legislator – wanted to show the films and claimed that the *government's* considering the films "propaganda" violated his First Amendment rights, a claim the Court rejected.   The attorney was under no disclosure obligations and he was free to remove the label the Canadian government had affixed to the film packaging.  As NAM's Supplemental Brief points out, *Keene* "did not suggest, much less hold, that it would be constitutionally permissible for Congress to force filmmakers to label their own films as 'political propaganda' – or not 'propaganda free' – however the term was defined." Appellants Supp. Br. 13.

We agree with NAM that the statutory definition of "conflict free" cannot save this law.  *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006); *cf. Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965-67 (9th Cir. 2009).  As NAM forcefully puts it, "[i]f the law were otherwise, there would be no end to the government's ability to skew public debate by forcing companies to use the government's preferred language.   For instance, companies could be compelled to state that their products are not 'environmentally sustainable' or 'fair trade' if the government provided 'factual' definitions of those slogans – even if the companies vehemently disagreed that their [products] were 'unsustainable' or 'unfair.'" Appellants Supp. Br. 12.[29]

---

[29] A famous example of governmental redefinition comes to mind:

24

In our initial opinion we stated that the description at issue – whether a product is "conflict free" or "not conflict free" – was hardly "factual and non-ideological." *NAM*, 748 F.3d at 371.[30] We put it this way: "Products and minerals do not fight conflicts. The label '[not] conflict free' is a metaphor that conveys moral responsibility for the Congo war. It requires an issuer to tell consumers that its products are ethically tainted, even if they only indirectly finance armed groups. An issuer, including an issuer who condemns the atrocities of the Congo war in the strongest terms, may disagree with that assessment of its moral responsibility. And it may convey that 'message' through 'silence.' *See Hurley*, 515 U.S. at 573. By compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment. *See id.*" *NAM*, 748 F.3d at 371.

We see no reason to change our analysis in this respect. And we continue to agree with NAM[31] that "[r]equiring a company to publicly condemn itself is undoubtedly a more

---

WAR IS PEACE
FREEDOM IS SLAVERY
IGNORANCE IS STRENGTH

GEORGE ORWELL, NINETEEN EIGHTY-FOUR 4 (Signet Classic) (1949).

[30] *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d at 652.

[31] Two of the five SEC Commissioners have expressed the same sentiment: "Requiring persons to presume their guilt by association with the current tragedy in the Congo region unless proven otherwise is neither factual nor uncontroversial." Yin Wilczek, *SEC Argues Its Conflict Minerals Rule Survives First Amendment Scrutiny*, BLOOMBERG BNA, Dec. 12, 2014 (quoting Joint Statement of Commissioners Gallagher and Piwowar).

25

'effective' way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so."  Appellants Reply Br. 27-28.

For all these reasons, we adhere to our original judgment "that 15 U.S.C. § 78m(p)(1)(A)(ii) & (E), and the Commission's final rule, 77 Fed. Reg. at 56,362-65, violate the First Amendment to the extent the statute and rule require regulated entities to report to the Commission and to state on their website that any of their products have 'not been found to be 'DRC conflict free.''"[32]  *NAM*, 748 F.3d at 373.

*So ordered.*

---

[32] As we stated in our initial opinion, the "requirement that an issuer use the particular descriptor 'not been found to be 'DRC conflict free'' may arise as a result of the Commission's discretionary choices, and not as a result of the statute itself.  We only hold that the statute violates the First Amendment to the extent that it imposes that description requirement.  If the description is purely a result of the Commission's rule, then our First Amendment holding leaves the statute itself unaffected."  *NAM*, 748 F.3d at 373 n.14.  The Commission has not shed any light on this in its recent filings with our court.

Srinivasan, *Circuit Judge*, *dissenting*: Issuers of securities must make all sorts of disclosures about their products for the benefit of the investing public. No one thinks that garden-variety disclosure obligations of that ilk raise a significant First Amendment problem. So here, there should be no viable First Amendment objection to a requirement for an issuer to disclose the country of origin of a product's materials—including, say, whether the product contains specified minerals from the Democratic Republic of the Congo (DRC) or an adjoining country, the site of a longstanding conflict financed in part by trade in those minerals. Such a requirement provides investors and consumers with useful information about the geographic origins of a product's source materials. Indeed, our court, sitting en banc, recently relied on "the time-tested consensus that consumers want to know the geographical origin of potential purchases" in upholding a requirement for companies to identify the source country of food products. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 24 (2014) (internal quotation marks omitted). It is hard to see what is altogether different about another species of "geographical origin" law requiring identification of products whose minerals come from the DRC or adjoining countries.

If an issuer's products contain minerals originating in those conflict-ridden countries, the Conflict Minerals Rule requires the issuer to determine whether the products are "DRC conflict free," where "DRC conflict free" is a statutorily defined term of art denoting products that are free of "conflict minerals that directly or indirectly finance or benefit armed groups" in the DRC or adjoining countries. 15 U.S.C. § 78m(p)(1)(D). If the issuer cannot conclude, after investigating the sourcing of its minerals, that a product is "DRC conflict free" under the statutory definition, it must say so in a report disclosing that the product has "not been found to be 'DRC conflict free.'" The requirement to make that disclosure, in light of the anticipated reaction by investors and

2

consumers, aims to dissuade manufacturers from purchasing minerals that fund armed groups in the DRC region. That goal is unique to this securities law; but the basic mechanism—disclosure of factual information about a product in anticipation of a consumer reaction—is regular fare for governmental disclosure mandates. Many disclosure laws, including the law upheld in *AMI*, operate in just that way.

Appellants raise no First Amendment objection to the obligation to find out which of their products fail to qualify as "DRC conflict free" within the meaning of the statutory definition. Nor do they challenge the obligation to list those products in a report for investors. Appellants also presumably would have no problem with a requirement to list the products by parroting the statutory definition, *i.e.*, as products that have not been determined to be free of conflict minerals that "directly or indirectly finance or benefit armed groups" in the DRC region. At least some issuers in fact have been making essentially that sort of disclosure, without apparent objection, under the partial stay of the Rule in effect since our original panel decision. *See* Exchange Act Rule 13p-1 and Form SD, Exchange Act Release No. 72,079 (May 2, 2014); *e.g.*, Canon Inc., Conflict Minerals Report (Form SD Ex. 1.01) § 5 (May 29, 2015).

Appellants' challenge instead is a more targeted one: they object only to the Rule's requirement to describe the listed products with the catchphrase "not been found to be 'DRC conflict free.'" But if there is no First Amendment problem with an obligation to identify and list those products, or to describe them by quoting the statutory definition, it is far from clear why the prescribed use of a shorthand phrase for that definition—in lieu of the technical definition itself— would materially change the constitutional calculus.

3

Perhaps one might object that the meaning of the shorthand description "DRC conflict free" would not necessarily be known to a reader. But that descriptor comes amidst a set of mandated disclosures about the measures undertaken to determine the source of minerals originating in the DRC or adjoining countries. So the meaning of "DRC conflict free" would seem quite apparent in context. And even if otherwise, an investor or consumer coming across that term for the first time would, with little effort, learn that it carries a specific meaning prescribed by law.

But that's not all. To eliminate any possibility of confusion, the Rule's disclosure obligation enables the issuer to elaborate on the prescribed catchphrase however it sees fit. So, for example, the issuer could say that the listed products have "not been found to be 'DRC conflict free,' *which is a phrase we are obligated to use under federal securities laws to describe products when we are unable to determine that they contain no minerals that directly or indirectly finance or benefit armed groups in the DRC or an adjoining country.*" At that point, there would seem to be nothing arguably confusing or misleading about the content of the Rule's mandated disclosure.

The First Amendment, under the Supreme Court's decisions, poses no bar to the Rule's disclosure obligation. The Court has emphasized that "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). Correspondingly, when the government requires disclosure of truthful, factual information about a product to consumers, a company's First Amendment interest in withholding that information from its consumers is "minimal." *Id.* That is why countless disclosure

4

mandates in the commercial arena—country of origin of products and materials, calorie counts and nutritional information, extensive reporting obligations under the securities laws, and so on—raise no serious First Amendment question.

The sum of the matter is this: in the context of commercial speech, the compelled disclosure of truthful, factual information about a product to consumers draws favorable review. That review takes the form of the permissive standard laid down by the Supreme Court in *Zauderer*. I would apply that approach here. Like the mine-run of uncontroversial requirements to disclose factual information to consumers in the commercial sphere, the descriptive phrase "not been found to be 'DRC conflict free'" communicates truthful, factual information about a product to investors and consumers: it tells them that a product has not been found to be free of minerals originating in the DRC or adjoining countries that may finance armed groups.

Appellants challenge the prescribed catchphrase for such a product—"not been found to be 'DRC conflict free'"—on the ground that it ostensibly brands issuers with a "scarlet letter." Appellant Br. 52. Appellants' invocation of a "scarlet letter" is out of place. If they mean to suggest that issuers would prefer to avoid the label "not found to be 'DRC conflict free'" because it invites public scrutiny, the same is true of all sorts of entirely permissible requirements to disclose factual information to consumers (high calorie counts or low nutritional value, for instance). When a law mandates disclosure of that sort of "particular factual information" about a company's product, the Supreme Court has said, the company has only a "minimal" cognizable interest in withholding public disclosure. *Zauderer*, 471 U.S. at 651. By contrast, the scarlet "A" affixed to Hester Prynne's gown

5

conveyed personal information that she had a strong and obvious interest in withholding from the public. In that sense, requiring a company to disclose product information in the commercial marketplace is not the same as requiring Hester Prynne to "show [her] scarlet letter in the [town] market-place." Nathaniel Hawthorne, The Scarlet Letter 63 (Laird & Lee 1892).

I would therefore hold that the favored treatment normally afforded to compelled factual disclosures in the commercial arena applies to the Conflict Minerals Rule. The obligation to use the term "not been found to be 'DRC conflict free'" should be subject to relaxed *Zauderer* review, which it satisfies. Even under the less permissive test for restrictions on commercial speech established in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980), I would find that the Rule survives. Because I would conclude that the Conflict Minerals Rule works no violation of the First Amendment, I respectfully disagree with the contrary decision reached by my colleagues.

I.

An understanding of the unique treatment afforded to compelled disclosures in the area of commercial speech substantially informs the proper resolution of the First Amendment challenge in this case. As we recognized in *AMI*, 760 F.3d at 21-22, and as the Supreme Court has emphasized, the starting premise in all commercial speech cases is the same: the First Amendment values commercial speech for different reasons than non-commercial speech.

Until 1976, commercial speech received no constitutional protection at all. *See Valentine v. Chrestensen*, 316 U.S. 52 (1942), *overruled by Va. State Bd. of Pharmacy v. Va.*

6

*Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).  When the Supreme Court eventually extended "First Amendment protection to commercial speech," it did so primarily because of the "value to consumers of the information such speech provides."  *Zauderer*, 471 U.S. at 651.  The Court protected commercial speech against unwarranted restriction through the framework set out in *Central Hudson*.  447 U.S. at 564.

Outside the context of commercial speech, the protections applicable to *restrictions* on speech directly mirror the protections applicable to *compelled* speech.  Compelled speech, the Supreme Court has observed, generally is "as violative of the First Amendment as prohibitions on speech."  *Zauderer*, 471 U.S. at 650.  That symmetry does not exist, however, in the area of commercial speech.  In that context, there are "material differences between disclosure requirements and outright prohibitions on speech."  *Id.*  When the government requires disclosure of "purely factual and uncontroversial information" about products in the commercial sphere, "the First Amendment interests implicated . . . are substantially weaker than those at stake when speech is actually suppressed."  *AMI*, 760 F.3d at 22 (quoting *Zauderer*, 471 U.S. at 652 n.14).

In particular, because the First Amendment's protection of commercial speech lies in the speech's value to consumers, there is only a "minimal" interest in resisting disclosure of product information to the public.  *Zauderer*, 471 U.S. at 651; *see Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010).  Laws "requiring a commercial speaker to make purely factual disclosures related to its business affairs . . . facilitate rather than impede the free flow of commercial information."  *Beeman v. Anthem Prescription Mgmt.*, 315 P.3d 71, 89 (Cal. 2013) (internal quotation marks omitted); *see generally* Robert Post, Compelled Commercial

7

Speech, 117 W. Va. L. Rev. 867 (2015). As a result, government compulsion of "purely factual and uncontroversial" commercial speech is subject to a more lenient constitutional standard than the *Central Hudson* framework applicable to restrictions on commercial speech. *Zauderer*, 471 U.S. at 651. The government can require disclosure of factual and uncontroversial information in the realm of commercial speech as long as the disclosure "reasonably relate[s]" to an adequate interest. *Id.*

The key to deciding whether to apply *Zauderer* or *Central Hudson*, then, turns on the effect of the challenged government regulation. Does the regulation restrict the flow of truthful commercial information, in which case it triggers more searching review under *Central Hudson*? Or does the regulation expand the flow of truthful commercial information by requiring its disclosure, in which case it occasions less demanding review under *Zauderer*?

II.

To answer that question for the Conflict Minerals Rule, we must first address a threshold issue: whether the challenged disclosure involves "commercial speech." The relaxed standard of *Zauderer*, according to the logic (and letter) of the Court's opinion, applies only in the context of "commercial speech." 471 U.S. at 651.

The Conflict Minerals Rule meets that condition. The Rule requires manufacturers of commercial products to disclose information to the public about the composition of their products—in particular, sourcing information about component minerals contained in the products. In that sense, the disclosure resembles the country-of-origin labeling this court deemed "commercial speech" in *AMI*. 760 F.3d at 21.

8

Like the labels at issue in *AMI*, the conflict minerals disclosure informs investors and consumers about the geographic origins of products for sale in the commercial marketplace.

It is true that the conflict minerals disclosure appears in annual reports made available on manufacturers' websites (and filed with the Securities and Exchange Commission) rather than in product labels or conventional advertisements. But under our precedents, the precise form of the speech does not determine whether it qualifies as "commercial speech." In *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) (per curiam), we treated corrective statements about products required to be included on the company's website as commercial speech. *Id.* at 1138, 1142-45. Philip Morris argued that disclosures on its website could not be considered commercial speech because they were unattached to advertisements. We disagreed. *Id.* at 1143. Commercial speech, we held, "include[s] material representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase" (or, given the corrective disclosures at issue, *not* to purchase) "the product." *Id.*

The Conflict Minerals Rule likewise calls for website disclosures about a company's products with an eye towards a potential commercial purchase. The conflict minerals disclosure, the Commission explained in announcing the Rule, "provide[s] information" about a product "that is material to an investor's understanding of the risks in an issuer's reputation and supply chain." Conflict Minerals, 77 Fed. Reg. 56,274, 56,276 (Sept. 12, 2012). That information self-evidently aims at a prospective commercial transaction: an investor's decision whether to purchase or invest in the

9

issuer's securities. The Rule's disclosure obligation therefore should be eligible for relaxed review under *Zauderer*.

My colleagues in the majority, however, hold that it is insufficient to conclude that the conflict minerals disclosure involves "commercial speech." In their view, the permissive review normally afforded to commercial disclosure mandates under *Zauderer* extends only to a *sub*-category of commercial speech: advertisements and product labels. *Ante* at 7-8. No other court has ever identified such a limit under *Zauderer* (or for any other purpose under commercial-speech law). *See United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005) (applying *Zauderer* to compelled disclosure in newsletter and radio program). The majority's newly minted constriction of *Zauderer* to those particular forms of commercial speech contradicts that decision's core rationale.

For starters, confining *Zauderer* to advertising and product labels gives rise to highly curious results. Suppose, for instance, that the Conflict Minerals Rule required companies to include the designation "not been found to be 'DRC conflict free'" in prominent text on product packaging rather than in a once-a-year report posted on a website. The majority would subject that requirement only to *Zauderer*'s less demanding form of review. It would be strange, though, if the same compelled commercial disclosure—providing the same information about the same product—commanded more demanding First Amendment scrutiny if it appeared in a single yearly report on the seller's website instead of on every product label. After all, if faced with the choice between an annual website report and product packaging, a seller would predictably opt for the former. Not only would the company prefer to post the disclosure once a year instead of printing it on every product label, but even as to a single product label, the limited physical space on a product's packaging makes for

10

a less desirable forum for a compelled commercial disclosure than the unlimited virtual space on a company website.

The majority's approach, though, would run in the opposite direction. It would impose a *more* searching First Amendment standard on a disclosure that imposes a *less* burdensome requirement on the speaker. The anomaly in that result, contrary to the majority's suggestion, *ante* at 11 n.14, has little to do with *AMI*'s application of *Zauderer* to contexts beyond prevention of consumer deception. After all, if a requirement to include a disclosure on every product label was aimed to prevent consumer deception, the majority would still subject that requirement only to deferential *Zauderer* review. But if the same compelled disclosure appeared in a once-a-year website report, the majority would apply a *more* searching First Amendment standard to that *less* restrictive obligation. It is entirely unclear why that should be so.

Nothing in *Zauderer* supports that counter-intuitive result. To the contrary, *Zauderer*'s basic rationale holds no less true across the full range of commercial speech than in the sub-category consisting of advertisements and product labels. The decision, by its terms, is grounded in the recognition that "the extension of First Amendment protection to *commercial speech* is justified principally by the value to consumers of the information *such speech* provides." 471 U.S. at 651 (emphasis added). That is why a commercial speaker has only a "minimal" interest in withholding disclosure of factual information about its products. *Id.* That reason for a permissive approach to disclosure obligations in the commercial sphere applies to every form of "commercial speech," all of which yields the "value to consumers" animating the Court's approach. *Id.*

11

To be sure, the *Zauderer* Court unsurprisingly used the word "advertising" numerous times in the relevant part of the opinion, *see ante* at 8-9, but only because that was the particular factual context in which the case arose.  For what it's worth, the Court also used "commercial speech" and "commercial speaker" a number of times in the same part of the opinion when explaining the rationale for the relaxed First Amendment standard it set forth, 471 U.S. at 650-52, and it also did so when framing the question it addressed in that part of its opinion, *id.* at 629.  What matters is that the Court's driving rationale, as the Court itself said, applies to "commercial speech" writ large, not just (and not any more so) to advertising alone.  *Id.* at 651.

Indeed, the majority would extend *Zauderer* beyond traditional advertising to encompass product labels, as it must after *AMI*.  But tellingly, *AMI* itself did not conceive of the possibility that *Zauderer* might apply only to that decision's specific factual context of advertising (in which event *AMI* would have needed to assess whether *Zauderer* also applies to product labels).   Rather, *AMI* examined the range of government interests to which *Zauderer* pertains on the natural assumption that, whatever the scope of those interests, *Zauderer* applies to "commercial speech," 760 F.3d at 21, not just to certain forms of commercial speech.

Contrary to the majority's suggestion, *ante* at 9-11, the Supreme Court's post-*Zauderer* decisions do not indicate otherwise.  In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, a case that had nothing to do with commercial speech, the Court simply quoted *Zauderer*'s observation that the government may at times "prescribe what shall be orthodox in commercial advertising."  515 U.S. 557, 573 (1995) (quoting *Zauderer*, 471 U.S. at 651).  In *United States v. United Foods, Inc.*, the Court described *Zauderer* as

12

"involving attempts by a State to prohibit certain voluntary advertising by licensed attorneys." 533 U.S. 405, 416 (2001). The Court then restated *Zauderer*'s outcome, *i.e.*, that it permitted "a rule requiring that attorneys who advertised by their own choice and who referred to contingent fees should disclose that clients might be liable for costs." *Id.* Those references in *United Foods* and *Hurley* accurately describe *Zauderer*'s factual context. But there is no reason to think that the references to "advertising" in any way confined *Zauderer*'s holding.

In short, nothing in *Zauderer* or any subsequent decision suggests that *Zauderer* review applies only to conventional advertisements, much less to advertisements plus product labels. *Zauderer* is a decision about compelled commercial speech. This is such a case.

III.

Once we conclude that the Conflict Minerals Rule regulates "commercial speech," the next question is whether the Rule should be examined under the relaxed standard set forth in *Zauderer* or the more restrictive test of *Central Hudson*. Because the Rule compels rather than restricts commercial speech, it triggers permissive review under *Zauderer* as long as it requires disclosure of "purely factual and uncontroversial information." *AMI*, 760 F.3d at 27 (quoting *Zauderer*, 471 U.S. at 651). And while *AMI* reaffirmed that only "purely factual and uncontroversial" disclosures qualify for *Zauderer* review, we had no occasion in *AMI* to define precisely what that standard entails. *See* 760 F.3d at 27. Inasmuch as "the criteria triggering the application of *Zauderer*" were "substantially unchallenged," we reasoned, whatever may be the precise meaning of "purely

factual and uncontroversial," the country-of-origin labeling at issue met that standard.  *Id.*

There was no question, for instance, that the country-of-origin disclosure was "purely factual."  As to "controversial," we understood that a disclosure might be "controversial" in the "sense" of "disagree[ment] with the truth of the facts required to be disclosed," but the challengers raised no claim that the country-of-origin disclosure was "controversial in that sense."  *Id.*  Nor did we perceive how the disclosure might be seen as "controversial" in any other sense, *i.e.*, "for some reason other than dispute about simple factual accuracy."  *Id.*  We made no effort to identify any such additional meaning of "controversial" that might matter under *Zauderer*, other than to note that a disclosure "could be so one-sided or incomplete" as to fall outside *Zauderer*'s zone.  *Id.*  But the challengers had made no argument along those lines.  *Id.*  The upshot is that *AMI* left it to a future panel to expound on the contours of "purely factual and uncontroversial."

In assessing whether the conflict minerals disclosure squares with the phrase "purely factual and uncontroversial," it is important to bear in mind that phrase comes from a judicial opinion, not a statute.  And the "language of an opinion is not always to be parsed as though we were dealing with language of a statute."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).  Language in a judicial opinion should be "read in context," *id.*, taking into account the whole of the court's analysis.  Here, that context starts with *Zauderer*'s firm grounding in the reason for protecting commercial speech in the first place:  its value in providing consumers with useful information about products and services.  471 U.S. at 651; *Milavetz*, 559 U.S. at 249-50.

14

That purpose is honored when a disclosure mandate calls for dissemination to consumers of "purely factual" and "accurate" information about a product, as *Zauderer* itself indicates. *Zauderer*, 471 U.S. at 651 & n.14. That means, at the least, that the "factual" disclosure must be non-deceptive. It also means that the government cannot attempt to prescribe, under the guise of requiring disclosure of "purely factual" information, "what shall be orthodox in politics, nationalism, religion, or other *matters of opinion*." *Id.* at 651 (emphasis added) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). If a compelled statement communicates a "matter of opinion," it of course would not be "purely factual." To qualify as "purely factual and uncontroversial," in short, the disclosed information must in fact be "factual," and it must also be "uncontroversially" so, in the sense that that there could be no "disagree[ment] with the truth of the facts required to be disclosed." *AMI*, 760 F.3d at 27.

Both pieces of that inquiry do important work. The "purely factual" inquiry looks to the nature of the information disclosed—is it entirely factual or does it communicate subjective opinion? If the disclosure communicates subjective opinion, or something other than "purely factual" information, *Zauderer* does not apply. But even if the disclosure qualifies as "purely factual," it would still fall outside of *Zauderer* review if the accuracy of the particular information disclosed were subject to dispute. The requirement that disclosures be "uncontroversial" in addition to "purely factual" thereby removes from *Zauderer*'s purview disclosures whose accuracy is contestable. *AMI* in fact assumes "controversial" in this context means exactly that: a "dispute about . . . factual accuracy." 760 F.3d at 27.

15

That reading draws support from the Supreme Court's most recent invocation of the *Zauderer* standard in *Milavetz*, 559 U.S. 229.  There, the Court applied the *Zauderer* standard without once reciting the phrase "purely factual and uncontroversial."   Instead, the Court concluded that the challenged disclosure mandate shared "the essential features of the rule at issue in *Zauderer*"—namely, that the disclosure involved "only an *accurate* statement" of "*factual* information."  *Id.* at 249-50 (emphasis added).  That approach is consistent with a reading of "purely factual and uncontroversial" that refrains from giving "uncontroversial" a meaning wholly untethered to the core question of whether the disclosure is "factual."  If a disclosure is factual, and if the truth of the disclosed factual information is incontestable (*i.e.*, if the facts are indisputably accurate), the interest in arming consumers with truthful, factual information about products calls for relaxed review under *Zauderer*.

It is also worth noting what "purely factual and uncontroversial" does *not* mean.  While it might be said that the Conflict Minerals Rule's disclosure requirement touches on a "controversial" topic, that alone cannot render the disclosure "controversial" in the sense meant by *Zauderer*.  Otherwise, our decision in *AMI* presumably would have turned out differently.   The country-of-origin disclosure in that case—as the majority points out, *ante* at 21-22—could be seen to involve a "controversial" issue.   And while *AMI* recognizes that a disclosure could be conceived of as "controversial" for "some reason other than dispute about simple factual accuracy," 760 F.3d at 27, the court did not say that any such broader understanding of "controversial" would necessarily count under *Zauderer*.  In fact, the court described only one such example of "controversial"—a disclosure that is "one-sided or incomplete," *id.*—and an understanding of

16

"controversial" centered on factual accuracy would comfortably deal with that sort of misleading disclosure.

Applying those principles here, I would conclude that the requirement to identify whether a product has "been found to be 'DRC conflict free'" calls for disclosure of "purely factual and uncontroversial" information. The term "DRC conflict free" is a term of art defined in the Rule and statute: a product is "DRC conflict free" if it contains no "conflict minerals" originating in the DRC or adjoining countries that finance armed groups in those countries. *See* 15 U.S.C. § 78m(p)(1)(A)(ii), (D); 77 Fed. Reg. at 56,321. The question whether a product has been "found to be 'DRC conflict free'" thus calls for a "factual" response: the product either has, or has not, been "found to be 'DRC conflict free'" under the statutory definition. There is nothing non-factual about the required disclosure, nor is the factual accuracy of the disclosure subject to dispute. If geographic information about the sourcing of meat products qualifies as "purely factual and uncontroversial," as we held in *AMI*, 760 F.3d at 27, so, too, does geographic information about the sourcing of a product's component minerals.

Appellants contend that the mandated catchphrase "not been found to be 'DRC conflict free'" is "highly misleading" and therefore should be ineligible for *Zauderer* review. NAM Supp. Br. 16. Appellants are correct that misleading disclosures would not qualify for *Zauderer*'s relaxed standard. A misleading disclosure, by definition, would not convey accurate information to a consumer, and it therefore would fail to qualify as "uncontroversial" in the sense discussed above. In fact, a misleading disclosure would run into a more basic First Amendment problem still. Because "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising," misleading speech in

17

the commercial realm gets no constitutional protection in the first place. *Central Hudson*, 447 U.S. at 563-64.

The conflict minerals disclosure, however, is not misleading. The phrase "not been found to be 'DRC conflict free,'" even considered in isolation, seems unlikely to be misunderstood. At worst, the language would elicit some uncertainty about its meaning, which would just direct the reader to the statutory definition. After all, the words "DRC conflict free" appear in quotation marks within the broader description "not been found to be 'DRC conflict free,'" *see* 77 Fed. Reg. at 56,321, alerting an uninitiated reader to the phrase's status as a term of art.

Any possibility of misperception seems especially remote in light of the setting in which the catchphrase appears. The phrase "not been found to be 'DRC conflict free'" is embedded within a broader set of disclosures about an issuer's due-diligence measures. Before characterizing any product as having "not been found to be 'DRC conflict free,'" the Commission obligates an issuer to provide "[a] description of the measures the [issuer] has taken to exercise due diligence on the source and chain of custody" of the minerals used in its products. Securities and Exchange Commission, OMB No. 3235-0697, Form SD Specialized Disclosure Report 3 (2014). Those due-diligence measures assess whether a product's sources in the DRC or an adjoining country come from mines that finance or benefit armed groups. When the phrase "not been found to be 'DRC conflict free'" appears in the midst of an extensive discussion of measures aimed to ascertain the origins of a product's minerals in conflict-ridden countries in the DRC region, it seems readily apparent how the phrase is to be understood.

18

An issuer, in any event, retains the ability to eliminate all doubt about the phrase's meaning. The Rule allows an issuer to elaborate on the catchphrase's meaning in any manner it would like. As the Supreme Court has noted, a speaker's ability to "convey[] any additional information" it desires is a factor weighing in favor of *Zauderer* review. *Milavetz*, 559 U.S. at 250. Here, the Commission explicitly instructs issuers that they may include in their disclosures any explanatory information they deem warranted. As the Commission understood, "[t]his allows issuers to include the statutory definition of 'DRC conflict free' in the disclosure to make clear that 'DRC conflict free' has a very specific meaning." 77 Fed. Reg. at 56,322.

The Commission also provided illustrative language. An "issuer could state: 'The following is a description of our products that have not been found to be "DRC conflict free" (where "DRC conflict free" is defined under the federal securities laws to mean . . . ).'" *Id.* at 56,322 n.562. And if an issuer is unable to pinpoint the source of the minerals in certain of its products, the Commission further explained, an issuer could say something like the following:

> Because we cannot determine the origins of the minerals, we are not able to state that products containing such minerals do not contain conflict minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country. Therefore, under the federal securities laws we must describe the products containing such minerals as having not been found to be 'DRC conflict free.' Those products are listed below.

19

*Id.* It is difficult to understand what could be seen as misleading or non-factual about that kind of disclosure.

That language does not "require[] an issuer to tell consumers that its products are ethically tainted," much less "to confess blood on its hands." *Ante* at 24. It instead communicates a statement of fact about the geographic source of the minerals in its products—*i.e.*, that the issuer could not determine with certainty whether component minerals directly or indirectly finance armed groups in the DRC region, thus obligating the issuer to describe the products as having "not been found to be 'DRC conflict free.'"

To be sure, an issuer presumably would prefer to avoid making any such disclosure. But the same could be said of a host of commonplace (and entirely unobjectionable) requirements to disclose factual information about products to consumers. A company presumably would rather avoid reporting calorie counts and nutritional information about unhealthy food products, *see New York State Restaurant Ass'n v. New York City Board of Health*, 556 F.3d 114 (2d Cir. 2009), or disclosing that its product contains mercury, *see National Electronic Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). Such disclosures of course can elicit a reaction by consumers—that is often the point, as with the country-of-origin rule upheld in *AMI*, *see* 760 F.3d at 24—but the disclosures still remain factual and truthful. And while it is true that a company would be required to make the conflict minerals disclosure even if it "condemns the atrocities of the Congo war in the strongest terms," *ante* at 24, there is no possibility of investor confusion about the company's views in that regard: the Rule gives a company full leeway to state its position explicitly, in the strongest terms, in its disclosure.

20

None of this is to grant the government carte blanche to compel commercial speakers to voice any prescribed set of words as long as the words are defined by statute or regulation. *Zauderer* does not grant the government that kind of license. The government, for instance, could not misleadingly redefine "peace" as "war," and then compel a factual statement using the term "peace" on the theory that a consumer could consult the government's redefinition to learn that "peace" in fact means "war" in the specific circumstances. *See ante* at 23 n.29. A consumer would have no reason to suppose that the word "peace" is a stylized term of art misleadingly redefined to be something far different from its ordinary meaning.

Nor, for similar reasons, could the government compel expression of a "matter[] of opinion," *Zauderer*, 471 U.S. at 651, by redefining the matter in factual terms, especially if (unlike here) there were no opportunity for the speaker to elaborate as it sees fit on the relationship between the term of art and the statutory definition. So a statement that immediately rings as a matter of opinion (*e.g.*, "this product is environmentally unsustainable," *see ante* at 23) would remain outside the fold of *Zauderer* even if it were reconceptualized as factual in a statutory definition (*e.g.*, a product qualifies as "environmentally unsustainable" if, as a factual matter, it releases *x* units of ozone in *y* hours). Insofar as the unelaborated label "environmentally unsustainable" could then be characterized as "factual," it still would not count as "purely" factual because it continues fundamentally to come across as a matter of opinion.

Of course, there could well be difficult questions of application at the margins, some hypothetical and others perhaps actual. *See ante* at 20-22. That is not entirely uncommon in the area of the First Amendment, in which

21

standards at times have been characterized as "elusive" in their application. *AMI*, 760 F.3d at 23. In certain situations, moreover, constitutional protections outside of the First Amendment might constrain the government's ability to compel disclosures—for instance, if the disclosures facilitated private discrimination. *See Palmore v. Sidoti*, 466 U.S. 429 (1984). But whatever may be the complexities of applying the standard in discrete situations, as a matter of precedent, an obligation in the commercial sphere to disclose "purely factual and uncontroversial" information about a product draws deferential First Amendment review. *Zauderer*, 471 U.S. at 651. The Conflict Minerals Rule, in my view, falls within that category. *Zauderer* therefore should govern.

IV.

Although I think *Zauderer*'s permissive standard provides the governing framework for review of the Conflict Minerals Rule, I would conclude that the Rule satisfies even the more demanding standard set forth in *Central Hudson*. And of course, if the Rule passes muster under *Central Hudson*, it necessarily survives the "less exacting scrutiny described in *Zauderer*." *Milavetz*, 559 U.S. at 249.

A.

To satisfy *Central Hudson*, the Commission must first demonstrate that the disclosure requirement advances a substantial governmental interest. The parties agree that Congress's overarching purpose in enacting the conflict minerals statute was to "promote peace and security" in the DRC. But *Central Hudson* calls for identifying the "substantial state interest" advanced by the challenged law "with care" and precision. *Edenfield v. Fane*, 507 U.S. 761, 767-68 (1993). Defining the governmental interest at a high

22

level of abstraction (*i.e.*, promotion of peace) naturally can make it challenging to assess whether the law "directly advances" that interest, *Central Hudson*, 447 U.S. at 566, a burden that remains unsatisfied by "mere speculation or conjecture," *Edenfield*, 507 U.S. at 770.

Here, the Conflict Minerals Rule's disclosure requirement does not aim simply to "promote peace and security" in the DRC in some highly general sense. The statute and the Rule both manifest a more specific intention to promote peace and security in the DRC *by reducing funding to armed groups in the DRC region from trade in conflict minerals*. Congress thus determined that "the exploitation and trade of conflict minerals originating in the Democratic Republic of the Congo is helping to finance" violent conflict in the region and is "contributing to an emergency humanitarian situation therein." Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1502(a), 124 Stat. 1376, 2213 (2010). Additionally, the statute defines the term "DRC conflict free" by reference to a product that "does not contain conflict minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country." 15 U.S.C. § 78m(p)(1)(D). And the statute defines the term "conflict mineral" to include any "mineral or its derivatives determined by the Secretary of State to be financing conflict in the Democratic Republic of the Congo or an adjoining country." Dodd-Frank Act § 1502(e)(4). The Commission therefore understood "Congress's main purpose to have been to attempt to inhibit the ability of armed groups . . . to fund their activities by exploiting the trade in conflict minerals." 77 Fed. Reg. at 56,275-76.

The Commission observed, as the majority points out, *ante* at 6 & n.7, that the purpose promoted by the statute—and

23

hence the Rule— is "different from the economic or investor
protection benefits that [the Commission's rules] ordinarily
strive to achieve." 77 Fed. Reg. at 56,350.  The Commission,
tasked with implementing the statute through a disclosure
rule, *see* 15 U.S.C. § 78m(p)(1), had little choice about the
Rule's purpose.  Even if that purpose differs from the interests
usually served by disclosures in the securities realm, it does
not differ from the kind of interests frequently promoted by
governmental disclosure requirements more generally.   The
country-of-origin labeling requirement we upheld in *AMI*, for
example, was adopted in part on the expectation that
consumers would prefer meat with a certain geographic origin
and would act on that preference when given the information.
*See* 760 F.3d at 24.  The Conflict Minerals Rule likewise
operates on the basis of assumptions about the reaction of
investors to disclosures about a product's place of origin.

At any rate, the ultimate question is whether the interest
promoted by the Rule, however unique, satisfies *Central
Hudson* review.  I would conclude that interest qualifies as a
substantial one under *Central Hudson*.  We have noted "the
pedestrian nature of those interests affirmed as substantial,"
and have even asked "whether *any* governmental interest—
except those already found trivial by the [Supreme] Court—
could fail to be substantial." *Kansas v. United States*, 16 F.3d
436, 443 (D.C. Cir. 1994); *see AMI*, 760 F.3d at 23.  The
parties here agree that the overarching interest in promoting
peace and security in the DRC region readily qualifies as
substantial.  The more focused objective of reducing funding
to armed groups in that region from trade in conflict minerals
should likewise count as substantial, particularly given that it
operates in direct service of the concededly substantial
interest in promoting peace and security there.

24

B.

Once we conclude that the Rule aims to promote a "substantial" interest, *Central Hudson* calls on us to assess whether the disclosure obligation "directly advance[s] the state interest involved," and does so in a way that is reasonably tailored to serve that end.   447 U.S. at 564. Applying those standards, I, like the district court, would hold that the conflict minerals disclosure requirement passes constitutional muster.

First, the Rule "directly advances" the government's substantial interest in reducing the flow of funds to armed groups in the DRC region from trade in conflict minerals. "[E]videntiary parsing," we recognized in *AMI*, "is hardly necessary when the government uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait."  760 F.3d at 26.  Here, the Rule shines a light on a manufacturer's use of conflict minerals from the DRC region.  As the Commission explained, the Rule (and statute) "use the securities laws disclosure requirements to bring greater public awareness of the source of issuers' conflict minerals and to promote the exercise of due diligence on conflict mineral supply chains."  77 Fed. Reg. at 56,275.

By requiring issuers to perform due diligence on their product supply chains and to disclose the results of that examination to investors and consumers, the Rule encourages manufacturers voluntarily to reduce their reliance on conflict minerals from the DRC and adjoining countries.  And by making information about mineral sourcing readily available to investors and consumers, the disclosure regime enables them to exert pressure on manufacturers to minimize the use of conflict minerals from the DRC region.  The Rule therefore makes conflict minerals from that area substantially less

25

appealing to manufacturers, diminishing the market for those minerals.

With regard to the means-ends fit, the Supreme Court "has made clear that the government's burden . . . is to show [only] a 'reasonable fit' or a 'reasonable proportion' between means and ends."   *AMI*, 760 F.3d at 26 (citations omitted). "What [the Court's] decisions require is a 'fit between the legislature's ends and the means chosen to accomplish those ends'—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served.'" *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (quoting *Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986), and *In re R.M.J.*, 455 U.S. 191, 203 (1982)).  "Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed."  *Id.*

Here, the disclosure rule is at least reasonably designed to encourage manufacturers to reduce their reliance on conflict minerals from the DRC region, thereby diminishing the extent to which armed groups in the area gain funding through trade in those minerals.  As we observed in *AMI*, "[t]o the extent that the government's interest is in assuring that consumers receive particular information" about products, "the means-end fit is self-evidently satisfied when the government acts only through a reasonably crafted mandate to disclose 'purely factual and uncontroversial information' about attributes of the product or service being offered."   760 F.3d at 26. Consequently, that "particular method of achieving a government interest will almost always demonstrate a reasonable means-ends relationship."  *Id.*

26

This case is no exception.  The inference that the disclosure obligations would affect manufacturers in a manner tending to reduce the overseas trade in conflict minerals rests on "sound reasoning." *Century Commc'ns Corp. v. FCC*, 835 F.2d 292, 304 (D.C. Cir. 1987).  Deference to the political branches' predictive judgment to that effect is all the more warranted because it arises in the arena of foreign affairs.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010).  "[W]hen it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate."  *Id.* at 34 (citation omitted) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)).  "In this context, conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government."  *Id.* at 34-35.  Here, there is more than an adequate foundation for concluding that the conflict minerals disclosure requirement reasonably furthers its aims.

Nor is there a basis for finding a lack of a "reasonable means-ends relationship" on the ground that the challenged disclosure mandate could be seen as "'unduly burdensome' in a way that 'chills protected commercial speech.'"  *AMI*, 760 F.3d at 26 (quoting *Zauderer*, 471 U.S. at 651).  The Rule mandates the use of the contested phrase "not found to be 'DRC conflict free'" as part of an effort to "present the information in a standardized manner," so that investors and consumers "will benefit from the standardization and simplification of the disclosure."  77 Fed. Reg. at 56,348. Obligating issuers to use a uniform, shorthand phrase—in lieu of a technical and lengthy statutory definition—directly furthers that objective.  The requirement for issuers to post the disclosure report on their websites likewise promotes the ability of investors and consumers to access information about

27

manufacturers' use of conflict minerals.  I would therefore find the requisite "reasonable fit" between the challenged disclosure regime and the government's interest in reducing funding to armed groups in the DRC region from the trade in conflict minerals.

## C.

My colleagues in the majority approach the matter differently.  They invalidate the Rule based on doubts about whether its disclosure obligation in fact will alleviate the conflict in the DRC region. *Ante* at 15-17.  Those doubts are grounded in "[p]ost-hoc evidence" that, in their eyes, gives rise to "uncertainty about whether the conflict minerals rule either alleviates or aggravates the stated problem." *Id.* at 16.  In my respectful view, the majority's approach is flawed on multiple levels.

First, even if there were uncertainty about the merits of Congress's and the Commission's predictive judgments concerning the effects of the disclosure requirement on the conflict in the DRC region, we should defer to the political branches' assessments.   Congress determined "that the exploitation and trade of conflict minerals originating in the Democratic Republic of Congo is helping to finance conflict characterized by extreme levels of violence in the Democratic Republic of Congo, particularly sexual- and gender-based violence."  Dodd-Frank Act § 1502(a).  Congress therefore called for "disclosures relating to conflict minerals originating in the Democratic Republic of the Congo" to ameliorate the situation.  15 U.S.C. § 78m(p) (title).  Predictive judgments about matters such as the overseas trade in conflict minerals lie uniquely within the expertise of Congress and the Executive.  The Supreme Court stressed the need to respect such judgments even when rejecting a First Amendment

28

challenge under strict scrutiny. *Humanitarian Law Project*, 561 U.S. at 33-36. There is all the more cause for doing so when applying less rigorous scrutiny under *Central Hudson*. *See AMI*, 760 F.3d at 25-26.

Second, it seems particularly unwarranted to question the political branches' predictive judgments on the basis of *post hoc* assessments of a law's ongoing effects on the ground (let alone in the face of other post hoc assessments pointing in the opposite direction, *ante* at 16-17). I would think the proper frame of reference for assessing the means-ends fit involves an ex ante examination of Congress's and the Commission's outlook when enacting the statute and promulgating the Rule. Whatever may be the actual effect of the statute and Rule—including the possibility that they may have had unanticipated consequences—their constitutionality would not turn on a post hoc referendum on their effectiveness at a particular point in time. Otherwise, a law's constitutionality might wax and wane depending on the precise time when its validity is assessed. I would think the relevant question is whether the disclosure regime, at the time of its establishment, was reasonably designed to reduce the flow of funding to armed groups in the DRC through the conflict minerals trade. I believe it was.

Finally, the particular post hoc concerns given effect by the majority should afford no basis for invalidating the Rule. The Rule seems to have had its desired effect even as a matter of after-the-fact assessment, with "companies in the United States . . . now avoiding the DRC," *ante* at 16, substantially reducing the money entering the country through the sale of conflict minerals. The law, in other words, is working as anticipated. The problem seen by some observers is that the law nonetheless has had unintended ripple effects. For instance, some workers who lost their jobs because of the

29

reduced demand for minerals occasioned by the law may have then turned around and joined armed groups in the region, adding to the strength of those groups.

Those sorts of unintended, tertiary consequences should not form a basis for invalidating the Rule. Even assuming Congress (and the Commission in implementing Congress's mandate) did not foresee all of the repercussions of the disclosure regime which might someday come to pass, the law was reasonably designed to further its aim of reducing funding for armed groups through the conflict minerals trade. Indeed, the law has done precisely that. If unanticipated downstream effects eventually call into question the ongoing desirability of a law working as intended, it should be up to the political branches to alter or repeal it, not to the judicial branch to invalidate it. For that reason, as well as the others explained in this opinion, I would uphold the Conflict Minerals Rule's disclosure mandate against appellants' First Amendment challenge.

# APPENDIX

***National Association of Manufacturers v. SEC*, No. 13-5252, 748 F.3d 359 (D.C. Cir. 2014):**

Before: SRINIVASAN, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in part filed by *Circuit Judge* SRINIVASAN

RANDOLPH, *Senior Circuit Judge*:

## I.

For the last fifteen years, the Democratic Republic of the Congo has endured war and humanitarian catastrophe. Millions have perished, mostly civilians who died of starvation and disease. Communities have been displaced, rape is a weapon, and human rights violations are widespread.

Armed groups fighting the war finance their operations by exploiting the regional trade in several kinds of minerals. Those minerals—gold, tantalum, tin, and tungsten[1]—are extracted from technologically primitive mining sites in the remote eastern Congo. They are sold at regional trading houses, smelted nearby or abroad, and ultimately used to manufacture many different

---

[1] *See* Conflict Minerals, 77 Fed. Reg. 56,274, 56,284-85 (Sept. 12, 2012).

2

**APPENDIX**

products.[2] Armed groups profit by extorting, and in some cases directly managing, the minimally regulated mining operations.

In 2010, Congress devised a response to the Congo war. Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (relevant parts codified at 15 U.S.C. §§ 78m(p), 78m note ('Conflict Minerals')), requires the Securities and Exchange Commission—the agency normally charged with policing America's financial markets—to issue regulations requiring firms using "conflict minerals" to investigate and disclose the origin of those minerals. *See* 15 U.S.C. § 78m(p)(1)(A).

The disclosure regime applies only to "person[s] described" in the Act. *See id.* A "person is described . . . [if] conflict minerals are necessary to the functionality or production of a product manufactured by such person." *Id.* § 78m(p)(2). A described person must "disclose annually, whether [its necessary] conflict minerals . . . did originate in the [Congo] or an adjoining country." *Id.* § 78m(p)(1)(A). If those minerals "did originate" in the Congo or an adjoining country (collectively, "covered countries") then the person must "submit [a report] to the Commission." *Id.* The report must describe the "due diligence" measures taken to establish "the source and chain of custody" of the minerals, including a "private sector audit" of the report. *Id.* The report must also list "the products manufactured or contracted to be manufactured that are not DRC conflict free." *Id.* A product is "DRC conflict free" if its

---

[2] For example, tantalum is used in turbines, camera lenses, medical devices, cell phones, and computers. Tin is used in plastics, phones, and automobile parts. Tungsten is used in lighting, power tools, and golf clubs.

3

**APPENDIX**

necessary conflict minerals did not "directly or indirectly finance or benefit armed groups" in the covered countries. *Id.*

In late 2010, the Commission proposed rules for implementing the Act. Conflict Minerals, 75 Fed. Reg. 80,948 (Dec. 23, 2010). Along with the proposed rules, the Commission solicited comments on a range of issues. In response, it received hundreds of individual comments and thousands of form letters. Conflict Minerals, 77 Fed. Reg. 56,274, 56,277-78 (Sept. 12, 2012) ("final rule") (codified at 17 C.F.R. §§ 240.13p-1, 249b.400). The Commission twice extended the comment period and held a roundtable for interested stakeholders. *Id.* By a 3-2 vote, it promulgated the final rule, which became effective November 13, 2012. *Id.* at 56,274. The first reports are due by May 31, 2014. *Id.*

The final rule adopts a three-step process, which we outline below, omitting some details not pertinent to this appeal. At step one, a firm must determine if the rule covers it. *Id.* at 56,279, 56,285. The final rule applies only to securities issuers who file reports with the Commission under sections 13(a) or 15(d) of the Exchange Act. *Id.* at 56,287. The rule excludes issuers if conflict minerals are not necessary to the production or functionality of their products. *Id.* at 56,297-98. The final rule does not, however, include a *de minimis* exception, and thus applies to issuers who use very small amounts of conflict minerals. *Id.* at 56,298. The rule also extends to issuers who only contract for the manufacture of products with conflict minerals, as well as issuers who directly manufacture those products. *Id.* at 56,290-92.

Step two requires an issuer subject to the rule to conduct a "reasonable country of origin inquiry." *Id.* at 56,311. The inquiry is a preliminary investigation reasonably designed to

4
## APPENDIX

determine whether an issuer's necessary conflict minerals originated in covered countries. *Id.* at 56,312. If, as a result of the inquiry, an issuer either knows that its necessary conflict minerals originated in covered countries or "has reason to believe" that those minerals "may have originated" in covered countries, then it must proceed to step three and exercise due diligence. *Id.* at 56,313.[3]

An issuer who proceeds to step three must "exercise due diligence on the source and chain of custody of its conflict minerals." *Id.* at 56,320. If, after performing due diligence an issuer still has reason to believe its conflict minerals may have originated in covered countries, it must file a conflict minerals report. The report must describe both its due diligence efforts, including a private sector audit,[4] *id.*, and those products that have "not been found to be 'DRC conflict free,'" *id.* at 56,322 (quoting 15 U.S.C. § 78m(p)(1)(A)(ii)). The report must also provide detailed information about the origin of the minerals used in those products. *Id.* at 56,320.

---

[3] If the inquiry discloses that there is *no* reason to believe the issuer's conflict minerals came from covered countries or that there is a reasonable basis for believing that the issuer's conflict minerals came from scrap or recycled sources, then the issuer need only file a specialized disclosure report on the newly-created Form SD, briefly describing its inquiry, 77 Fed. Reg. at 56,313, and provide a link to the report on its website. *Id.* at 56,315. No due diligence is required.

[4] To be precise, an issuer must also submit a conflict minerals report if, as a result of its earlier inquiry, it *knows* that its conflict minerals came from covered countries. 77 Fed. Reg. at 56,320. That issuer must still perform due diligence, but the trigger for the report is the preliminary inquiry, not the due diligence results.

5
# APPENDIX

The final rule does offer a temporary reprieve. During a two-year phase-in period (four years for smaller issuers), issuers may describe certain products as "DRC conflict undeterminable" instead of conflict-free or not conflict-free. *Id.* at 56,321-22. That option is available only if the issuer cannot determine through due diligence whether its conflict minerals originated in covered countries, or whether its minerals benefitted armed groups. *Id.* An issuer taking advantage of the phase-in by describing its products as "DRC conflict undeterminable" must still perform due diligence and file a conflict minerals report, but it need not obtain a private sector audit. *Id.*

The Commission analyzed in some detail the final rule's costs. *Id.* at 56,333-54. It estimated the total costs of the final rule would be $3 billion to $4 billion initially, and $207 million to $609 million annually thereafter. *Id.* at 56,334. To come up with this estimate, the Commission reviewed four cost estimates it received during the comment period, supplemented with its own data. *Id.* at 56,350-54. Where possible, the Commission also estimated or described the marginal costs of its significant discretionary choices. *Id.* at 56,342-50.

The Commission was "unable to readily quantify" the "compelling social benefits" the rule was supposed to achieve: reducing violence and promoting peace and stability in the Congo. *Id.* at 56,350. Lacking quantitative data on those issues, the Commission explained that it could not "assess how effective" the rule would be in achieving any benefits. *Id.* Instead, the Commission relied on Congress's judgment that supply-chain transparency would promote peace and stability by reducing the flow of money to armed groups. *Id.* at 56,275-76, 56,350. That judgment grounded many of the Commission's

6
**APPENDIX**

discretionary choices in favor of greater transparency. *See, e.g.*, *id.* at 56,288, 56,291, 56,298.

The National Association of Manufacturers challenged the final rule, raising Administrative Procedure Act, Exchange Act, and First Amendment claims.[5] The district court rejected all of the Association's claims and granted summary judgment for the Commission and intervenor Amnesty International. *See Nat'l Ass'n of Mfrs. v. SEC*, 956 F. Supp. 2d 43, 46 (D.D.C. 2013).

**II.**

Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action . . . found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[, or] in excess of statutory jurisdiction." 5 U.S.C. § 706(2). In making these determinations, we review the administrative record as if the case had come directly to us without first passing through the district court. *See Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002).

**A.**

The Act does not include an exception for *de minimis* uses of conflict minerals. The Association claims that the rule should have included a *de minimis* exception and that the Commission erred when, during the rulemaking, it failed to recognize its

_____

[5] The Association initially filed a petition for review in this court. After our opinion in *American Petroleum Institute v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013), the Association moved to transfer the case to the district court, and we granted the motion. *See Per Curiam Order, Nat'l Ass'n of Mfrs. v. SEC*, No. 12-1422 (D.C. Cir. May 2, 2013).

7
**APPENDIX**

authority to create one and assumed that the statute foreclosed any exception.

Although the Commission acknowledges that it had the authority to create such an exception, *see, e.g.*, 15 U.S.C. § 78mm(a)(1); *Ala. Power Co. v. Costle*, 636 F.2d 323, 360-61 (D.C. Cir. 1979), it stated during the rulemaking that a *de minimis* exception "would be contrary to the [statute] and Congressional purpose," and that if Congress intended to include such an exception it "would have done so explicitly" as it did in a nearby section of Dodd-Frank. 77 Fed. Reg. at 56,298. But we do not interpret that explanation the way the Association does. Read in context, the Commission's language addressed the general purpose of the statute and the effects of its policy choices. Congress knew that conflict minerals are often used in very small quantities. The Commission, relying on text, context, and policy concerns, inferred that Congress wanted the disclosure regime to work even for those small uses. *Id.* A *de minimis* exception would, in the Commission's judgment, "thwart" that goal. *Id.*

The Commission's explanation was thus a far cry from a mere "parsing of the statutory language," *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797 (D.C. Cir. 2004)), that has caused us to set aside agency action in other cases. *See, e.g.*, *id.* at 1353 (statute's "plain language" "does not permit" action); *Arizona v. Thompson*, 281 F.3d 248, 253-54 (D.C. Cir. 2002) ("intent of Congress, rather than of HHS" "does not permit" action); *Alarm Indus. Commc'ns Comm. v. FCC*, 131 F.3d 1066, 1068 (D.C. Cir. 1997) ("plain meaning" of a statute was "unambiguous"). Nothing in the Commission's explanation suggests, as in those cases, that the statutory text by itself foreclosed any exception.

8

# APPENDIX

Rather, the explanation "looks to be a quite ordinary construction of a statute over which the agency has been given interpretive authority." *PDK Labs.*, 362 F.3d at 807-08 (Roberts, J., concurring in part and concurring in the judgment).

The Commission did not act arbitrarily and capriciously by choosing not to include a *de minimis* exception. Because conflict minerals "are often used in products in very limited quantities," the Commission reasoned that "a de minimis threshold could have a significant impact on the final rule." 77 Fed. Reg. at 56,298 (quoting U.S. Dep't of State Responses to Request for Comment). The Association suggests that this rationale would not apply to *de minimis* thresholds measured by mineral use per-issuer, instead of per-product. Although that sort of threshold was *suggested* in a few comments, those comments did not explain the merits of the proposal or compare it to other thresholds. The Commission was not obligated to respond to those sorts of comments. *See Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see also Alianza Fed. de Mercedes v. FCC*, 539 F.2d 732, 739 (D.C. Cir. 1976). In any event, the Commission's rationale still applies to a per-issuer exemption. Having established that conflict minerals are frequently used in minute amounts, the Commission could reasonably decide that a per-issuer exception could "thwart" the statute's goals by leaving unmonitored small quantities of minerals aggregated over many issuers. Though costly, that decision bears a "rational connection" to the facts. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## B.

As we have mentioned, the final rule requires an issuer to conduct "due diligence" if, after its inquiry, it "has *reason to believe* that its necessary conflict minerals *may have originated*

9

**APPENDIX**

in" covered countries. 77 Fed. Reg. at 56,313 (emphasis added). According to the Association, that requirement contravenes the statute, which requires issuers to "submit to the Commission a report" only "in cases in which [their] conflict minerals *did originate*" in covered countries. 15 U.S.C. § 78m(p)(1)(A) (emphasis added).

The Association has conflated distinct issues. The statute does require a conflict minerals report if an issuer has already performed due diligence and determined that its conflict minerals did originate in covered countries. But the statute does not say in what circumstances an issuer must perform due diligence before filing a report. The statute also does not list what, if any, reporting obligations may be imposed on issuers uncertain about the origin of their conflict minerals.

In general, if a statute "is silent or ambiguous with respect to the specific issue at hand" then "the Commission may exercise its reasonable discretion in construing the statute." *Bldg. Owners & Managers Ass'n Int'l v. FCC*, 254 F.3d 89, 93-94 (D.C. Cir. 2001) (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984)). And that discretion may be exercised to regulate circumstances or parties beyond those explicated in a statute. *See, e.g.*, *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 371-73 (1973); *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991). Here, the statute is silent with respect to both a threshold for conducting due diligence, and the obligations of uncertain issuers. The Commission used its delegated authority to fill those gaps, and nothing in the statute foreclosed it from doing so.[6]

_____

[6] The parties also disagree over a more subtle point. The Association concedes that due diligence can be required if an issuer has "reason to believe" its conflict minerals "did" originate in covered

10
**APPENDIX**

We also reject the Association's argument that the Commission's due diligence threshold was arbitrary and capricious. The Commission adopted a lower due diligence threshold to prevent issuers from "ignor[ing] . . . warning signs" that their conflict minerals originated in covered countries. 77 Fed. Reg. at 56,313. In particular, the Commission wanted issuers who encounter red flags to "learn[] the ultimate source" of their conflict minerals. *Id*. at 56,314. Requiring a good-faith inquiry does not resolve the Commission's concerns. A good-faith inquiry could generate red flags but, without a further due diligence requirement, those red flags would not give way to "ultimate" answers, which result would "undermine the goals of the statute." *Id.*

Although the Commission adopted an expansive rule, it did not go as far as it might have, and it declined to require due diligence by issuers who encounter no red flags in their inquiry. *Id.* By doing so, the Commission reduced the costs of the final rule, and resolved the Association's concern that the rule will yield a flood of trivial information. *Id.*

**C.**

By its terms, the statute applies to "Persons Described," or those that "manufacture[]" a product in which conflict minerals "are necessary to the functionality or production" of the product. 15 U.S.C. § 78m(p)(2). If those persons file a conflict minerals

---

countries. *See* Oral Arg. Tr. at 4:14-5:16. Since "reason to believe" inherently conveys uncertainty, it is unclear how that standard would differ in practice from the Commission's "reason to believe . . . may" standard. Because the statute is ambiguous we need not resolve the issue.

11
## APPENDIX

report the statute requires them to describe products they
"manufacture[] or contract[] to be manufactured." *Id.*
§ 78m(p)(1)(A)(i). The Commission reconciled these provisions
in an expansive fashion, applying the final rule not only to
issuers that manufacture their own products, but also to those
that only contract to manufacture. 77 Fed. Reg. at 56,290-91.
The Association claims that decision violates the statute. By
using the phrase "contracted to be manufactured" in one
provision, but only "manufactured" in another, Congress
allegedly intended to limit the scope of the latter.

The persons-described provision, though it refers expressly
to manufacturers, is silent on the obligations of issuers that only
contract for their goods to be manufactured. Standing alone, that
silence allows the Commission to use its delegated authority in
determining the rule's scope, just as with the due diligence
provision. The Association's argument is no more persuasive
here because Congress explicitly used the phrase "contracted to
be manufactured" in a nearby provision.

The Association invokes the canon *expressio unius est
exclusio alterius*. But that canon is "an especially feeble helper
in an administrative setting, where Congress is presumed to have
left to reasonable agency discretion questions that it has not
directly resolved." *Cheney R. Co., Inc. v. ICC*, 902 F.2d 66, 69
(D.C. Cir. 1990); *see Tex. Rural Legal Aid*, 940 F.2d at 694. The
more reasonable interpretation of the statute as a whole is that
Congress simply "deci[ded] not to mandate any solution" and
left the rule's application to contractors "to agency discretion."
*Cheney R. Co.*, 902 F.2d at 69 (emphasis omitted).

Potential "internal[] inconsisten[cy]" between the due
diligence and persons-described provisions also persuades us
that the statute is ambiguous. *See* 77 Fed. Reg. at 56,291. An

12
**APPENDIX**

issuer subject to the rule must describe due diligence measures it undertakes on the source and chain of custody of "such minerals." 15 U.S.C. § 78m(p)(1)(A)(i). "[S]uch minerals" refers, in the preceding paragraph, to "minerals that are necessary as described in paragraph (2)(B)." *Id.* § 78m(p)(1)(A). Paragraph (2)(B) in turn refers to minerals "necessary to . . . a product *manufactured*" by a person described. *Id.* § 78m(p)(2) (emphasis added). Thus, under the Association's reading, an issuer would not have to describe its due diligence efforts (or even, presumably, to conduct due diligence) for products it does not manufacture. And yet, the statute requires that same issuer to describe its contracted-for products as not conflict free under § 78m(p)(1)(A)(ii) if they do not meet the statute's definition. We do not understand how an issuer could describe its contracted-for products without first conducting due diligence on those products, or why the statute would require certain products to be described in a report without a corresponding explanation of the related due diligence efforts. The Commission's interpretation is therefore reasonable because it reconciles otherwise confusing and conflicting provisions "into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation omitted).

The Commission did not erroneously assume that its interpretation was compelled by Congress. As the district court explained, referring once to Congress's intent as "clear" does not establish that the Commission believed it lacked discretion. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 72 (quoting *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 445 (D.C. Cir. 2012)). The balance of the Commission's explanation, as with the *de minimis* exception, falls well short of the language on which we have relied to set aside agency action. *See supra* at 8-9. Rather than merely parsing the statutory language, the Commission provided policy justifications and

13

**APPENDIX**

structural inferences supporting its decision. 77 Fed. Reg. at 56,291.

Nor did the Commission act arbitrarily or capriciously. The final rule applies to contractors so that issuers cannot "avoid [its] requirements by contracting out of the manufacture" of their products. *Id.* at 56,291. The Association thinks the final rule reaches too far and overstates the risk of circumvention. But that is a question of judgment for the Commission, which we will not second-guess. The Commission's explanation was "rational," and that is enough. *State Farm*, 463 U.S. at 43.

**D.**

The final rule's temporary phase-in period allows issuers to describe certain products as "DRC conflict undeterminable" and to avoid conducting an audit. 77 Fed. Reg. at 56,320-21. The Association claims the length of the phase-in—two years for large issuers and four years for small issuers—is inconsistent, arbitrary, and capricious because small issuers are part of large-issuer supply chains. All issuers, the Association says, will therefore face the same information problems. Not so. Large issuers, the Commission explained, can exert greater leverage to obtain information about their conflict minerals, *id.* at 56,322-23, and they may be able to exercise that leverage indirectly on behalf of small issuers in their supply chains. *Id.* at 56,323 n.570. Like the district court, we can "see the trickledown logic underlying the Commission's approach," even if it does not hold in all cases. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 73 n.24.

**III.**

Two provisions require the Commission to analyze the effects of its rules. Under 15 U.S.C. § 78w(a)(2), the

14
# APPENDIX

Commission "shall not adopt any rule [under § 78m(p)] . . . which would impose a burden on competition not necessary or appropriate" to advance the purposes of securities laws. Also, when the Commission "is engaged in rulemaking," it must "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f). The Association, citing several of our recent opinions, alleges that the Commission violated those sections because it did not adequately analyze the costs and benefits of the final rule. *See Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011); *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).[7]

We do not see any problems with the Commission's cost-side analysis. The Commission exhaustively analyzed the final rule's costs. *See* 77 Fed. Reg. at 56,333-54. It considered its own data as well as cost estimates submitted during the comment period, *id.* at 56,350-54, and arrived at a large bottom-line figure that the Association does not challenge. *Id.* at 56,334. The Commission specifically considered the issues listed in § 78c(f) and concluded that the rule would impose competitive costs, but have relatively minor or offsetting effects on efficiency and capital formation. 77 Fed. Reg. at 56,350-51. The Association does not dispute those conclusions.

Instead, the Association argues on the benefit side that the Commission failed to determine whether the final rule would

---

[7] Dodd-Frank independently requires the Comptroller General of the United States to submit annual reports to Congress "assess[ing ] the effectiveness of . . . 15 U.S.C. § 78m(p) in promoting peace and security in the" covered countries. 15 U.S.C. § 78m note ('Conflict Minerals').

15
**APPENDIX**

actually achieve its intended purpose. But we find it difficult to see what the Commission could have done better. The Commission determined that Congress intended the rule to achieve "compelling social benefits," *id.* at 56,350, but it was "unable to readily quantify" those benefits because it lacked data about the rule's effects. *Id.*

That determination was reasonable. An agency is not required "to measure the immeasurable," and need not conduct a "rigorous, quantitative economic analysis" unless the statute explicitly directs it to do so. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013) (internal quotation marks omitted); *see Chamber of Commerce*, 412 F.3d at 360. Here, the rule's benefits would occur half-a-world away in the midst of an opaque conflict about which little reliable information exists, and concern a subject about which the Commission has no particular expertise. Even if one could estimate how many lives are saved or rapes prevented as a direct result of the final rule, doing so would be pointless because the costs of the rule—measured in dollars—would create an apples-to-bricks comparison.

Despite the lack of data, the Commission *had* to promulgate a disclosure rule. 15 U.S.C. § 78m(p)(1)(A). Thus, it relied on Congress's "determin[ation] that [the rule's] costs were necessary and appropriate in furthering the goals" of peace and security in the Congo. 77 Fed. Reg. at 56,350. The Association responds that the Commission only had to adopt some disclosure rule; Congress never decided the merits of the Commission's discretionary choices. True enough. But Congress did conclude, as a general matter, that transparency and disclosure would benefit the Congo. *See* 15 U.S.C. § 78m note. And the Commission invoked that general principle to justify each of its discretionary choices. *See id.* at 56,291; (contractors to

16

# APPENDIX

manufacture); *id.* at 56,298 (no *de minimis* exception); *id.* at 56,313-14 (due diligence standard); *id.* at 56,322 (phase-in).

What the Commission did not do, despite many comments suggesting it, was question the basic premise that a disclosure regime would help promote peace and stability in the Congo. If the Commission second-guessed Congress on that issue, then it would have been in an impossible position. If the Commission had found that disclosure would fail of its essential purpose, then it could not have adopted *any* rule under the Association's view of §§ 78w(a)(2) and 78c(f). But promulgating some rule is exactly what Dodd-Frank required the Commission to do.

## IV.

This brings us to the Association's First Amendment claim. The Association challenges only the requirement that an issuer describe its products as not "DRC conflict free" in the report it files with the Commission and must post on its website.[8] 15 U.S.C. § 78m(p)(1)(A)(ii) & (E). That requirement, according to the Association, unconstitutionally compels speech. The

---

[8] The district court stated that the Association had limited its First Amendment claim to product descriptions on an issuer's "website[]." *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 73. In this court both the Commission and the intervenor Amnesty International understood the Association's claim to encompass also the not "DRC conflict free" statement required in a company's report to the Commission. *See, e.g.*, Appellee Br. 58, 61; Intervenor Br. 31. When asked about the scope of the claim during oral argument, counsel for the Association clarified that the First Amendment claim also extends to labeling of products as not conflict free in reports to the Commission. Oral Arg. Tr. at 15:25-16:11. The Association does not have any First Amendment objection to any other aspect of the conflict minerals report or required disclosures. *Id.* at 16:11-16:25.

17
**APPENDIX**

district court, applying *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 564-66 (1980), rejected the First Amendment claim. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 73, 75-82. We review its decision *de novo. Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 737 (D.C. Cir. 2011).[9]

The Commission argues that rational basis review is appropriate because the conflict free label discloses purely factual non-ideological information. We disagree. Rational basis review is the exception, not the rule, in First Amendment cases. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994). The Supreme Court has stated that rational basis review applies to certain disclosures of "purely factual and uncontroversial information." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). But as intervenor Amnesty International forthrightly recognizes,[10] we have held that

---

[9] The concurring opinion suggests that we hold the First Amendment portion of our opinion in abeyance and stay implementation of the relevant part of the final rule. We do not see why that approach is preferable, even though it might address the risk of irreparable First Amendment harm. Issuing an opinion now provides an opportunity for the parties in this case to participate in the court's *en banc* consideration of this important First Amendment question. That is consistent with the court's previous approach in *United States v. Crowder*, 87 F.3d 1405, 1409 (D.C. Cir. 1996) (en banc), *cert. granted, judgment vacated*, 519 U.S. 1087 (1997), *on remand* 141 F.3d 1202 (D.C. Cir. 1998) (en banc), in which we consolidated two cases presenting the same legal issue so that all parties could participate in the *en banc* proceeding.

[10] *See* Intervenor Br. 32 n.5 ("Amnesty International recognizes that this panel is bound by *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), which circumscribed *Zauderer*'s rational-basis standard."). For its part, the Commission makes no attempt to

18
## APPENDIX

*Zauderer* is "limited to cases in which disclosure requirements are 'reasonably related to the State's interest in preventing deception of consumers.'" *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012) (quoting *Zauderer*, 471 U.S. at 651); *see Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 n.18 (D.C. Cir. 2013). *But see Am. Meat Inst. v. USDA*, No. 13-5281, 2014 WL 1257959, at *4-7 (D.C. Cir. Mar. 28, 2014), *vacated and en banc rehearing ordered*, Order, No. 13-5281 (D.C. Cir. Apr. 4, 2014) (en banc). No party has suggested that the conflict minerals rule is related to preventing consumer deception. In the district court the Commission admitted that it was not. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 77.

That a disclosure is factual, standing alone, does not immunize it from scrutiny because "[t]he right against compelled speech is not, and cannot be, restricted to ideological messages." *Nat'l Ass'n of Mfrs.*, 717 F.3d at 957. Rather, "th[e] general rule, that the speaker has the right to tailor the speech, applies . . . equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573-74 (1995) (citing cases). As the Supreme Court put it in *Riley v. National Federation of the Blind of North Carolina, Inc.*, the cases dealing with ideological messages[11]

---

distinguish *R.J. Reynolds*; in fact, it does not even acknowledge the holding of *R.J. Reynolds* regarding *Zauderer*, which the Commission also fails to cite.

[11] *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705 (1977); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("Some of [the] Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say.").

19
**APPENDIX**

"cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact.'" 487 U.S. 781, 797 (1988).

At all events, it is far from clear that the description at issue—whether a product is "conflict free"—is factual and non-ideological. Products and minerals do not fight conflicts. The label "conflict free" is a metaphor that conveys moral responsibility for the Congo war. It requires an issuer to tell consumers that its products are ethically tainted, even if they only indirectly finance armed groups. An issuer, including an issuer who condemns the atrocities of the Congo war in the strongest terms, may disagree with that assessment of its moral responsibility. And it may convey that "message" through "silence." *See Hurley*, 515 U.S. at 573. By compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment. *See id.*

Citing our opinion in *SEC v. Wall Street Publishing Institute, Inc.*, intervenor Amnesty International argues that rational basis review applies because the final rule exercises "the federal government's broad powers to regulate the securities industry." 851 F.2d 365, 372 (D.C. Cir. 1988).[12] In *Wall Street Publishing* the court held that the Commission could, without running afoul of the First Amendment, seek an injunction requiring that a magazine disclose the consideration it received in exchange for stock recommendations. *Id*. at 366. Significantly, the court chose to apply a less exacting level of scrutiny, even though the injunction did not fall within any well-established exceptions to strict scrutiny. *Id.* at 372-73.

---

[12] The Commission does not join this argument.

20
## APPENDIX

It is not entirely clear what would result if *Wall Street Publishing* did apply to this case. The opinion never states that rational basis review governs securities regulations as such. At one point, the opinion even suggests that the power to regulate securities might be roughly tantamount to the government's more general power to regulate commercial speech. *Id.* at 373.

Whatever its consequences, we do not think *Wall Street Publishing* applies here. The injunction at issue there regulated "inherently misleading" speech "employed . . . to sell securities." *Id.* at 371, 373. The opinion thus concerned the same consumer-deception rationale as did *Zauderer*. *See id.* at 374. As explained above, consumer-deception is not an issue here, and the "conflict free" label is not employed to sell securities.

To read *Wall Street Publishing* broadly would allow Congress to easily regulate otherwise protected speech using the guise of securities laws. Why, for example, could Congress not require issuers to disclose the labor conditions of their factories abroad or the political ideologies of their board members, as part of their annual reports? Those examples, obviously repugnant to the First Amendment, should not face relaxed review just because Congress used the "securities" label.

Having established that rational basis review does not apply, we do not decide whether to use strict scrutiny or the *Central Hudson* test for commercial speech. That is because the final rule does not survive even *Central Hudson*'s intermediate standard.

Under *Central Hudson*, the government must show (1) a substantial government interest that is; (2) directly and materially advanced by the restriction; and (3) that the restriction is narrowly tailored. 447 U.S. at 564-66; *see R.J.*

21

**APPENDIX**

*Reynolds*, 696 F.3d at 445. The narrow tailoring requirement invalidates regulations for which "narrower restrictions on expression would serve [the government's] interest as well." *Cent. Hudson*, 447 U.S. at 565. Although the government need not choose the "least restrictive means" of achieving its goals, there must be a "reasonable" "fit" between means and ends. *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989). The government cannot satisfy that standard if it presents no evidence that less restrictive means would fail. *Sable Commc'ns v. FCC*, 492 U.S. 115, 128-32 (1989).

The Commission has provided no such evidence here. The Association suggests that rather than the "conflict free" description the statute and rule require, issuers could use their own language to describe their products, or the government could compile its own list of products that it believes are affiliated with the Congo war, based on information the issuers submit to the Commission. The Commission and Amnesty International simply assert that those proposals would be less effective. But if issuers can determine the conflict status of their products from due diligence, then surely the Commission can use the same information to make the same determination. And a centralized list compiled by the Commission in one place may even be more convenient or trustworthy to investors and consumers. The Commission has failed to explain why (much less provide evidence that) the Association's intuitive alternatives to regulating speech would be any less effective.

The Commission maintains that the fit here is reasonable because the rule's impact is minimal. Specifically, the Commission argues that issuers can explain the meaning of "conflict free" in their own terms. But the right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation. *See Nat'l Ass'n*

22
**APPENDIX**

*of Mfrs.*, 717 F.3d at 958. Even if the option to explain minimizes the First Amendment harm, it does not eliminate it completely. Without any evidence that alternatives would be less effective, we still cannot say that the restriction here is narrowly tailored.[13]

We therefore hold that 15 U.S.C. § 78m(p)(1)(A)(ii) & (E), and the Commission's final rule, 77 Fed. Reg. at 56,362-65, violate the First Amendment to the extent the statute and rule require regulated entities to report to the Commission and to state on their website that any of their products have "not been found to be 'DRC conflict free.'"[14]

The judgment of the district court is therefore affirmed in part and reversed in part and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[13] Because the statute and final rule fail the third part of the *Central Hudson* test, we need not decide whether they satisfy the second part: that the speech restrictions directly and materially advance the government's asserted interest.

[14] The requirement that an issuer use the particular descriptor "not been found to be 'DRC conflict free'" may arise as a result of the Commission's discretionary choices, and not as a result of the statute itself. We only hold that the statute violates the First Amendment to the extent that it imposes that description requirement. If the description is purely a result of the Commission's rule, then our First Amendment holding leaves the statute itself unaffected.

# APPENDIX

SRINIVASAN, *Circuit Judge*, *concurring in part*:  I concur fully in Parts I, II, and III of the court's opinion, which sustain the SEC's Conflict Minerals Rule against challenges brought by the National Association of Manufacturers under the Administrative Procedure Act and the Securities Exchange Act.  Respectfully, I do not join Part IV of the court's opinion, which addresses the Association's First Amendment claim.  A question of central significance to the resolution of that claim is pending before the en banc court in another case.  I would opt to hold in abeyance our consideration of the First Amendment issue in this case pending the en banc court's decision in the other, rather than issue an opinion that might effectively be undercut by the en banc court in relatively short order.

The intersection between the two cases arises from the way in which the court resolves the Association's First Amendment claim.  An essential step in the majority's First Amendment analysis is that the relaxed standard for reviewing compelled commercial-speech disclosures set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), applies only if the disclosure requirement serves a governmental interest in preventing consumer deception.  *Ante*, at 18-19.  That precise question is currently pending before our en banc court in *American Meat Institute v. United States Department of Agriculture*, No. 13-5281.  In that case, a panel of this court (of which I was a member) issued an opinion upholding labeling requirements for meat products under *Zauderer*'s standard, which requires that disclosure mandates be "reasonably related" to the government's interests.  __ F.3d __ (slip op. at 11) (quoting *Zauderer*, 471 U.S. at 651).  The panel relied on the government's interest in arming consumers with additional information when purchasing food, rejecting the suggestion that *Zauderer* review applies only to disclosure mandates aimed to cure consumer deception.  *Id.* at __ (slip op. at 10).

2

# APPENDIX

The full court, acting on the panel's suggestion, *id.* at __ (slip op. at 14 n.1), has now voted to rehear the case en banc, with oral argument set to take place on May 19, 2014. *See* Order, No. 13-5281 (D.C. Cir. Apr. 4, 2014) (en banc) (per curiam). The en banc court will receive supplemental briefing on the question whether review of "mandatory disclosure" obligations can "properly proceed under *Zauderer*" even if they serve interests "other than preventing deception." *Id.* My good colleagues in the majority here assume the answer to that question is no, and their decision on the First Amendment claim rests on that assumption. *Ante*, at 18-19. But if the en banc court in *American Meat* decides otherwise, the First Amendment claim in this case presumably would need to be reconsidered afresh.

To avert that possibility, a panel in such circumstances can elect to withhold its decision until the en banc court decides the potentially dispositive question. *See, e.g.*, *United States v. Johnson*, No. 91-3221, 1993 U.S. App. LEXIS 36925, at *1-2 (D.C. Cir. Dec. 14, 1993) (per curiam) (non-precedential); *United States v. Gerald*, 5 F.3d 563, 565 (D.C. Cir. 1993); *United States v. Dockery*, 965 F.2d 1112, 1113-14 & n.1 (D.C. Cir. 1992); *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 259 (D.C. Cir. 1988); *see also Judicial Watch, Inc. v. Dep't of Energy*, No. 04-5204, 2004 U.S. App. LEXIS 22661, at *2 (D.C. Cir. Oct. 8, 2004) (per curiam) (on court's own motion, ordering parties to show cause why appeal should not be held in abeyance pending en banc court's resolution of related question). The court likewise frequently withholds a decision in analogous situations in which a case potentially implicates a question pending before the Supreme Court. *See, e.g.*, *Wagner v. FEC*, No. 13-5162 (D.C. Cir. Sept. 11, 2013) (en banc) (per curiam); *United States v. Epps*, 707 F.3d 337, 341 (D.C. Cir. 2013); *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822,

3

**APPENDIX**

826 (D.C. Cir. 2012); *Belbacha v. Bush*, 520 F.3d 452, 456-57 (D.C. Cir. 2008).  Ordinarily, when resolution of a case before a panel could turn on a question under consideration by the en banc court in a separate case, the latter case would have been pending for some time.  The circumstances here are unusual in that regard because this case was docketed shortly before, and presented to the court essentially contemporaneously with, *American Meat*.  But because en banc review has now been granted in *American Meat*, my own respectful preference would be to withhold a decision on the First Amendment claim here pending the en banc decision in that case.

To be sure, there is no certainty that the en banc decision in *American Meat* will alter the panel's resolution here.  As could always be the case when a panel addresses an issue pending before the en banc court in a different case, the full court might agree with the panel's inclination—here, by concluding that *Zauderer*'s "reasonably related" standard applies only to disclosure requirements aimed to prevent consumer deception. Moreover, even if the en banc court were to decide that *Zauderer* extends more broadly, the majority suggests that the conflict minerals disclosure requirement might fail to satisfy another precondition to *Zauderer* scrutiny, i.e., that the disclosure be factual and non-controversial.  *See ante*, at 20.  As it stands, though, the majority's decision on the First Amendment challenge hinges on the premise that *Zauderer* applies only to the prevention of deception—the issue now under consideration by the en banc court.

I fully join the court's resolution of the Association's remaining challenges to the SEC's rule, however.  The parties understandably desire a final decision from this court before the May 31, 2014, deadline for the first conflict minerals disclosure report.  *See* 77 Fed. Reg. 56,274, 56,305 (Sept. 12, 2012).  Parts

4

# APPENDIX

I, II, and III of the court's opinion address non-First Amendment challenges bearing no connection to the en banc proceedings in *American Meat*. Those parts of the court's opinion—which resolve the claims to which the Association devotes its principal attention—should issue forthwith. *See, e.g.*, *Coke Oven Envtl. Task Force v. EPA*, No. 06-1131, 2006 U.S. App. LEXIS 23499, at *4 (D.C. Cir. Sept. 13, 2006) (per curiam) (severing one aspect of case and holding it in abeyance pending Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007)); *United States v. Coles*, No. 03-3113, 2004 U.S. App. LEXIS 25904, at *3-4 (D.C. Cir. Dec. 13, 2004) (per curiam) (affirming judgment in part and holding remaining portion of case in abeyance pending Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005)); *Wrenn v. Shalala*, No. 94-5198, 1995 U.S. App. LEXIS 8731, at *1-3 (D.C. Cir. Mar. 8, 1995) (per curiam) (non-precedential) (affirming dismissal of certain claims, reversing dismissal of other claims, and holding separate claim in abeyance pending Supreme Court decision in *Kimberlin v. Quinlan*, 515 U.S. 321 (1995)).

That approach would afford a resolution as to the lion's share of the challenges to the SEC's rule in advance of the date by which the parties seek a decision. It would still leave unresolved, though, the more narrowly focused challenge under the First Amendment to the particular requirement that manufacturers categorize certain products as "not found to be 'DRC conflict-free'" in a conflict minerals report. 17 C.F.R. § 249b.400, Form SD, Item 1.01(c)(2). The court, however, could stay enforcement of that aspect of the SEC's rule pending disposition of the Association's First Amendment claim.

In these unique circumstances, there would be strong arguments supporting issuance of a stay under the governing standards. *See generally Wash. Metro. Area Transit Comm'n v.*

5

## APPENDIX

*Holiday Tours, Inc.*, 559 F.2d 841, 842-43 & n.1 (D.C. Cir. 1977).  With regard to the likelihood of success on the merits: the majority concludes that the disclosure requirement fails to satisfy the test of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980); and there are, at the least, substantial questions concerning *Zauderer*'s applicability given the grant of en banc review in *American Meat* and the majority's suggestion, *ante* at 20, that the disclosure requirement may fail to qualify for *Zauderer* review regardless.  With regard to irreparable harm and the balance of equities:  "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); and any adverse consequences for the SEC and the public would be limited because a stay would leave the bulk of the SEC's rule (including the disclosure obligations) in place, affecting only the requirement to use a particular phrase.  The court perhaps could enter a stay on its own motion, *see* Fed. R. App. P. 2; *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1129 (D.C. Cir. 1978) ("balance of the equities" favors a stay "so much so that we should act sua sponte"), or at least could invite submissions from the parties on the desirability of a stay or order the SEC to show cause why one should not be granted.

It bears noting that there would be no evident need to stay any part of the statute, as opposed to the SEC's rule.  The Exchange Act requires covered manufacturers to list products qualifying as "not DRC conflict free" under the statutory definition.   15 U.S.C. § 78m(p)(1)(A)(ii);  *see id.* § 78m(p)(1)(D).  The Act, however, contains no mandate to use any magic words when categorizing those products.  Congress elected to use the descriptor, "not DRC conflict free," in the Act, *id.* § 78m(p)(1)(A)(ii), but Congress imposed no requirement for manufacturers to use that (or any) particular phrase when

6

**APPENDIX**

describing their products.  The latter obligation comes from the SEC's rule, not the statute.  The rule, moreover, compels use of the phrase, "not been found to be 'DRC conflict free'"—rather than "not DRC conflict free"—an adjustment viewed by the agency to ameliorate any First Amendment objections by allowing for a more "accurate disclosure."  77 Fed. Reg. at 56,323.   If the court were to withhold a decision on the Association's First Amendment claim pending the en banc court's decision in *American Meat*, but were to grant temporary relief to the Association in the interim, any stay order presumably would run against the SEC's rule (not the statute) and would correspond to the particular disclosure compelled by that rule.