**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8   CTIA – THE WIRELESS ASSOCIATION®,          No. C-15-2529 EMC

9              Plaintiff,

10        v.                                    **ORDER GRANTING IN PART AND
                                                DENYING IN PART PLAINTIFF'S
11  THE CITY OF BERKELEY, CALIFORNIA,           MOTION FOR PRELIMINARY
    *et al.*,                                   INJUNCTION; AND GRANTING
                                                NRDC'S MOTION FOR LEAVE TO
12                                              FILE AMICUS BRIEF
              Defendants.
13  _____/   **(Docket Nos. 4, 36)**

14

15

16        As alleged in its complaint, Plaintiff CTIA – The Wireless Association ("CTIA") is a not-

17  for-profit corporation that "represents all sectors of the wireless industry, including but not limited

18  to manufacturers of cell phones and accessories, providers of wireless services, and sellers of

19  wireless services, handsets, and accessories." Compl. ¶ 18.  Included among CTIA's members are

20  cell phone retailers.  *See* Compl. ¶ 19.  CTIA has filed suit against the City of Berkeley and its City

21  Manager in her official capacity (collectively "City" or "Berkeley"), challenging a City ordinance

22  that requires cell phone retailers to provide a certain notice regarding radiofrequency ("RF") energy

23  emitted by cell phones to any customer who buys or leases a cell phone.  According to CTIA, the

24  ordinance is preempted by federal law and further violates the First Amendment.  Currently pending

25  before the Court is CTIA's motion for a preliminary injunction in which it seeks to enjoin

26  enforcement of the ordinance.  Having considered the parties' briefs and accompanying submissions,

27

28

as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion.[1]

# I.   FACTUAL & PROCEDURAL BACKGROUND

A.   City Ordinance

RF energy is "'a form of electromagnetic radiation that is emitted by cell phones.'"  *In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*, 28 F.C.C. Rcd. 3498, 3585 (Mar. 29, 2013) [hereinafter "2013 FCC Reassessment"].  The City ordinance at issue concerns RF energy emitted by cell phones.

The ordinance at issue is found in Chapter 9.96 of the Berkeley Municipal Code.  It provides in relevant part as follows:

> A.   A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:
>
> The City of Berkeley requires that you be provided the following notice:
>
> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines.  If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation.  This potential risk is greater for children.  Refer to the instructions in your phone or user manual for information about how to use your phone safely.
>
> B.   The notice required by this Section shall either be provided to each customer who buys or leases a Cell phone or shall be prominently displayed at any point of sale where Cell phones are purchased or leased.  If provided to the customer, the notice shall include the City's logo, shall be printed on paper that is no less than 5 inches by 8 inches in size, and shall be printed in no smaller than a 18-point font.  The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer, as long as that information is distinct from the notice language required by subdivision (A) of this Section.  If prominently displayed at a point of sale, the notice shall

---

[1] The National Resources Defense Council ("NRDC") has filed a motion for leave to file an amicus brief in conjunction with the preliminary injunction proceedings.  This motion is hereby **GRANTED**.  CTIA has failed to show that it would be prejudiced by the Court's consideration of the brief, particularly because CTIA had sufficient time to submit a proposed opposition to NRDC's proposed amicus brief.

United States District Court

For the Northern District of California

include the City's logo, be printed on a poster no less than 8-1/2 by 11 inches in size, and shall be printed in no small than a 28-point font.  The City shall make its logo available to be incorporated in such notices.

Berkeley Mun. Code § 9.96.030.

The stated findings and purpose behind the notice requirement are as follows:

A. Requirements for the testing of cell phones were established by the federal government [*i.e.*, the Federal Communications Commission ("FCC")] in 1996.

B. These requirements established "Specific Absorption Rates" (SAR[2]) for cell phones.[3]

C. The protocols for testing the SAR for cell phones carried on a person's body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time.  Testing of cell phones under these protocols has generally been conducted based on an assumed separation of 10-15 millimeters.

D. To protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices.

E. Consumers are not generally aware of these safety recommendations.

F. Currently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify.

G. Some consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations.

H. While the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets, waistbands, etc., these disclosures and warnings are often buried in fine print, are not written in easily understood language, or are accessible only by looking for the information on the device itself.

---

[2] SAR is "a measure of the amount of RF energy absorbed by the body from cell phones." *CTIA – The Wireless Ass'n v. City & County of San Francisco*, 827 F. Supp. 2d 1054, 1056 (N.D. Cal. 2011) (Alsup, J.).

[3] *See* 47 C.F.R. § 2.1093 (setting RF energy exposure limits).

I.      The purpose of this Chapter is to assure that consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation.

Berkeley Mun. Code § 9.96.010.

Prior to issuing the ordinance, the City conducted a telephone survey on the topic of cell phones.  Data was collected from 459 Berkeley registered voters.  *See* Jensen Decl. ¶ 6.  Seventy percent of those surveyed were not "aware that the government's radiation tests to assure the safety of cell phones assume that a cell phone would not be carried against your body, but would instead be held at least 1- to 15 millimeters from your body."  Jensen Decl., Ex. A (survey and results).

B.      FCC Pronouncements

As indicated by the above, the FCC has set RF energy exposure standards for cell phones. The present RF energy exposure limits were established in 1996.  *See generally* FCC Consumer Guide, Wireless Devices and Health Concerns, *available at* https://www.fcc.gov/guides/wireless-devices-and-health-concerns (last visited September 17, 2015) [hereinafter "FCC Consumer Guide"].  This was done pursuant to a provision in the Telecommunications Act of 1996 ("TCA") that instructed the agency  "to prescribe and make effective rules regarding the environmental effects of radio frequency emissions."  104 P.L. 104 (1996).

The FCC has also issued some pronouncements regarding RF energy emission and cell phones, three of which are discussed briefly below.

1.      FCC KDB Guidelines

First, as CTIA alleges in its complaint,

[t]he FCC's Office of Engineering and Technology Knowledge Database ("KDB") advises cell phone manufacturers [as opposed to cell phone retailers] to include in their user manual a description of how the user can operate the phone under the same conditions for which its SAR was measured.  *See* FCC KDB, No. 447498, *General RF Exposure Guidelines*, § 4.2.2(4).

Compl. ¶ 75; *see also* 2013 FCC Reassessment, 28 F.C.C. Rcd. 3498, 3587 (stating that "[m]anufacturers have been encouraged since 2001 to include information in device manuals to

4

United States District Court

For the Northern District of California

make consumers aware of the need to maintain the body-worn distance – by using appropriate accessories if they want to ensure that their actual exposure does not exceed the SAR measurement obtained during testing").

The relevant guideline from the FCC's KDB Office provides as follows:

> Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements. Users must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-worn accessories to maintain compliance. Instructions on how to place and orient a device in body-worn accessories, in accordance with the test results, should also be included in the user instructions. All supported body-worn accessory operating configurations must be clearly disclosed to users through conspicuous instructions in the user guide and user manual to ensure unsupported operations are avoided. . . .

FCC KDB, No. 447498, *General RF Exposure Guidelines*, § 4.2.2(4), *available at* https://apps.fcc.gov/oetcf/kdb/forms/FTSSearchResultPage.cfm?switch=P&id=20676 (last visited September 17, 2015).

        2.    FCC Consumer Guide

The FCC currently has a FCC Consumer Guide regarding wireless devices and health concerns. In the FCC Consumer Guide, the agency states, *inter alia*, as follows:

•    "Several US government agencies and international organizations work cooperatively to monitor research on the health effects of RF exposure. According to the FDA and the World Health Organization (WHO), among other organizations, to date, the weight of scientific evidence has not effectively linked exposure to radio frequency energy from mobile devices with any known health problems." FCC Consumer Guide.

•    "Some health and safety interest groups have interpreted certain reports to suggest that wireless device use may be linked to cancer and other illnesses, posing potentially greater risks for children than adults. While these assertions have gained increased public attention, currently no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses. Those evaluating the potential risks of using wireless devices agree that more and longer-term studies should explore whether there is a better basis for RF safety

standards than is currently used.  The FCC closely monitors all of these study results. However, at this time, there is no basis on which to establish a different safety threshold than our current requirements." *Id.*

- "Even though no scientific evidence currently establishes a definite link between wireless device use and cancer or other illnesses, and even though all cell phones must meet established federal standards for exposure to RF energy, some consumers are skeptical of the science and/or the analysis that underlies the FCC's RF exposure guidelines.  Accordingly, some parties recommend taking measures to further reduce exposure to RF energy.  **The FCC does not endorse the need for these practices**, but provides information on some simple steps that you can take to reduce your exposure to RF energy from cell phones.  **For example**, wireless devices only emit RF energy when you are using them and, the closer the device is to you, the more energy you will absorb." *Id.* (emphasis in original).

- "Some parties recommend that you consider the reported SAR value of wireless devices. However, comparing the SAR of different devices may be misleading.  First, the actual SAR varies considerably depending upon the conditions of use.  The SAR value used for FCC approval does not account for the multitude of measurements taken during the testing. Moreover, cell phones constantly vary their power to operate at the minimum power necessary for communications; operation at maximum power occurs infrequently.  Second, the reported highest SAR values of wireless devices do not necessarily indicate that a user is exposed to more or less RF energy from one cell phone than from another during normal use (see our guide on SAR and cell phones).  Third, the variation in SAR from one mobile device to the next is relatively small compared to the reduction that can be achieved by the measures described above.  Consumers should remember that all wireless devices are certified to meet the FCC maximum SAR standards, which incorporate a considerable safety margin." *Id.*

3.      2013 FCC Reassessment

Finally, in 2013, the FCC issued its Reassessment.  *See generally* 2013 FCC Reassessment, 28 F.C.C. Rcd. 3498.  One of the components of the Reassessment was a Notice of Inquiry,

"request[ing] comment to determine whether our RF exposure limits and policies need to be reassessed." *Id.* at 3500.

> We adopted our present exposure limits in 1996, based on guidance from federal safety, health, and environmental agencies using recommendations published separately by the National Council on Radiation Protection and Measurements (NCRP) and the Institute of Electrical and Electronics Engineers, Inc. (IEEE). Since 1996, the International Commission on Non-Ionizing Radiation Protection (ICNIRP) has developed a recommendation supported by the World Health Organization (WHO), and the IEEE has revised its recommendations several times, while the NCRP has continued to support its recommendation as we use it in our current rules. In the Inquiry, we ask whether our exposure limits remain appropriate given the differences in the various recommendations that have developed and recognizing additional progress in research subsequent to the adoption of our existing exposure limits.

*Id.* at 3501.

The FCC included the following comments in its Reassessment:

- "Since the Commission is not a health and safety agency, we defer to other organizations and agencies with respect to interpreting the biological research necessary to determine what levels are safe. As such, the Commission invites health and safety agencies and the public to comment on the propriety of our general present limits and whether additional precautions may be appropriate in some cases, for example with respect to children. We recognize our responsibility to both protect the public from established adverse effects due to exposure to RF energy and allow industry to provide telecommunications services to the public in the most efficient and practical manner possible. In the Inquiry we ask whether any precautionary action would be either useful or counterproductive,  given that there is a lack of scientific consensus about the possibility of adverse health effects at exposure levels at or below our existing limits. Further, if any action is found to be useful, we inquire whether it could be efficient and practical." *Id.* at 3501-02.

- "In the Inquiry we ask questions about several other issues related to public information, precautionary measures, and evaluation procedures. Specifically, we seek comment on the feasibility of evaluating portable RF sources without a separation distance when worn on the body to ensure compliance with our limits under present-day usage conditions. We ask

whether the Commission should consistently require either disclosure of the maximum SAR value or other more reliable exposure data in a standard format – perhaps in manuals, at point-of-sale, or on a website." *Id.* at 3502.

- • "The Commission has a responsibility to 'provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible.' The intent of our exposure limits is to provide a cap that both protects the public based on scientific consensus and allows for efficient and practical implementation of wireless services. The present Commission exposure limit is a 'bright-line rule.' That is, so long as exposure levels are below a specified limit value, there is no requirement to further reduce exposure. The limit is readily justified when it is based on known adverse health effects having a well-defined threshold, and the limit includes prudent additional safety factors (e.g., setting the limit significantly below the threshold where known adverse health effects may begin to occur). Our current RF exposure guidelines are an example of such regulation, including a significant 'safety' factor, whereby the exposure limits are set at a level on the order of 50 times below the level at which adverse biological effects have been observed in laboratory animals as a result of tissue heating resulting from RF exposure. This 'safety' factor can well accommodate a variety of variables such as different physical characteristics and individual sensitivities – and even the potential for exposures to occur in excess of our limits without posing a health hazard to humans."[4] *Id.* at 3582.

- • "Despite this conservative bright-line limit, there has been discussion of going even further to guard against the possibility of risks from non-thermal biological effects, even though

---

[4] Some contend that RF energy can have both thermal biological effects and nonthermal biological effects. *See, e.g.*, Miller Decl. ¶¶ 7, 10-14 (noting that "RF radiation is non-ionizing radiation," that "[n]on-ionizing radiation can harm through thermal effects, usually only in high dosage," and that "[t]here is an increasingly clear body of evidence that non-ionizing radiation can harm through non-thermal effects as well," including cancer; adding that the evidence indicates that "RF fields are not just a *possible* human carcinogen but a *probable* human carcinogen"). The safety factor built in by the FCC seems to be addressed to the thermal biological effects only.

8

such risks have not been established by scientific research. As such, some parties have suggested measures of 'prudent avoidance' – undertaking only those avoidance activities which carry modest costs." *Id.* at 3582-83 (emphasis added).

- "Given the complexity of the information on research regarding non-thermal biological effects, taking extra precautions in this area may fundamentally be qualitative and may not be well-served by the adoption of lower specific exposure limits without any known, underlying biological mechanism. Additionally, adoption of extra precautionary measures may have the unintended consequence of 'opposition to progress and the refusal of innovation, ever greater bureaucracy, . . . [and] increased anxiety in the population.' Nevertheless, we invite comment as to whether precautionary measures may be appropriate for certain locations which would not affect the enforceability of our existing exposure limits, as well as any analytical justification for such measures." *Id.* at 3583.

- "We significantly note that extra precautionary efforts by national authorities to reduce exposure below recognized scientifically-based limits is considered by the WHO to be unnecessary but acceptable so long as such efforts do not undermine exposure limits based on known adverse effects. Along these lines, we note that although the Commission supplies information to consumers on methods to reduce exposure from cell phones, it has also stated that it does not endorse the need for nor set a target value for exposure reduction, and we seek comment on whether these policies are appropriate. We also observe that the FDA has stated that, 'available scientific evidence – including World Health Organization (WHO) findings released May 17, 2010 – shows no increased health risk due to radiofrequency (RF) energy, a form of electromagnetic radiation that is emitted by cell phones.' At the same time, the FDA has stated that '[a]lthough the existing scientific data do not justify FDA regulatory actions, FDA has urged the cell phone industry to take a number of steps, including ... [d]esign[ing] cell phones in a way that minimizes any RF exposure to the user.' We seek information on other similar hortatory efforts and comment on the utility and propriety of such messaging as part of this Commission's regulatory regime." *Id.* at 3584-85.

- "Commission calculations similar to those in Appendix D suggest that some devices may not be compliant with our exposure limits without the use of some spacer to maintain a separation distance when body-worn, although this conclusion is not verifiable for individual devices since a test without a spacer has not been routinely performed during the body-worn testing for equipment authorization. Yet, we have no evidence that this poses any significant health risk. Commission rules specify a pass/fail criterion for SAR evaluation and equipment authorization. However, exceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply 'safer' operation. The limits were set with a large safety factor, to be well below a threshold for unacceptable rises in tissue temperature. As a result, exposure well above the specified SAR limit should not create an unsafe condition. We note that, even if a device is tested without a spacer, there are already certain separations built into the SAR test setup, such as the thickness of the mannequin shell, the thickness of the device exterior case, etc., so we seek comment on the implementation of evaluation procedures without a spacer for the body-worn testing configuration. We also realize that SAR measurements are performed while the device is operating at its maximum capable power, so that given typical operating conditions, the SAR of the device during normal use would be less than tested. In sum, using a device against the body without a spacer will generally result in actual SAR below the maximum SAR tested; moreover, a use that possibly results in non-compliance with the SAR limit should not be viewed with significantly greater concern than compliant use." *Id.* at 3588.

## II.  DISCUSSION

A.  Legal Standard

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7 (2008) (rejecting the position that, "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered

United States District Court

For the Northern District of California

based only on a 'possibility' of irreparable harm")).  The Ninth Circuit has held that the "serious questions" approach survives *Winter* when applied as part of the four-element *Winter* test.  In other words, "serious questions going to the merits" and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met.  *See Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

B.    Likelihood of Success on the Merits

As noted above, the thrust of CTIA's complaint is twofold: (1) the Berkeley ordinance is preempted by federal law and (2) the ordinance violates the First Amendment.  Thus, the Court must evaluate the likelihood of success as to each contention.

1.    Preemption

The specific preemption argument raised by CTIA is conflict preemption.[5]  "Conflict preemption is implicit preemption of state law that occurs where 'there is an actual conflict between state and federal law.'  Conflict preemption 'arises when [1] 'compliance with both federal and state regulations is a physical impossibility,' . . . or [2] when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1040 (9th Cir. 2015).

Here, CTIA puts at issue only obstacle preemption, not impossibility preemption.  Under Supreme Court law, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  "'If the purpose of the [federal] act cannot otherwise be accomplished – if its operation within its chosen field must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power.'"  *Id.*

In the case at bar, the federal statute at issue is the TCA, "which [*inter alia*] directed the FCC to 'make effective rules regarding the environmental effects of [RF] emissions' within 180 days of

---

[5] CTIA has claimed only conflict preemption and not other kinds of preemption such as *e.g.*, field preemption.  *See, e.g.*, Reply at 12-13 (arguing that the City "challenges a *field* preemption argument that CTIA does not raise") (emphasis in original).

United States District Court

For the Northern District of California

the TCA's enactment [in 1996]."  *Farina*, 625 F.3d at 106; *see also* 47 C.F.R. § 2.1093 (setting

exposure limits).  CTIA argues that the purposes underlying the statute are twofold: (1) to achieve a

balance between the need to protect the public's health and safety and the goal of providing an

efficient and practical telecommunications services for the public's benefit and (2) to ensure

nationwide uniformity as to this balance.  In support of this argument, CTIA relies on the Third

Circuit's decision *Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010).

The Court agrees with CTIA that *Farina* is an instructive case with respect to the purposes

underlying the above TCA provision.  In *Farina*, the plaintiff sued on the ground that "cell phones,

as currently manufactured, are unsafe to be operated without headsets because the customary manner

in which they are used – with the user holding the phone so that the antenna is positioned next to his

head – exposes the user to dangerous amounts of radio frequency ('RF') radiation."  *Id.* at 104.  The

Third Circuit held that the plaintiff's lawsuit was subject to obstacle preemption.  The court noted

first that, "although [the plaintiff] disavow[ed] any challenge to the FCC's RF standards, that is the

essence of his complaint. . . . In order for [the plaintiff] to succeed, he necessarily must establish that

cell phones abiding by the FCC's SAR guidelines are unsafe to operate without a headset."  *Id.* at

122.  The court then concluded that there was obstacle preemption, particularly because "regulatory

situations in which an agency is required to strike a balance between competing statutory objectives

lend themselves to a finding of conflict preemption."  *Id.* at 123.

> The reason why state law conflicts with federal law in these balancing
> situations is plain.  When Congress charges an agency with balancing
> competing objectives, it intends the agency to use its reasoned
> judgment to weigh the relevant considerations and determine how best
> to prioritize between these objectives.  Allowing state law to impose a
> different standard permits a re-balancing of those considerations.  A
> state-law standard that is more protective of one objective may result
> in a standard that is less protective of others.

*Id.*  The FCC was tasked with a balancing act – not only to "protect[] the health and safety of the

public, but also [to] ensur[e] the rapid development of an efficient and uniform network, one that

provides effective and widely accessible service at a reasonable cost."  *Id.* at 125.  "Were the FCC's

standards to constitute only a regulatory floor upon which state law can build, juries could re-

balance the FCC's statutory objectives and inhibit the provision of quality nationwide service."  *Id.*

United States District Court
For the Northern District of California

Moreover, in *Farina*, the Third Circuit also stated that uniformity was one of the purposes underlying the TCA:

> The wireless network is an inherently national system. In order to ensure the network functions nationwide and to preserve the balance between the FCC's competing regulatory objectives, both Congress and the FCC recognized uniformity as an essential element of an efficient wireless network. Subjecting the wireless network to a patchwork of state standards would disrupt that uniformity and place additional burdens on industry and the network itself.

*Id.* at 126.

Finally, as noted in *Farina*, the legislative history for the TCA, which instructed the FCC to "to prescribe and make effective rules regarding the environmental effects of radio frequency emissions," 104 P.L. 104 (1996) (discussing § 704), includes a House Report that also indicates uniformity is an important goal. The House Report states, *inter alia*:

> The Committee finds that current State and local requirements, siting and zoning decisions by non-federal units of government, have created an inconsistent and, at times, conflicting patchwork of requirements which will inhibit the deployment of Personal Communications Services (PCS) as well as the rebuilding of a digital technology-based cellular telecommunications network. The Committee believes it is in the national interest that uniform, consistent requirements, with adequate safeguards of the public health and safety, be established as soon as possible. Such requirements will ensure an appropriate balance in policy and will speed deployment and the availability of competitive wireless telecommunications services which ultimately will provide consumers with lower costs as well as with a greater range and options for such services.

H.R. Rep. No. 104-204, at 94 (1996).[6]

But even though *Farina* persuasively identifies the purposes underlying the TCA provision at issue, the limited disclosure mandated by the Berkeley ordinance does not, with one exception, impose an obstacle to those purposes. As noted above, the notice required by the City ordinance states as follows:

---

[6] The Court notes, however, that statement in the House Report is not clearly targeted at the requirement that the agency make rules regarding RF energy emissions. This is because § 704 of the TCA concerned not only this directive but also another – *i.e.*, that the FCC "prescribe a national policy for the siting of commercial mobile radio services facilities." H.R. Rep. No. 104-204, at 94 (also stating that "[t]he siting of facilities cannot be denied on the basis of Radio Frequency (RF) emission levels which are in compliance with the Commission RF emission regulated levels").

United States District Court

For the Northern District of California

The City of Berkeley requires that you be provided the following notice:

To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. This potential risk is greater for children. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Mun. Code § 9.96.030(A). This disclosure, for the most part, simply refers consumers to the fact that there are FCC standards on RF energy exposure – standards which assume a minimum spacing of the cell phone away from the body – and advises consumers to refer to their manuals regarding maintenance of such spacing. The disclosure mandated by the Berkeley ordinance is consistent with the FCC's statements and testing procedures regarding spacing. *See, e.g.*, FCC Consumer Guide (advising "on some simple steps that you can take to reduce your exposure to RF energy from cell phones[;] [f]or example, wireless devices only emit RF energy when you are using them and, the closer the device is to you, the more energy you will absorb"); 2013 FCC Reassessment, 28 F.C.C. Rcd. at 3588 (stating that "Commission calculations . . . suggest that some devices may not be compliant with our exposure limits without the use of some spacer to maintain a separation distance when body-worn, although this conclusion is not verifiable for individual devices since a test without a spacer has not been routinely performed during the body-worn testing for equipment authorization"). It is also consistent with the FCC's own requirement that cell phone manufacturers disclose to consumers information and advice about spacing. *See* FCC KDB, No. 447498, *General RF Exposure Guidelines*, § 4.2.2(4). Thus, the ordinance does not ban something the FCC authorizes or mandates. And CTIA has failed to point to any FCC pronouncement suggesting that the agency has any objection to warning consumers about maintaining spacing between the body and a cell phone. Moreover, the City ordinance, because it is consistent with FCC pronouncements and directives, does not threaten national uniformity.

There is, however, one portion of the notice required by the City ordinance that is subject to obstacle preemption – namely, the sentence "This potential risk is greater for children." Berkeley Mun. Code § 9.96.030(A). Notably, this sentence does not say that the potential risk *may* be greater

for children; rather, the sentence states that the potential risk *is* greater.  But whether the potential risk is, in fact, greater for children is a matter of scientific debate.  The City has taken the position in this lawsuit that its notice is simply designed to reinforce a message that the FCC already requires and make consumers aware of FCC instructions and mandates, *see, e.g.*, Opp'n at 1, 4, but the FCC has never made any pronouncement that there *is* a greater potential risk for children, and, certainly, the FCC has not imposed different RF energy exposure limits that are applicable to children specifically.  At most, the FCC has taken note that there is a scientific debate about whether children are potentially at greater risk.  *See, e.g.*, FCC Consumer Guide ("Some health and safety interest groups have interpreted certain reports to suggest that wireless device use may be linked to cancer and other illnesses, posing potentially greater risks for children than adults.  While these assertions have gained increased public attention, currently no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses."); 2013 FCC Reassessment, 28 F.C.C. Rcd. at 3501 ("[T]he Commission invites health and safety agencies and the public to comment on the propriety of our general present limits and whether additional precautions may be appropriate in some cases, for example with respect to children.").  Importantly, however, the FCC has not imposed different exposure limits for children nor does it mandate special warnings regarding children's exposure to RF radiation from cell phones.  Thus, the content of the sentence – that the potential risk *is* indeed greater for children compared to adults – threatens to upset the balance struck by the FCC between encouraging commercial development of all phones and public safety, because the Berkeley warning as worded could materially deter sales on an assumption about safety risks which the FCC has refused to adopt or endorse.[7]

---

[7] At the hearing, the City argued that there *is* a greater potential risk because of behavioral differences between children and adults.  *See* Cortesi Decl. ¶¶ 5-8 (testifying, *inter alia*, that children are heavy users of cell phones, that they often sleep with their phones on or next to their beds, that they often text which leads to them keeping phones close to their bodies, etc.).  The City contends that CTIA has done nothing to refute the evidence submitted by the City on the behavioral differences, and thus the evidence of record establishes that the potential risk *is* greater.  This argument, however, has little merit in light of the FCC evidence cited above, which indicates that at most there is a scientific debate regarding the risk to children.  Moreover, the wording of the notice suggests to the general public that the danger to children arises from their inherent biological susceptibility to RF radiation, not behavioral susceptibility.

United States District Court

For the Northern District of California

1    Accordingly, although CTIA has not demonstrated a likelihood of success or even serious

2    question on the merits in its preemption challenge to the main portion of the notice, it has

3    established a likelihood of success on its claim that the warning about children is preempted.

4        2.    First Amendment

5    Having determined that the required statement, "This potential risk is greater for children," is

6    likely preempted by federal law, the Court now addresses CTIA's likelihood of success with respect

7    to its First Amendment challenge to the remainder of the notice.[8]

8        a.    Level of Scrutiny

9    With respect to CTIA's First Amendment claim, the Court must first determine what First

10   Amendment test should be used to evaluate the ordinance at issue.  CTIA contends that strict

11   scrutiny must be applied because the ordinance is neither content nor viewpoint neutral.  *See Reed v.*

12   *Town of Gilbert*, 135 S. Ct. 2218, 2228, 2230 (2015) (stating that "strict scrutiny applies either when

13   a law is content based on its face or when the purpose and justification for the law are content

14   based"; adding that "[g]overnment discrimination among viewpoints . . . is a 'more blatant' and

15   'egregious form of content discrimination'").  But in making this argument, CTIA completely

16   ignores the fact that the speech rights at issue here are its members' *commercial* speech rights.  *See*

17   *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (stating that "[c]ommercial speech is 'defined

18   as speech that does no more than propose a commercial transaction'"; "'strong support' that the

19   speech should be characterized as commercial speech is found where the speech is an advertisement,

20   the speech refers to a particular product, and the speaker has an economic motivation").  The

21   Supreme Court has clearly made a distinction between commercial speech and noncommercial

22   speech, *see, e.g.*, *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562-63

---

23

24        [8] The Court shall evaluate the ordinance as if the sentence regarding children were excised
     from the text.  This approach is appropriate in light of Berkeley Municipal Code § 1.01.100 which,
25   in effect, allows for severance.  *See* Berkeley Mun. Code § 1.01.100 ("If any section, subsection,
     sentence, clause or phrase of this code is for any reason held to be invalid or unconstitutional, such
26   decision shall not affect the validity of the remaining portions of this code.  The council hereby
     declares that it would have passed this code, and each section, subsection, sentence, clause and
27   phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses
     or phrases had been declared invalid or unconstitutional, and if for any reason this code should be
28   declared invalid or unconstitutional, then the original ordinance or ordinances shall be in full force
     and effect.").

1 (1980) (stating that "[t]he Constitution . . . accords a lesser protection to commercial speech than to

2 other constitutionally guaranteed expression"); *see also Nat'l Ass'n of Mfrs. v. SEC*, No. 13-5252,

3 2015 U.S. App. LEXIS 14455, at *75-76 (D.C. Cir. Aug. 18, 2015) (noting that, "as the Supreme

4 Court has emphasized, the starting premise in all commercial speech cases is the same: the First

5 Amendment values commercial speech for different reasons than non-commercial speech"), and

6 nothing in its recent opinions, including *Reed*, even comes close to suggesting that that well-

7 established distinction is no longer valid.[9]

8       CTIA contends that, even if the commercial speech rubric is applied, the ordinance should be

9 subject to at least intermediate scrutiny, pursuant to *Central Hudson*:

> If the communication is neither misleading nor related to
> unlawful activity, . . . [t]he State must assert a substantial interest to be
> achieved by restrictions on commercial speech.  Moreover, the
> regulatory technique must be in proportion to that interest.  The
> limitation on expression must be designed carefully to achieve the
> State's goal.  Compliance with this requirement may be measured by
> two criteria.  First, the restriction must directly advance the state
> interest involved. . . . .  Second, if the governmental interest could be
> served as well by a more limited restriction on commercial speech, the
> excessive restrictions cannot survive.

16 *Central Hudson*, 447 U.S. at 564.  But as indicated by the above language, *Central Hudson* was

17 addressing *restrictions* on commercial speech.  Here, the Court is not confronted with any

18 restrictions on CTIA members' commercial speech; rather, the issue is related to *compelled*

19 *disclosure* of commercial speech.  The Supreme Court has treated  restrictions on commercial

20 speech differently from compelled disclosure of such speech.  This difference in treatment was first

21 articulated in the plurality decision in *Zauderer v. Office of Disciplinary Counsel of the Supreme*

22 *Court of Ohio*, 471 U.S. 626 (1985), and subsequently affirmed by the majority opinion in *Milavetz,*

23 *Gallp & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).

24       Because *Zauderer* is a critical opinion, the Court briefly discusses its holding.  The plaintiff

25 in *Zauderer* was an attorney.  He ran an advertisement in which he "publiciz[ed] his willingness to

---

[9] Ironically, the classification of speech between commercial and noncommercial is itself a content-based distinction.  Yet it cannot seriously be contended that such classification itself runs afoul of the First Amendment.

United States District Court
For the Northern District of California

represent women who had suffered injuries resulting from their use of a contraceptive device known as the Dalkon Shield Intrauterine Device." *Id.* at 630. In the advertisement, the plaintiff stated that "'[t]he case are handled on a contingent fee basis of the amount recovered. If there is no recovery, no legal fees are owed by our clients.'" *Id.* at 631. Based on the advertisement, the state Office of Disciplinary Counsel filed a complaint against the plaintiff, alleging that the plaintiff had violated a disciplinary rule because the advertisement "fail[ed] to inform clients that they would be liable for costs (as opposed to legal fees) even if their claims were unsuccessful" and therefore was deceptive. *Id.* at 633. The state supreme court agreed with the state Office of Disciplinary Counsel. The plaintiff appealed, asserting that his First Amendment rights had been violated.

In resolving the issue, the plurality began by noting that

> [o]ur general approach to restrictions on commercial speech is . . . by now well settled. The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading. Commercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest [*i.e.*, *Central Hudson*].

*Id.* at 638.

The plurality pointed out, however, that there are "material differences between disclosure requirements and outright prohibitions on speech." *Id.* at 650. While, "in some instances compulsion to speak may be as violative of the First Amendment as prohibitions on speech," that is not always the case. *Id.* Here, the state was not "'prescrib[ing] what shall be orthodox in politics, religion, [etc].'"; rather,

> [t]he State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available. Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal. Thus, in virtually all our commercial speech decisions to date, we have emphasized that *because disclosure requirements trench much more narrowly on an advertiser's interest than do flat prohibitions on speech*, "[warnings]

> or [disclaimers] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception."
>
> We do not suggest that disclosure requirements do not implicate the advertiser's First Amendment rights at all. We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.

*Id.* at 651 (emphasis added).

The plurality then held that this standard was satisfied in the case at hand.

> Appellant's advertisement informed the public that "if there is no recovery, no legal fees are owed by our clients." The advertisement makes no mention of the distinction between "legal fees" and "costs," and to a layman not aware of the meaning of these terms of art, the advertisement would suggest that employing appellant would be a no-lose proposition in that his representation in a losing cause would come entirely free of charge. The assumption that substantial numbers of potential clients would be so misled is hardly a speculative one: it is a commonplace that members of the public are often unaware of the technical meanings of such terms as "fees" and "costs" – terms that, in ordinary usage, might well be virtually interchangeable. When the possibility of deception is as self-evident as it is in this case, we need not require the State to "conduct a survey of the . . . public before it [may] determine that the [advertisement] had a tendency to mislead." The State's position that it is deceptive to employ advertising that refers to contingent-fee arrangements without mentioning the client's liability for costs is reasonable enough to support a requirement that information regarding the client's liability for costs be disclosed.

*Id.* at 652-53. Accordingly, *Zauderer* suggests that compelled disclosure of commercial speech, unlike suppression or restriction of such speech, is subject to rational basis review rather than intermediate scrutiny.

Approximately fifteen years later, a majority of the Supreme Court addressed *Zauderer* in *Milavetz*. *Milavetz* concerned the constitutionality of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The act regulated the conduct of debt relief agencies, *i.e.*, "professionals who provide bankruptcy assistance to consumer debtors." *Milavetz*, 559 U.S. at 232. Part of the act required debt relief agencies to make certain disclosures in their advertisements. *See id.* at 233. The parties disagreed as to whether *Central Hudson* or *Zauderer*

provided the applicable standard in evaluating the statute.  The Supreme Court concluded that

*Zauderer* governed, noting as follows:

> The challenged provisions of § 528 share the essential features
> of the rule at issue in *Zauderer*.  As in that case, § 528's required
> disclosures are intended to combat the problem of inherently
> misleading commercial advertisements – specifically, the promise of
> debt relief without any reference to the possibility of filing for
> bankruptcy, which has inherent costs.  Additionally, the disclosures
> entail only an accurate statement identifying the advertiser's legal
> status and the character of the assistance provided, and they do not
> prevent debt relief agencies . . . from conveying any additional
> information.

*Id.* at 250.  The Court then determined that "§ 528's requirements that [the petitioner] identify itself

as a debt relief agency and include information about its bankruptcy-assistance an related services

are 'reasonably related to the [Government's] interest in preventing deception of consumers.'" *Id.* at

252-53.  Accordingly, it "upheld those provisions as applied to [the petitioner]." *Id.* at 253.

Since *Zauderer* and *Milavetz*, circuit courts have essentially characterized the *Zauderer* test

as a rational basis or rational review test.  *See, e.g.*, *Nat'l Ass'n*, 2015 U.S. App. LEXIS 14455, at

*55 (stating that "[t]he Supreme Court has stated that rational basis review applies to certain

disclosures of 'purely factual and uncontroversial information'"; quoting *Zauderer*); *King v.*

*Governor of N.J.*, 767 F.3d 216, 236 (3d Cir. 2014) (stating that *Zauderer* "outlin[ed] the 'material

differences between disclosure requirements and outright prohibitions on speech' and subject[ed] a

disclosure requirement to rational basis review"); *Safelite Group v. Jepsen*, 764 F.3d 258, 259 (2d

Cir. 2014) (characterizing *Zauderer* as "rational basis review"); *Centro Tepeyac v. Montgomery*

*County*, 722 F.3d 184, 189 (4th Cir. 2013) (noting that, under *Zauderer*, "disclosure requirements

aimed at misleading commercial speech need only survive rational basis scrutiny"); *Disc. Tobacco*

*City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012) (characterizing *Zauderer*

as a "rational-basis rule"); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir.

2005) (Boudin, J., concurring) (stating that "[t]he idea that these thousands of routine regulations

require an extensive First Amendment analysis is mistaken" because *Zauderer* is in essence a

rational basis test).  This is consistent with the underlying theory of the First Amendment.  As the

Second Circuit has noted, "mandated disclosure of accurate, factual, commercial information does

United States District Court

For the Northern District of California

20

not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests" – indeed, "disclosure further, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.'" *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001).

CTIA protests that, even if *Zauderer* makes a distinction between restrictions on commercial speech and compelled disclosure, the more lenient test articulated in *Zauderer* is applicable only where the governmental interest at issue is the prevention of consumer deception, and that, here, the governmental interest is in public health or safety, not consumer deception. But tellingly, no court has expressly held that *Zauderer* is limited as CTIA proposes. In fact, several circuit courts have held to the contrary. For example, in *American Meat Institute v. United States Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014), the D.C. Circuit, sitting en banc, considered a regulation of the Secretary of Agriculture that required disclosure of country-of-origin information about meat products. The plaintiffs argued that the regulation violated their First Amendment rights. The question for the court was whether "the test set forth in *Zauderer* applies to government interests beyond consumer deception." *Id.* at 21. The court began by acknowledging that

> *Zauderer* itself does not give a clear answer. Some of its language suggests possible confinement to correcting deception. Having already described the disclosure mandated there as limited to "purely factual and uncontroversial information about the terms under which [the transaction was proposed]," the Court said, "we hold that an advertiser's rights are adequately protected as long as [such] disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." (It made no finding that the advertiser's message was "more likely to deceive the public than to inform it," which would constitutionally subject the message to an outright ban. The Court's own later application of *Zauderer* in *Milavetz, Gallop & Milavetz, P.A. v. United* States, 559 U.S. 229 (2010), also focused on remedying misleading advertisements, which was the sole interest invoked by the government. Given the subject of both cases, it was natural for the Court to express the rule in such terms. The language could have been simply descriptive of the circumstances to which the Court applied its new rule, or it could have aimed to preclude any application beyond those circumstances.

> The language with which *Zauderer* justified its approach, however, sweeps far more broadly than the interest in remedying deception. After recounting the elements of *Central Hudson*, Zauderer rejected that test as unnecessary in light of the "material differences between disclosure requirements and outright prohibitions on speech." Later in the opinion, the Court observed that "the First Amendment

interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." After noting that the disclosure took the form of "purely factual and uncontroversial information about the terms under which [the] services will be available," the Court characterized the speaker's interest as "minimal": "Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in not providing any particular factual information in his advertising is minimal." All told, *Zauderer*'s characterization of the speaker's interest in opposing forced disclosure of such information as "minimal" seems inherently applicable beyond the problem of deception, as other circuits [*e.g.*, the Second and First] have found.

*Id.* at 21-22.

In *National Electrical*, the Second Circuit also rejected a reading of *Zauderer* as being limited to a situation where the government's interest is prevention of consumer deception. The case concerned a Vermont statute that "require[d] manufacturers of some mercury-containing products to label their products and packaging to inform consumers that the products contain mercury and, on disposal, should be recycled or disposed of as hazardous waste." *Nat'l Elec.*, 272 F.3d at 107. The court acknowledged that

the compelled disclosure at issue here was not intended to prevent "consumer confusion or deception" per se, but rather to better inform consumers about the products they purchase. Although the overall goal of the statute is plainly to reduce the amount of mercury released into the environment, it is inextricably intertwined with the goal of increasing consumer awareness of the presence of mercury in a variety of products. Accordingly, we cannot say that the statute's goal is inconsistent with the policies underlying First Amendment protection of commercial speech, described above, and the reasons supporting the distinction between compelled and restricted commercial speech. We therefore find that it is governed by the reasonable-relationship rule in *Zauderer*.

We believe that such a reasonable relationship is plain in the instant case. The prescribed labeling would likely contribute directly to the reduction of mercury pollution, whether or not it makes the greatest possible contribution. It is probable that some mercury lamp purchasers, newly informed by the Vermont label, will properly dispose of them and thereby reduce mercury pollution. By encouraging such changes in consumer behavior, the labeling requirement is rationally related to the state's goal of reducing mercury contamination.

We find that the Vermont statute is rationally related to the state's goal, notwithstanding that the statute may ultimately fail to

**United States District Court**
For the Northern District of California

1    eliminate all or even most mercury pollution in the state.

2    *Id.* at 115; *see also N.Y. St. Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009)

3    (stating that "*Zauderer*'s holding was broad enough to encompass nonmisleading disclosure

4    requirements").

5          The First and Sixth Circuits are in accord with the D.C. and Second Circuits.  *See Pharm.*

6    *Care*, 429 F.3d at 310 n.8 (noting that "we have found no cases limiting *Zauderer* [to potentially

7    deceptive advertising directed at consumers]"); *Disc. Tobacco*, 674 F.3d at 556-57 (discussing

8    *National Electrical* approvingly); *cf. Pharm. Care*, 429 F.3d at 316 (Boudin, J., concurring) (stating

9    that "[t]he idea that these thousands of routine regulations require an extensive First Amendment

10   analysis is mistaken" because *Zauderer* is in essence a rational basis test).  Furthermore, in an

11   unpublished decision, the Ninth Circuit addressed a San Francisco ordinance which also imposed a

12   notice requirement on cell phone retailers (based on RF energy emission), but the court did not hold

13   that *Zauderer* was limited to circumstances in which a state or local government was trying to

14   prevent potentially misleading advertising.  *See generally CTIA – The Wireless Ass'n v. City &*

15   *County of San Francisco*, 494 Fed. Appx. 752 (9th Cir. 2012).  The court assumed *Zauderer* applied

16   to mandatory disclosures directed at health and safety, not consumer deception.

17         The circuit authority cited above is persuasive, and thus the Court disagrees with CTIA's

18   interpretation of *Zauderer* as being limited to preventing consumer deception.  Indeed, it would

19   make little sense to conclude that the government has greater power to regulate commercial speech

20   in order to prevent deception than to protect public health and safety, a core function of the historic

21   police powers of the states.  *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 715 (2000) (stating that "[it] is

22   a traditional exercise of the States' 'police powers to protect the health and safety of their

23   citizens'"); *Barnes v. Glen Theatre*, 501 U.S. 560, 569 (1991) (noting that "[t]he traditional police

24   power of the States is defined as the authority to provide for the public health, safety, and morals").

25         Moreover, there is a persuasive argument that, where, as here, the compelled disclosure is

26   that of clearly identified *government* speech, and not that of the *private speaker*, a standard even less

27   exacting than that established in *Zauderer* should apply.  In *Zauderer*, the plaintiff-attorney was

28   being compelled to speak, and nothing about that compelled speech indicated it was anyone's speech

United States District Court

For the Northern District of California

1   but the plaintiff-attorney's.  In contrast, here, CTIA's members are being compelled to communicate

2   a message, but the message being communicated is clearly the City's message, and not that of the

3   cell phone retailers.  *See, e.g.*, Berkeley Mun. Code § 9.96.030(A)-(B) (providing that the notice

4   shall state "The City of Berkeley requires that you be provided the following notice" and that "the

5   notice shall include the City's logo").  In other words, while CTIA's members are being compelled

6   to provide a mandated disclosure of Berkeley's speech, no one could reasonably mistake that speech

7   as emanating from a cell phone retailer itself.  Where a law requires a commercial entity engaged in

8   commercial speech merely to permit a disclosure by the *government*, rather than compelling speech

9   out of the mouth of the *speaker*, the First Amendment interests are less obvious.  Notably, at the

10  hearing, CTIA conceded that there would be no First Amendment violation if the City handed out

11  flyers or had a poster board immediately outside a cell phone retailer's store.  But that then begs the

12  question of what is the difference between that conduct and the conduct at issue herein – *i.e.*, where

13  the City information is being provided at the sales counter inside the store instead of immediately

14  outside the store.  While the former certainly seems more intrusive, that is more so because it seems

15  to impinge on property rights rather than on expressive rights.  CTIA has not cited any appellate

16  authority addressing the proper standard of First Amendment review where the government requires

17  mandatory disclosure of *government* speech by a private party in the context of commercial speech.

18         To be sure, there are First Amendment limits to the government's ability to require that a

19  speaker carry a hostile or inconsistent message of a third party, at least in the context of

20  noncommercial speech.  *See*, *e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515

21  U.S. 557 (1995) (holding that First Amendment rights of a parade organizer and council were

22  violated when they were required to include a gay rights organization in their parade); *Pac. Gas &

23  Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986) (plurality decision) (concluding that the

24  First Amendment rights of privately owned utility company were violated by an order from the

25  California Public Utilities Commission that required the company to include in its billing envelopes

26  speech of a third party with which the company disagreed); *Miami Herald Pub'g Co. v. Tornillo*,

27  418 U.S. 241, 243, 256, 258 (1974) (holding that "a state statute granting a political candidate a right

28  to equal space to reply to criticism and attacks on his record by a newspaper violates the guarantees

of a free press"; noting that the "statute exacts a penalty on the basis of the content of a newspaper" and also "intru[des] into the function of editors"). But, as stated above, these cases involved noncommercial speech, not commercial speech as here. *See*, *e.g.*, *PG&E*, 475 U.S. at 9 (noting that company's newsletter, which was included in the billing envelopes, covered a wide range of topics, "from energy-saving tips to stories about wildlife conservation, and from billing information to recipes," and thus "extend[ed] well beyond speech that [simply] proposes a business transaction"; citing *Zauderer* and *Central Hudson*). This is a significant distinction, particularly because First Amendment analysis in the commercial speech context assumes that more speech, so long as it is not misleading, enhances the marketplace (as well as the marketplace of ideas). *See Zauderer*, 471 U.S. at 651 (noting that "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides"). That is why the Court in *Zauderer* afforded particular deference to the government's decision to compel disclosures (in contrast to laws restricting speech). Here, the ordinance expressly affords retailers the right to add comments to the notice, and there is no showing that adding comments would be a significant burden on retailers.

Moreover, *Miami Herald* can be distinguished on an additional ground. More specifically, in *Miami Herald*, the primary concern was the chilling of speech by the entity subject to the disclosure requirement as a consequence of the challenged law. *See Miami Herald*, 418 U.S. at 257 (noting that, "[f]aced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy"). In contrast to *Miami Herald*, here, there is no real claim that the retailer's speech is chilled by the Berkeley ordinance; in fact, as indicated above, the ordinance expressly allows retailers to add "other information" at the retailer's discretion. Berkeley Mun. Code § 9.96.030(B).

While CTIA has argued that being forced to engage in counter-speech (*i.e.*, speech in response to the City notice) is, in and of itself, a First Amendment burden (as indicated in *PG&E*), that is not necessarily true where commercial speech is at issue. As the City points out, *Zauderer* spoke only in terms of chilling speech as a First Amendment burden in the context of commercial

United States District Court

For the Northern District of California

speech. *See Zauderer*, 471 U.S. at 651 (stating that "unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech"); *see also Am. Meat*, 760 F.3d at 27 (acknowledging the same; also stating that "*Zauderer* cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech"). This makes sense as the value of commercial speech comes from the information it provides – *i.e.*, more speech, not less. That being said, even if CTIA were correct that the right not to speak had some application to commercial speech, he need for counter-speech – at least in the circumstances presented herein – are minimal, as discussed *infra*.

Thus, there is good reason to conclude that the First Amendment test applicable in this case should be even more deferential to the government than the test in *Zauderer*. More particularly, the rational basis test applicable to compelled display of government speech need not be cabined by the *Zauderer*'s requirement that the compelled disclosure be "purely factual and uncontroversial." *Zauderer*, 471 U.S. at 651. In *Zauderer*, it made sense that the Supreme Court imposed the baseline requirement that the compelled speech be purely factual and uncontroversial because, where speech is in fact purely factual and uncontroversial, then the speaker's interest in countering such information is minimal. The *Zauderer* test thus insures any First Amendment interest against compelled speech is minimal. But where there is attribution of the compelled speech to someone other than the speaker – in particular, the government – the *Zauderer* factual-and-uncontroversial requirement is not needed to minimize the intrusion upon the plaintiff's First Amendment interest.

Instead, under more general rational basis principles, the challenged law must be reasonably related to a legitimate governmental interest. In particular, if the law furthers a legitimate government interest in requiring disclosure of governmental speech, it should be upheld. This is not to say that First Amendment interest in this context is nonexistent. Even though no speech is compelled out of the mouth of retailers and there is no claim that their speech is chilled, the fact that they may feel compelled to respond to Berkeley's notice arguably implicates to some extent the First Amendment. *See PG&E*, 471 U.S. at 15 (in case involving noncommercial speech, noting that the company "may be forced either to appear to agree with [third party's] views [included in the company's billing envelope] or to respond"). Because there is an arguable First Amendment

United States District Court

For the Northern District of California

interest, it may reasonably be contended that the more exacting forum of rational basis review (which some commentators have labeled "rational basis with bite," *see Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014) (citing law review articles addressing "rational basis with bite," "rational basis with teeth," or "rational basis plus"); *Powers v. Harris*, 379 F.3d 1208, 1224-25 n.21 (10th Cir. 2004) (same)), which requires an examination of actual state interests and whether the challenged law actually furthers that interest rather than the traditional rational basis review which permits a law to be upheld if rationally related to any conceivable interest. *Compare Romer v. Evans*, 517 U.S. 620 (1996) (holding that a Colorado constitutional amendment that prohibited all legislative, executive, or judicial action designed to protect homosexual persons from discrimination "lacks a rational relationship to legitimate state interests"); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking down under rational basis city council decision preventing group home for mentally disabled); *Plyler v. Doe*, 457 U.S. 202 (1982) (invalidating under rational basis portion of statute excluding immigrant children from public schools), *with Williamson v. Lee Optical*, 348 U.S. 483 (1955) (applying traditional rational relationship test in evaluating constitutionality of legislation). *See also Wal-Mart Stores, Inc. v. City of Turlock*, 483 F. Supp. 2d 1023, 1038, n 6 (E.D. Cal. 2007) (recognizing *Cleburne/Romer* approach commonly referred as "rational basis with bite").

For purposes of this opinion, the Court shall evaluate the Berkeley ordinance under the  the more rigorous rational basis review as well as the *Zauderer* test.  As discussed below, both of these standards have been met in the instant case.

    b.  Application of Rational Basis Test

In identifying the government interest supporting the notice required by the ordinance, Berkeley argues that it simply seeks to insure fuller consumer awareness of the FCC's SAR testing procedures and directive to manufacturers to disclose the spacing requirements used to insured SAR does not exceed stated levels.  Promoting consumer awareness of the government's testing procedures and guidelines obviously is a legitimate governmental interest. *Compare Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2672 (2011) (stating that "the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to

United States District Court
For the Northern District of California

1   greater governmental regulation than noncommercial speech'"), *with Int'l Dairy Foods Ass'n v.*

2   *Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996) (stating that "consumer curiosity alone is not a strong

3   enough state interest to sustain the compulsion of even an accurate, factual statement in a

4   commercial context"). And the mandated notice (apart from the warning about risk to children)

5   furthers and is reasonably related that governmental interest. As noted in the preemption analysis

6   above, nothing in the required Berkeley notice contradicts what the FCC has said and done, and the

7   upshot of the notice (advising consumers to consult the cell phone instructions or user manual on

8   how to safely use the phone) tracks what the FCC requires.

9           CTIA argues that framing the governmental interest as insuring consumer awareness begs the

10  question and misses the real mark. It contends that the real asserted interest here is purported public

11  safety and that the mandated notice is misleading because it suggests a substantial risk to health that

12  does not in fact exist. To the extent the true ultimate governmental interest for the ordinance is

13  public health and safety (since the purpose of referring consumers to the user manual is so that

14  consumers will know how to "use your phone safely"), such an interest undoubtedly is a legitimate

15  public interest. *See, e.g.*, *Hispanic Taco Vendors v. Pasco*, 994 F.2d 676, 680 (9th Cir. 1993)

16  (finding ordinance that regulated itinerant vending and imposed licensing fees supported by

17  legitimate governmental interests in, *e.g.*, health and safety). The question then is whether the

18  ordinance is reasonably related to such interest. Notwithstanding CTIA's argument to the contrary,

19  the Court concludes that it is.

20          While there is scientific uncertainty as to the relationship between SAR levels and the risk

21  of, *e.g.*, cancer, and there is scientific debate about whether nonthermal as well as thermal effects of

22  RF radiation may pose health risks, there is a reasonable scientific basis to believe that RF radiation

23  at some levels can and do present health risks. The SAR limits were established by the FCC in the

24  interests of safety in view of the potential risks of RF radiation exposure. Although current

25  maximum SAR levels set by the FCC were designed to provide a comfortable margin, at least with

26  respect to risks posed by the thermal effect of RF radiation, the FCC has in fact established specific

27  limits to SAR exposure and uses those limits in the testing and approval of cell phones for sale to the

28  public. And testing procedures governed by FCC rules incorporating those SAR limits assume a

1   minimal amount of spacing of the cell phone from the body, without which SAR levels may exceed

2   the established guidelines.   *See CTIA*, 827 F. Supp. 2d at 1062 (noting that "the FCC has implicitly

3   recognized that excessive RF radiation is potentially dangerous[;] [i]t did so when it 'balanced' that

4   risk against the need for a practical nationwide cell phone system," and "[t]he FCC has never said

5   that RF radiation poses no danger at all, only that RF radiation can be set at acceptable levels"),

6   *rev'd on other grounds*, 494 Fed. Appx. 752 (9th Cir. 2012).  Unless the Court were to find that the

7   FCC guidelines themselves are scientifically baseless and hence irrational – which no one has asked

8   this Court to do – the mandated notice here, being predicated on the FCC's guidelines, is reasonably

9   related to a legitimate governmental interest.[10]  In short, so long as the challenged law requiring

10  display and disclosure of governmental message in the context of commercial speech is supported by

11  some reasonable scientific basis, it is likely to pass the rational basis test applicable under the First

12  Amendment.

13           c.       Application of *Zauderer* Test

14       Even if the ordinance is subject to the more specific *Zauderer* test,[11] *see CTIA*, 494 Fed.

15  Appx. at 752 (addressing San Francisco ordinance also imposing a notice requirement on cell phone

16  retailers and applying *Zauderer*), the Berkeley ordinance would likely be upheld.  Under *Zauderer*,

17  the predicate requirement is that the compelled speech must be factual and uncontroversial.  But

18  how a court should determine whether such speech is factual and uncontroversial is not clear.

---

[10] The mere fact of scientific uncertainty and/or inexactitude does not render the
government's interest in issuing safety warnings to the public irrational or unreasonable.  Such
uncertainty and inexactitude inheres in the assessment of any risk.  To require the government to
prove a particular quantum of danger before issuing safety warnings would jeopardize an
immeasurable number of laws, regulations, and directives.  *See Nat'l Elec.*, 272 F.3d at 116 (taking
note of "the potentially wide-ranging implications of NEMA's First Amendment complaint," as
"[i]nnumerable federal and state regulatory programs require the disclosure of product and other
commercial information," ranging from securities disclosures and disclosures in prescription drug
advertisements to tobacco and nutritional labeling and California's Proposition 65).

[11] At the hearing, the Court discussed with the parties who had the burden of proof with
respect to the *Zauderer* test.  Where a commercial speech restriction is at issue, the party seeking to
uphold the restriction bears the burden of proof in justifying it.  *See Thompson v. W. States Med.
Ctr.*, 535 U.S. 357, 373 (2002). But here, the Court is not dealing with a commercial speech
restriction but rather a compelled disclosure.  For purposes of this opinion, the Court need not
resolve the issue of who bears the burden of proof.

United States District Court

For the Northern District of California

For example, a good case can be made that a court should tread carefully before deeming compelled speech controversial for *Zauderer* purposes.  As the Sixth Circuit has noted, facts alone "can disconcert, displease, provoke an emotional response, spark controversy, and even overwhelm reason"; thus, the court rejected "the underlying premise that a disclosure that provokes a visceral response must fall outside *Zauderer*'s ambit." *Disc. Tobacco*, 674 F.3d at 569 (adding that "whether a disclosure is scrutinized under *Zauderer* turns on whether the disclosure conveys factual information or an opinion, not on whether the disclosure emotionally affects its audience or incites controversy").  The Sixth Circuit also made the point that the use of the word "uncontroversial" appeared only once in *Zauderer* and that elsewhere the *Zauderer* plurality simply "refer[red] to a commercial speaker disclosing 'factual information' and 'accurate information.'" *Id.* at 559 n.8 (citing *Zauderer*, 471 U.S. at 651 & n.14).  Furthermore, in *Milavetz*, the Supreme Court did not repeat the use of the term and instead "use[d] the language *required factual information* and *only an accurate statement* when describing the characteristics of a disclosure that is scrutinized for a rational basis." *Id.* (emphasis in original; citing *Milavetz*, 1130 S. Ct. at 1339-40).  Accordingly, this Court agrees with the Sixth Circuit that the term "uncontroversial" should generally be equated with the term "accurate."

As for the requirement that the compelled speech be factual (or accurate), in any given case, it is easy to conceive of an argument that, even if the compelled speech is technically accurate, (1) it is still suggestive of an opinion or (2) it is misleading.  For example, on the former, one could contend that the mere fact that the government is compelling the speech in the first place indicates that it is the government's opinion that there is a point of concern for the public.  One could also argue that the compelled speech is misleading because it omits more specific information.

But *Zauderer* cannot be read to establish a "factual and uncontroversial" requirement that can be so easily manipulated that it would effectively bar any compelled disclosure by the government.  This is particularly true where public health and safety are at issue, as in the instant case.  Any time there is an element of risk to public health and safety, practically any speech on the matter could be deemed misleading unless there were a disclosure of everything on each side of the scientific debate – an impossible task.  One could easily imagine that an overly rigorous "factual and

uncontroversial" test would render even the Surgeon General's textual warnings found on cigarette packages a violation of the First Amendment.  *See* 15 U.S.C. § 1333(a) (listing warnings, including "Tobacco smoke can harm your children," "Tobacco smoke causes fatal lung disease in nonsmokers," and "Quitting smoking now greatly reduces serious risks to your health"); *see also Nat'l Elec.*, 272 F.3d at 116 (taking note of "the potentially wide-ranging implications of NEMA's First Amendment complaint," as "[i]nnumerable federal and state regulatory programs require the disclosure of product and other commercial information," ranging from securities disclosures and disclosures in prescription drug advertisements to tobacco and nutritional labeling and California's Proposition 65).

Turning to the City ordinance at issue here, the Court finds that the factual-and-uncontroversial predicate requirement has likely been met, particularly as the Court has now found the sentence regarding children preempted.  With that sentence excised, the ordinance provides in relevant part as follows:

> The City of Berkeley requires that you be provided the following notice:
>
> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines.  If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation.  ~~This potential risk is greater for children.~~  Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Mun. Code § 9.96.030(A).

The notice contains accurate and uncontroversial information – *i.e.*, that the FCC has put limits on RF energy emission with respect to cell phones and that wearing a cell phone against the body (without any spacer) may lead the wearer to exceed the limits.  This is consistent with the FCC's directive to cell phone manufacturers to advise consumers about minimum spacing to be maintained between the body and a cell phone, and although there is in fact a good safety margin (at least for thermal effects of RF radiation), nothing indicates that the FCC objects to informing consumers about spacing the phone away from the body.

United States District Court

For the Northern District of California

CTIA takes issue with the use of the words "safety" and "radiation," but the use of both words is accurate and uncontroversial.  Regarding "safety," the FCC clearly imposed limits because of safety concerns.  The limits that the agency ultimately chose reflected a balancing of the risk to public health and safety against the need for a practical nationwide cell phone system, but it cannot be denied that safety was a part of that calculus.  *See CTIA*, 827 F. Supp. 2d at 1062 (in the San Francisco ordinance case, noting that, "[e]ven the FCC has implicitly recognized that excessive RF radiation is potentially dangerous" because it "'balanced' that risk against the need for a practical nationwide cell phone system[;] [t]he FCC has never said that RF radiation poses no danger at all, only that RF radiation can be set at acceptable levels"), *rev'd on other grounds*, 494 Fed. Appx. 752 (9th Cir. 2012).  As for the term "radiation," RF energy is undisputedly a form of radiation.  *See* 2013 FCC Reassessment, 28 F.C.C. Rcd. at 3585 (stating that RF energy is "'a form of electromagnetic radiation that is emitted by cell phones'").  That the City notice does not make the finer distinction that RF energy is non-ionizing radiation rather than ionizing radiation is immaterial as that distinction would likely have little meaning to the public.  As for CTIA's contention that there may be a negative association with nuclear radiation (ionizing radiation), that seems unlikely, particularly in this day and age when radiation comes from various sources in everyday life, including, *e.g.*, radios, televisions, and microwave ovens.  No one seriously contends that consumers are likely to believe cell phones emit nuclear radiation or something akin to that.

Finally, CTIA protests that the notice is misleading because, even if a cell phone is worn against the body, it is unlikely that the federal guidelines for SAR will be exceeded.  *See* Mot. at 15-16 (arguing that "this may be possible only 'with the device transmitting continuously and at maximum power [such as might happen during a call with a handset and the phone in the user's pocket at the fringe of a reception area],' and that 'using a device against the body without a spacer will generally result in an actual SAR below the maximum SAR testing'").  But as indicated above, the Court is wary about any contention that a compelled disclosure – particularly where the message in the disclosure is attributed to the government – is misleading simply because the disclosure does not describe with precision the magnitude of the risk;  the point remains that the FCC established certain limits regarding SAR, limits which have not been challenged as illegal.  The mandated

United States District Court

For the Northern District of California

1   disclosure truthfully states that federal guidelines *may* be exceeded where spacing is not observed,

2   just as the FDA accurately warns that "Tobacco smoke *can* harm your children."  More importantly,

3   the sentence criticized by CTIA is tempered by the following sentence: "Refer to the instructions in

4   your phone or user manual for information about how to use your phone safely."  That is the upshot

5   of the disclosure – users are advised to consult the manual wherein the FCC itself mandates

6   disclosures about maintaining spacing.   *See* FCC KDB, No. 447498, *General RF Exposure*

7   *Guidelines*, § 4.2.2(4).  This is, in essence, factual in nature for purposes of *Zauderer*.

8          For the foregoing reasons, the Court finds that the City notice, with the sentence regarding

9   children excised from the text on preemption grounds, *likely* meets the *Zauderer* factual-and-

10   uncontroversial predicate requirement.

11                      d.      Government Interest

12          As indicated above, under the *Zauderer* test, if the disclosure requirement is factual and

13   uncontroversial, then it does not violate the First Amendment so long as it is reasonably related to

14   the governmental interest.  This test has been met, for largely the reasons articulated above in

15   discussing the traditional rational review test.  Given the fact that the spacing requirements

16   employed by the FCC were established to insure maximum specific levels of SAR are not exceeded

17   and the FCC acknowledges there is a connection between SAR and safety, even if the precise

18   parameters and limits are matters of scientific debate, the ordinance appears "reasonably related" to

19   a legitimate government interest.

20                      e.      Undue Burden

21          Finally, CTIA contends that the disclosure requirement here cannot be upheld because it still

22   violates the First Amendment as it is unduly burdensome.  But for this argument to succeed, CTIA

23   cannot show just any kind of burden; rather, it must show a *First Amendment* burden, *i.e.*, a burden

24   on speech.

25          CTIA has not made any argument that the City ordinance would chill its or its members'

26   speech; rather, it contends that there is a burden on its or its members' speech because they would

27   rather remain silent but, with the compelled disclosure, are now being forced to engage in counter-

28   speech.  As noted above, the City asserts that, where commercial speech is at issue, the only

33

United States District Court

For the Northern District of California

1    cognizable burden is chilling of speech, not the burden of being compelled to speak.  While this

2    position has some grounding in *Zauderer*, which identified only the chilling of commercial speech

3    as a burden, *see Zauderer*, 471 U.S. at 651, the Court need not definitively resolve whether

4    compelled commercial counter-speech can be an undue burden because, even accepting that it can,[12]

5    the burden here to CTIA or its members is nothing more than minimal.  The ordinance gives retailers

6    the discretion to add their own speech to Berkeley's message.  And because the City's required

7    notice contains factual and uncontroversial information, the need for "corrective" counter-speech is

8    minimal.

9                        f.      Summary on First Amendment Claim

10          On the first preliminary injunction factor, the Court cannot say that CTIA has established a

11   strong likelihood of success on the merits with respect to its First Amendment claim.  Nor has it

12   raised serious question on the merits.  While the sentence in the Berkeley ordinance regarding the

13   potential risk to children is likely preempted, the remainder of the City notice is factual and

14   uncontroversial and is reasonably related to the City's interest in public health and safety.

15   Moreover, the disclosure requirement does not impose an undue burden on CTIA or its members'

16   First Amendment rights.

17   C.     Likelihood of Irreparable Harm and Balancing of Equities

18          CTIA's argument on both the likelihood of irreparable harm and the balancing of equities

19   largely depends on there being preemption or a First Amendment violation in the first place.[13]  *See*

20   Mot. at 21 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (stating that "the loss of First

21   Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

22   injury")).  But, as discussed above, the likelihood of success on both the preemption and First

23   Amendment claims is weak once the sentence on children is excised from the text of the City notice.

24          [12] As noted above, there is an arguable First Amendment interest in not being compelled to
25   respond to speech of a third party, though the only precedent for such a proposition is in the context
     of noncommercial speech.

26          [13] CTIA also argues irreparable harm to its members' customer goodwill and business
27   reputations and from the threatened enforcement of a preempted ordinance, *see* Mot. at 22, but
     ultimately these arguments are predicated on the First Amendment argument.  In any event, CTIA
28   has made no satisfactory showing that its business interests are jeopardized by the Berkeley notice if
     the warning about children is excised.

1  Accordingly, the second and third preliminary injunction factors, like the first, do not weigh in

2  CTIA's favor.

3  D.    Public Interest

4        Finally, the fourth preliminary injunction factor does not weigh in CTIA's favor – again

5  because of the weakness of its claims on the merits.  CTIA contends that the public interest does not

6  weigh in favor of the City because "accurate and balanced disclosures regarding RF energy are

7  *already* available," Mot. at 23 (emphasis in original), but the City has a fair point that, in spite of the

8  availability, there is evidence that the public does not know about those disclosures.  *See, e.g.*,

9  Jensen Decl., Ex. A (survey) (reflecting that a majority of persons surveyed were, *e.g.*, not "aware

10  that the government's radiation tests to assure the safety of cell phones assume that a cell phone

11  would not be carried against your body, but would instead be held at least 1- to 15 millimeters from

12  your body").  Furthermore, as suggested above, there is a public interest in public safety as well as

13  assuring fuller consumer awareness, particularly where the federal government through the FCC has

14  endorsed consumer awareness by requiring that cell phone manufacturers provide information about

15  spacing to consumers.

16                              **III.    CONCLUSION**

17        For the foregoing reasons, the Court grants in part and denies in part CTIA's motion for a

18  preliminary injunction.  The motion is granted to the extent the Court finds a likely successful

19  preemption claim with respect to the sentence in the City notice regarding children's safety.  The

20  motion is denied to the extent the Court finds that a First Amendment claim and preemption claim

21  are not likely to succeed on the remainder of the City notice language.

22        The Berkeley ordinance is enjoined, unless and until the sentence in the City notice

23  regarding children safety is excised from the notice.

24        This order disposes of Docket Nos. 4 and 36.

25        IT IS SO ORDERED.

26  Dated:  September 21, 2015

27                              _____
                               EDWARD M. CHEN
                               United States District Judge

28

35