UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CTIA - THE WIRELESS ASSOCIATION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF BERKELEY, et al.,<br><br>　　　　　Defendants. | Case No. 15-cv-02529-EMC<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION TO DISSOLVE<br>PRELIMINARY INJUNCTION**<br><br>Docket No. 59 |

　　　　Plaintiff CTIA – The Wireless Association has filed suit against Defendants the City of Berkeley and its City Manager (collectively, "City" or "Berkeley"), asserting that a Berkeley ordinance is preempted by federal law and further violates the First Amendment. Previously, CTIA moved for a preliminary injunction and, in September 2015, the Court granted CTIA relief, enjoining the ordinance "unless and until the sentence in the City notice regarding children safety is excised from the notice." Docket No. 53 (Order at 35).

　　　　Subsequently, the City amended the ordinance to excise the language regarding children's safety. Berkeley now moves for dissolution of the preliminary injunction. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Berkeley's motion. The Court also **DENIES** CTIA's request for a stay of dissolution pending appeal.

## I.　FACTUAL & PROCEDURAL BACKGROUND

　　　　In granting in part and denying in part CTIA's motion for preliminary injunction, the Court found that Berkeley's required notice warning about risk to children was preempted, but that the remainder of the required notice was not preempted because it was consistent with the FFC's statements and testing procedures. The Court noted the "disclosure, for the most part, simply

refers consumers to the fact that there are FCC standards on RF energy exposure – standards which assume a minimum spacing of the cell phone away from the body – and advises consumers to refer to their manuals regarding maintenance of such spacing." Docket No. 53 (Order at 14). The notice was consistent with the FCC's requirement that cell phone manufacturers disclose to consumers information and advice about spacing between the body and a cell phone. *See* Docket No. 53 (Order at 14).

The Court also concluded the notice (after omission of the statement regarding children's safety) did not violate the First Amendment, and noted the distinction drawn by cases between *commercial* and *noncommerical* speech, between *restrictions* on and compelled *disclosures* of commercial speech, and between compelling speech *by the speaker* and requiring disclosure of the *government's* speech. It found the City ordinance in this case was subject to rational basis review, under both a general rational basis test (more particularly rational basis "with a bite") and the particularized test under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), and *Milavetz Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010). The Court found that *Zauderer* applied a species of the rational basis test and that *Zauderer* was not limited to disclosures designed to prevent consumer deception, but extended to matters of public health and safety. *See* Docket No. 53 (Order at 21-23). In applying *Zauderer*, the Court adopted the Sixth Circuit's analysis of the phrase "'purely factual and uncontroversial'" as used in *Zauderer*, Docket No. 53 (Order at 18-19, 29-33) (*quoting Zauderer*, 471 U.S. at 651), and concluded that the compelled disclosure must only be factual and accurate, not undisputed. *See* Docket No. 53 (Order at 30). The Court found the information mandated by the ordinance met the *Zauderer* test because the information that "the FCC has put limits on RF energy emission with respect to cell phones and that wearing a cell phone against the body (without any spacer) may lead the wearer to exceed the limits," Docket No. 53 (Order at 31), was consistent with the FCC's directive. It was factual and accurate because "the FCC established certain limits regarding SAR limits which have not been challenged as illegal. The mandated disclosure truthfully states that federal guidelines may be exceeded where spacing is not observed," Docket No. 53 (Order at 32-33), and accurately advises users "to consult the manual wherein the FCC itself mandates

1  disclosures about maintaining spacing." Docket No. 53 (Order at 33). The Court found that any
2  burden on cell phone retailers was minimal because there likely was no First Amendment right
3  violated, and retailers were authorized by the ordinance to add their own language clarifying or
4  countering the City's message on the required notice. *See* Docket No. 53 (Order at 33-34). The
5  Court thus issued a preliminary injunction against the portion of the ordinance regarding
6  children's safety, but denied CTIA's motion as to the remainder of the notice language.

Thereafter, the City amended the ordinance to excise the language regarding children's safety. Berkeley now moves for dissolution of the preliminary injunction.

## II. DISCUSSION

Given the Court's prior ruling, the fact that the ordinance has now been amended should lead to dissolution of the preliminary injunction. However, CTIA has taken this opportunity to argue in its opposition brief that the Court's analysis in its preliminary injunction order was erroneous. While CTIA has not technically asked the Court to reconsider its prior order (nor would it since the Court ultimately issued CTIA's requested preliminary injunction), CTIA has asked the Court to stay dissolution of the preliminary injunction pending appeal because of the purported errors. Accordingly, evaluating CTIA's request for a stay essentially requires this Court to retread ground already covered in its prior order.

A.  Legal Standard

In *Hilton v. Braunskill*, 481 U.S. 770 (1987), the Supreme Court held that, in evaluating whether there should be a stay of an order pending appeal, a court should consider the following:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 776. "The 'irreparably-injured' and 'likelihood-of-success' factors are considered on 'a sliding scale . . . .'" *Stormans Inc. v. Selecky*, 526 F.3d 406, 412 (9th Cir. 2008) (discussing applications for a stay pending appeal). That is, relief may be appropriate where the likelihood of success is such that serious questions going to the merits are raised and the balance of hardships

3

1    tips sharply in the stay applicant's favor.  *Cf. Alliance For The Wild Rockies v. Cottrell*, 632 F.3d
2    1127, 1131 (9th Cir. 2011) (holding that the serious questions approach survives in the context of
3    deciding whether a preliminary injunction should issue).

B. <u>Likelihood of Success on the Merits or Serious Questions Going to the Merits</u>

In its opposition, CTIA largely makes arguments that it previously made as part of the briefing on the motion for preliminary injunction.  The Court shall not re-address those arguments but instead will focus on the arguments made by CTIA that are different from, or least slightly different from, those made as part of the briefing on the preliminary injunction motion.  CTIA's new arguments concern the First Amendment issue rather than the preemption issue.

1. *Retail Digital*

Post-briefing, CTIA provided the Court with a recent decision issued by the Ninth Circuit, *Retail Digital Network, LLC v. Appelsmith*, No. 13-56069 (9th Cir. Jan. 7, 2016).  *See* Docket No. 67 (statement of recent decision).  CTIA asserts that *Retail Digital* supports its position that a more demanding standard of review should apply in evaluating the City's ordinance for constitutionality.

In *Retail Digital*, the Ninth Circuit held that *Central Hudson*'s immediate scrutiny test should *not* be applied when there are content- or speaker-based restrictions on nonmisleading commercial speech regarding lawful goods or services; rather, under the Supreme Court's decision in *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011), heightened judicial scrutiny should apply.  *See Retail Digital*, slip. op. at 4, 16.  The Ninth Circuit implicitly acknowledged that *Sorrell* did not precisely define what heightened judicial scrutiny meant but indicated that it was something less than strict scrutiny, *see* slip op. at 16 n.3, but more than intermediate scrutiny.  In essence, the Ninth Circuit suggested that a more exacting form of *Central Hudson* review would constitute heightened judicial scrutiny within the meaning of *Sorrell*.  *See also* slip. op. at 16-18 (stating that "[h]eightened judicial scrutiny may be applied using the familiar framework of the four-factor *Central Hudson* test").

While *Retail Digital* is undoubtedly a significant case, it does not address the critical issue here which is what impact *Sorrell* should have on the *Zauderer* line of cases.  *Retail Digital*

4

involved outright *restriction* on commercial speech based on content, and the court described *Sorrell* as involving "content- or speaker-based restrictions" on non-misleading commercial speech. Slip op. at 16. The court also described Eighth, Second, and Third Circuit opinions as involving "restrictions" on speech as well. *See* slip. op. at pp. 18-19. Quoting *Sorrell*, the *Retail Digital* court emphasized that heightened security was designed to check the raw paternalism of laws which "'keep people in the dark,'" slip. op. at 18 (quoting *Sorrell*) and which allowed the government to "silence truthful speech." Slip. op. at 22.

As this Court indicated in its prior order, *Zauderer* and other cases have noted that laws requiring *disclosure* of accurate information does not silence truthful speech or keep people in the dark; disclosures are designed precisely to accomplish the opposite. Thus, nothing in *Retail Digital*'s holding or reasoning suggests *Sorrell* did away with the Supreme Court's distinction (as articulated in *Zauderer* and embraced in *Milavetz*) between restrictions on commercial speech and compelled disclosure of such speech. Unless and until *Zauderer* and *Milavetz* are overruled or narrowed by the Supreme Court or Ninth Circuit, this Court adheres to its earlier analysis.

2. Rational Review

CTIA argues next that the Court erred in holding that "even the more forgiving requirements of *Zauderer* do not apply because the compelled commercial speech in this case is attributed to the City of Berkeley." Opp'n at 7. In other words, according to CTIA, the Court improperly applied rational review (with some bite) rather than *Zauderer*. But CTIA has not cited any authority involving the combination of (1) commercial speech, (2) compelled disclosure (as opposed to restriction or suppression), and (3) speech clearly and expressly attributed to the government to support its position.

The CTIA's reliance upon *United States v. United Foods, Inc.*, 533 U.S. 405 (2001), is misplaced. There, the Supreme Court was called upon to evaluate whether a mushroom producer was fairly subject to a mandatory assessment under federal law (the Mushroom Act), where the funds were used to sponsor an advertising message with which it did not agree. The message was that "mushrooms are worth consuming whether or not they are branded," and the mushroom producer disagreed with this message because it wanted "to convey the message that its brand of

mushrooms is superior to those grown by other producers." *Id.* at 411. The Supreme Court held that there was a First Amendment violation. But it is not clear from the opinion whether the advertising message was clearly attributed to the federal government in the first place. Moreover, the Supreme Court did not evaluate the First Amendment issue under *Zauderer*. It simply stated that its conclusion was not inconsistent with *Zauderer*. *See id.* at 416 ("There is no suggestion in the case now before us that the mandatory assessments imposed to require one group of private persons to pay for speech by others are somehow necessary to make voluntary advertisements nonmisleading for consumers [as in *Zauderer*]."). Notably, the Supreme Court's analysis was guided by a different line of cases involving the compelled subsidization of speech with which the speaker/contributor disagreed. *See id.* at 413 ("conclud[ing] . . . that the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity") (citing, *inter alia*, *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234 (1977) (agreeing that union members "may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative")).

In any event, the Court need not dwell on this argument because, in its prior order, the Court did not take a firm position as to whether general rational basis review should in fact apply – *i.e.*, rational review *without* the specific requirement in *Zauderer* that the compelled speech be factual and uncontroversial. While the Court did note that there was a "persuasive argument" in favor of such general rational review, Docket No. 53 (Order at 23, 26), ultimately, it applied both general rational review and *Zauderer*.

3. Voluntary Advertising

In its papers, CTIA presents the new argument (not articulated in its briefing on the preliminary injunction) that *Zauderer* is applicable only when a party has put out "'voluntary advertisements'" and, here, "the Amended Ordinance does not 'involve voluntary commercial advertising.'" Opp'n at 6. In support of this argument, CTIA relies primarily on two cases: *United Foods, Inc.*, 533 U.S. at 405, and *National Association of Manufacturers v. SEC*, 800 F.3d

6

518 (D.C. Cir. 2015) (hereinafter "*NAM*").

*United Foods*, however, provides little support for CTIA's position. *United Foods* simply states that *Zauderer* was

> a case involving attempts by a State to prohibit certain voluntary advertising by licensed attorneys. The Court invalidated the restrictions in substantial part but did permit a rule requiring that attorneys who advertised by their own choice and who referred to contingent fees should disclose that clients might be liable for costs.

*United Foods*, 533 U.S. at 416. But the rationale of *Zauderer*'s holding was not conditioned on the fact that the plaintiff therein had engaged in voluntary advertising. Rather, it was based on the reasoning that the plaintiff in *Zauderer* had a minimal constitutional interest in not disclosing purely factual and uncontroversial information. *See, e.g.*, *Zauderer*, 471 U.S. at 651 (stating that "the interests at stake in this case are not of the same order as those discussed in [other cases;] Ohio has not attempted to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein'"). United *Foods* did not purport to change the core rational of *Zauderer*; as noted above, its analysis was focused on *Abood*, not *Zauderer* and *Milavetz*.

CTIA's citation to *NAM* does provide more support for its position. There, the D.C. Circuit, in a divided opinion, considered certain SEC-required disclosures regarding "conflict minerals" (*i.e.*, certain minerals such as gold, tantalum, tin, and tungsten which can be used by armed groups, *e.g.*, in the Congo, to finance their war operations). *See NAM*, 800 F.3d at 522 (noting that "[c]onflict mineral disclosures are to be made on each reporting company's website and in its reports to the SEC"). The specific issue for the court was "whether *Zauderer* . . . reaches compelled disclosures that are unconnected to advertising or product labeling at the point of sale." *NAM*, 800 F.3d at 521. The panel majority in *NAM* held that *Zauderer* does not:

> [T]he Supreme Court's opinion in *Zauderer* is confined to advertising, emphatically, and, one may infer, intentionally. In a lengthy opinion, the Court devoted only four pages to the issue of compelled disclosures. Yet in those few pages the Court explicitly identified advertising as the reach of its holding no less than thirteen times. Quotations in the preceding footnote prove that the Court

7

> was not holding that any time a government forces a commercial entity to state a message of the government's devising, that entity's First Amendment interest is minimal. Instead, the *Zauderer* Court . . . held that the advertiser's "constitutionally protected interest in *not* providing any particular factual information *in his advertising* is minimal."

*Id.* at 522 (emphasis in original). But CTIA has read too much into the statements from *NAM* above. *NAM* understandably focused on advertising because of the specific issue presented before it – *i.e.*, whether *Zauderer* should apply to SEC disclosures, a context entirely different from the typical case which involves speech directed at consumers which lies at the core of the definition of commercial speech – proposal of a commercial transaction. *See Retail Digital*, slip op. at 12. Although the Court in *Zauderer* may have referred repeatedly to advertising (as noted by the court in *NAM*), theses references were contextual and not the *sine qua non* of *Zauderer*'s reasoning. *Zauderer* did not base its holding on any notion of estoppel or equity, but on the lack of a significant constitutional interest in not disclosing factual and noncontroversial information to consumers.

In any event, the *NAM* majority opinion did not restrict *Zauderer*'s reach to advertising only. Indeed, as indicated above, the court noted that *Zauderer* required a connection to either advertising *or* a point-of-sale disclosure. *See also id.* (stating that the SEC "recognized that this case does not deal with advertising *or with point of sale disclosures*") (emphasis added). In restricting *Zauderer*'s reach, the majority in *NAM* accepted the D.C. Circuit's *en banc* decision in *America Meat Institute v. U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014) (en banc), which applied *Zauderer* to a law requiring disclosure of country-of-origin information about meat products at the time of sale, even though there had been no voluntary advertising to the contrary. *See id.* at 20.

In the instant case, the ordinance requires a point-of-sale disclosure: "The notice required by this Section shall either be provided to each customer who buys or leases a Cell phone or shall be prominently displayed at any point of sale where Cell phones are purchased or leased." Berkeley Mun. Code § 9.96.030(B). Like the disclosure in *AMI*, and unlike the disclosure in *NAM*, the notice in the case at bar occurs at the time of sale and is targeted directly at the consumer who has a direct interest in the matter. Accordingly, even under *NAM*, *Zauderer* is

applicable to the instant case.

Finally, no other circuit court has limited *Zauderer*'s holding to voluntary advertising. *See, e.g.*, *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 518 (6th Cir. 2012) (addressing, *inter alia*, statute's requirement that "tobacco manufacturers reserve significant packaging space for textual health warnings"); *Nat'l Elec. Mfrs. v. Sorrell*, 272 F.3d 104, 107 (2d Cir. 2001) (addressing statute that required "manufacturers of some mercury-containing products to label their products and packaging to inform consumers that the products contain mercury and, on disposal, should be recycled or disposed of as hazardous waste"). *NAM* does not state the prevailing view.

    4.    *Zauderer*'s "Uncontroversial" Requirement

According to CTIA, even if *Zauderer* is applicable, the Court has not properly interpreted *Zauderer*'s "factual and uncontroversial" requirement. More specifically, CTIA contends that the Court improperly construed "uncontroversial" to mean accurate. According to CTIA, this position, although endorsed by the Sixth Circuit, is a minority position.

CTIA's argument is problematic for several reasons. First, although CTIA claims that the majority of cases go against the Sixth Circuit, it has cited only one case in support of its position – *i.e.*, *NAM*, where the majority opinion stated that "'uncontroversial,' as a legal test, must mean something different than 'purely factual.'" *NAM*, 800 F.3d at 528. As the sole circuit opinion so holding, *NAM* hardly represents the majority view on this issue.

Second, even in *NAM*, the court did not come up with a clear definition for the term "uncontroversial" and even suggested that uncontroversial should not necessarily be equated with undisputed. *See id.* at 529 (noting that "[a] controversy, the dictionaries tell us, is a dispute, especially a public one" but, under that definition, it was difficult to understand an earlier court decision that certain country-of-origin disclosures were "uncontroversial" because there was a public dispute over such).

Third, *NAM* is not irreconcilable with the Court's ruling. There is a difference, under this Court's interpretation, between "factual" and "uncontroversial." "Uncontroversial" should generally be equated with the term "accurate"; in contrast, "factual" goes to the difference

9

1   between a "fact" and an "opinion." Notably, in the San Francisco CTIA case, the Ninth Circuit
2   made that distinction between fact and opinion in discussing *Zauderer*. *See CTIA – Wireless*
3   *Ass'n v. City & County of San Francisco*, 494 Fed. Appx. 752, 753-54 (9th Cir. 2012) (stating that
4   the city's "fact sheet contains more than just facts" – *i.e.*, it also contained the city's
5   "recommendations"; the "language could prove to be interpreted by consumers as expressing San
6   Francisco's opinion that using cell phones is dangerous"). The Seventh Circuit also made that
7   same distinction in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641, 652-53 (7th
8   Cir. 2006) (stating that "[t]he State's definition of this term [*i.e.*, sexually explicit] is far more
9   opinion-based than the question of whether a particular chemical is within any given product").

Finally, the Court finds CTIA's interpretation of "uncontroversial" untenable. A "controversy" cannot be created any time there is a disagreement between the parties because *Zauderer* would never apply, especially where there are health and safety risks, which invariably are dependent in some degree on the current state of science and research. A "controversy" cannot automatically be deemed created any time there is a disagreement about the science behind a warning because science is almost always debatable at some level (*e.g.*, even if there is agreement that there is a safety issue, there is likely disagreement about at what point a safety concern is fairly implicated). Under CTIA's position, any science-based warning required by a governmental agency would automatically be subject to heightened scrutiny under the First Amendment. *See Nat'l Elec.*, 272 F.3d at 116 (taking note of "the potentially wide-ranging implications of NEMA's First Amendment complaint" as "[i]nnumerable federal and state regulatory programs require the disclosure of product and other commercial information," including tobacco and nutritional labeling and reporting of toxic substances and pollutants).

5.  Misleading

CTIA asserts that, even if *Zauderer*'s "uncontroversial" requirement simply demands accuracy, here, there is inaccuracy or, more specifically, the compelled disclosure is misleading because it claims there is a safety issue when, in fact, there is none. This argument is predicated on the fact that the FCC's standards have built in a substantial safety margin (at least for thermal effects of RF radiation). *See* 2013 FCC Reassessment, 28 F.C.C. Rcd. 3498, 3588 (2013) ("The

1  limits were set with a large safety factor, to be well below a threshold for unacceptable rises in
2  tissue temperature.  As a result, exposure well above the specified SAR limit should not create an
3  unsafe condition.").
4      CTIA's argument is not persuasive, particularly when the actual text of the notice required
5  by the amended ordinance is taken into account.  The notice provides:

> To assure safety, the Federal Government requires that cell phones
> meet radio frequency (RF) exposure guidelines.  If you carry or use
> your phone in a pants or shirt pocket or tucked into a bra when the
> phone is ON and connected to a wireless network, you may exceed
> the federal guidelines for exposure to RF radiation.  Refer to the
> instructions in your phone or user manual for information about how
> to use your phone safely.

11 The first two sentences are undisputedly accurate.  The FCC promulgated guidelines for safety
12 reasons.  Even though the FTC built a large margin into its RF exposure guidelines, it did set
13 specific limits and did so in order to assure safety.  CTIA does not challenge those guidelines.
14 Furthermore, carrying or using a phone in the above-identified manner (without spacing) could
15 lead a person to exceed the FCC guidelines for exposure.
16     CTIA contends that, even if the two sentences are technically accurate, the juxtaposition of
17 the two gives rise to the implication that carrying or using your phone in a pants or shirt pocket or
18 tucked into a bra when the phone is on and connected to a wireless network is unsafe.[1]  But even
19 though the FCC has indicated that such *should* not be unsafe (at least from a thermal effects
20 perspective), the fact remains that the FCC still decided to set the guidelines at particular levels

---

[1] CTIA indicated at the hearing that it would take the same position *even if* the safety-related words (*e.g.*, "safety," "radiation") were removed from the notice or modified so as to read:

> The Federal Government requires that cell phones meet radio
> frequency (RF) exposure guidelines.  If you carry or use your phone
> in a pants or shirt pocket or tucked into a bra when the phone is ON
> and connected to a wireless network, you may exceed the federal
> guidelines for exposure to RF energy.  Refer to the instructions in
> your phone or user manual for information about how to use your
> phone.

CTIA's position borders on the extreme.

11

because of its safety concerns. Thus, ultimately, CTIA's beef should be with the FCC. If CTIA believes that the safety margin is too generous because there is no real safety concern at that level, it should take that matter up with the FCC administratively. It has not done so. Berkeley's reference to these unchallenged FCC guidelines does not violate the First Amendment.

6. Government Interest

Finally, CTIA reiterates its prior argument that, even if *Zauderer* were to apply, there is no legitimate governmental interest here because "courts have consistently held that the public's right to know is insufficient to justify compromising protected constitutional rights." Docket No. 4 (Mot. at 11) (internal quotation marks omitted). But the authority cited by CTIA is not on point. For example, in *International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996), the state did not claim that health or safety concerns prompted the passage of its labeling law but instead defended the statute simply on the basis of strong consumer interest and the public's right to know. *See id.* at 73 (also stating, that, "[a]bsent . . . some indication that this information bears on a reasonable concern for human health or safety . . . , the manufacturers cannot be compelled to disclose it"). Here, Berkeley's ordinance specifically identifies safety as an animating concern in the stated findings and purpose behind the notice requirement. *See, e.g.*, Berk. Mun. Code § 9.96.010(E) ("Consumers are not generally aware of these *safety recommendations*.") (emphasis added). Because the ordinance is ultimately anchored in consumer awareness of FCC guidelines designed to insure safety, the Court concludes that there is a legitimate, indeed substantial, government interest here.

C. Irreparable Injury

As it did before, CTIA claims irreparable injury because it could not "undo the damage to its reputation and customer goodwill from having put out a misleading disclosure that generated fear in consumers about 'exposure' to cell phone 'radiation.'" Opp'n at 16. However, CTIA has generated no evidence to substantiate any such damage. Moreover, CTIA could prevent or substantially mitigate any such damage by engaging in counterspeech as the ordinance authorizes. While CTIA argues that forced counterspeech itself inflicts a First Amendment injury, that depends on there being a First Amendment violation in the first place. As the Court noted in its

preliminary injunction order, the claim of irreparable harm is ultimately "predicated on the First Amendment argument," an argument which has no merit. Docket No. 53 (Order at 34 n.13).

The Court again concludes that, even if serious questions going to the merits were raised here (and the Court finds that there are not), the balance of hardships does not tip *sharply* in CTIA's favor.

### III. CONCLUSION

For the foregoing reasons, the Court grants the City's motion to dissolve the preliminary injunction. The Court further denies CTIA's request that this order dissolving the preliminary injunction be stayed pending appeal.

This order disposes of Docket No. 59.

**IT IS SO ORDERED**.

Dated: January 27, 2016

_____
EDWARD M. CHEN
United States District Judge

13