Theodore B. Olson (#38137)
TOlson@gibsondunn.com
Helgi C. Walker (Admitted *Pro Hac Vice*)
HWalker@gibsondunn.com
Jacob T. Spencer (Admitted *Pro Hac Vice*)
JSpencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:     202.955.8668
Facsimile:      202.530.9575

Joshua D. Dick (#268853)
JDick@gibsondunn.com
Alexander N. Harris (#278482)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:     415.393.8233
Facsimile:      415.374.8469

*Attorneys for Plaintiff*
*CTIA – The Wireless Association*®

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION®,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, in her official capacity,<br><br>                    Defendants. | **CASE NO. 3:15-cv-02529**<br><br>**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br><br>Date:   July 23, 2020<br><br>Time:  1:30 p.m.<br><br>Place:  Courtroom 5, 17th Floor, San Francisco |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION .......................................................................................... 1

RELIEF SOUGHT ....................................................................................................................... 1

STATEMENT OF THE ISSUES .................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 1

INTRODUCTION ........................................................................................................................ 1

PROCEDURAL BACKGROUND ................................................................................................. 4

FACTUAL BACKGROUND ......................................................................................................... 7

ARGUMENT .............................................................................................................................. 10

    I.     The Ordinance Violates The First Amendment By Compelling Misleading, Controversial Speech ............................................................................................. 11

          A.     The Ordinance Is Not Reasonably Related To Health And Safety ................ 12

          B.     The Ordinance Is Misleading, Not "Purely Factual And Uncontroversial" ............................................................................................ 16

    II.    The Ordinance Is Preempted By An Exclusive Federal Regime Of Cell Phone Regulation .................................................................................................. 20

          A.     Congress Has Established A Uniform National Regime For The Regulation Of RF Emissions From Cell Phones ............................................. 21

          B.     The Ordinance Undermines The FCC's Comprehensive, Uniform Regulatory Approach .............................................................................. 22

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
    760 F.3d 18 (D.C. Cir. 2014) ............................................................................18, 19

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n*,
    447 U.S. 557 (1980) ........................................................................................12

*City of New York v. FCC*,
    486 U.S. 57 (1988) .........................................................................................20

*Credit Suisse First Boston Corp. v. Grunwald*,
    400 F.3d 1119 (9th Cir. 2005) ........................................................................24

*CTIA – The Wireless Ass'n v. City of Berkeley, California*,
    138 S. Ct. 2708 (2018) .....................................................................................5

*CTIA – The Wireless Ass'n v. City of Berkeley, California*
    928 F.3d 832 (9th Cir. 2019) .............................2, 4, 5, 12, 14, 16, 17, 18, 21, 22, 23

*CTIA – The Wireless Ass'n v. City of Berkeley, California*,
    854 F.3d 1105 (9th Cir. 2017) ..........................................................................5

*CTIA – The Wireless Ass'n v. City of Berkeley, California*,
    139 F. Supp. 3d 1048 (N.D. Cal. 2015) .........................................................3, 20, 23

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ........................................................................................13

*Evergreen Ass'n, Inc. v. City of New York*,
    740 F.3d 233 (2d Cir. 2014) .............................................................................19

*Farina v. Nokia Inc.*,
    625 F.3d 97 (3rd Cir. 2010) ..........................................................................21, 24

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ........................................................................................20

*Geier v. Am. Honda Motor Co., Inc.*,
    529 U.S. 861 (2000) ........................................................................................20

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) ................................................................................13

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
    556 F.3d 114 (2d Cir. 2009) .............................................................................19

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) .............................................................................19

**TABLE OF AUTHORITIES** (*continued*)                                    Page(s)

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ...............................................................................5, 12, 13, 16

*Phigenix, Inc. v. Genentech Inc.*,
    No. 15-01238-BLF, 2016 WL 7985261 (N.D. Cal. Jan. 12, 2016) ...............................10

*R.J. Reynolds v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) .................................................................................19

*Sao v. Pro-Tech Prod. Inc.*,
    No. 19-05261, 2019 WL 6909566 (D. Ariz. Dec. 19, 2019) .......................................10

*Semiconductor Components Indus., LLC v. I2A Techs., Inc.*,
    No. 10-0603-TEH, 2010 WL 3036731 (N.D. Cal. July 30, 2010)................................10

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................................................16

*Story v. Mammoth Mountain Ski Area, LLC*,
    No. 14-02422, 2015 WL 2339437 (E.D. Cal. May 13, 2015) ......................................10

*Stuart v. Camnitz*,
    774 F.3d 238 (4th Cir. 2014).......................................................................................18

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ...................................................................................................11

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ...................................................................................................11

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009)......................................................................................13

*Williamson v. Mazda Motor of Am., Inc.*,
    562 U.S. 323 (2011) ...................................................................................................24

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ...................................................................................................11

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ...................................................................................................20

**Statutes**

47 U.S.C. § 151 .................................................................................................................21

Berkeley Municipal Code § 9.96.010 ..............................................................12, 15, 18, 22

Berkeley Municipal Code § 9.96.030 ................................2, 10, 11, 14, 15, 17, 18, 22

Pub. L. No. 104-204, § 704(b), 110 Stat. 56 (1996) ........................................................21

**TABLE OF AUTHORITIES** (*continued*)                                      Page(s)

**Regulations**

47 C.F.R. § 2.1033 .................................................................................................23

47 C.F.R. § 2.1093 ...................................................................................................9

**Other Authorities**

*In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation,*
    11 F.C.C. Rcd. 15123 (1996) ..............................................................................8

*In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation,*
    12 F.C.C. Rcd. 13494 (1997) ............................................................................21

FCC, *Radiofrequency Safety: RF Safety FAQ,* https://www.fcc.gov/engineering-
    technology/electromagnetic-compatibility-division/radio-frequency-safety/faq/rf-
    safety (last visited Apr. 24, 2020) ....................................................................19

FCC Statement of Interest, *Cohen v. Apple, Inc.,*
    No. 19-05322 (N.D. Cal. filed Apr. 13, 2020), Dkt. 101-1 .........................3, 4, 6, 8, 14, 15, 23, 24

*Future Use of Frequency Band 806-960 MHz,*
    46 F.C.C. 2d 752 (1974) .....................................................................................7

H.R. Rep. No. 103-111 (1993) .................................................................................22

H.R. Rep. No. 104-204 (1995) ...........................................................................4, 7, 21

*Petition on Behalf of the State of Conn.,*
    10 F.C.C. Rcd. 7025 (1995) ..............................................................................21

*In re Proposed Changes in the Commission's Rules Regarding Human Exposure to
    Radiofrequency Electromagnetic Fields,*
    F.C.C. 19-126, 2019 WL 6681944 (Dec. 4, 2019) ............................................ *passim*

*In re Reassessment of FCC Radiofrequency Exposure Limits & Policies,*
    28 F.C.C. Rcd. 3498 (2013) ................................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 23, 2020, at 1:30 p.m., or as soon thereafter as may be convenient for the Court, Plaintiff CTIA – The Wireless Association® ("CTIA") will bring on for hearing this motion for judgment on the pleadings.

**RELIEF SOUGHT**

CTIA seeks judgment on the pleadings that Berkeley Municipal Code Chapter 9.96 (the "Ordinance"), entitled "REQUIRING NOTICE CONCERNING RADIO FREQUENCY EXPOSURE OF CELL PHONES," violates the First Amendment of the Constitution of the United States and is preempted by federal regulations pursuant to the Constitution's Supremacy Clause.

**STATEMENT OF THE ISSUES**

1.  Whether the Ordinance violates the First Amendment of the Constitution of the United States because it is not purely factual and uncontroversial, and does not materially advance any substantial government interest.

2.  Whether the Ordinance is preempted because it interferes with and stands as an obstacle to the Federal Communications Commission's regulations governing disclosures about radiofrequency energy emissions from cell phones that it was authorized and obligated to promulgate by Congress in the Telecommunications Act of 1996.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

There have been significant, and dispositive, developments since this Court declined to preliminarily enjoin the Ordinance and the Ninth Circuit affirmed that decision on the record then before it.  Less than five months ago, in December 2019, the Federal Communications Commission ("FCC") issued an Opinion and Order on radiofrequency ("RF") emissions that upends the landscape of this case in several important ways, fatally undermining the City's arguments in defense of the Ordinance and the very basis on which the Ninth Circuit affirmed this Court's decision.  *See In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, FCC 19-126, 2019 WL 6681944 (Dec. 4, 2019) ("*FCC Order*").

Gibson, Dunn &
Crutcher LLP

*First*, the FCC unequivocally and explicitly confirmed that all cell "phones legally sold in the United States pose ***no health risks***." *FCC Order* ¶ 14 (emphasis added). But the FCC did not stop there. It also explained, in the exercise of its expert judgment based on a comprehensive review of all available scientific data, that all cell phones are safe "even if" they "produce RF exposure levels in excess of Commission limits under normal use." *Id.* Indeed, Berkeley has effectively conceded that it has no scientific evidence that cell phones are unsafe. *See* Dkt. 1 (Compl.) ¶¶ 92–93. That directly contravenes the City's compelled speech mandate, which conveys, by its terms and design, the message that using cell phones in certain ways—"[i]f you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network"—creates a "safety" issue due to "radiation." Compl., Ex. A (Ordinance) § 9.96.030. Accordingly, the Ordinance violates the First Amendment, even under the *Zauderer* standard adopted by the Ninth Circuit, for two independent reasons: (1) the compelled speech mandate is not "purely factual and uncontroversial"; and (2) the City does not have a "substantial government interest" in forcing retailers to warn customers about theoretical health risks of cell phones when the FCC has concluded there are no such risks at all.

Berkeley is entitled to its own opinions, however disputed, and is free to disseminate those views itself. But the First Amendment sharply limits the government's ability to conscript private speakers to convey messages scripted by the government that are inaccurate, misleading, or controversial. The City's Ordinance does precisely that. By inventing a false and scientifically indefensible distinction between allegedly safe and unsafe uses of cell phones, the Ordinance compels retailers to issue to their customers a misleading, controversial, government-crafted statement that is directly at odds with the FCC's conclusions, as reiterated and confirmed in the *FCC Order*. The City can have no legitimate interest, let alone the required "substantial government interest," in compelling an inflammatory and misleading "health and safety" disclosure that will only serve to stoke false and unnecessary fear and anxiety among consumers.

*Second*, the Ninth Circuit and this Court found that the Ordinance likely did not violate the First Amendment and was not preempted by federal law because it supported FCC-required information about RF limits and separation distances in user manuals. *E.g.*, *CTIA – The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 841 (9th Cir. 2019) ("The disclosure underlying Berkeley's

ordinance is the disclosure the FCC requires cell phone manufacturers to provide to consumers."); *CTIA – The Wireless Ass'n v. City of Berkeley, California*, 139 F. Supp. 3d 1048, 1060 (N.D. Cal. 2015) (reasoning that the Ordinance is "consistent with the FCC's own requirement that cell phone manufacturers disclose to consumers information and advice about spacing").  But the *FCC Order* makes clear that the "context and placement" of RF information is critically important, and state or municipal requirements compelling manufacturers to disclose RF information in contexts other than in user manuals create the "misimpression that FCC-certified phones are unsafe" and contribute "to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices." *FCC Order* ¶ 16.

   *Third*, this Court and the Ninth Circuit held that it was unlikely CTIA would be able to show that the Ordinance was preempted by federal law because, as this Court stated, CTIA had not "point[ed] to any FCC pronouncement suggesting that the agency has any objection to warning consumers about maintaining spacing between the body and a cell phone." *CTIA*, 139 F. Supp. 3d at 1060.  ***That is no longer true.***  The *FCC Order* makes clear that the Commission has significant objections and reservations about requiring warnings or mandated disclosures.  The *Order* states that the FCC is concerned about an "erroneous public perception of a possible risk" from "RF signals." *FCC Order* ¶ 16.  The *Order* further finds that "the context and placement of RF exposure information is so important" to avoid creating needless "feeling[s] of uncertainty or a lack of control," and that "the information on the FCC's websites and in device manuals [is] both adequate to inform consumers of these issues and do[es] not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices." *Id.*  Moreover, in a Statement of Interest filed by the FCC just last month in litigation pending in this District, the FCC explained that forcing cell phone manufacturers "to disclose that [their] FCC-certified cell phones exceed the FCC's RF exposure limits in some circumstances" would "conflict with the FCC's considered policy judgment regarding how best and in what form to disseminate relevant information about RF exposure to the public."  FCC Statement of Interest, *Cohen v. Apple, Inc.*, No. 19-05322 (N.D. Cal. filed Apr. 13, 2020), Dkt. 101-1, at 19 ("FCC Statement of Interest").

1    The Ordinance does exactly what the FCC seeks to prevent—it requires one-sided, prominently

2    placed warnings using alarmist terms that will undoubtedly cause a false sense of fear and a lack of

3    trust in cell phones.  As the Ninth Circuit observed, the Telecommunications Act shows "that Congress

4    desired 'uniform, consistent requirements, with adequate safeguards of public health and safety' in

5    nationwide telecom services."  *CTIA*, 928 F.3d at 850 (quoting H.R. Rep. No. 104-204, 94 (1995)).

6    But the Ordinance upsets the FCC's goals of conveying appropriate, balanced information while not

7    misleading the public about the safety of our telecommunications network.  The recent *FCC Order* and

8    FCC Statement of Interest now make clear that Berkeley's Ordinance will undermine and frustrate that

9    objective by overwarning and misleading consumers.

10       Moreover, if Berkeley's Ordinance is allowed to stand, it may swiftly lose its outlier status—

11   other cities will follow suit.  The result will be exactly the crazy quilt of differing and inconsistent

12   "disclosure" obligations across the country that Congress deliberately sought to eliminate when it

13   directed the FCC to adopt comprehensive, national standards that cover all aspects of cell phone safety.

14   If the science evolves or changes and additional disclosures or warnings become necessary, it is the

15   FCC, not thousands of cities and counties across the country, that will provide accurate, consistent

16   information to the public.  As the *FCC Order* explains, the FCC "will continue to evaluate public

17   information materials and update as appropriate" and "continue to ensure that relevant information is

18   made available to the public."  *FCC Order* ¶ 16; *see also* FCC Statement of Interest, at 17 (noting that

19   the *FCC Order* "affirmed" the FCC's "commitment" to ensuring that appropriate information reaches

20   the public).  The Ordinance, on the other hand, will lead to more compelled speech, mixed and

21   confusing messages, and widespread and unwarranted anxiety for consumers about the safety of a

22   product that plays an important role in our daily lives.

23                              **PROCEDURAL BACKGROUND**

24       CTIA filed suit on June 8, 2015.  Dkt. 1.  Berkeley answered the Complaint, but did not allege

25   any facts, bring any counterclaims, or raise any affirmative defenses.  Dkt. 31 (Answer).

26       CTIA moved for a preliminary injunction.  Dkt. 4.  The Court enjoined a provision of the

27   Ordinance compelling retailers to say:  "This potential risk is greater for children" (Dkt. 53); Berkeley

28   excised that statement from its speech mandate (Dkt. 59-2); and the Court dissolved the injunction

(Dkt. 74).  CTIA appealed.  The Ninth Circuit affirmed, *CTIA – The Wireless Ass'n v. City of Berkeley, California*, 854 F.3d 1105, 1111 (9th Cir. 2017); the Supreme Court vacated and remanded for reconsideration in light of *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2369 (2018), *CTIA – The Wireless Ass'n v. City of Berkeley, California*, 138 S. Ct. 2708 (2018); and the Ninth Circuit affirmed again, *CTIA*, 928 F.3d 832.

Addressing CTIA's First Amendment claim, the Ninth Circuit held that a compelled statement must be "reasonably related to a substantial governmental interest and involve[] purely factual and uncontroversial information that relates to the service or product provided."  *CTIA*, 928 F.3d at 842 (quotation marks and citation omitted).  Addressing the "substantial governmental interest" requirement, the court ruled that the Ordinance was reasonably related to "protecting … health and safety."  *Id.* at 845.  It concluded that the FCC has furthered that interested "by adopting a highly protective policy, setting low SAR limits on RF radiation and compelling cell phone manufacturers to disclose information to cell phone users that will allow them to avoid exceeding those limits," and that the Ordinance furthers the same interest as the FCC because it compels retailers "to provide, in summary form, the same information that the FCC already requires cell phone manufacturers to provide to those same consumers."  *Id.* at 845–46.

Turning to the "purely factual and uncontroversial" requirement, the court noted that "a statement may be literally true but nonetheless misleading" and, therefore, not "purely factual and uncontroversial."  *CTIA*, 928 F.3d at 846–47.  But it concluded that the Ordinance could not be misleading because it merely "provides in summary form information that the FCC has concluded that consumers should know in order to ensure their safety."  *Id.* at 847.

The court also rejected CTIA's preemption challenge based on the same reasoning—*i.e.*, that "Berkeley's compelled disclosure does no more than alert consumers to the safety disclosures that the FCC requires, and direct consumers to federally compelled instructions in their user manuals providing specific information about how to avoid excessive exposure."  *CTIA*, 928 F.3d at 851.

Less than five months after the Ninth Circuit's ruling, the FCC issued a new Opinion and Order that destroys the foundation for the court's ruling.  *See FCC Order* ¶¶ 10–16.  Contrary to the Ninth Circuit's conclusion that the Ordinance serves a substantial government interest in protecting public

health and safety, the FCC concluded that "no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses," *FCC Order* ¶ 12, and therefore all "phones legally sold in the United States pose *no health risks*," *id.* ¶ 14 (emphasis added).  And contrary to the court's conclusion that requiring a warning be displayed prominently or handed directly to customers was consistent with, and advanced the same interests as, the disclosures in cell phone user manuals and on the FCC's websites,[1] the FCC stated that "the context and placement of RF exposure information is so important" to prevent erroneous "feeling[s] of uncertainty or a lack of control." *Id.* ¶ 16.  Unlike the Ordinance, "the information on the FCC's websites and in device manuals [is] both adequate to inform consumers of these issues and do[es] not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices." *Id.*  Although the FCC decision refutes the Ninth Circuit's rationale, it was not made public until after the court had already issued its mandate, and the litigation had returned to this Court.

And just two weeks ago, the FCC submitted a Statement of Interest in *Cohen v. Apple, Inc.* to explain the proper application of its regulations and guidance concerning RF emissions from cell phones.  FCC Statement of Interest, at 1.  Plaintiffs in that suit allege that Apple's FCC-certified cell phones are unsafe—and that Apple should have made additional disclosures about RF emissions—because under some circumstances the cell phones could supposedly exceed the FCC's RF exposure limits.  *See id.* at 2.  Relying on the *FCC Order*, the Commission explained that "[a]ny claim that FCC-certified cell phones are unsafe" would be "preempted by federal law, because it conflicts with the FCC's judgment that cell phones that satisfy the FCC's RF standards *pose no health risk* and may be certified for sale in the United States." *Id.* (emphasis added).  Moreover, "plaintiffs' claims that Apple should have made additional disclosures about the RF emissions of its FCC-certified cell phones *conflict with the FCC's determination that warnings about FCC-certified cell phones that go beyond those mandated by the FCC could mislead consumers into believing that RF emissions from those phones are unsafe.*  For this reason, such claims are likewise … preempted." *Id.* (emphasis added).

---

[1]  For example, "one of those webpages informs 'consumers who are skeptical' of the science underlying the FCC's RF guidelines about 'simple steps [they] can take to reduce [their] exposure to RF energy from wireless phones,' while also emphasizing that the Commission 'does not endorse the need' for such measures." FCC Statement of Interest, at 17–18.

**FACTUAL BACKGROUND**

The following material facts are either alleged in the Complaint (Dkt. 1) and not disputed in Defendants' Answer (Dkt. 31) or are subject to judicial notice.

The federal government ensures that all cell phones authorized for sale in the United States are safe.  Compl. ¶¶ 52–53, 55.  One way the government does this is by setting standards to limit cell phones' emission of RF energy.  RF energy—another name for radio waves—is used by all sorts of wireless communications systems, including Wi-Fi networks, baby monitors, garage door openers, and GPS systems.  *Id.* ¶ 24.  It is a form of non-ionizing radiation, like visible light or infrared.  *Id.* ¶ 28. Unlike ionizing radiation (such as X-rays), which is always potentially harmful to human tissue, non-ionizing radiation is incapable of breaking chemical bonds that could damage DNA.  *Id.* ¶¶ 27–28. Non-ionizing radiation can cause heat, but scientific organizations recognize that there is a threshold level of heat below which consumers do not need to be concerned about any adverse health effect.  *Id.* ¶¶ 28, 30.

The FCC has established comprehensive, nationwide standards to protect against any adverse health effects from cell phones' emission of RF energy.  Compl. ¶¶ 32–43.  Congress directed the FCC to adopt these standards out of concern that "decisions by non-federal units of government [had] created an inconsistent and, at times, conflicting patchwork of requirements" regarding RF emissions, and it was in "the national interest" to establish "uniform, consistent requirements."  H.R. Rep. No. 104-204, at 94.  The FCC was tasked with striking "an appropriate balance" between "the availability of competitive wireless telecommunications services" and "adequate safeguards of the public health and safety."  *Id.*  And the FCC has long asserted that its regulatory program "[is] to be carried out on a national basis … without regard to state boundaries or varying local jurisdictions."  *Future Use of Frequency Band 806-960 MHz*, 46 F.C.C. 2d 752, 766–67 (¶ 43) (1974).

The FCC worked with the Food and Drug Administration and other federal agencies to adopt the current RF exposure standards for all cell phones marketed, sold, or distributed in the United States. Compl. ¶ 43.  These guidelines are derived from industry standards developed by leading scientific standard-setting bodies, and are based on a measurement known as the "Specific Absorption Rate" or "SAR."  *Id.* ¶ 50.  SAR measures how many watts of RF energy emitted from a cell phone are absorbed

by a particular mass of tissue.  *Id.* ¶ 31.  To conservatively determine the maximum amount of RF energy that a cell phone model is capable of generating, the FCC "require[s] consumer portable devices to be tested at maximum power under normal use conditions," *FCC Order* ¶ 14, even though consumers' cell phones rarely operate at full power, Compl. ¶ 64.  The FCC approves for sale only those cell phone models that are certified as compliant with the SAR standards.  *Id.* ¶ 62.

Critically, the FCC's SAR limit for cell phones is *not* the threshold above which RF energy has the potential for adverse biological effects on humans.  Rather, the SAR limit is set "at a level on the order of *50 times below* the level at which adverse biological effects have been observed in laboratory animals."  *In re Reassessment of FCC Radiofrequency Exposure Limits & Policies*, 28 FCC Rcd. 3498, 3582 (¶ 236) (2013) (emphasis added).  This 50-fold "'safety' factor can well accommodate a variety of variables such as different physical characteristics and individual sensitivities—and even the potential for exposures to occur in excess of [FCC] limits without posing a health hazard to humans." *Id.*; *see also FCC Order* ¶ 14 ("[O]ur existing exposure limits are set with a large safety margin, well below the threshold for unacceptable rises in human tissue temperature.").  The FCC has concluded that its standards "represent the best scientific thought" on the RF emission limits that are necessary "to protect the public health."  *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 11 FCC Rcd. 15123, 15184 (¶ 168) (1996).  But the FCC "declined to adopt stricter standards based on *controversial and unsubstantiated* claims that RF energy causes non-thermal biological effects."  FCC Statement of Interest, at 3 (quotation marks omitted) (emphases added).

For cell phones, testing for SAR compliance "is performed against the head, representing normal use during a phone call, and at a separation distance of up to 2.5 centimeters … from the body to represent phone use in other ways."  *FCC Order* ¶ 14.  The FCC recently rejected comments arguing that it should require testing "against the body" as "unnecessary."  *Id.*  Among other reasons, cell phone "testing is performed under more extreme conditions than a user would normally encounter, so any potential dangers at zero-space would be mitigated."  *Id.*  And the FCC's "existing exposure limits are set with a large safety margin, well below the threshold for unacceptable rises in human tissue temperature."  *Id.*  "Thus, even if certified or otherwise authorized devices produce RF exposure levels in excess of Commission limits under normal use, such exposure would still be well below levels

considered to be dangerous, and therefore phones legally sold in the United States pose no health risks" regardless of how they may be used or carried.  *Id*.  Put simply, "no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses."  *Id*. at ¶ 12.

Because of the 50-fold safety factor, the FCC has decided not to require cell phone manufacturers to warn about RF energy exposure.  By contrast, the FCC uses a different regime to protect users of devices in "occupational" settings:  It sets a higher SAR limit—thereby approving devices that emit more RF energy—but requires manufacturers to either place "visual advisories" (such as labels) on portable devices or offer "specific training."  47 C.F.R. § 2.1093(d)(1)(i).  "Visual advisories" must be "legible and clearly visible to the user from the exterior of the device," *id*. § 2.1093(d)(1)(ii)(A), and must "refer the user to specific information on RF exposure, such as that provided in a user manual."  *Id*. § 2.1093(d)(1)(ii)(B).  But manufacturers of *consumer* cell phones are not subject to these requirements:  The cell phone guideline is set low enough *to eliminate the need for warnings*.  *See id*. § 2.1093(d)(2).  To be sure, "guidance from the FCC Laboratory continue recommending that device manuals include operating instructions and advisory statements for RF exposure compliance," but manufacturers are allowed to provide that information in a manner they believe will be most helpful.  *FCC Order* ¶ 16; *see also* 47 C.F.R. § 2.1093(d)(3) ("The staff guidance provided [by the FCC Laboratory] does not necessarily represent the only acceptable methods for measuring RF exposure or emissions, and is not binding on the Commission or any interested party.").  And "to ensure that relevant information is made available to the public," the FCC itself "maintains several webpages."  *FCC Order* ¶ 16.  "This information allows users to make informed decisions on the type of body-worn accessories and operating configurations that are appropriate for their usage."  *Id*.  Moreover, the FCC has evaluated and "will continue to evaluate public information materials and update as appropriate."  *Id*.

The City of Berkeley disagrees with the FCC's conclusions that all cell phones sold in the United States are safe and that there is no need to warn consumers about how they use their cell phones.  On May 26, 2015, the City Council adopted an Ordinance that imposes on cell phone retailers the City's own regulatory program for RF energy emissions.  Specifically, the Ordinance compels retailers

in Berkeley to provide the following notice to every customer who purchases or leases a cell phone, either by displaying the notice on a poster or by distributing it on a handout:

> The City of Berkeley requires that you be provided the following notice:

> To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines.  If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation.  Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Municipal Code § 9.96.030(A), (B) (Compl. Ex. A), *as amended*, *see* Dkt. 59-2.

As explained below, this compelled speech mandate is not factually accurate or uncontroversial, does not materially advance any substantial government interest, and is directly at odds with and undermines the FCC's views and objectives.

## ARGUMENT

"Granting a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Semiconductor Components Indus., LLC v. I2A Techs., Inc.*, No. 10-0603-TEH, 2010 WL 3036731, at *2 (N.D. Cal. July 30, 2010) (quotation marks omitted).  Where a plaintiff moves for judgment on the pleadings, its "uncontested allegations, to which the defendant had an opportunity to respond, are also taken as true." *Sao v. Pro-Tech Prod. Inc.*, No. 19-05261, 2019 WL 6909566, at *2 (D. Ariz. Dec. 19, 2019).  The court may also consider judicially noticeable documents like "publicly availabl[e] government records." *Phigenix, Inc. v. Genentech Inc.*, No. 15-01238-BLF, 2016 WL 7985261, at *3 (N.D. Cal. Jan. 12, 2016).[2]  A court does not accept an answer's "legal conclusions couched as factual allegations." *Sao*, 2019 WL 6909566, at *3.  And a defendant cannot defeat judgment on the pleadings by merely denying allegations without "rais[ing] any issue of fact that would lead to any other conclusion." *Semiconductor Components*, 2010 WL 3036731, at *4.

---

[2]  The parties agreed at the last Case Management Conference (held March 6, 2020) that the *FCC Order* is subject to judicial notice.  *See also Story v. Mammoth Mountain Ski Area, LLC*, No. 14-02422, 2015 WL 2339437, at *1 (E.D. Cal. May 13, 2015) ("[J]udicial notice may … be taken of official acts of the legislative, executive, or judicial branch of the United States government"—including "reports and orders of the FCC," "FCC notice[s] of proposed rulemaking," and "the Federal Register.").

Here, it is clear from the pleadings and judicially noticeable material—particularly the recent *FCC Order* and the FCC Statement of Interest—that the Ordinance is unconstitutional for two independent reasons.  First, the Ordinance violates the First Amendment because it compels CTIA's members to convey to their customers inaccurate, misleading, and controversial messages with which they disagree, and without materially advancing any substantial government interest.  Second, the Ordinance is preempted because it frustrates the FCC's goal of establishing a system of nationwide cell phone regulation with consistent and uniform requirements to adequately protect health and safety.

## I.     The Ordinance Violates The First Amendment By Compelling Misleading, Controversial Speech

The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  A law that "requires the utterance of a particular message favored by the Government contravenes this essential right."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) (punctuation omitted).  "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views."  *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (citations omitted).

The Ordinance requires cell phone retailers to convey the City's opinion that cell phones can be dangerous, depending on how they are used.  *See* Berkeley Municipal Code § 9.96.030(A).  By its terms and design, the Ordinance conveys to the average consumer that:  cell phones emit dangerous RF "radiation"; exposure to RF radiation in excess of federal guidelines creates a "safety" concern; the consumer should refrain from carrying a cell phone against the body while powered on and connected in order to mitigate that safety concern; there is a "potential risk" from RF radiation emitted from cell phones; and, at a minimum, consumers should look to their user manuals to determine "how to use [their] phone[s] safely."  *Id.*

Plaintiff's members do not wish to convey any of these messages because they are inaccurate and misleading.  And under the First Amendment, they do not have to.  Only if a statement is "reasonably related to a substantial governmental interest" *and* "involves purely factual and

uncontroversial information" may the government compel a business to utter it.  *CTIA*, 928 F.3d at 842 (quotation marks omitted).[3]  Berkeley's compelled speech is and does neither.

## A.    The Ordinance Is Not Reasonably Related To Health And Safety

Laws compelling disclosures must "remedy a harm that is potentially real not purely hypothetical," and may not extend any "broader than reasonably necessary."  *NIFLA*, 138 S. Ct. at 2377 (quotation marks omitted).  In affirming this Court's order dissolving the preliminary injunction, the Ninth Circuit ruled that the Ordinance was "reasonably related to protection of the health and safety of consumers."  *CTIA*, 928 F.3d at 846 (quotation marks omitted).  The court reached that conclusion on the basis of two key assertions:  (1) that the FCC implemented its "SAR limits on exposure to RF radiation" to "protect[] the health and safety of cell phone users"; and (2) that Berkeley "further[ed] th[e] same interest" as the FCC by compelling cell phone retailers to make statements already included in cell phone user manuals more prominent.  *Id.* at 845–46.

The *FCC Order* and Statement of Interest make clear that these assertions are incorrect or incomplete, and insufficient to justify Berkeley's Ordinance under the First Amendment.  As to the first one, the FCC explained that its "existing exposure limits are set with a large safety margin, well below the threshold for unacceptable rises in human tissue temperature."  *FCC Order* ¶ 14.  Even if cell phones "produce RF exposure levels in excess of [SAR] limits under normal use, such exposure would still be well below levels considered to be dangerous."  *Id.*  As a result, "**phones legally sold in the United States pose no health risks**."  *Id.* (emphasis added).

Thus, despite the Ordinance's assumption that there is a "safety" problem with RF energy emitted from cell phones and concomitant effort to change the way consumers use their phones, *see* Berkeley Municipal Code § 9.96.010(G), the Ordinance cannot be supported by any *real* health or safety concern.  Speech mandates implying that there are health-related implications depending on how one uses FCC-approved phones are not reasonably related to health and safety because the emissions

---

[3]  CTIA has argued that the Ninth Circuit was incorrect to hold that *Zauderer* permits less exacting scrutiny of speech mandates that are unnecessary to correct misleading speech; at a minimum, intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980) is required.  CTIA preserves this argument, but recognizes that the Court is bound by the Ninth Circuit's pronouncement.  For purposes of this motion, CTIA argues that it is entitled to judgment on the pleadings under that Ninth Circuit law.

from such cell phones "pose no health risks," regardless of how they are used.  *FCC Order* ¶ 14; *see also* FCC Statement of Interest, at 2 ("The Commission has found that RF emissions from FCC-certified cell phones pose no health risks.").

The government has the burden of proof in demonstrating that a compelled speech mandate will materially advance a substantial government interest.  *See Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).  As the Supreme Court explained in *NIFLA*, this means that the government must prove that the compelled speech will actually "achieve" the government's purported substantial interest.  138 S. Ct. at 2375.  Far from meeting its burden, the City has effectively conceded that it has no scientific evidence of harm associated with RF energy emitted from cell phones or that there is any significance as to how a cell phone is used.  *See* Compl. ¶¶ 92–93.  In fact, the sponsor of the Ordinance admitted that it "is not [about] the science itself," as "[t]he science itself will be debated and will resolve itself as the momentum of scientific discovery and research presents itself."  *Id.* ¶ 92.  He further admitted that the City has not done "studies that would yield the information" necessary to regulate even as a "precautionary" matter.  *Id.* ¶ 93.  Instead he asked his colleagues to compel cell phone retailers to engage in government-prescribed speech based on a generalized and undefined notion of the Council's "moral and ethical role."  *Id.*

Berkeley cannot compel speech that has no legitimate connection to health and safety.  "Absent … some indication that this information bears on a reasonable concern for human health or safety," CTIA's members "cannot be compelled to disclose it."  *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996).  Here, there is no evidence that the manner in which consumers use FCC-approved phones has any impact on health and safety, and the *FCC Order* makes clear that it does not.  Thus, the Ordinance—which, at a minimum, implies that there are health and safety risks with certain uses of cell phones—is misleading and does not even advance a legitimate government interest, let alone a substantial one.  *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) (The government has "no legitimate reason to force retailers to affix false information on their products.").  The Ninth Circuit's first premise is not accurate, as the *FCC Order* confirms.

The *FCC Order* also undermines the Ninth Circuit's premise that Berkeley's Ordinance supports the FCC's interest by requiring disclosure of RF information at the point of sale.  Throughout

its First Amendment analysis, the Ninth Circuit reiterated that the FCC "already requires" cell phone manufacturers to disclose the same information in user manuals that Berkeley's Ordinance compels disclosure of "in summary form." *CTIA*, 928 F.3d at 841; *see also*, *e.g.*, *id.* at 840 ("The FCC requires that cell phone user manuals contain information that alerts users to the minimum distances appropriate for the device they are using."); *id.* at 841 ("The Berkeley disclosure directs consumers to user manuals for the specifics of the information required by the FCC."); *id.* at 845 (Berkeley demands "the same information that the FCC already requires cell phone manufacturers to provide to those same consumers."). Ultimately, the Ninth Circuit found that it was "not in a position to disagree with the conclusion[] of FCC" that supposedly "requiring cell phone manufacturers to inform consumers in their users manuals of SAR limits on RF radiation, and to tell them how to avoid excessive exposure, furthered the federal government's interest in protecting their health and safety." *Id.* at 846. And because "consumers [a]re largely unaware of the contents of their users manuals," the Ninth Circuit concluded that Berkeley's Ordinance furthered the same interest as the FCC by ensuring that the SAR information is handed directly to customers or "prominently displayed." *Id.*; Berkeley Municipal Code § 9.96.030(B).

But the FCC has now confirmed, both in the *FCC Order* and in its Statement of Interest, that requiring disclosure of RF information beyond user manuals *conflicts* with its interests and considered policy judgment. Specifically, the FCC "emphasized the importance of the 'context and placement of RF Exposure information' to avoid giving the misimpression that FCC-certified cell phones are unsafe" and overwarning consumers. FCC Statement of Interest, at 17 (quoting *FCC Order* ¶ 16). The FCC has concluded that the information in the manufacturer's user manuals and on the FCC website "was not only 'adequate to inform consumers of [RF exposure] issues,' but also did 'not risk contributing to the erroneous perception or overwarning of RF emissions from FCC certified or authorized devices.'" *Id* at 18 (quoting *FCC Order* ¶ 16). The *FCC Order* explains that there are significant costs to stoking fears—even by simply placing information in a more prominent context. It noted that the World Health Organization found that "the erroneous public perception of a possible risk from" cell phones' RF energy "may, even while unsupported by evidence, still contribute to a feeling of uncertainty or a lack of control." *FCC Order* ¶ 16. It explained that it is important to avoid these unfounded fears: "That

is why the context and placement of RF exposure information is so important." *Id.* The "context and placement" of Berkeley's compelled speech, which is expressly designed to be much *more* "prominent[]" than the FCC's recommendations (Berkeley Municipal Code § 9.96.030(B)), thus "risk[s] contributing to an erroneous public perception [and] overwarning," according to the FCC (*FCC Order* ¶ 16). For these reasons, the FCC has expressly proclaimed that imposing any "duty to disclose additional information about the RF emissions of … FCC-certified cell phones [would] conflict with the FCC's considered policy judgment regarding how best and in what form to disseminate relevant information about RF exposure to the public." FCC Statement of Interest, at 19. Thus, far from supporting the FCC's interests, Berkeley's Ordinance *contravenes* those interests by dramatically altering the "context and placement" of information contained in user manuals, thereby undermining consumer confidence in the safety of cell phones by transforming information that the FCC wants consumers to have into a safety warning that the FCC rejects.

Not only is the context and placement different from the FCC's and manufacturers' existing disclosures, the content is as well. While the Ordinance suggests that it merely seeks to amplify and clarify disclosures "generally" contained in existing cell phone user manuals "[t]o protect the safety of … consumers," Berkeley Municipal Code § 9.96.010(D), (H), that is not so. In fact, in their Answer, "Defendants admit the Ordinance does not repeat the statements in manufacturers' existing consumer disclosures." Answer ¶ 85. The vast majority of cell phone manufacturers do *not* recommend that consumers keep their phones away from their bodies while using them "to protect the safety of their consumers." Compl. ¶ 99. If the City's only intention were amplifying manufacturers' existing disclosures on RF energy, it would have left off all but the last sentence of its required disclosure and simply referred consumers to the user manuals for information, without editorializing about "radiation"—a term the FCC has noted can be confusing to consumers—and recasting manufacturers' statements as "safety" warnings. *Cf.* Berkeley Municipal Code § 9.96.030(A) ("Refer to the instructions in your phone or user manual for information about how to use your phone safely."). Far from merely "clarifying" existing disclosures, the City seeks to compel disclosure of entirely *different* information that is not included in many manufacturers' existing speech. The City is not seeking simply

1    to highlight or clarify CTIA's members' speech; it is seeking to *change* the content of that speech to

2    fit its own, scientifically unfounded, views and opinions about cell phones.

3         In short, none of the City's ostensible interests are sufficient to justify forcing CTIA's members

4    to convey to their customers a message with which they strongly disagree.  The City's flimsy, and

5    frequently changing, justifications demonstrate its real purpose:  "to suppress" the FCC's and cell

6    phone retailers' "disfavored message" (*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011)) that all

7    "phones legally sold in the United States pose no health risks."  *FCC Order* ¶ 14.  The City may not

8    like the FCC's position that lawfully approved cell phones are safe no matter how they are carried.

9    And the City can disseminate, with its own speech, whatever unfounded, contrary opinions it (or its

10   electorate) holds about cell phones.  But it may not force CTIA's members to spread those opinions.[4]

11   **B.    The Ordinance Is Misleading, Not "Purely Factual And Uncontroversial"**

12        Nor is the compelled disclosure "purely factual and uncontroversial," as required under the

13   *Zauderer* standard of review applied by the Ninth Circuit.  The Ninth Circuit recognized that *if* the

14   Ordinance were "misleading," it would not meet these criteria.  *CTIA*, 928 F.3d at 847.  But it ruled

15   that the Ordinance could not be misleading because it merely "provides in summary form information

16   that the FCC has concluded that consumers should know in order to ensure their safety."  *Id.* at 847–

17   48.  And it concluded that the Ordinance was not controversial because the FCC had supposedly

18   "determined that cell phone users should be cautioned to store their cell phones at a certain distance

19   from their bodies in order to avert any possible danger" and that "Berkeley's required disclosure is a

20   short-hand description of the warning the FCC already requires cell phone manufacturers to include in

21   their user manuals."  *Id.*  Those conclusions cannot be squared with the FCC's most recent statements

22   in the *FCC Order*.

23        As an initial matter, CTIA alleges facts—that the City does not dispute—demonstrating that

24   the Ordinance is misleading:  Exposure above the SAR limits does not pose an unsafe condition, and

25

26   [4]  The Ordinance is also not reasonably tailored because the City could easily accomplish its goals
     without compelling Plaintiff's members to disseminate misleading and controversial opinions.  *See*

27   *NIFLA*, 138 S. Ct. at 2377 (compelled disclosures may "extend no broader than reasonably necessary")
     (quotation marks omitted).  For example, the City could publish information on its website, as the FCC
     has done, or distribute its own "fact sheets" to consumers.  If the City wishes to share its opinions about

28   the safe usage of cell phones, however unsupported, it must do so itself.

the "measures to further reduce exposure to RF energy" are **unnecessary**.  *E.g.*, Compl. ¶¶ 47, 53, 54, 55, 68, 76.  And:  "The FCC's SAR guideline that applies to cell phones is designed to be sufficiently protective of human health and safety so that **there is no need for RF safety-related warnings or disclosures**, such as those that the FCC requires for certain other types of devices."  *Id.* ¶ 69 (emphasis added).  The SAR "standard is set at a level that **eliminates the need for warnings**."  *Id.* ¶ 70.  Critically, the City denies none of these allegations.  Instead, its Answer states that they are "legal arguments and/or conclusions that are not a proper allegation in a Complaint."  Answer ¶¶ 47, 53, 54, 55, 68, 69, 70, 76.  But they are self-evidently factual, and in any event are based on a source of undisputed authenticity—the FCC's own pronouncements.

In assessing whether the Ordinance was "literally true," the Ninth Circuit analyzed the compelled disclosure "sentence by sentence."  *CTIA*, 928 F.3d at 846.  Critical to the analysis is the second sentence, which suggests potential health and safety risks if "you carry or use your cell phone in a pants or shirt pocket or tucked into a bra."  Berkeley Municipal Code § 9.96.030(A).  The full sentence reads:

> If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation.

*Id.*

The Ninth Circuit reasoned that this sentence was "true" because "[t]he FCC has established SAR limits for RF radiation premised on maintaining a certain separation between a cell phone and the user's body" and "[m]aintaining that separation protects consumers from exceeding the SAR limits."  *CTIA*, 928 F.3d at 847.  But the *FCC Order* illustrates that reasoning is incorrect.  As the FCC explained, "testing is [also] performed against the head, representing normal use during a phone call" and "actual testing separation distances tend to be less than the 2.5 cm prescribed for many devices."  *FCC Order* ¶ 14.  Moreover, the FCC concluded that its current testing regime adequately protects consumers without requiring "testing … against the body."  *Id.*  Critically, the FCC concluded that "even if certified or otherwise authorized devices produce RF exposure levels in excess of Commission limits under normal use, such exposure would still be well below levels considered to be dangerous."  *Id.*  Thus, legal cell phones "pose no health risks" regardless of whether consumers maintain separation

between the phones and their bodies.  Put simply, cell phones are safe irrespective of how they are used or how they are held—it makes no difference whatsoever if you "carry or use your phone in a pants or shirt pocket or tucked into a bra."  That is why, contrary to Berkeley's compelled speech mandate, the FCC does "*not* endorse the need" to take measures to further reduce exposure to RF energy, as Berkeley's compelled speech mandate suggests.  FCC Statement of Interest, at 18 (emphasis added).

In addition, the FCC recently has stated that additional warnings like Berkeley's do *not* merely summarize "information that the FCC has concluded that consumers should know in order to ensure their safety."  *CTIA*, 928 F.3d at 847.  Rather, "the information on the FCC's websites and in device manuals are both adequate to inform consumers of these issues and do not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices"; new warnings outside of the "context and placement" of the existing information risk exactly that spread of needless fear.  *FCC Order* ¶ 16.

The Ordinance ignores the FCC's view that the manner in which a cell phone is used makes no difference from a health and safety perspective, and that additional warnings outside the "context and placement" of existing information are likely to spread needless anxiety.  *See*, *e.g.*, *Stuart v. Camnitz*, 774 F.3d 238, 246 (4th Cir. 2014) (the government may not require even factual disclosures where the required facts "all fall on one side" of a public debate); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (noting that "one-sided" or "incomplete" disclosures do "not qualify as 'factual and uncontroversial'").  Indeed, the City's rationale for enacting the Ordinance is that it wanted to upset the FCC's careful balance, and make warnings much more "prominent[]" (Berkeley Municipal Code § 9.96.030(B)) than the information the FCC endorses.  *See id.* § 9.96.010(H) (describing the disclosures in cell phone manufacturers' user manuals as "buried in fine print, [and] not written in easily understood language").

The City's mandated speech also has radically different content than the speech the FCC endorses as the proper approach, as explained above.  It exploits the average person's understanding of and likely reaction to the term "radiation," deliberately avoiding the difference between ionizing versus non-ionizing radiation.  *See* FCC, *Radiofrequency Safety: RF Safety FAQ*, https://www.fcc.gov/engineering-technology/electromagnetic-compatibility-division/radio-

frequency-safety/faq/rf-safety (last visited Apr. 24, 2020) ("RF Safety FAQ") (warning that these concepts, and their "possible biological effects," "should not be confused").   The RF "radiation" emitted from cell phones is non-ionizing and, unlike ionizing radiation, is not dangerous to humans below a particular threshold.   The FCC has made clear that no cell phone approved for sale in the United States emits RF energy at a level anywhere close to that threshold, regardless of how used.   By stringing together the words "radiation" and "potential risk" in the same warning, and by directing consumers to review user manuals for information about how to use their phones safely— notwithstanding the FCC's finding that "phones legally sold in the United States pose no health risks" no matter how used (*FCC Order* ¶ 14)—the City uses "inflammatory" language that is an "unabashed attempt[] to evoke emotion."   *R.J. Reynolds v. FDA*, 696 F.3d 1205, 1216–17 (D.C. Cir. 2012), *overruled on other grounds by Am. Meat Inst.*, 760 F.3d 18.[5]   The City may not stoke public anxiety by compelling CTIA's members to broadcast this controversial message.   As is the case with other controversies—such as misguided and speculative fears about harm from vaccines—some people hold fierce yet unfounded opinions about the safety of cell phones.   Government may not force businesses to convey its chosen message where that message implicates a matter of public controversy.   *See*, *e.g.*, *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 n.6 (2d Cir. 2014) (holding that the government may not require a company to "mention controversial services" that some providers oppose).

The power to turn private businesses into mouthpieces for the government's chosen message is a dangerous one that must be strictly limited.   Under *Zauderer*, courts have narrowly confined that power to such innocuous and uncontroverted facts as country-of-origin labels on meat products, *see Am. Meat Inst.*, 760 F.3d at 27, calorie counts, *see N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 136 (2d Cir. 2009), or how to dispose of mercury, *see Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001).   How many calories are in a sandwich, or where a cow was born, are objectively verifiable facts.   Here, by contrast, little to nothing in the Ordinance is an objectively

---

[5]   *See also* RF Safety FAQ (noting that "radiation" is often used, "colloquially, to imply that ionizing radiation (radioactivity), such as that associated with nuclear power plants, is present," but that the two types of radiation differ significantly and "should not be confused").

demonstrable fact, and its creation of purported safety concerns is invented out of whole cloth.  Instead, the City would use its governmental power to force CTIA's members to distribute its one-sided, innuendo-laden, highly misleading, and scientifically unsupported opinion on a matter of public controversy.  The First Amendment forbids this incursion on free speech rights of private entities.

## II.     The Ordinance Is Preempted By An Exclusive Federal Regime Of Cell Phone Regulation

Federal law preempts any state law that stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quotation marks omitted).  "Federal regulations have no less pre-emptive effect than federal statutes."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  "The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."  *City of New York v. FCC*, 486 U.S. 57, 64 (1988).  And where federal regulations strike a balance between competing national priorities, state prescriptions in the same area can stand as an "obstacle" to achievement of the federal goals, because federal law serves as a regulatory ceiling as well as a floor.  *See, e.g.*, *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 886 (2000).  Here, the Ordinance is preempted because it interferes, in multiple ways, with the FCC's comprehensive, uniform regulation of RF energy emissions from cell phones and related disclosures.

This Court previously held that the sentence about children in Berkeley's initial Ordinance was preempted "because the Berkeley warning as worded could materially deter sales on an assumption about safety risks which the FCC has refused to adopt or endorse."  *CTIA*, 139 F. Supp. 3d at 1060.  But the Court declined to enjoin the rest of the Ordinance because, at that time, CTIA had not "point[ed] to any FCC pronouncement suggesting that the agency has any objection to warning consumers about maintaining spacing between the body and a cell phone."  *Id.*  ***That no longer holds true***.  The FCC has now made crystal clear that it has significant objections and reservations about requiring warnings or mandating disclosures in this context.  Warnings like Berkeley's go well beyond what the FCC considers "adequate"; "risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices"; and stoke unnecessary fear that could lead to a

decline in the use of cell phones.  *FCC Order* ¶ 16; *see also* FCC Statement of Interest, at 17-19.  As a result, the Ordinance is preempted in its entirety.

### A. Congress Has Established A Uniform National Regime For The Regulation Of RF Emissions From Cell Phones

For over a century, wireless communications have been subject to continuous, pervasive, and uniform regulation by the federal government.  *See Farina v. Nokia Inc.*, 625 F.3d 97, 105–06 (3rd Cir. 2010).  In 1934, Congress passed the Communications Act "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges."  47 U.S.C. § 151.  "To that end, the [Act] established the FCC, which was endowed with broad authority to license and regulate radio communications."  *Farina*, 625 F.3d at 105. In 1993, Congress amended the Act to further consolidate wireless regulation at the federal level, in order to ensure a "national regulatory policy for [wireless telephony], not a policy that is balkanized state-by-state."  *Petition on Behalf of the State of Conn.*, 10 FCC Rcd. 7025, 7034 (¶ 14) (1995).

The FCC has regulated human exposure to RF emissions since 1985.  *Farina*, 625 F.3d at 106. In the Telecommunications Act of 1996 (the "1996 Act"), Congress expressly charged the FCC with establishing a federal safety standard governing RF emissions from wireless handsets.  *See* Pub. L. No. 104-104, § 704(b), 110 Stat. 56, 152 (1996).  Congress directed the FCC to adopt these rules because "decisions by non-federal units of government [had] created an inconsistent, and, at times, conflicting patchwork of requirements" regarding RF emissions, and it was in "the national interest" to establish "uniform, consistent requirements."  H.R. Rep. No. 104-204, at 94; *see also CTIA*, 928 F.3d at 850 ("Legislative hearings, as well as the Act itself, show that Congress desired uniform, consistent requirements, with adequate safeguards of public health and safety in nationwide telecom services." (quotation marks omitted)).  In crafting its RF energy rules, the FCC calibrated a "proper balance between" two Congressionally mandated goals—"the need to protect the public" from high levels of RF energy and "the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible."  *In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation*, 12 FCC Rcd. 13494, 13496 (¶ 2) (1997); *see also Farina*,

625 F.3d at 125 ("In order to satisfy both its mandates to regulate the safety concerns of RF emissions and to ensure the creation of an efficient and uniform nationwide network, the FCC was required to weigh those considerations and establish a set of standards that limit RF emissions enough to protect the public and workers while, at the same time, leav[ing] RF levels high enough to enable cell phone companies to provide quality nationwide service in a cost-effective manner.").  In short, as the Ninth Circuit explained, "the FCC was tasked not only with protecting health and safety of the public, but also with ensuring rapid development of an efficient and uniform network."  *CTIA*, 928 F.3d at 850 (citation omitted).

### B.     The Ordinance Undermines The FCC's Comprehensive, Uniform Regulatory Approach

The Ordinance frustrates and stands as an obstacle to the FCC's uniform, nationwide regulations of RF energy emissions from cell phones by warning consumers about potential safety risks from cell phones based on how cell phones are used and carried, even though the FCC has disavowed such safety risks and rejected the need for such a warning.  The Ordinance requires cell phone manufacturers to "prominently" warn customers about RF energy exposure, overturning the FCC's carefully tailored regime, because Berkeley believes the content and placement of information that the FCC endorses is "buried in fine print, [and] not written in easily understood language."  Berkeley Municipal Code §§ 9.96.010, 9.96.030(B).  The overall effect of the City's compelled speech mandate will be to interfere with core federal objectives, including efficient deployment and use of wireless devices and services, a uniform national regulatory approach to wireless communications, a consistent disclosure regime, and an effective and accurate public safety system.

*First*, the Ordinance communicates to an average consumer that cell phones are unsafe:  that exposure to "radiation" from a cell phone in excess of the federal guideline creates a "safety" concern, and that there is a "potential risk" from such "radiation" emitted from cell phones.  Berkeley Municipal Code § 9.96.030(A).  This conflicts with the FCC's recent determination that "phones legally sold in the United States pose no health risks."  *FCC Order* ¶ 14.  By igniting unfounded fear and stoking consumer anxiety, the Ordinance threatens to change consumers' behavior in a way that would hamper "the growth and development of mobile services" that Congress wants to foster.  H.R. Rep. No. 103-

111, at 260 (1993).  Moreover, if Berkeley's effort to second-guess the FCC's decisions regarding RF emissions is upheld, then other state and local governments will soon follow—thus recreating the very crazy quilt of RF emission regulation that Congress purposely sought to eliminate in the 1996 Act.

*Second*, the Ordinance overturns the FCC's carefully crafted disclosure regime that ensures adequate information reaches consumers while avoiding needless "feeling[s] of uncertainty or a lack of control."  *FCC Order* ¶ 16.  This Court found that CTIA had not shown that the Ordinance was likely preempted because "CTIA has failed to point to any FCC pronouncement suggesting that the agency has any objection to warning consumers about maintaining spacing between the body and a cell phone."  *CTIA*, 139 F. Supp. 3d at 1060.  And the Ninth Circuit affirmed because it concluded that the Ordinance "complements and reinforces" FCC policy by "alert[ing] customers to the safety disclosures that the FCC requires" in user manuals.  *CTIA*, 928 F.3d at 851.

But the FCC now has made a pellucidly clear pronouncement objecting to warnings outside the "context and placement" of existing information.  *FCC Order* ¶ 16.  The FCC itself makes information about "wireless devices and health concerns" available to the public.  *Id.*  And the FCC's Laboratory continues to "recommend[] that device manuals include operating instructions and advisory statements for RF exposure compliance."  *Id.*[6]  Critically, the FCC has concluded that these disclosure are appropriate and sufficient:  "Given the federal safety determination, the information on the FCC's websites and in device manuals are both adequate to inform consumers of these issues and do not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices."  *Id.*  The FCC has also explained that the "context and placement" of a disclosure is critical to avoid an erroneous public perception of a possible risk and "contribute to a feeling of uncertainty or a lack of control," even though these risks are "unsupported by evidence."  *Id.*  Thus, far from "complement[ing] and reinforc[ing]" the FCC's regulatory regime, *CTIA*, 928 F.3d at 851, Berkeley's Ordinance undermines it by compelling a warning that the FCC does not require or endorse.

---

[6] The FCC reviews user manuals as part of the process of certifying cell phone models, and thus can monitor whether cell phone manufacturers include appropriate information about RF emissions.  *See* 47 C.F.R. § 2.1033(b)(3).  FCC-certified cell phones necessarily satisfy whatever requirements the FCC may impose.  But the FCC has made clear that disclosures "about FCC-certified cell phones that go beyond those mandated by the FCC could mislead consumers into believing that RF emissions from those phones are unsafe."  FCC Statement of Interest, at 2.

As the FCC recently explained, requiring warnings like Berkeley's Ordinance would "conflict with the FCC's considered policy judgment" and thus be "preempted." FCC Statement of Interest, at 19. Indeed, the FCC noted that it "has a legitimate interest in guarding against 'overwarning' about the potential dangers of a product sold to consumers," *id.* at 18, and disclosures that "go beyond those mandated by the FCC could mislead consumers into believing that RF emissions from those phones are unsafe" and are therefore preempted, *id.* at 2.

Moreover, the FCC provides that *it* should control the information available: *The FCC* "ensure[s] that relevant information is made available to the public" and "*[t]he FCC* will continue to evaluate public information materials and update as appropriate." *FCC Order* ¶ 16 (emphasis added). This avoids the patchwork of differing rules and requirements that the Ordinance invites, and guarantees the nationwide uniformity Congress entrusted to the FCC in the 1996 Act. *See Farina*, 625 F.3d at 126 (explaining that "both Congress and the FCC recognized uniformity as an essential element of an efficient wireless network").

There can now be no doubt that there is conflict preemption, because allowing cities and counties across the country to require their own scripted warnings or messages would undermine the nationwide uniformity that Congress tasked the FCC with securing. Any state law imposing additional warning requirements is preempted. *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 332 (2011) (where "manufacturer choice was an important regulatory objective," state law "restrict[ing] that choice" was preempted); *see also* FCC Statement of Interest, at 18 ("State disclosure requirements that stand as an obstacle to the implementation of federal disclosure rules are preempted by federal law.") (citing *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1135-36 (9th Cir. 2005)). That is true for RF exposure in occupational settings, where the FCC demands consumer warnings about RF energy. It is especially true for RF exposure in general population settings—including from cell phones—where the FCC does not.

In sum, the FCC considered public safety and the efficient provision of wireless phone service by setting an RF exposure guideline that eliminated the need for consumer warnings. *See Farina*, 625 F.3d at 125. By undermining the nationally uniform disclosure system that the FCC established in carrying out its congressionally assigned tasks, and by requiring warnings that the FCC has not, the

City's Ordinance stands as an obstacle to federal objectives.  If Berkeley is allowed to impose its warning requirement, then many other localities will soon attempt the same thing, thereby reestablishing exactly the balkanized and inconsistent regulatory regime that Congress sought to replace with a uniform, national approach.

## CONCLUSION

Because the new *FCC Order* shows that Berkeley's compelled speech mandate is misleading, does not advance any substantial government interest, and undermines the FCC's uniform national regulatory regime, CTIA respectfully requests that this Court grant judgment on the pleadings that the Ordinance is an unconstitutional speech regulation and is preempted.

April 24, 2020

By:  /s/ Theodore B. Olson

Theodore B. Olson
Helgi C. Walker
Joshua D. Dick
Alexander N. Harris
Jacob T. Spencer

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Plaintiff*
*CTIA – The Wireless Association®*