Farimah F. Brown, City Attorney, SBN 201227
Christopher D. Jensen, Deputy City Attorney, SBN 235108
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6998
Facsimile: (510) 981-6960
Email: cjensen@cityofberkeley.info

Lester Lawrence Lessig, III (*pro hac vice*)
HARVARD LAW SCHOOL
1563 Massachusetts Avenue
Areeda 235
Cambridge, MA 02138
Telephone: (617) 496-8853
Email: lessig@law.harvard.edu

Amanda Shanor (*pro hac vice*)
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06510
Telephone: (203) 247-2195
Email: amanda.shanor@yale.edu

Attorneys for Defendants City of Berkeley and Christine Daniel

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION, | No.  3:15-CV-02529-EMC |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| THE CITY OF BERKELEY, CALIFORNIA, and CHRISTINE DANIEL, CITY MANAGER OF BERKELEY, CALIFORNIA, in her official capacity, | Judge:     Hon. Edward M. Chen<br>Date:      July 23, 2020<br>Time:      1:30 p.m.<br>Location:  Courtroom 5, 17th Floor |
| Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF ISSUES ....................................................................................... 1

STATEMENT OF RELEVANT FACTS .................................................................. 2

I.    Procedural Background ...................................................................................... 2

II.   Factual Background ............................................................................................ 3

ARGUMENT ............................................................................................................ 5

I.    Berkeley's "Health and Safety" Ordinance Does Not Violate the First Amendment ........... 5

      A.   Corporations Have No First Amendment Right to Avoid Factual and Uncontroversial Compelled Commercial Speech ........................................... 6

      B.   Berkeley's Ordinance Is Related to Health and Safety .............................. 7

      C.   Berkeley's Ordinance Is Not Misleading ................................................. 10

      D.   The Supreme Court's Reasoning in NIFLA Confirms the Inappropriateness of the Heightened Review That CTIA Demands ..................................... 13

II.   Berkeley's Ordinance Is Not Preempted ........................................................ 14

      A.   Berkeley's Ordinance Does Affect the Uniform National Regime for the Regulation of RF Exposure from Cell Phones .......................................... 14

      B.   Berkeley's Ordinance Does Not Conflict with Any Properly Established Federal Policy .......................................................................................... 15

             1.   Berkeley's complementing ordinance creates no "obstacle" to the FCC's own policy .............................................................................. 16

             2.   Berkeley's Ordinance gives consumers the same information as the FCC .......... 17

             3.   The FCC Statement does not change this analysis ............................. 19

      C.   To The Extent the FCC's Policy Objective Is Obscurity, It Must Pursue That Objective Expressly ......................................................................... 20

             1.   If obscurity is the FCC policy, then the FCC did not follow ordinary rulemaking procedures in adopting that policy ................................. 21

             2.   The TCA forbids implied preemption claims ................................... 22

CONCLUSION ....................................................................................................... 23

## <u>TABLE OF AUTHORTIES</u>

**Federal Cases**

*Central Hudson Gas & Electric Corp.* v. *Public Service Commission of N.Y.*,
  447 U.S. 557 (1980) .................................................................................................. 6

*CTIA v. City of Berkeley,*
  139 F. Supp.3d 1048 (N.D. Cal. 2015) ................................................................ *passim*

*CTIA—The Wireless Association v. City of Berkeley,*
  138 S. Ct. 2708, 2708 (2018) .............................................................................. *passim*

*CTIA—The Wireless Association v. City of Berkeley,*
  140 S. Ct. 658 (2019) .................................................................................................. 3

*CTIA–The Wireless Association v. City of Berkeley,*
  158 F. Supp.3d 897 (N.D. Cal. 2016) ........................................................................ 2

*CTIA—The Wireless Association v. City of Berkeley,*
  873 F.3d 774 (9th Cir. 2017) ...................................................................................... 3

*CTIA—The Wireless Association v. City of Berkeley,*
  928 F.3d 832, 837 (2019) ...................................................................................... *passim*

*Farina v. Nokia Inc.*,
  625 F.3d 97 (3d Cir. 2010) ........................................................................................ 15

*Int'l Dairy Foods Ass'n v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996) ............................................................................................ 8

*Janus v. AFSCME*,
  138 S. Ct 2448 (2018) ............................................................................................... 14

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010) .................................................................................................... 6

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ..................... 1

*Wooley v. Maynard*,
  430 U.S. 705 (1977) .................................................................................................... 6

*Wyeth v. Levine,* 555 U.S. 555 (2009) .......................................................................... 21, 23

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626 (1985)
  ................................................................................................................... 6, 7, 13

**Federal Statutes and Constitution**

U.S. Const. art. I, § 8, cl. 3 ......................................................................................... 20

47 U.S.C. § 152 ................................................................................................. *passim*

47 U.S.C. § 253 ................................................................................................. *passim*

**Other Authorities**

Berkeley, Cal. Mun. Code § 9.96.030 (2015) .................................................. 2, 10, 11

FCC Office of Engineering and Technology Laboratory Division, *RF Exposure Procedures and Equipment Authorization Policies for Mobile and Portable Devices* (Oct. 23, 2015)............. 18

FCC Statement of Interest, *Cohen v. Apple, Inc.*, No. 19-05322 (N.D. Cal. filed Apr. 13, 2020) ................................................................................................................. *passim*

Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, 61 Fed. Reg. 41006 (Aug. 7, 1996) ................................................................................... 18

*IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz,* C95.1-2005 (IEE-SA 2006)................................. 13

In the Matter of Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies, ET Docket No. 13-84 ............................................... 4

*In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields,* FCC 19-126, 2019 WL 6681944 (Dec. 4, 2019) ................................................................................................................. *passim*

Telecommunications Act of 1996 Conference Report, 104 S. Rep. 230 (February 1, 1996). ..... 22

**INTRODUCTION**

CTIA asks this Court to grant it judgment on the pleadings. Citing two recent actions by the FCC that it says "destroy[] the foundation for th[is] court's ruling," Pl. Mot. J. Pleadings ("Pl. Mot.") 5—*In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, FCC 19-126, 2019 WL 6681944 (Dec. 4, 2019) ("*FCC RF Order*"), *terminating Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies*, 28 FCC Rcd. 3498 (2013) ("*Reassessment*"), and FCC Statement of Interest, *Cohen v. Apple, Inc.*, No. 19-05322 (N.D. Cal. filed Apr. 13, 2020) ("*FCC Statement*")—CTIA argues that it is now "clearly establish[ed] on the face of the pleadings that … it is entitled to judgment as a matter of law." Pl. Mot 10 (citation omitted). These two FCC actions have altered, CTIA asserts, the factual predicate for this Court's and the Ninth Circuit's earlier ruling. Specifically, presumptions that this Court had drawn about the FCC's own view of complementing local regulation, are "***no longer true***." Pl. Mot. 3 (emphasis in the original). These changes, CTIA argues, now render Berkeley's ordinance both unconstitutional under the First Amendment and preempted by federal law.

This Court should reject CTIA's motion. There is no doubt that Berkeley's ordinance remains constitutional under the First Amendment. Indeed, as the City of Berkeley has argued, the ordinance is even more clearly constitutional after the Supreme Court's decision in *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2369 (2018), than before. Suppl. Br. Appellees City of Berkeley and Christine Daniel 1-3. (App. Dkt. 130).

Neither is there any doubt that the ordinance is not preempted. The FCC has not exercised its power to preempt Berkeley's complementing health and safety warning. The ordinance does not create any "obstacle" to any FCC policy.

**STATEMENT OF ISSUES**

1.   Whether Berkeley's Ordinance violates the First Amendment.

2.   Whether Berkeley's Ordinance is preempted by federal law.

1

## STATEMENT OF RELEVANT FACTS

2

### I.     Procedural Background

3        In May 2015, the City of Berkeley enacted an ordinance to assure that purchasers of cell

4  phones within city limits were aware that the FCC regulated radio-frequency ("RF") exposure,

5  and that the FCC required cell phone manufacturers to provide guidance about how consumers

6  could avoid exceeding those RF exposure limitations. Specifically, the Ordinance provided as

7  follows:

8           The City of Berkeley requires that you be provided the following notice:

9           To assure safety, the Federal Government requires that cell phones meet radio-
          frequency (RF) exposure guidelines. If you carry or use your phone in a pants or
10         shirt pocket or tucked into a bra when the phone is ON and connected to a
          wireless network, you may exceed the federal guidelines for exposure to RF
11         radiation. This potential risk is greater for children. Refer to the instructions in
          your phone or user manual for information about how to use your phone safely.

12

13  Berkeley, Cal. Mun. Code § 9.96.030(A) (2015) ("Ordinance").

14        Immediately after the Ordinance went into effect, CTIA filed an action challenging the

15  Ordinance under both the First Amendment and the Supremacy Clause, and filed a motion for a

16  preliminary injunction. Dkt. 4.

17        This Court found one provision of the Ordinance, as it related to children, to be

18  preempted. *CTIA v. City of Berkeley,* 139 F. Supp.3d 1048, 1060–61 (N.D. Cal. 2015) ("*CTIA*").

19  It otherwise found the Ordinance both constitutional under the First Amendment, and, except for

20  the provision referencing children, not preempted under the Supremacy Clause. *Id.* at 1075. The

21  Court enjoined the Ordinance "unless and until the sentence in the City notice regarding children

22  safety is excised from the notice." *Id.* Berkeley amended the Ordinance to remove the clause

23  referencing children ("This potential risk is greater for children.") and moved to dissolve the

24  preliminary injunction. Dkt. 59. This Court granted Berkeley's motion. *CTIA–The Wireless*

25  *Association v. City of Berkeley*, 158 F. Supp.3d 897, 898 (N.D. Cal. 2016).

26        CTIA appealed this Court's judgment. The Ninth Circuit affirmed, finding the Ordinance

27  likely constitutional under the First Amendment, and as amended, likely not preempted by

28  federal law. *CTIA—The Wireless Association v. City of Berkeley*, 854 F.3d 1105 (2017) ("*CTIA*

2

1  *I*").

2       CTIA asked the Ninth Circuit for rehearing *en banc* as to the First Amendment question

3  but not as to preemption. App. Dkt. 93. The Court denied rehearing. *CTIA—The Wireless*

4  *Association v. City of Berkeley*, 873 F.3d 774, 775 (9th Cir. 2017). CTIA then asked the

5  Supreme Court to grant certiorari on its First Amendment claim. It did not ask the Court to

6  review its preemption claim. The Supreme Court vacated the judgment and remanded for

7  reconsideration in light of *NIFLA. CTIA—The Wireless Association v. City of Berkeley*, 138 S.

8  Ct. 2708, 2708 (2018). The Ninth Circuit again affirmed the judgment of this Court in light of

9  *NIFLA, CTIA—The Wireless Association v. City of Berkeley,* 928 F.3d 832, 837 (2019) ("*CTIA*

10  *II*"). CTIA again asked the Supreme Court to grant certiorari, again limited to its First

11  Amendment claim. In December, the Supreme Court denied CTIA's motion. *CTIA—The*

12  *Wireless Association v. City of Berkeley*, 140 S. Ct. 658, 658 (2019). CTIA's present motion for

13  judgment on the pleadings follows the Supreme Court's denial of certiorari.

14  **II.**    **Factual Background**

15       With important qualifications, the City of Berkeley largely accepts CTIA's statement of

16  facts.

17       First, Berkeley has agreed that non-ionizing radiation cannot remove electrons from

18  atoms, which would "damage DNA." Pl. Mot. 7. Answer ¶ 28 (Dkt. 31). But Berkeley has

19  expressly denied "that the only known adverse health effect of non-ionizing radiation is a

20  'thermal effect,'" *id.*, and it has denied that "there are no adverse effects on the body below [the

21  thermal] threshold, regardless of how long or how intense the exposure to RF energy." Answer ¶

22  30.

23       Second, Berkeley has acknowledged that the safety factor adopted by the FCC is

24  designed to avoid "posing a health hazard to humans" from RF exposures, Pl. Mot. 8. But CTIA

25  misstates the size of that safety factor. CTIA repeatedly claims a "50-fold" safety factor is

26  incorporated into cell phone safety standards. *Id*. This refers to the whole-body RF exposure

27  limit set by the FCC—.08 W/kg—which is one-fiftieth of the exposure presumed to cause a

28  behavioral effect—4 W/kg. Yet the SAR limit for cell phones is a *partial-body* limit of 1.6

3

1   W/kg, as averaged over one gram of tissue. *See* Reply Comments of Pong Research Corporation,

2   In the Matter of Reassessment of Federal Communications Commission Radiofrequency

3   Exposure Limits and Policies, ET Docket No. 13-84, at 9-16 (explaining why '50-Fold' safety

4   factor "is a myth"), *available at* https://perma.cc/5NYY-TTWF. It is for this reason that the FCC

5   does not refer to a "50-fold safety factor," but instead, correctly, states that it is "a large safety

6   margin." *FCC RF Order* ¶ 14.

7        Third, Berkeley has acknowledged that the FCC does not mandate "safety warnings" for

8   cell phones of the kind required for workers exposed to non-ionizing radiation in closed

9   environments. Pl. Mot. 9. But it is the law of this case that the FCC *does* mandate that

10  manufacturers include information to advise consumers about how they might use their phones

11  without exceeding RF exposure limits, as both this Court and the Ninth Circuit have held. *CTIA*

12  *II,* 928 F.3d at 840; *CTIA*, 139 F. Supp.3d at 1053.

13       Finally, Berkeley does not accept CTIA's characterization of Berkeley's own views

14  about cell phones. Specifically, Berkeley does not "disagree[] with the FCC's conclusions that

15  all cell phones sold in the United States are safe." Pl. Mot. 9. The Ordinance does not assert that

16  cell phones are not "safe." Instead, as this Court and the Ninth Circuit have held, the notice is

17  designed to inform consumers about how they can use their cell phones without exceeding

18  federal RF exposure limits—if they so choose. By so informing its residents, Berkeley no more

19  directs them to avoid RF exposure beyond the FCC's RF limits than does the FCC by mandating

20  such warnings be included in FCC manuals.

21       CTIA's confusion is driven by its assumption that by declaring cell phones "safe," the

22  FCC had declared that non-ionizing RF emissions can have no biologic effect, at least beyond

23  their thermal effects, that any individual or community could have any reason to be concerned

24  about. That conclusion does not follow. A product may be "safe" even if it has particular effects

25  that raise health-related concerns.

26       Consider, for example, antibiotics. Many antibiotics are deemed by the FDA to be "safe

27  and effective." That declaration does not mean that there are no contexts or uses in which

28  antibiotics might be inappropriate—for example, in pregnancy. That same logic applies here:

4

1   Berkeley does not condemn cell phones as unsafe. But especially in light of the science that

2   establishes potential biologic effects from cell phones on, for example, sperm, *see, e.g.*, Ashok

3   Agarwal, *Cell Phones And Male Infertility: Dissecting The Relationship,* 15 Reproductive

4   BioMedicine Online 266 (2007), *available at* https://perma.cc/MBG9-7WYQ, Berkeley believes

5   it has a substantial interest in informing, in this case, at the very least, young males within the

6   City of Berkeley about ways in which they might avoid exceeding RF exposure to their sperm.

7   <u>**ARGUMENT**</u>

8   **I.      Berkeley's "Health and Safety" Ordinance Does Not Violate the First Amendment**

9   For five years now, CTIA has waged a campaign to get the federal courts to craft a new

10   field of First Amendment jurisprudence, by requiring the judiciary to apply heightened First

11   Amendment review to health and safety warnings. Yet in its latest motion before this Court,

12   CTIA fails to even acknowledge that the Supreme Court has now *expressly rejected* this new

13   First Amendment mission. In the case CTIA represents as establishing the standard that this

14   Court should apply, *NIFLA*, the Supreme Court expressly denied that it was sanctioning such

15   review, stating that it did "**not question the legality of health and safety warnings long**

16   **considered permissible.**" *NIFLA,* 138 S. Ct. at 2376 (emphasis added).

17   This language was not simple dicta. Justice Breyer had argued that the decision of the

18   Court would "radically change prior law, perhaps placing much securities law or consumer

19   protection law at constitutional risk." 138 S. Ct. at 2380 (Breyer, J., dissenting). The Court

20   expressly rejected Justice Breyer's suggestion. Instead, directly responding, the Court offered the

21   language that Berkeley has cited—that it did "not question the legality of health and safety

22   warnings long considered permissible." *Id.* at 2376.

23   Yet without even citing this language from *NIFLA*, CTIA now expressly asks this Court

24   to "question the legality of health and safety warnings long considered permissible," because of

25   two (ultimately irrelevant) actions by the FCC. As Berkeley will demonstrate, neither action

26   warrants a reversal of the judgments of this Court or the Ninth Circuit.

27

28

## A.     Corporations Have No First Amendment Right to Avoid Factual and Uncontroversial Compelled Commercial Speech

CTIA grounds its First Amendment argument in a misunderstanding that it has repeated at every stage of this litigation. CTIA asserts the "[t]he freedom of speech protected by the First Amendment 'includes both the right to speak freely and the right to refrain from speaking at all.' *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)." Pl. Mot. 11.

That statement is true of *non-commercial* speech, such as being banned from advocating "Black Lives Matter" or for reelection of the President. It is false—as the Supreme Court expressly stated in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651 (1985), and again reaffirmed in *NIFLA,* 138 S. Ct. at 2365-66—with respect to commercial speech. Instead, with commercial speech, commercial actors have no autonomy right "to refrain from speaking at all"—at least if they choose to remain in the market. To the contrary, since the Founding, commercial actors have been required to provide information (aka, "speak") to their customers, whether they have wanted to or not. Whether health and safety warnings, financial disclosures, or consumer protection information, the long history of government regulation of commercial actors has been a history of compelled speech requirements in the interest of consumers—that is, the listening public. This is again because commercial speech is constitutionally valuable for its informational function. *Central Hudson Gas & Electric Corp.* v. *Public Service Commission of N.Y.*, 447 U.S. 557, 566-71 (1980).

*Zauderer* addressed possible limits to such requirements. At least in the context of commercial advertising, a compelled speech requirement would be constitutional if "purely factual and uncontroversial." *Zauderer,* 471 U.S. at 651. Later Supreme Court authority clarified the reach of the *Zauderer* principle. *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010). And *NIFLA* again reaffirmed the principle, though holding that a higher standard of review applied in the context of plainly politically controversial speech requirements regarding abortion. 138 S. Ct. at 2376.

If anything, the Court's express mention of "health and safety warnings" as beyond *Zauderer* review should suggest that a *lower* standard of review could now apply to "health and

1    safety warnings long considered permissible." *Id.* But on remand, the Ninth Circuit continued to

2    apply *Zauderer* to the Berkeley Ordinance. That standard thus remains the law of this case.

3         Under that standard, a "compelled disclosure of commercial speech complies with the

4    First Amendment if the information in the disclosure is reasonably related to a substantial

5    governmental interest and is purely factual and uncontroversial." *CTIA II*, 928 F.3d at 845. In

6    this case, as the Ninth Circuit held, *id.* at 845-46, the "substantial governmental interest" is "the

7    health and safety of consumers." Berkeley's Ordinance is constitutional under this standard.

8         **B.    Berkeley's Ordinance Is Related to Health and Safety**

9         On CTIA's view, a regulation is "health-related" if and only if the government can prove

10   with certainty that complying with the regulation would improve someone's health. Because, on

11   CTIA's view, cell phones are "safe" no matter how they are carried, Pl. Mot. 2, it follows that no

12   regulation requiring information about their use could be "health-related."

13        This view is directly contrary to the FCC's own justification for its own compelled

14   speech requirement. The FCC mandates that manufacturers provide information that alerts users

15   to the minimum distances appropriate for the device they are using. *CTIA II*, 928 F.3d at 840. It

16   does that *even though* it believes cell phones have "not been proven dangerous." *Id.* at 846. The

17   *reason* it does so was made explicit by the FCC in the second of the two recent FCC actions that

18   CTIA cites, *FCC Statement*. In the FCC's own words, the FCC's regulations are designed to

19   enable users who are "skeptical of the science underlying the FCC's RF guidelines," *FCC*

20   *Statement* at 17-18 (citation omitted), to be confident in cell phone safety, by giving those users

21   the information they need to assure that they don't use their cell phones in a manner that exceeds

22   the RF limits imposed by the FCC—*if they so choose*.

23        The FCC has not concluded that the concerns of those "skeptical" consumers are

24   fantasies or superstitions. To the contrary, in the recent *FCC RF Order*, the agency

25   acknowledged the "record includes scientific papers of variable quality and significance" raising

26   concerns about potential biologic effects from RF exposure. *FCC RF Order* ¶ 12. But whether or

27   not that evidence compelled a different regulatory regime for cell phones, the FCC did not

28

determine that this evidence was scientifically baseless or unrelated to health.[1] It did not provide

any reason to reject the valid and scientifically supported studies that point to potential biologic

effects from RF radiation.[2]

Nor could it—given the FCC's own recognition that it is not a health agency.

*Reassessment* ¶ 215. The FCC relies upon the FDA for its health-related judgments. The FDA

has nowhere concluded that the studies establishing biologic effects from non-ionizing radiation

are invalid or prove no biologic effect.[3] At most, the FDA has concluded that those studies don't

merit a change in the FCC current regime of protection. They do not establish that there is no

reason for that regime of protection, or even that there is no reason for anyone to have any

concern with that regime of protection.

In this respect, the FDA and FCC's attitude to the potential risks from RF radiation is

fundamentally different from the questions at issue in *Int'l Dairy Foods Ass'n v. Amestoy*, 92

F.3d 67 (2d Cir. 1996). In that case, the Court rejected a labeling requirement about whether

products were derived from dairy cows treated with a synthetic growth hormone. The Court

found it "undisputed" that "the dairy products derived from herds treated with rBST are

indistinguishable from products derived from untreated herds." *Id.* at 69. The FDA had thus

declined to require labeling of such products. Concerns about the growth hormone, the relevant

---

[1] In making its First Amendment argument, CTIA insists that the FCC's Statement of Interest undermines the claim that there is a legitimate informational interest. To the contrary, the FCC's Statement of Interest flatly *affirms* that there is a substantial interest in providing such information, *regardless* of whether the FCC believes exceeding RF limits creates a certain health risk, because the Statement continues to validate providing information to "skeptical" users.

[2] The FCC order has been challenged for failing to address the scientific literature raising concerns about cell phone safety. See *Environmental Health Trust v. FCC*, Case No. 20-125 (2020).

[3] Though the FDA's website sometimes refers to RF radiation having no "health effect," the most comprehensive review of recent scientific studies focuses upon the carcinogenic effect of RF radiation. FDA, Review of Published Literature between 2008 and 2018 of Relevance to Radiofrequency Radiation and Cancer 87 (February 2020) ("the epidemiological data published between January 1, 2008 to May 8, 2018, continue to support the FDA's findings that there is no quantifiable causal link between RFR exposure and tumor formation."). Though the study references evidence of harm to sperm, *id.* at 22, it does not evaluate studies that have raised concerns about RF exposure and sperm.

1    regulatory agency had effectively concluded, were mere superstitions.

2         Here, by contrast, everyone acknowledges that at some level, RF radiation has a biologic

3    effect. Moreover, there is important evidence that RF exposure could have such an effect even

4    within the range of RF limits. *See, e.g.*, Ashok Agarwal, *Cell Phones and Male Infertility:*

5    *Dissecting The Relationship,* 15 Reproductive BioMedicine Online 266 (No. 3) (2007) *available*

6    *at* https://perma.cc/MBG9-7WYQ. And the FCC has required warnings about non-ionizing

7    radiation in the occupational environment, see *infra* note 5, and information in cell phone

8    manuals about to use the phone consistent with RF exposure limits. Whether RF radiation has

9    been proven to cause cancer or not, concerns about RF radiation are not mere superstition.

10        Berkeley concedes that if its concerns were mere superstition—the equivalent of a rule

11   that required mirror manufacturers to warn that "breaking a mirror could lead to 7 years bad

12   luck"—then there could be no justification for either the FCC's requirements or Berkeley's. But

13   the FCC has *never* held as CTIA repeatedly asserts—that RF radiation has no biologic effect "no

14   matter how used." Pl. Mot. 19.[4] The FCC has no competence to make such a determination. The

15   FDA has not even tried.

16        Thus on this account, the purpose of the FCC and Berkeley's health-related compelled

17   speech is to give consumers health-related information about how their use of cell phones might

18   affect their exposure to RF emissions. The regulation therefore clearly satisfies the standard that

19   CTIA itself sets: that "the compelled speech will actually 'achieve' the government's purported

20

---

21   [4] In its motion, CTIA repeats a claim that it has repeatedly made throughout this litigation—that
22   "the FCC" has stated that cell phones can cause no harm "no matter how" a cell phone is "used,"
     "worn," "carried," or "held." *See* Compl. ¶ 140 (Dkt. 1) ("worn"), Motion for a Preliminary
23   Injunction 5 (Dkt. 4) ("worn"), Reply Br. 1-2 (App. Dkt. 60) ("carried"), Reply Br. in Supp. of
     Reh'g En Banc 2 (App. Dkt. 108) ("used"), First Pet. for Cert. 34 ("used"), Suppl. Br. 7 (App.
24   Dkt. 126) ("held"), Second Pet. for Cert. 31 ("used"), Suppl. Br. before the Ninth Circuit 7 (App.
     Dkt. 126) ("held"), Second Pet. Cert., United States Supreme Court 31 ("used"). ***Never*** has
25   CTIA actually cited to an example of the FCC using these words, despite Berkeley's repeated
     insistence to the contrary. What is true is what CTIA in its complaint claimed first: "**CTIA's**
26   **members**—including cell phone manufacturers—do not believe that any phone approved for
     sale in the United States creates a safety concern for consumers by emission of RF energy, no
27   matter how the phone is worn." Compl. ¶ 99. Berkeley submits there remains a difference
     between "the FCC" and "CTIA's members."
28

9

1  substantial interest," Pl. Mot. 13. The "substantial interest" is in providing the factual

2  information. That is true of the FCC's regulations; it is true of Berkeley's. And there is certainly

3  no authority to suggest that merely because a trade association representing a regulated product

4  does not believe that there is any risk from its product, health and safety warnings about that

5  product are rendered unconstitutional. (By comparison, consider that executives from major

6  tobacco corporations continued until the late 1990s to deny that cigarettes cause cancer. *See* K.

7  Michael Cummings, Anthony Brown and Richard O'Connor, *The Cigarette Controversy*, 16

8  Cancer Epidemiology Biomarkers & Prevention 1070, 1072 (June 1 2007), *available at*

9  https://perma.cc/J8CP-3BER. No Court ever suggested that the industry's doubts about the harm

10  from its product rendered mandated warnings unconstitutional.)

**C.     Berkeley's Ordinance Is Not Misleading**

12  The Ninth Circuit has concluded that Berkeley's Ordinance is not misleading. The Court

13  concluded each statement in the Ordinance is true. The three true statements together are also

14  true. *CTIA II*, 928 F.3d at 846-48. The Ordinance is thus "factual." And on remand from *NIFLA*,

15  the Ninth Circuit affirmed that the subject of the Ordinance was not "controversial" *Id.* at 844-

16  45.

17  The first three paragraphs of CTIA's argument to the contrary simply repeat the

18  arguments already rejected by this Court and the Ninth Circuit. *Id.* Once again, CTIA assumes

19  that the only legitimate "health-related" reason for a "health and safety warning" is the actual

20  health effects of using a product in a certain way. The FCC and the Ninth Circuit have concluded

21  that legitimate "health-related" reasons could include providing the information necessary to

22  users to make an informed decision about how to use their cell phones so as to avoid RF

23  exposure—if they so choose.

24  CTIA's arguments beyond its rehash are also plainly wrong. CTIA asserts that the Ninth

25  Circuit was wrong to conclude that the following sentence in the Ordinance was true:

26  > If you carry or use your phone in a pants or shirt pocket or tucked into a bra
> when the phone is ON and connected to a wireless network, you may exceed the
27  > federal guidelines for exposure to RF radiation.

28

1    Berkeley, Cal. Mun. Code § 9.96.030(A) (2015).

2         CTIA claims the Ninth Circuit had held that this sentence was true "because '[t]he FCC

3    has established SAR limits for RF radiation premised on maintaining a certain separation

4    between a cell phone and the user's body' and '[m]aintaining that separation protects consumers

5    from exceeding the SAR limits.'" Pl. Mot. 18 (citing *CTIA II*, 928 F.3d at 847).

6         But this sentence is true because of physics, not the FCC. No one can deny that using a

7    cell phone in this manner "may exceed federal guidelines for exposure to RF radiation." And

8    neither can anyone deny that "[m]aintaining [] separation protects consumers from exceeding the

9    SAR limits." The Ninth Circuit may well have been incomplete in recounting the FCC's full

10   testing regime. It may be the case that the FCC perform tests "against the head, representing

11   normal use during a phone call" and "actual testing separation distances tend to be less than the

12   2.5 cm prescribed for many devices." *FCC RF Order* ¶ 14. But it is not the completeness of the

13   Ninth Circuit's opinion that is being challenged in this proceeding. It is Berkeley's Ordinance.

14   And there could be no doubt that "if you carry or use your phone in a pants or shirt pocket or

15   tucked into a bra when the phone is ON and connected to a wireless network, you may exceed

16   the federal guidelines for exposure to RF radiation."

17        CTIA insists nonetheless that the FCC's Order is relevant to its First Amendment

18   argument because CTIA insists—falsely, see *supra* note 4—that the *FCC RF Order* affirms that

19   "cell phones are safe irrespective of how they are used or how they are held." Pl. Mot. 18. But

20   again, beyond its false attribution to the FCC, this argument assumes what the FCC's own

21   regulations reject: that the only legitimate scope for "health and safety warnings" is the certain

22   effect on health that would occur if those warnings were not complied with. This is not how risk

23   regulation or health and safety warnings operate, as the FCC's own disclosure requirements

24   demonstrate. The FCC requires manual disclosures that, on CTIA's logic, are unconstitutional

25   because failure to comply with them will not lead to certain harm. The First Amendment

26   mandates no such requirement. Absent preemption, Berkeley, like the FCC, can mandate the

27

28

1    disclosure of health and safety information.[5]

2          CTIA claims Berkeley's Ordinance is "misleading" because its language doesn't track

3    the FCC's disclosure requirement word for word and is not limited to the product manuals. Pl.

4    Mot. 15-16. This again misses the point relevant to the First Amendment analysis. The FCC's

5    regulation reveals the legitimate and substantial interest that a government might have for

6    mandating a "health and safety warning." The Ordinance is designed to assure that consumers

7    know what Berkeley had determined, through survey research before it regulated, its residents

8    did not know: (1) that the FCC regulated RF radiation; (2) that the manner in which a consumer

9    uses her cell phone might affect whether she exceeds RF exposure limits; and (3) that the

10   manufacturer's manual provides more information about how to avoid exceeding RF exposure

11   limits, if the consumer so chooses. Decl. of Tom Jensen, Public Policy Polling, Results of the

12   March 6-8, 2015 Survey, Excerpts of Record 165 (App. Dkt. 45) (finding 85% had "not seen"

13   manufacturers' manual warnings about excessive RF exposure and 82% would like to be aware

14   of such information).

15         Finally, CTIA repeats its claim that the term "radiation" renders the Ordinance

16   misleading. Pl. Mot. 18-19. The Ninth Circuit correctly and expressly rejected this argument.

17   *CTIA II,* 928 F.3d at 847-48. CTIA has added nothing to give this Court any basis for reversing

18   the Ninth Circuit's conclusion. To argue as a matter of law that an Ordinance could be

19   interpreted incorrectly is to invoke the heightened standard of review that *NIFLA* expressly

20   rejects. *NIFLA,* 138 S. Ct. at 2367.

21

22

23   ───────────────────────

24   [5] The same point could be made about RF exposure in occupational or "controlled
     environments." As CTIA has correctly noted, the FCC mandates RF warnings in "occupational"
     or "controlled" settings. *See* Opening Br. 49-50 (App. Dkt. 30). *See also Reassessment* ¶ 75

25   ("The fundamental purpose" of the FCC's rules in those settings "is to require that workers at the
     higher permitted levels of exposure have the appropriate level of awareness.") But the RF

26   emissions in these contexts is also non-ionizing radiation. On CTIA's account of the science,
     that radiation too could have no health effects. Yet the FCC mandates express warnings to assure

27   "awareness." On CTIA's argument, those regulations too would be unconstitutional if the only
     justification for mandated warnings were an actual showing of a health effect.

28
                                                   12

1
2

### D.      The Supreme Court's Reasoning in NIFLA Confirms the Inappropriateness of the Heightened Review That CTIA Demands

3

Berkeley maintains that the Supreme Court has clearly indicated that heightened review

4

of "health and safety warnings" is not required by the First Amendment. But whether that review

5

is mere rational basis, or the slightly different *Zauderer* standard as interpreted by the Ninth

6

Circuit that governs this case, the justifications for such deference are clear.

7

As Berkeley has argued repeatedly, regulators require substantial freedom when making

8

judgments about health and safety, given the extraordinary uncertainty such judgments

9

inherently entail and given the wide range of views of the public about questions of risk and

10

safety. *See, e.g.*, Answering Br. 48-52 (App. Dkt. 44). Every safety standard involves a "safety

11

factor"—a multiple beyond the regulated risks that the standard incorporates. Elevators, for

12

example, are regulated by safety standards. Those standards include a safety factor of 11.9. *IEEE*

13

*Standard for Safety Levels with Respect to Human Exposure to Radio Frequency*

14

*Electromagnetic Fields, 3 kHz to 300 GHz,* C95.1-2005 at 114 (IEE-SA 2006), at 114 ("The

15

term 'safety factor' is commonly interpreted to be the ratio of an exposure level causing an

16

adverse effect to the corresponding allowable exposure limit."). Thus, if an elevator is designed

17

to lift up to 11,900 lbs., a safety factor of 11.9 would require that the stated load limit be set at

18

1,000 lbs. This means that users of the elevator would be told that the "maximum load" of that

19

elevator is 1,000 lbs., even though the design would permit a load of up to 11,900 lbs. before

20

certain failure.

21

Under the argument advanced by CTIA, Otis Elevators would be free to use the First

22

Amendment to challenge such a safety warning, and the government would then bear the burden

23

of demonstrating that requiring a warning at 1,000 lbs.—rather than 2,000 lbs., or 10,000 lbs.—

24

was justified. Under that standard, there would be no end to unproductive litigation by

25

corporations seeking to avoid warnings that they happen not to like.

26

The First Amendment requires no such result. It is therefore unsurprising, given the

27

uncertainty inherent in any such judgment, that the Court in *NIFLA* instructed lower courts that

28

"the legality of health and safety warnings long considered permissible," 138 S. Ct. at 2367, was

13

1   not, under *NIFLA*, to be "question[ed]." CTIA has offered no answer to the question of how an

2   opinion which instructs lower courts not to "question" "health and safety warnings" provides the

3   foundation for such questioning nonetheless. *Id.*

4                                              * * * *

5           Were the Supreme Court to hold that "health and safety warnings" are subject to strict or

6   even intermediate First Amendment scrutiny, CTIA's arguments may well have merit. But this

7   effort to "weaponiz[e] the First Amendment," as Justice Kagan recently put it, *Janus v.*

8   *AFSCME*, 138 S. Ct 2448, 2501 (2018) (Kagan, J., dissenting), has been resisted by the Supreme

9   Court. Until CTIA prevails in its campaign, its challenge to Berkeley's Ordinance must continue

10  to fail.

11  **II.      Berkeley's Ordinance Is Not Preempted**

12          CTIA argues that this Court should imply a preemption of Berkeley's Ordinance from a

13  brief filed by the FCC in a separate case, *FCC Statement*, and an order of the FCC declining to

14  change its RF exposure standards. *FCC RF Order*. Neither action should change the conclusion

15  of the Ninth Circuit, *CTIA I*, 854 F.3d at 1121-23, and this Court, *CTIA*, 139 F. Supp.3d at 1059-

16  1060, that Berkeley's Ordinance is not preempted.

17

18          **A.   Berkeley's Ordinance Does Affect the Uniform National Regime for the
                    Regulation of RF Exposure from Cell Phones**

19          Before addressing the thrust of CTIA's preemption claim, it is important to clarify a

20  point that CTIA's brief obscures: There is *no chance* that Berkeley's Ordinance would create a

21  "patchwork of differing rules," Pl. Mot. 24, or any conflicting obligations on cell phone

22  manufacturers. Berkeley's Ordinance is inherently local. It applies to *retailers* within the City of

23  Berkeley. It simply requires those retailers to provide a leaflet to the purchasers of cell phones,

24  or to post a sign at the point of sale. Berkeley does not purport to regulate Apple or Samsung. Its

25  rules cannot affect any actor outside of the City of Berkeley, and therefore cannot create

26  conflicting obligations.

27

28

---

DEFENDANTS' OPPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS,
Case No. 3:15-CV-02529-EMC

**B. Berkeley's Ordinance Does Not Conflict with Any Properly Established Federal Policy**

As the Ninth Circuit has directed,

> "Preemption analysis 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " ... "Congressional intent, therefore, is the ultimate touchstone of preemption analysis."

*CTIA I,* 854 F.3d at 1121 (citation omitted).

CTIA does not argue that either Congress or the FCC has expressly preempted state or local health or safety warnings, or that the federal government occupies the "field." *CTIA,* 139 F. Supp.3d at 1057 n.5. Its claim is that Berkeley's Ordinance creates an "obstacle" to the proper enforcement of a federal policy. As this Court described the "obstacle" test for preemption,

> "'If the purpose of the [federal] act cannot otherwise be accomplished—if its operation within its chosen field must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.'"

*CTIA,* 139 F. Supp.3d at 1057 (citation omitted).

In evaluating CTIA's claims initially, this Court followed the decision of the Third Circuit in *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010). In that case, the Court concluded that the "FCC was tasked with a balancing act—not only to 'protect[ ] the health and safety of the public, but also [to] ensur[e] the rapid development of an efficient and uniform network, one that provides effective and widely accessible service at a reasonable cost.'" *CTIA*, 139 F. Supp.3d at 1058.

Berkeley submits that under this standard, nothing in this Court's analysis of the Ordinance should change. As described below, Berkeley's Ordinance simply complements the FCC's own regulations to "protect the health and safety of the public." *Id.* "Complements" are not "obstacles."

But Berkeley would add to this argument, by asking this Court to recognize the other clear congressional principle articulated in *Farina*: That Congress expressly signaled that federal law was not to be exclusive, and that preemption was not to be "implied," Telecommunications

15

Act of 1996 § 601(c)(1), codified at 47 U.S.C. § 152 (notes) ("TCA"). To the extent Berkeley's complementing regulation is suggested to create "tension" with an implied federal policy—to occupy the field of health and safety warnings—that implied preemption must be rejected.

### 1. Berkeley's complementing ordinance creates no "obstacle" to the FCC's own policy

As this Court has held, *CTIA*, 139 F. Supp.3d at 1053, and the Ninth Circuit has confirmed, *CTIA I*, 854 F.3d at 1122, the FCC's policy includes an objective to give consumers information about their RF exposure, to enable them to take steps to assure they don't exceed RF exposure limits—*if they so choose*. The *reason* for that objective is not tied necessarily to any health consequences from RF exposure. Instead, as the FCC has recently explained, the rule responds to "'consumers who are skeptical' of the science underlying the FCC's RF guidelines." *FCC Statement,* 17-18. "Skeptical consumers" are less likely to use a product. Addressing the skeptic's concerns thus serves an important interest in advancing a market.

The FCC's recent RF order confirms this policy objective. Paragraph 16 of that order declares the FCC's policy to be "to ensure that relevant information is made available to the public." *FCC RF Order* ¶ 16. As the paragraph makes clear, by "relevant information" the FCC means information related to RF exposure. Such information is made available by the FCC on its website, and includes "general RF exposure information" as well as information on "specific topics," including "health concerns." *Id.* Such information is also made available privately, in the device manuals provided by manufacturers, including specifically "advisory statements for RF exposure compliance." *Id.* These sources together are, the FCC has declared, "both adequate to inform consumers of these issues and do not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices." *Id.*

It is this single sentence that is the ultimate source for CTIA's argument that the FCC has "destroy[ed] the foundation for th[is] court's ruling," Pl. Mot. 5. By declaring that the information that the FCC offers and requires is "adequate to inform consumers" and does not risk "overwarning," CTIA infers that the FCC has now impliedly declared as federal policy that ***no other words shall be uttered***. On CTIA's account, the *FCC RF Order* declares a new federal

16

1  policy that prohibits states or localities from taking complementary steps to "inform consumers

2  of these issues" because, on CTIA's understanding, *any* complementing steps risk

3  "overwarning." By providing and mandating some information, the FCC, on CTIA's account,

4  has *by implication* forbidden any other mandates—including mandates that effectively say

5  simply, "read what the FCC has required."

6       As a matter of federalism, as embraced and implemented by the TCA, this conclusion

7  reaches too far procedurally. If the FCC wants to establish this new "National Information

8  Policy" about the safety of RF emissions, at a minimum, it must follow the notice and comment

9  procedures of the TCA. 47 U.S.C. § 253(d) (preemption permitted after "notice and opportunity

10 for public comment"). The inquiry terminated by *FCC RF Order* did not identify preemption of

11 local health and safety ordinances as an issue it would address. On the pretense of not changing

12 anything, the FCC should not now be allowed to imply a broad exclusion of local regulatory

13 authority.

14      But as a matter of substance, a concern about the possibility of "overwarning" is not the

15 same as a federal conclusion that no information may be disclosed except for the FCC mandated

16 disclosures. The FCC's statement cannot be read to exclude automatically any notice

17 requirement by any other government. Specifically, when the notice requirement is effectively

18 the same as the information that the FCC is providing, then—except by recognizing a federal

19 interest in assuring that such information *not* be conveyed to consumers—there could be no

20 "obstacle" from local governments providing that same information as well.

21      **2.  Berkeley's Ordinance gives consumers the same information as the FCC**

22      Berkeley's Ordinance makes three substantive claims: First, that the FCC regulates RF

23 radiation. ("To assure safety, the Federal Government requires that cell phones meet radio-

24 frequency (RF) exposure guidelines.") Second, that some ways of using a cell phone risk

25 exceeding FCC RF exposure limits. ("If you carry or use your phone in a pants or shirt pocket or

26 tucked into a bra when the phone is ON and connected to a wireless network, you may exceed

27 the federal guidelines for exposure to RF radiation.") And third, that the user manual has

28

1    information about how to use cell phones safely. ("Refer to the instructions in your phone or

2    user manual for information about how to use your phone safely.")

3         All three statements are asserted by the FCC as well—either directly on its website, or

4    through its regulations. First, the FCC openly declares—as an assurance of safety—that it

5    regulates RF radiation. *See* Guidelines for Evaluating the Environmental Effects of

6    Radiofrequency Radiation, 61 Fed. Reg. 41006, 41006–07 (Aug. 7, 1996). Second, the FCC

7    openly declares that how you use your cell phone will affect the "energy you will absorb." *See*

8    FCC, *Wireless Devices and Health*, *available at* https://perma.cc/Z9SW-E38R. Third, the FCC

9    requires cell phone manuals to include "advisory statements for RF exposure *compliance*." *FCC*

10   *RF Order* ¶ 16 (emphasis added). *See also* FCC Office of Engineering and Technology

11   Laboratory Division, *RF Exposure Procedures and Equipment Authorization Policies for Mobile*

12   *and Portable Devices*, § 4.2.2(d) (Oct. 23, 2015) (emphasis added) ("Specific information must

13   be included in the operating manuals to enable users to select body-worn accessories that meet

14   the minimum test separation distance requirements. … All supported body-worn accessory

15   operating configurations must be clearly disclosed to users, through conspicuous instructions in

16   the user guide and user manual, to ensure unsupported operations are avoided."). There is no

17   difference in the content of the information provided by the FCC and the Berkeley Ordinance.

18   Both make certain claims themselves (about how the use of a cell phone will affect exposure);

19   both refer consumers to cell phone manuals for further information about using the phone

20   consistent with, as the FCC puts it, "advisory statements for RF exposure compliance." *FCC RF*

21   *Order* ¶ 16.

22        The only difference that Berkeley's Ordinance creates is the potential that more people

23   will actually know the information that the FCC declares it will "continue to ensure … is made

24   available to the public." *Id.* Put differently, if there is a federal policy that Berkeley's Ordinance

25   conflicts with, it is a policy that consumers *not* actually know the information that the FCC

26   declares it will "continue to ensure … is made available to the public." *Id.*

27        This claim is bizarre. CTIA asks this Court to imply preemption on the basis of a policy

28   that the FCC nowhere states that it has adopted—a policy of obscurity, that demands that the

1    public *not* know the information that the FCC says it will "continue to ensure … is made

2    available" to the public. *Id.* And if indeed obscurity is the FCC's policy—specifically, that its

3    policy objective was both to assure that certain information was made available and assure that

4    not many people actually knew of it—then at a minimum, this Court should require the FCC to

5    declare that policy openly and honestly, and defend it through ordinary notice and comment

6    procedures mandated by the TCA. 47 U.S.C. § 253(d).

7    　　　　To be clear: Berkeley is not arguing that a locality should be free to mandate warnings

8    that are *inconsistent* with the FCC's statements. If a city required retailers to include a notice that

9    declared that consumers should avoid carrying cell phones because they cause cancer, that

10   statements would clearly conflict with the "relevant information" that the FCC seeks to make

11   "available to the public." *Id.* But at the very least, a local government should be free to assure

12   that a wider range of its residents have access to precisely the same information that the FCC has

13   declared is the "relevant information" that the FCC itself commits to continue to make "available

14   to the public." *Id.* It cannot be—consistent with ideals of transparency—that a court should

15   imply a policy of keeping safety information obscure.

16   　　　　　**3.   The FCC Statement does not change this analysis**

17   　　　　The April 2020 FCC Statement of Interest does not change this analysis. *FCC Statement*.

18   In the case on which the FCC was asked to comment, Plaintiffs claim that Apple has a duty to

19   warn about iPhones that *exceed* the FCC RF limitations. In evaluating that potential obligation,

20   the FCC, through its general counsel, wrote as follows:

21   　　　　　Plaintiffs' claims regarding the adequacy of Apple's disclosures risk precisely
　　　　　the kind of "overwarning" regarding RF exposure that concerned the FCC. If
22   　　　　plaintiffs were to prevail on such claims, Apple could be compelled to disclose
　　　　　that its FCC-certified cell phones exceed the FCC's RF exposure limits in some
23   　　　　circumstances, even though "such exposure would ... be well below levels
　　　　　considered to be dangerous" given the "large safety margin" built into the FCC's
24   　　　　limits. Any such disclosures would "risk contributing to an erroneous public
　　　　　perception" regarding the safety of FCC-certified cell phones. Therefore, insofar
25   　　　　as plaintiffs' claims are based on the premise that Apple has a duty to disclose
　　　　　additional information about the RF emissions of its FCC-certified cell phones,
26   　　　　they conflict with the FCC's considered policy judgment regarding how best and
　　　　　in what form to disseminate relevant information about RF exposure to the
27   　　　　public. They are thus beyond the Court's jurisdiction and in any event
　　　　　preempted.

28

　　　　　　　　　　　　　　　　　　　　19

1    *FCC Statement* at 19 (citations omitted).

2    Here again, the concern expressed by the FCC is about a duty to disclose information

3    that is claimed to be *inconsistent* with the information the FCC already discloses. The FCC does

4    not require that Apple disclose that some of its iPhones exceed RF exposure limits. The question

5    in that case is whether adding such a disclosure conflicts with the disclosures already required.

6    Berkeley's disclosure obligations are different: They in no sense "conflict with the

7    FCC's considered policy judgment regarding how best and in what form to disseminate relevant

8    information about RF exposure to the public"—unless again, the FCC's policy objective is

9    obscurity. *Id.* Making sure the public knows public information is only "overwarning" if the

10   government's policy is that people not know that public information. *Id.*

11   **C.      To The Extent the FCC's Policy Objective Is Obscurity, It Must Pursue That
12             Objective Expressly**

13   Berkeley does not deny that the FCC could well choose obscurity as a policy objective.

14   Bureaucrats at the FCC could calculate the "optimal information spread" for RF exposure

15   information. The FCC could then decide how much true information is too much information,

16   and seek, through its regulations, to avoid the spread of too much true information. Thus, subject

17   to the limits of the First Amendment, the FCC could well determine that state and local

18   governments should simply shut up. It could determine to advance that policy by banning local

19   governments from uttering anything through regulation about RF radiation. The scope of federal

20   power within our Constitution is vast. No doubt, Congress has the power to vest in bureaucrats

21   the power to quash contrary views throughout the Republic—at least if enforced by

22   governments, at least for matters than plainly affect "commerce among the several states." U.S.

23   Const. art. I, § 8, cl. 3.

24   However, no Court should recognize such an extraordinary policy choice by the FCC

25   unless the FCC has manifested this policy expressly through ordinary notice and comment

26   rulemaking. 47 U.S.C. § 253(d). Specifically, no Court should view such an extraordinary policy

27   as somehow implied from the FCC's mandate to establish a national telecommunications policy.

28   As the Supreme Court has directed that "the ultimate touchstone in every pre-emption case" is

20

congressional intent. *Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (quotation omitted). Congress's *express* statement that preemption is not to be implied, TCA § 601(c)(1), should, at the very least, require notice and comment rulemaking before the agency enforces such an extraordinary policy.

### 1. If obscurity is the FCC policy, then the FCC did not follow ordinary rulemaking procedures in adopting that policy

There is nothing in the text of the TCA itself that would support an FCC policy to advance obscurity. The TCA authorizes the FCC to preempt state and local requirements under limited circumstances—but only if the FCC employs notice and comment rulemaking. 47 U.S.C. § 253(d). CTIA relies heavily upon the *FCC RF Order* in its argument that Berkeley's law is preempted. But the *FCC RF Order* did not comply with the statutorily required notice and comment procedures for express preemption. In 47 U.S.C. § 253(b), Congress explicitly preserved state authority to "impose ... requirements necessary to preserve and advance universal service, *protect the public safety and welfare*, ensure the continued quality of telecommunications services, and *safeguard the rights of consumers*." (emphasis added). In 47 U.S.C. § 253(d), Congress authorized the FCC to preempt "the enforcement" of state or local statutes, regulations, or "legal requirement[s]" that do not meet those statutory requirements, "to the extent necessary to correct such violation or inconsistency." Such preemptive action, however, must be preceded by "notice and an opportunity for public comment." *Id.*

The 2013 Notice of Inquiry, *Reassessment,* did not signal that the preemption of health and safety warnings was a policy under consideration. The Notice was merely "intended to open a discussion on the propriety of the Commission's exposure limits and policies pertaining to RF exposure, relying on the guidance of other expert federal health and safety agencies and institutes." *Reassessment* at ¶ 216. Topics of inquiry included the general exposure limits, RF emissions information provided to consumers, controlling RF exposure, and RF emissions evaluation procedures. *Reassessment* at ¶ 217. Preemption was not listed among these topics.

As a result, prior to the 2019 *FCC RF Order*, states, local entities, and interested individuals were not on notice that the FCC would address, much less take a position on,

1  preemption of regulations such as Berkeley's. There is no history—ever—of the FCC effectively

2  gagging local government when local governments seek nothing more than to echo the FCC.

3  Without this procedural predicate, the FCC is not now authorized to preempt health and safety

4  warning legislation—especially when the substance of that legislation is consistent with the

5  FCC's own rules.

### 2. The TCA forbids implied preemption claims

7  Neither can a policy of obscurity be implied under the TCA. Implied preemption is

8  expressly prohibited by the TCA. As the statute states in Section 601(c)(1):

9  NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall
not be construed to modify, impair, or supersede Federal, State, or local law
10  unless expressly so provided in such Act or amendments.

11  This clear language was made even clearer by the final report preceding the bill's

12  passage: "[t]he conference agreement adopts the House provision stating that the bill does not

13  have any effect on any other Federal, State, or local law unless the bill expressly so provides.

14  This provision prevents affected parties from asserting that the bill impliedly preempts other

15  laws." Telecommunications Act of 1996 Conference Report, 104 S. Rep. 230 at 201 (February 1,

16  1996). Section 601(c)(1) establishes Congress's clear intent that preemption must be express and

17  a result of the legislative process or notice and comment rulemaking.

18  No such rulemaking has happened in this case. Instead, CTIA ignores TCA § 601(c)(1).

19  From an anodyne paragraph in an order affirming an interest in making "relevant information"

20  available, plus a paragraph in a brief submitted in another case, CTIA asks this Court to imply a

21  policy of obscurity as the policy of the United States government. These statements do not

22  establish such a policy clear. If they are to have an effect, that effect is only because of an

23  implication. Section 601 forbids such an implication. It likewise forbids this Court from

24  displacing local law.

25  Five years ago, this Court remarked that "CTIA has failed to point to any FCC

26  pronouncement suggesting that the agency has any objection to warning consumers about

27  maintaining spacing between the body and a cell phone." *CTIA*, 139 F. Supp.3d 1060.

28  No doubt, the General Counsel's brief is now a "suggest[ion]." *Id.* But courts do not

22

"defer[] to an agency's *conclusion* that state law is pre-empted." *Wyeth,* 555 U.S. at 576 (emphasis in original). Rather, "[t]he weight [they] accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." *Id.* at 577. The FCC's Statement of Interest utterly fails to meet this burden. As with the FDA regulations at issue in *Wyeth*, there was no indication in the *Reassessment* that the FCC was considering exercising its power to preempt traditional state and local health and safety ordinances. No doubt, the General Counsel's words could be read to support such a conclusion — but only by implication upon implication, in a context in which Congress has said explicitly that preemption must be express. TCA § 601(c)(1).

## **CONCLUSION**

For the reasons given, this Court should deny CTIA's motion for judgment on the pleadings.


Dated:  June 12, 2020                    LAWRENCE LESSIG


                                         By:   /s/Lawrence Lessig
                                               Lawrence Lessig

                                         Attorney for Defendants City of Berkeley and
                                         Christine Daniel