United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CTIA - THE WIRELESS ASSOCIATION,
Plaintiff,

v.

CITY OF BERKELEY, et al.,
Defendants.

Case No. 15-cv-02529-EMC

**ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINIGS**

Docket No. 143

In 2015, the City of Berkeley passed an ordinance that "requires cell phone retailers to inform prospective cell phone purchasers that carrying a cell phone in certain ways may cause them to exceed Federal Communications Commission guidelines for exposure to radio-frequency radiation." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 836 (9th Cir. 2019).

Plaintiff CTIA – The Wireless Association previously moved for a preliminary injunction to stay enforcement of the ordinance. CTIA argued that the ordinance violated its First Amendment rights and further was preempted by federal law. This Court initially granted the motion in part because it found certain language in the ordinance problematic. But after the City modified its ordinance to delete that language, the Court dissolved the preliminary injunction. CTIA then appealed. After the Ninth Circuit affirmed on appeal, CTIA sought relief from the Supreme Court. The Supreme Court remanded to the Ninth Circuit, instructing it to consider a recently issued Supreme Court decision. On remand, the Ninth Circuit again affirmed. *See id.*

Currently pending before the Court is CTIA's motion for judgment on the pleadings. CITA argues that, "in December 2019 [*i.e.*, after the Ninth Circuit's most recent affirmance], the Federal Communications Commission ('FCC') issued an Opinion and Order on radiofrequency

('RF') emissions that upends the landscape of this case in several important ways, fatally undermining the City's arguments in defense of the Ordinance and the very basis on which the Ninth Circuit affirmed this Court's decision." Mot. at 1 (citing *In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, FCC 19-126 (Dec. 4, 2019)).

Having considered the parties' briefs, the statement of interest submitted by the United States, and the oral argument of counsel, the Court hereby **GRANTS** CTIA's motion. The Court concludes that Berkeley's ordinance, as drafted, is preempted by the FCC's regulatory actions.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. City Ordinance

The City ordinance at issue provides in relevant part as follows:

> A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:
>
> > The City of Berkeley requires that you be provided the following notice:
> >
> > To assure safety, the Federal Government requires that cell phones meet radio frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Docket No. 59-2 (Berkeley Mun. Code § 9.96.030(A)).

As the Ninth Circuit noted,

> [t]he ordinance requires that the compelled disclosure be provided either on a prominently displayed poster no less than 8 1/2 by 11 inches with no smaller than 28-point font, or on a handout no less than 5 by 8 inches with no smaller than 18-point font. . . . [A] cell phone retailer may include additional information on the poster or handout if it is clear that the additional information is not part of the compelled disclosure.

*CTIA*, 928 F.3d at 838.

CTIA challenges the City ordinance on two grounds: (1) that it is compelled speech that violates the First Amendment and (2) that it is preempted "because it stands as an obstacle to the

balance struck by the FCC on two federal policies: safeguarding against potential health risks from RF energy emitted from cell phones, on the one hand, and maintaining a robust and efficient, nationwide, wireless communication system (which itself carries significant benefits for consumers and public safety)." Compl. ¶ 139.

B. Preliminary Injunction Orders and Ninth Circuit Appeal

As noted above, CTIA moved this Court for a preliminary injunction. The Court held that certain language in the ordinance (regarding risk to children) was likely preempted but otherwise there did not appear to be any preemption concerns at the time. The Court further found that CTIA was not likely to succeed on the merits of its First Amendment claim. The Court thus enjoined the ordinance "unless and until the sentence in the City notice regarding children safety is excised from the notice." *CTIA – The Wireless Ass'n v. City of Berkeley*, 139 F. Supp. 3d 1048, 1075 (N.D. Cal. 2015).

Subsequently, the City removed the problematic language from the ordinance, and the Court therefore dissolved the preliminary injunction. CTIA appealed. After the Ninth Circuit affirmed on appeal, CTIA sought relief from the Supreme Court. The Supreme Court remanded to the Ninth Circuit, instructing it to consider a recently issued Supreme Court decision. On remand, the Ninth Circuit again affirmed in a decision issued in July 2019. *See generally CTIA*, 928 F.3d at 832. Below the Court briefly summarizes the Ninth Circuit's analysis on the likelihood of success on the merits.

1. First Amendment

On the First Amendment claim, the Ninth Circuit held that *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), provided the governing standard, and not *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). "Under *Zauderer*, . . . the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest and involves 'purely factual and uncontroversial information' that relates to the service or product provided." *CTIA*, 928 F.3d at 842.

The Ninth Circuit held that CTIA was not likely to succeed on its First Amendment claim

under *Zauderer*. First, there was a substantial governmental interest behind the compelled disclosure: "There is no question that protecting the health and safety of consumers is a substantial governmental interest," and the City ordinance was designed to "further that interest." *Id.* at 845.

Second, the Ninth Circuit held that the compelled disclosure required by the City's ordinance was factual and uncontroversial. "The text of the compelled disclosure is literally true." *Id.* at 847. And even though "a statement may be literally true but nonetheless misleading," *id.*, the Ninth Circuit was not persuaded by CTIA's contention that the ordinance was inflammatory and misleading. For example, the first sentence of the compelled disclosure "tells consumers that cell phones are required to meet federal 'RF exposure guidelines' in order '[t]o assure safety.' Far from inflammatory, this statement is largely reassuring" because "[i]t assures consumers that the cell phones they are about to buy or lease meet federally imposed safety guidelines." *Id.*

The Ninth Circuit also took note that CTIA did not argue that the compelled disclosure was "controversial as a result of disagreement about whether radio-frequency radiation can be dangerous to cell phone users." *Id.* at 848 ("We agree with CTIA's tacit admission that the required disclosure is not controversial on that account."). The court went on to explain that, in fact, the ordinance was not controversial because

> [i]t does not force cell phone retailers to take sides in a heated political controversy. The FCC's required disclosure is no more and no less than a safety warning, and Berkeley's required disclosure is a short-hand description of the warning the FCC already requires cell phone manufacturers to include in their user manuals.

*Id.*

Finally, the Ninth Circuit found that, even though, under *Zauderer*, unduly burdensome compelled disclosure would not be permitted, CTIA had not shown such a burden in the instant case.

> [T]he ordinance may be satisfied by a single 8.5 x 11" posted notice of 5 x 8" handout to which the retailer may add additional information so long as that information is distinct from the compelled disclosure. This minimal requirement does not interfere with advertising or threaten to drown out messaging by the cell phone retailers subject to the requirement.

*Id.* at 849.

2.     Preemption

On the preemption claim, the Ninth Circuit began its analysis by noting that conflict preemption was at issue. "'Conflict preemption is implicit preemption of state law that occurs where there is an actual conflict between state and federal law.'"  *Id.* at 849.  "Conflict preemption arises either when 'compliance with both federal and state regulations is a physical impossibility . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.*  Here, CTIA was arguing that "Berkeley's compelled disclosure . . . requir[es] more disclosure than is required by the FCC," and thus, obstacle preemption was the focus.  *Id.*

Whether there was preemption turned on the intent of Congress.  *See id.* at 850 (stating that "[p]reemption analysis start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (internal quotation marks omitted).  With respect to the Telecommunications Act of 1996 (the "FCC's organic statute"),

> Congress desired "uniform consistent requirements, with adequate safeguards of public health and safety" in nationwide telecom services.  The Act delegated to the FCC the authority "to 'make effective rules regarding the environmental effects of [RF] emissions.'"  Specifically, "the FCC was tasked not only with protecting the health and safety of the public, but also with ensuring the rapid development of an efficient and uniform network."

*Id.* at 850.

CTIA argued that the City ordinance was preempted because "the FCC does not compel cell phone manufacturers to provide information to consumers about SAR limits on RF radiation exposure," *id.*, but the Ninth Circuit was not persuaded.  The court noted that, "[b]eginning in October 2015, the FCC required cell phone manufacturers to inform consumers of minimum separation distances in user manuals."  *Id.* at 850 (citing In re Exposure Procedures and Equipment Authorization Policies for Mobile and Portable Devices, FCC Office of Engineering and Technology Laboratory Division § 4.2.2(d) at 11 (Oct. 23, 2015)).  Because of the FCC's requirement, the court found the preemption argument untenable:

> Berkeley's compelled disclosure does no more than alert consumers

> to the safety disclosures that the FCC requires, and directs consumers to federally compelled instructions in their user manuals providing specific information about how to avoid excessive exposure. Far from conflicting with federal law and policy, the Berkeley ordinance complements and reinforces it.

*Id.* at 851. Accordingly, the ordinance did not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as implemented by the FCC.

C. <u>FCC Orders</u>

In December 2019, several months after the Ninth Circuit issued its decision, the FCC issued an order that CTIA now argues impacts the merits of this case. That order shall hereinafter be referred to as the 2019 RF Order. *See* 2019 RF Order, 2019 WL 6681944 (indicating adoption date of November 27, 2019).

To understand the 2019 RF Order, however, the Court must first consider the background to that order – in particular, the 2013 RF Order that preceded it. *See* 2013 RF Order, 28 F.C.C.R. 3498 (adopted on March 27, 2013, and released on March 29, 2013), *available at* 2013 WL 1304134.

1. <u>2013 RF Order</u>

The 2013 RF Order had three parts: (1) a Report and Order (*i.e.*, Order), (2) a Further Notice of Proposed Rulemaking (*i.e.*, Further Notice), and (3) a Notice of Inquiry (*i.e.*, Inquiry). The Inquiry is what is relevant to the instant case.

The main point of the Inquiry was to "determine whether there is a need for reassessment of the Commission radiofrequency (RF) exposure limits and policies." *Id.* at 3501 (¶ 5) (noting that the last time RF exposure limits had been considered was in 1996). However, the Inquiry also covered related topics, such as asking for comment on what information should be provided to the public about RF exposure and safety. *See, e.g.*, *id.* at 3502 (¶ 7) (asking "whether the Commission should consistently require either disclosure of the maximum SAR value or other more reliable exposure data in a standard format – perhaps in manuals, at point-of-sale, or on a website"); *id.* at 3581 (¶ 231) (noting that information is provided to the public through Bulletins and the FCC website; asking for "comment on what additional information should be provided to consumers and in what format to assist in making decisions about reducing exposure"); *id.* at 3582 (¶ 235)

("request[ing] comment in general on the information discussed that would be most useful to provide precautionary guidance to consumers").

2. 2019 RF Order

Six years after the 2013 RF Order, the FCC issued the 2019 RF Order. Among other things, the 2019 RF Order "resolv[ed] [the 2013 Inquiry above] that sought public input on, among other issues, whether the Commission should amend its existing RF emission exposure limits." 2019 RF Order, 2019 WL 6681944, at *2 (¶ 2). On this specific issue, the FCC found

> no appropriate basis for and thus decline to propose amendments to our existing limits at this time. We take to heart the findings of the Food & Drug Administration (FDA), an expert agency regarding the health impacts of consumer products, that "[t]he weight of scientific evidence has not linked cell phones with any health problems." Despite requests from some to increase and others to decrease the existing limits, we believe they reflect the best available information concerning safe levels of RF exposure for workers and members of the general public, including inputs from our sister federal agencies charged with regulating safety and health and from well-established international standards.

*Id.* at *2 (¶ 2). The FCC further found that, "even if certified or otherwise authorized devices produce RF exposure levels in excess of Commission limits under normal use, such exposure would still be well below levels considered to be dangerous, and therefore phones legally sold in the United States pose no health risks." *Id.* at *6 (¶ 14); *see also id.* at *4 (¶ 10) ("[N]o expert health agency expressed concern about the Commission's RF exposure limits. Rather, agencies' public statements continue to support the current limits."); *id.* at *4 (¶ 11) ("[T]he FDA maintains that '[t]he weight of scientific evidence has not linked cell phones with any health problems' and that 'the current safety limits for cell phones are acceptable for protecting the public health.'"); *id.* at *5 (¶ 12) ("[A]s noted by the FDA, there is no evidence to support that adverse health effects in humans are caused by exposures at, under, or even in some cases above, the current RF limits. Indeed, no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses.").

As for the issue of what information should be provided to the public, the FCC noted that it was

> continu[ing] to ensure that relevant information is available to the

> public. First, the Commission maintains several webpages that provide information about RF exposure to the public. These range from general RF exposure information to information on specific topics, including wireless devices and health concerns. Second, guidance from the FCC Laboratory continue recommending that device manuals include operating instructions and advisory statements for RF exposure compliance. This information allows users to make informed decisions on the type of body-worn accessories and operating configurations that are appropriate for their usage. Third, we make available information on the characterization of typical RF exposure levels emitted from base stations. Relatedly, we note that the World Health Organization (WHO) states that "[f]rom all evidence accumulated so far, no adverse short-or long-term health effects have been shown to occur from the RF signals produced by base stations." WHO goes on to say that the erroneous public perception of a possible risk from such exposure may, even while unsupported by evidence, still contribute to a feeling of uncertainty or a lack of control. That is why the context and placement of RF exposure information is so important. Given the federal safety determination, the information on the FCC's websites and in device manuals are both adequate to inform consumers of these issues and *do not risk contributing to an erroneous public perception or overwarning* of RF emissions from FCC certified or authorized devices. The FCC will continue to evaluate public information materials and update as appropriate.

*Id.* at *8 (¶ 16) (emphasis added).[1] In short, the FCC determined that it would not *require* additional disclosures to the public; however, it did not comment explicitly on whether additional disclosures (*e.g.*, if imposed by local government) would be *permitted*. On the other hand, the FCC did take note of the countervailing concern of "overwarning" consumers.

D. FCC Statement of Interest

Although, in the 2019 RF Order, the FCC did not address whether additional disclosures required by local government would be permitted, the FCC made an appearance in the instant case to explicitly tender an opinion (more specifically, a Statement of Interest) on whether the Berkeley ordinance at issue here should be allowed. The agency took the express position that the ordinance should not be allowed to require the warnings therein.[2]

---

[1] The City focuses on the sentence "That is why the context and placement of RF exposure information is so important" – arguing that this sentence applies to RF exposure from base stations, not cell phones. *See* City Resp. to FCC St. at 5. While that may be true, the sentence that follows applies more broadly not just to RF exposure from base stations but also RF exposure from cell phones. This is clear from the reference to "device manuals."

[2] The City contends that the Statement of Interest simply represents the views of the FCC's General Counsel, and not the views of the FCC itself (*i.e.*, those of the Commissioners who direct

According to the FCC, the Berkeley ordinance is subject to preemption because it "conflicts with or undermines [a] policy judgment made" by the agency. FCC St. at 12. "The FCC has acted 'to ensure that relevant information' about RF emissions from cell phones 'is made available to the public" – in particular, on FCC webpages and in cell phone user manuals FCC St. at 12.

> In December 2019, the FCC concluded that the information about RF exposure on its website and in cell phone user manuals was "adequate to inform consumers" of potential health risks associated with RF emissions from FCC-certified cell phones. *2019 RF Order* ¶ 16. Explaining that "the context and placement of RF exposure information is so important," the Commission found that any additional warnings about RF exposure could create "an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices" and "contribute to a feeling of uncertainty or a lack of control" among consumers. *Ibid.* These findings reflect "the FCC's considered policy judgment regarding how best and in what form to disseminate relevant information about RF exposure to the public." FCC Statement of Interest, *Cohen v. Apple*, Attachment at 19.
>
> The Berkeley ordinance conflicts with that policy judgment and therefore is preempted. Given the FCC's calibrated regime regarding RF disclosures and its determination that existing RF exposure information provided on the FCC's website and in cell phone user manuals is adequate to inform consumers without prompting unwarranted fears about RF emissions, the Berkeley ordinance is not only unnecessary but likely detrimental to the public. On its face, the notice mandated by Berkeley goes beyond what the FCC provides on its website and requires in user manuals, and therefore has the potential to "overwarn" consumers, creating the false impression that FCC-certified cell phones are unsafe when carried against the body.

FCC St. at 11-12.

The FCC further asserted that the Berkeley ordinance is preempted because the agency has determined that "certified cell phones 'pose no health risks'" but the ordinance suggests that "certified cell phones could emit unsafe levels of RF energy when carried against the body." FCC St. at 13.

---

the agency). The Court does not agree. It is true that Mr. Johnson authored the letter that effectively constitutes the Statement of Interest. However, in the letter, Mr. Johnson specifically states that "[t]he *Commission* respectfully requests that the Department of Justice file a Statement of Interest in this case attaching the letter." Docket No. 148-1 (Letter at 1) (emphasis added). There is nothing to indicate that Mr. Johnson's representation was not accurate and authorized by the Commission.

## II. DISCUSSION

A. Legal Standard

Federal Rule of Civil Procedure 12(c) governs motions for judgment on the pleadings. Under the rule, "[a]fter the pleadings are closed – but early enough not to delay trial – a party may" make such a motion. Fed. R. Civ. P. 12(c). In evaluating a motion for judgment on the pleadings, a court

> must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party. Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law.

*Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, 'a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.'" *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

According to CTIA, it is entitled to judgment on the pleadings, on both its First Amendment claim and its preemption claim. The Court addresses the preemption argument first because, if the ordinance is in fact preempted, then there is no need to consider the First Amendment implications of the ordinance.

B. Preemption

CTIA asserts that the Berkeley ordinance is preempted for the same two reasons articulated by the FCC in its Statement of Interest: (1) "the [Berkeley] ordinance conflicts with the FCC's determination that RF emissions from FCC-certified cell phones pose no health risks" and (2) "[t]he Berkeley ordinance conflicts with the FCC's judgment concerning how best and in what form to provide information about RF exposure to the public." FCC St. at 14. For purposes of this opinion, the Court need only address the second preemption argument. CTIA's second preemption argument is predicated on statements made by the FCC in (1) its 2019 RF and (2) its Statement of Interest submitted in conjunction with this litigation.

As a preliminary matter, the Court notes that this particular preemption argument was not addressed by the Ninth Circuit in its prior order – nor could it have been given that the 2019 RF

Order and Statement of Interest both post-date the Ninth Circuit's decision. CTIA's preemption argument, however, is similar to its prior preemption argument in that it again relies on conflict preemption.

In its opposition brief, the City seems to argue (for the first time) that there can be no conflict preemption because there is a provision in the Telecommunications Act of 1996 ("TCA") suggesting that preemption must be express and not implied. *See* Opp'n at 22-23. That provision states as follows: "NO IMPLIED EFFECT. – This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 110 Stat. 56, 143 (§ 601(c)(1)).

The City's argument, however, is not persuasive for the reasons articulated by the Third Circuit in *Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010). In *Farina*, the plaintiff brought various claims "based on the allegation that cell phones, as currently manufactured, are unsafe to be operated without headsets because the customary manner in which they are used – with the user holding the phone so that the antenna is positioned next to his head – exposes the user to dangerous amounts of radio frequency ('RF') radiation." *Id.* at 104. In response to a conflict preemption argument made by the defendants, the plaintiff argued that § 601(c)(1) "demonstrates Congress's intent to limit the preemption of state law to only those situations covered by an express preemption provision." *Id.* at 131. The Third Circuit stated that, while this argument was "not without some force," "it is a general rule in preemption analysis that a savings provision does not 'bar the ordinary working of conflict pre-emption principles.'" *Id.* After all, "'[w]hy . . . would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?'" *Id.*; *cf. Ariz. v. United States*, 567 U.S. 387, 406 (2012) (stating that "the existence of an express pre-emption provisio[n] does *not* bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the pre-emption of laws falling outside the clause") (emphasis in original; internal quotation marks omitted). The Court agrees with *Farina* that the TCA does not displace the application of conventional conflict preemption doctrine, including obstacle preemption.

Under a conflict preemption analysis, the Court begins with the "'presumption that

Congress did not intend to displace state law,'" particularly "in fields within the police power of the state." *Id.* at 116. Here, CTIA suggests that the police power of the City is not implicated because, at the hearing, Berkeley argued that the "Ordinance is designed to reassure skeptical consumers about the safety of a product that poses no health risks. That interest – if it is a legitimate interest at all – is not a traditional health and safety interest within the historic police powers of the States." Docket No. 156 (Pl.'s Supp. Br. at 5). This argument is not entirely lacking in merit. Notably, at the hearing, the City conceded that FCC-certified cell phones are safe. Nonetheless, the Court assumes for purposes of this opinion that the presumption against preemption is still significant here – both because health and safety are still involved inasmuch as consumer perception and conduct may be affected. *See* Opp'n at 4 (arguing that "the notice is designed to inform consumers about how they can use their cell phones without exceeding federal RF exposure limits – if they so choose").[3] Also, a presumption against preemption is not unreasonable given the TCA savings clause referenced above. *See* 110 Stat. 56, 143 (§ 601(c)(1)) ("This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." 110 Stat. 56, 143 (§ 601(c)(1)).

That being said, the presumption against preemption is not the only guiding principle in the instant case. As the Third Circuit noted in *Farina*, "[t]he Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption." *Farina*, 625 F.3d at 123.

> The reason why state law conflicts with federal law in these balancing situations is plain. When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a *re-balancing* of those considerations. *A state-law standard that is more protective of one objective may result in a standard that is less protective of*

[3] *See also* Docket No. 33 (Opp'n at 9-10) (arguing that the purpose of the ordinance "is to assure that 'consumers have the information they need to make their own choices about the extent and nature of their exposure to radio frequency radiation'").

*others.*

*Id.* (emphasis added).

In the instant case, there is no dispute that the FCC has been tasked with accommodating competing objectives. Under the Federal Communications Act ("FCA"), "the FCC was tasked not only with protecting the health and safety of the public, but also with ensuring the rapid development of an efficient and uniform [telecommunications] network, one that provides effective and widely accessible service at a reasonable cost."[4] *Id.* at 125. Similarly, under the TCA (which amended the FCA), the FCC was again "tasked not only with protecting health and safety of the public, but also with ensuring rapid development of an efficient and uniform network."[5] *CTIA*, 928 F.3d at 850. And by being tasked with the development and deployment of an efficient and uniform telecommunications network, it may reasonably be inferred that this task encompassed promoting the growth of that network and related services. This evidently is what underpins the FCC's concern in the 2019 RF Order of "overwarning" consumers.

CTIA contends that the FCC's 2019 RF Order and its Statement of Interest submitted in this litigation express the FCC's balancing of the above competing objectives. CTIA further argues that the City ordinance, by emphasizing the risk of wearing cell phones closer than that addressed in the user device manuals and implying that doing so creates a health risk, upsets that balance. As stated above, neither this Court (in its earlier ruling in denying preliminary injunction) nor the Ninth Circuit (on appeal) addressed the conflict preemption argument now presented as a result of the FCC's 2019 RF Order and Statement of Interest.

The Court begins with the 2019 RF Order. As noted above, in the 2019 RF Order, the

---

[4] *See, e.g.*, 47 U.S.C. § 151 (indicating the goal of "mak[ing] available . . . a rapid, efficient, nationwide, and world-wide wire and radio communication service"; *id.* § 157 (stating that "[i]t shall be the policy of the United States to encourage the provision of new technologies and services to the public"); *id.* § 332 (providing that, with respect to private mobile services, the FCC shall consider whether its actions "promote the safety of life and property" and "provide services to the largest feasible number of users").

[5] *See, e.g.*, 110 Stat. 56 (1996) (indicating that one purpose for the TCA is to "encourage the rapid deployment of new telecommunications technologies"); *see also Reno v. ACLU*, 521 U.S. 844, 857 (1997) (stating that the TCA's "primary purpose was to reduce regulation and encourage 'the rapid deployment of new telecommunications technologies'").

FCC stated that it was

> continu[ing] to ensure that relevant information is available to the public. First, the Commission maintains several webpages that provide information about RF exposure to the public. These range from general RF exposure information to information on specific topics, including wireless devices and health concerns. Second, guidance from the FCC Laboratory continue recommending that device manuals include operating instructions and advisory statements for RF exposure compliance. This information allows users to make informed decisions on the type of body-worn accessories and operating configurations that are appropriate for their usage. Third, we make available information on the characterization of typical RF exposure levels emitted from base stations. Relatedly, we note that the World Health Organization (WHO) states that "[f]rom all evidence accumulated so far, no adverse short-or long-term health effects have been shown to occur from the RF signals produced by base stations." WHO goes on to say that the erroneous public perception of a possible risk from such exposure may, even while unsupported by evidence, still contribute to a feeling of uncertainty or a lack of control. That is why the context and placement of RF exposure information is so important. Given the federal safety determination, the information on the FCC's websites and in device manuals are both adequate to inform consumers of these issues and do not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices. The FCC will continue to evaluate public information materials and update as appropriate.

2019 RF Order, 2019 WL 6681944, at *8 (¶ 16).

As an initial matter, the Court acknowledges the parties' dispute over whether this passage from the 2019 RF Order is simply a policy statement (the City's position) or something more akin to a rule or regulation (CTIA's position). If the former, less deference would be afforded to the agency; if the latter, more deference. *Cf. Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (noting that an interpretation expressed in an agency opinion letter is different from one arrived at after formal notice-and-comment rulemaking; it is "like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law [and] do not warrant *Chevron*-style deference"[6] but rather are subject to *Skidmore* deference[7]). The Court, however, need not resolve this dispute because the 2019 RF Order does not state what

---

[6] *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 437 U.S. 837 (1984).

[7] *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

CTIA (or the FCC) claims it does. That is, as noted above, the 2019 RF Order on its face simply indicates that additional disclosures about RF exposure and safety are not *required* but that does not address whether additional disclosures are *permitted*. It simply embodies the FCC's recognition that there are competing interests with which it must contend.

But assuming that the passage above from the 2019 RF Order were entitled to *Skidmore* deference only, *see Skidmore*, 323 U.S. at 140 (noting that deference would depend on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"), the Court finds that it is entitled to modest weight. It is consistent with the overarching statutes which recognizes the varying interests at stake. And it is a fair and valid point for the FCC to state that disclosures about RF exposure and safety have the potential to overwarn – particularly in light of the FCC's finding that cell phones do not pose a health risk under normal use and the City's concession that FCC-certified cell phones are safe. It was based on the FCC's consideration of extensive comments and information received over the span of several years. Furthermore, the FCC's position here is consistent with its earlier actions in providing information to the public about RF exposure and safety in limited ways.[8]

The Court therefore turns to the FCC Statement of Interest which directly addresses the matter at issue herein. The Statement is a clear statement by the FCC that the Berkeley ordinance specifically constitutes overwarning.[9] According to CTIA, the Statement is entitled to a high level

[8] In its papers, the City has argued that, if the 2019 RF Order was intended to preempt local regulation, then the FCC should have had to comply with the notice-and-comment procedures provided for in 47 U.S.C. § 253(d). The Court need not address this argument because, as discussed above, it has concluded that the 2019 RF Order does not address whether and what kind of additional disclosures, if imposed by a local government, are permitted. (The City did not argue that the Section 253(d) notice and comment procedure should have applied to the FCC's filing of the Statement of Interest discussed below. Had Berkeley so argued, it is notable that the ability to obtain such notice and comment in the midst of litigation would seem highly problematic, and it may be contended that Berkeley's ability to respond to and oppose the Statement is functionally similar to a notice and comment process.) The Court also notes that the lack of a notice-and-comment process is a factor that informs the degree of deference to the FCC's order under *Skidmore*. As noted herein, the degree of deference afforded in this case is modest.

[9] The FCC goes further, of course, to say that the Berkeley ordinance is preempted by federal law. *See* FCC St. at 14. But the Court affords no deference to an agency's legal conclusion of preemption. *See Farina*, 625 F.3d at 126. In contrast, "[w]here 'the subject matter is technical

of deference under *Auer v. Robbins*, 519 U.S. 452 (1997). Under *Auer* deference, "where an agency interprets its own regulation, even if through an informal process, its interpretation . . . is controlling . . . unless 'plainly erroneous or inconsistent with the regulation.'" *Bassiri v. Xerox*, 463 F.3d 927, 930 (9th Cir. 2006). CTIA's contention that *Auer* deference applies assumes that the 2019 RF Order amounts to a rule or regulation – such that the Statement of Interest constitutes an interpretation of that rule/regulation and thereby should be deemed controlling absent plain error or inconsistency. The City, however, as noted above, disputes that the 2019 RF order is effectively a rule or regulation, contending that the order constitutes a policy statement and nothing more. But similar to above, the Court need not resolve this dispute. For purposes of this opinion, the Court assumes that the 2019 RF Order is essentially a policy statement and therefore only modest *Skidmore* deference should be applied to the Statement of Interest. The problem for the City is that, even under *Skidmore*, the Statement of Interest is entitled to some deference to the extent it has the power to persuade.

The Statement of Interest is consistent with the 2019 RF Order in recognizing that additional disclosures pose a risk of overwarning. Furthermore, even if the Berkeley ordinance specifically is (as the Ninth Circuit indicated) literally true and not misleading, it does not necessarily follow that there is no risk of "overwarning" – especially given that the FCC is tasked with balancing the competing objectives of ensuring public health and safety and promoting the development and growth of the telecommunications network and related services. The City contends that its ordinance "simply complements the FCC's own regulations to 'protect the health and safety of the public'" and thus cannot be an obstacle to the accomplishment of a federal objective. Opp'n at 15. But the FCC's objective here is not singularly focused on health and safety, but to balance that with the other objective of promoting industry growth. *See Farina*, 625

---

and the relevant history and background are complex and extensive' [a court] defer[s] to 'an agency's explanation of how state law affects the regulatory scheme." *Farina*, 625 F.3d at 126; *see also Wyeth v. Levine*, 555 U.S. 555, 576-77 (2009) (stating that "we have given 'some weight' to an agency's views about the impact of tort law on federal objectives when 'the subject matter is technica[l] and the relevant history and background are complex and extensive'" but "we have not deferred to any agency's *conclusion* that state law is pre-empted") (emphasis in original). "'The weight . . . accord[ed] the agency's explanation . . . depends on its thoroughness, consistency, and persuasiveness.'" *Farina*, 625 F.3d at 127; *see also Wyeth*, 555 U.S. at 577.

United States District Court
Northern District of California

F.3d at 125; *see also id.* at 130 (distinguishing the Supreme Court case, *Wyeth*, 555 U.S. at 555, which considered whether state law claims were preempted by the FDA's approval of a drug label, because "*Wyeth* was not a balancing case[;] [s]tate-law actions seeking to impose liability for inadequate warnings would not conflict with the FDA's labeling approval because both were designed to serve the same objective – protecting the public safety"). The Court cannot conclude the FCC's position stated in the Statement of Interest is not persuasive, at least in the context of this competing objective and the content of the required disclosure in this case. Given the specificity of the warning required by the Berkeley ordinance, the implied risk to safety if the warning is not followed (a risk the FCC has concluded does not exist), and the acknowledged "controversy concerning whether radio-frequency radiation from cell phones can be dangerous if the phones are kept too close to a user's body over a sustained period," *CTIA*, 928 F.3d at 848, the FCC could properly conclude that the Berkeley ordinance – as worded – overwarns and stands as an obstacle to the accomplishment of balancing federal objectives by the FCC.[10]

///

///

///

///

///

///

///

///

///

///

[10] This is so even if the ordinance for First Amendment purposes concerns a purely factual and uncontroversial matter under *Zauderer*, a matter determined by the Court and not the FCC. The Court acknowledges that the agency did not offer, in the context of the First Amendment analysis, any specific evidence "showing how Berkeley consumers have understood the compelled disclosure, or evidence showing that sales of cell phones in Berkeley were, or are likely to be, depressed as a result." *CTIA*, 928 F.3d at 848. But that is not dispositive to the preemption analysis above where the Court, in upholding the FCC's determination, has considered a number of factors that warrant some, albeit modest, deference under *Skidmore*.

United States District Court
Northern District of California

## III. CONCLUSION

For the foregoing reasons, the Court grants CTIA's motion for judgment on the pleadings. The Court holds, in view of the 2019 RF Order and FCC Statement of Interest, that the Berkeley ordinance as drafted is preempted.[11] Because the Court finds preemption, it need not address CTIA's argument that the ordinance also violates the First Amendment.

The Clerk of the Court is instructed to enter a final judgment in accordance with this order and close the file in this case.

This order disposes of Docket No. 143.

**IT IS SO ORDERED**.

Dated: September 17, 2020

EDWARD M. CHEN
United States District Judge

[11] The Court does not opine whether an ordinance stripped of any implication about public safety would be preempted.